**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

**PRESTIGE INSURANCE GROUP, LLC,**
a Delaware limited liability company, and
**ULISES CICCIARELLI, individually,**

    Plaintiffs,

vs.

**ALLSTATE INSURANCE COMPANY,**
    an Illinois corporation,

    Defendant.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Prestige Insurance Group, LLC, a Delaware limited liability company ("Prestige"), and Ulises Cicciarelli ("Cicciarelli"), individually, state as follows for their Complaint against Allstate Insurance Company ("Allstate"):

1. Prestige Insurance Group, LLC is a Delaware limited liability company authorized to do business in Florida, with principal place of business located in Tamarac, Broward County, Florida.

2. Cicciarelli is an individual who is domiciled in Florida.

3. Cicciarelli is the sole owner of Prestige.

4. Allstate Insurance Company is an Illinois corporation with principal place of business in Illinois which does business throughout the State of Florida.

5. This Court's jurisdiction in this matter arises under 28 U.S.C. § 1332(a)(1) and 28 U.S.C. §2201 and damages exceed $75,000.00.

6. Venue is proper under 28 U.S.C. § 1391(a)(l) and (2).

7. Cicciarelli has held professional licenses with the State of Florida since 2006 when he was employed as a real estate broker associate with Florida Realty of Miami.

8. In that capacity, he interacted regularly with buyers and sellers on their real estate transactions including contract negotiations, coordination of closing processes and post-purchase support; worked closely with attorneys, title companies, lenders and property management companies, in an effort to facilitate the closing process; and had extensive experience with short sales and foreclosures in the Miami Dade and Broward County Florida areas.

9. In 2010, Cicciarelli, became President/ Broker of Prestige Real Estate Services Inc. where he oversaw brokerage operations for a real estate brokerage which he owned.

10. Cicciarelli also held a mortgage brokers license.

11. In those 14 years of Florida professional licensure, Cicciarelli never had any complaint or even a formal investigation instituted against him.

12. In March 2019, Cicciarelli began working with Allstate as a Producer in order to learn the insurance business and ultimately become an Agency Owner.

13. April 2020, Cicciarelli was approached by an Allstate Field Sales Leader ("FSL"), Kaylee Colvard to become an insurance agent for Allstate.

14. Cicciarelli had many discussions with Allstate employees, representatives and agents, who made representations regarding the benefits of becoming an Allstate agent.

15. These representations and inducements resulted in Cicciarelli executing an Agent Pre-Appointment Agreement For Allstate Exclusive Agency Program in March of 2020 and ultimately, as described below, agency agreements.

16. Part of the material inducements made to Cicciarelli by Allstate was an Enhanced Compensation Plan "designed to provide additional compensation that rewards new agency

owners for profitable growth and helps them deliver on the customer value proposition through the trusted advisor model."

17. The Enhanced Compensation Plan was delivered to Cicciarelli by FSL Kaylee Colvard via the Allstate Exclusive Agent Opportunity Tool (EAOT), which projects future commissions and bonuses. See **Exhibit A**.

18. Subsequently, Cicciarelli was guided through the process of becoming an Allstate agent by numerous individuals representing Allstate's interests including Kaylee Colvard and Char Jordan, Territory Sales Leader ("TSL").

19. In or around April of 2020, Cicciarelli made application to Allstate for an exclusive agency agreement.

20. Cicciarelli's assigned FSL from Allstate provided all the financial information for Cicciarelli's business plan which he did not create.

21. Cicciarelli made representations in the application with the assistance and encouragement of those acting on behalf of Allstate which, unbeknownst to Cicciarelli, would form the basis of his subsequent termination by Allstate.

22. Cicciarelli and Prestige were in regular communication with Allstate from the time of application through the execution of the agency agreements discussed below and subsequently regarding all aspects of Cicciarelli and Prestige's operations.

23. On July 23, 2020, Cicciarelli executed Allstate's R3001S Exclusive Agency Agreement ("R3001S") in his individual capacity. See **Exhibit B**.

24. On July 27, 2020, Stephen Gilbert, on behalf of Allstate, countersigned the R3001S.

25. The R3001S purports to govern the independent contractor relationship between Allstate and Cicciarelli.

26. On August 3, 2020, Prestige executed Allstate's R3001C Exclusive Agency Agreement ("R3001C") in its corporate capacity. See **Exhibit C**.

27. Both the R3001S and the R3001C purport to incorporate several supplements as part of the terms of the agreements including Supplement for the R3001 Agreement ("Supplement"), Exclusive Agency Independent Contractor Manual ("EA Manual") and the Allstate Agency Standards ("Agency Standards").

28. From the commencement of operations, Cicciarelli and Prestige, by all objective calculations, was the most successful Allstate agent in the country.

29. These efforts earned substantial profit for Allstate and were contractually bound to earn commensurate commissions for Cicciarelli and Prestige.

30. Unbeknownst to Cicciarelli and Prestige during and after their onboarding process, Allstate was developing internal policies and procedures intended to reduce the commissions and bonuses paid to agents regardless of contractual obligations and increase the profits kept by Allstate on premiums.

31. Among other initiatives, Allstate, in June of 2020 or earlier, began a "Direct Channel Pricing" initiative. Allstate introduced a "channel of bind" in the District of Columbia and upon information and belief, elsewhere.

32. Through this initiative, customers bound through Allstate approved websites and mobile applications or an Allstate call center would receive lower cost insurance policies ("Policies") based on Allstate's circumvention of commissions paid to its agents.

33. Aside from this initiative, upon information and belief, Allstate sought to reduce commissions and bonuses paid to its contracted agents including Cicciarelli and Prestige, by contrived default of their agency agreement.

34. Although Cicciarelli and Prestige constantly and proactively communicated with Allstate regarding its operations, Allstate took notice of the immediate substantial success of Cicciarelli and Prestige.

35. Allstate determined that Plaintiffs' success, while benefiting Allstate's profits, would require substantial commissions and bonuses to be paid to Plaintiffs under the terms of their compensation structure as set forth in the agreements with Plaintiffs, including the Enhanced Compensation Plan.

36. In order to ascertain some inconsequential basis to terminate the agreements with Plaintiffs, Allstate began an "investigation" to determine whether the veracity of representations made by Plaintiffs in their application.

37. Allstate contemporaneously began a simultaneous investigation regarding the Policies written by Plaintiffs' employees and agents.

38. After refusing to grant a reasonable extension of interviews demanded by Allstate for its "investigation", Allstate conducted interviews of Plaintiffs and their employees on October 12, 2020, to achieve a result which Allstate had already pre-determined.

39. During fully cooperative interviews of Prianca Little, Meileik Williams, Glen Hunter, Jose Rijos and Cicciarelli, Allstate was provided full explanations and documentation of all relevant information regarding the alleged basis for the "investigation".

40. Plaintiffs and their employees fully complied and participated in Allstate's sham investigation providing details, e-mails and text messages of all relevant communications and even provided further information subsequent to the interviews, which substantiated the policies were written to Allstate's standards.

41. The information provided by Plaintiffs and corroborated by Allstate's own employees demonstrated that, with respect to representations made by Plaintiffs in their application, Allstate was fully aware of and assented to modifications and authorized amendments to Plaintiffs' intended operations prior to the time Plaintiffs began business on or around August 1, 2020 as was common practice with Allstate.

42. Further, with respect to Policies written by Plaintiffs' employees, Allstate was fully aware of circumstances that false or misleading information was provided by certain customers to Plaintiffs' employees which is commonplace in the insurance industry.

43. Certain customers also provided information to Allstate subsequent to issuance of Policies which contradicted information they previously provided to Plaintiffs' employees.

44. Even assuming Plaintiffs' employees issued Policies outside of Allstate guidelines, Cicciarelli had no knowledge of such issuance and was not afforded any opportunity by Allstate to take any corrective actions regarding such alleged practices.

45. Furthermore, Cicciarelli proactively sought assistance to ensure Allstate compliance.

46. In particular, an Allstate agency process specialist who began assisting Cicciarelli because no compliance training was offered by Allstate until at least 45 days after Plaintiffs began business found no issues with any of the Policies Prestige wrote.

47. Indeed, from the date it began its "investigation" through November 13, 2020, Allstate allowed Plaintiffs to continue to pay overhead costs for operations while Allstate continued to profit by collecting premiums for customers who bound coverage because of Plaintiffs' efforts.

48. On November 13, 2020, Allstate terminated the R3001C Agreement with Prestige. See **Exhibit D** ("Termination Letter").

49. In a less than personalized letter, Plaintiffs were advised that:

"This letter is notice that Allstate Insurance Company is terminating the Allstate R3001C Exclusive Agency Agreement ("Agreement") with [INSERT AGENCY NAME], ("Agency") effective immediately."

50. The Termination Letter purported that it was sent pursuant to Section XVII.B.3 of the R3001C Agreement and alleged that:

"Allstate is taking this action for reasons that include providing false information to the company and failing to issue policies according to Allstate guidelines."

51. Section XVII.B.3 of the R3001C Agreement provides that "This Agreement may be terminated . . . by Company, with cause, immediately upon providing written notice to Agency. Cause may include, but is not limited to, breach of this Agreement, fraud, forgery, misrepresentation or conviction of a crime. The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination."

52. In correspondence dated November 17, 2020, Allstate published a letter to the Florida Office of Insurance Regulation communicating that Cicciarelli had been terminated for cause for providing false information to the company and failing to issue Policies according to Allstate guidelines.

53. That November 17, 2020, correspondence was known to be false by Allstate at the time it was sent.

54. That November 17, 2020, correspondence offered to provide the Florida Office of Insurance Regulation "supporting documentation."

55. Plaintiffs subsequently requested and were refused the supporting documentation or any additional information regarding the termination. In correspondence dated December 14,

2020, Allstate stated: "We will not provide you with any of the internal investigation material that you requested."

56. Allstate further communicated in the December 14, 2020, correspondence, that despite profiting from Plaintiffs' performance under the Agreements both before and after the commencement of the "investigation", it would not pay any bonus commissions to Plaintiffs earned from the inception of the relationship on August 1, 2020:

> "The Supplement for the R3001 Agreement, which Mr. Cicciarelli had access to, outlines any bonus commission guidelines. The supplement states that if the Company has terminated the R3001 Agreement immediately for cause, an Agent shall not be eligible for bonus compensation starting with the year in which the incident occurred that led to the termination through the year in which the Company has terminated the R3001 Agreement immediately for cause. Therefore, Mr. Circciarelli [sic] is not eligible for any bonus compensation for 2020."

57. The Agreements and the Supplement afforded Allstate substantial discretion to determine the existence of a possible ground for termination with cause and withhold commissions earned.

58. There was no valid basis for Allstate to terminate the Agreements for cause and to withhold payment of bonuses earned in 2020 under the Enhanced Compensation Plan.

59. Plaintiffs did not provide false information to Allstate as it was in constant communication regarding all aspects of its business operations and Allstate assented to all changes to Plaintiffs' proposed operations.

60. Allstate leadership was immediately aware of all aspects of Plaintiffs' business model as it meets weekly to discuss staffing levels and quoting volume in the region which are monitored and compiled in daily and weekly reports.

61. These communications, at a minimum, constituted amendments to any information provided by Plaintiffs to Allstate.

62. Plaintiffs did not fail to issue Policies according to Allstate guidelines.

63. Moreover, to the extent that any particular policy was incorrect or issued improperly, Allstate selectively enforced its "guidelines" against Plaintiffs for the purpose of avoiding the payment of significant commissions to Plaintiffs.

64. Subsequent to sending the Termination Letter, Allstate has otherwise acted in bad faith and breached its obligations to Plaintiffs.

65. The Termination Letter and the Supplement provided that if Plaintiffs elected to sell their economic interest in their book of business, Allstate has the right of approval of the buyer.

66. However, Allstate imposed an arbitrary and capricious March 1, 2021 transfer deadline which it knew was an impossibility for Plaintiffs to meet.

67. Further, Allstate never advised Cicciarelli that there was a deadline to submit any documentation to Allstate for a proposed sale.

68. On February 3, 2021, when Cicciarelli contacted Allstate assigned representative, Maria Reuthers, to discuss the sale of Plaintiffs' book to a potential buyer, he was advised that he could no longer transfer his interest because the submission deadline had passed.

69. Allstate had never previously advised of any such deadline.

70. Additionally, Allstate delayed sending Plaintiffs reports that were needed to sell the interest, further making it impossible for any transfer to have occurred.

71. Moreover, Allstate's actions are consistent with an intent that it will not process any termination payment to Plaintiffs as required by the Agreement and Supplement.

72. The Termination Letter forewarned that "the termination payment is conditioned upon, for example, compliance with the confidentiality and non-solicitation provisions that survive the termination of the Agreement and the immediate return of all Allstate property."

73. Indeed, on February 8, 2021, Allstate sent another letter to Plaintiffs falsely alleging that Plaintiffs "misappropriated Allstate confidential and proprietary information, including customer names and contact information."

74. Plaintiffs immediately responded through counsel, denying the allegations and requesting that Allstate provide:

   a. Any information to help identify the specific confidential and proprietary information Allstate believes was misappropriated;

   b. Specific names and authors of the documents involved and the dates they were created, the format of the documents, the number of customers listed on such documents, and how Allstate first generated this customer list.

   c. Specific dates on which Allstate believed Cicciarelli gained access, how Allstate believed he gained access, and the specific actions Allstate believed constituted misuse and the dates such actions occurred.

75. Allstate provided no such information.

76. The allegations in Allstate's February 8, 2021, correspondence were contrived by Allstate to avoid approving any transfer of Plaintiffs' interests or paying Plaintiffs any termination payment.

## COUNT I

## BREACH OF CONTRACT

77. Plaintiffs reincorporate all prior paragraphs of the complaint as if restated herein.

78. Valid agreements exist between Plaintiffs and Allstate.

79. Plaintiffs complied with all provisions of their agreements.

80. Allstate was advised of and assented to any modifications to Plaintiffs' application and their agreements with Allstate.

81. Allstate is in breach of those agreements by, among other things, falsely alleging a contrived reason for termination with cause.

82. Allstate's purpose in alleging a basis for a termination with cause is to avoid paying Plaintiffs commissions and bonuses due under the agreements and the Enhanced Compensation Plan.

83. Allstate is also in breach of their agreements by failing to provide sufficient time for Plaintiffs to transfer their interest.

84. Allstate is also in breach of their agreements by failing to pay the termination payment due to Plaintiffs.

85. Plaintiffs were damaged by Allstate's breach.

## COUNT II

## FRAUDULENT INDUCEMENT

86. Plaintiffs reincorporate all prior paragraphs of the complaint as if restated herein.

87. The representations made by Allstate by and through senior management to Plaintiffs were material and induced Plaintiffs to enter into the Agreements.

88. Allstate made these representations expecting that Plaintiffs would rely on the representations when entering into the Agreement.

89. Plaintiffs did rely on those representations and were induced by those representations to enter into the agreements.

90. As a result of Allstate's unilateral internal policy modifications, Plaintiffs have suffered and will continue to suffer injury.

## COUNT III

## BREACH OF IMPLIED DUTY OF GOOD FAITH

91. Plaintiffs reincorporate all prior paragraphs of the complaint as if restated herein.

92. There exists within the Agreements between Allstate and Plaintiffs an implied covenant of good faith and fair dealing.

93. Plaintiffs had reasonable and justifiable expectations in light of their express agreement with Allstate.

94. The terms of the Agreements afforded Allstate substantial discretion to promote its own self-interest.

95. Allstate was obligated to not do anything that would injure the right of the Plaintiffs to receive the benefits of the contract.

96. Allstate was limited in its ability to negatively impact the value of the Agreements to the Plaintiffs.

97. Even if Allstate did not breach the terms of the Agreements in a technical sense, its conduct nevertheless deprived Plaintiffs of the benefit of their bargain.

98. Allstate pursued its own self-interest instead of engaging in cooperative behavior by deferring to Plaintiffs' contractual interests.

99. Allstate acted consciously, deliberately and capriciously to contravene the reasonable contractual expectations of Plaintiffs.

100. Allstate unfairly frustrated the agreed common purpose of the Agreements and the reasonable expectations of Plaintiffs thereby depriving them of the benefits of the Agreements.

101. Plaintiffs suffered damages as a result.

## COUNT IV

## VIOLATION OF FLORIDA FRANCHISE ACT

102.   Plaintiffs reincorporate all prior paragraphs of the complaint as if restated herein.

103.   Plaintiffs and Allstate had a commercial relationship of definite duration or continuing indefinite duration.

104.   Plaintiffs were granted the right to offer, sell, and distribute services organized and directed by Allstate.

105.   Plaintiffs' independent business constitutes a component of Allstate's distribution system.

106.   The operation of Plaintiffs' business is substantially reliant on Allstate.

107.   Plaintiffs are "franchisees" under the Florida Franchise Act ("Act"), Fla Stat Ann 817.416, who were granted the right to sell Allstate insurance products pursuant to Allstate's standards and requirements.

108.   Allstate intentionally misrepresented the prospects or chances for success of Plaintiffs' proposed agency.

109.   Allstate intentionally misrepresented or failed to disclose efforts to establish the Direct Pricing initiative as well as a new independent agency model which allows independent agencies to sell Allstate products at a higher commission rate.

110.   Allstate's Direct Pricing initiative has reduced Plaintiffs' ability to sell its book of business for fair value, if at all, in violation of the Act.

111.   Allstate's misrepresentations and failures to disclose are violations of the Act.

112.   Plaintiffs suffered damages as a result of Allstate's actions and omissions.

## COUNT V

## DEFAMATION

113. Cicciarelli reincorporates all prior paragraphs of the complaint as if restated herein.

114. Allstate's correspondence to the Florida Office of Insurance Regulation was a publication.

115. The statements that Cicciarelli provided false information to Allstate and failed to issue Policies according to Allstate guidelines were false.

116. Allstate acted with knowledge or reckless disregard as to the falsity of these matters which were defamatory.

117. Cicciarelli has suffered and will suffer damages as a result.

## COUNT VI

## DECLARATORY RELIEF

118. Plaintiffs reincorporate all prior paragraphs of the complaint as if restated herein.

119. The agreements between the parties purport to impose various covenants upon Plaintiffs subsequent to termination of the R3001C Agreement, including non-competition agreements.

120. As a result of the breaches of the agreements by Allstate and its otherwise inequitable conduct, Plaintiffs should be relieved of all post-termination obligations to Allstate.

WHEREFORE, Plaintiffs request this Court to:

    a. Declare that all post-termination obligations of Plaintiffs are null and void;

    b. Grant other such relief as the Court deems equitable and just.

## DEMAND FOR JURY

Plaintiffs request a trial by jury on all claims so triable.

                                              Respectfully submitted,
                                              **HUBBARD SNITCHLER & PARZIANELLO PLC**

                                              */s/ Eric A. Parzianello*
                                              Eric A. Parzianello (FL Bar No. 161225)
                                              John A. Hubbard (FL Bar No. 100925)
                                              Attorney for Plaintiffs
                                              999 Vanderbilt Beach Road, Suite 200
                                              Naples, FL 34108
                                              239.325.1802
                                              eparzianello@hspplc.com
                                              jhubbard@hspplc.com

Dated: March 5, 2021