# EXHIBIT 8

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                FT. LAUDERDALE DIVISION
 3               CASE NO. 0:21-CV-60515-FAM
 4

    PRESTIGE INSURANCE GROUP, LLC,
 5  a Delaware Limited Liability
    Company and ULISES CICCIARELLI,
 6  an individual,
 7          Plaintiff(s),
 8  vs.
 9  ALLSTATE INSURANCE COMPANY,
    an Illinois Corporation,
10
            Defendant(s).
11
12  * * * * * * * * * * * * * * * * * * * * * * * *
13
14  DEPOSITION OF:      ULISES CICCIARELLI
15  DATE TAKEN:         AUGUST 3, 2022
16  TIME:              COMMENCED AT:  9:00 A.M.
17                     CONCLUDED AT:  4:04 P.M.
18  PLACE:             REMOTE VIA ZOOM
19
20  * * * * * * * * * * * * * * * * * * * * * * * *
21  Taken before Debra Kirshen, FPR, Professional Court
22  Reporter and Notary Public for the State of Florida
23  at Large, pursuant to Notice of Taking Deposition
24  filed in the above case.
25
```

Page 2

1  APPEARANCES:
2
3  On behalf of the Plaintiff(s) via Zoom:
4      John A. Hubbard, Esquire
         Hubbard Snitchler & Parzianello PLC
5      999 Vanderbilt Beach Road, Suite 200
         Naples, Florida 34108
6      (313) 672-7300
         jhubbard@hspplc.com
7
8  On behalf of the Defendant(s) via Zoom:
9      Robert G. Lian, Jr., Esquire
         Andrew Gear, Esquire
10     Katherine I. Heise, Esquire
         Akin Gump Strauss Hauer & Feld LLP
11     2001 K Street, N.W.
         Washington, DC 20006
12     (202) 887-4000
         blian@akingump.com
13
14  ALSO PRESENT:
15     Cameron Hodges, Videographer
16
17
18
19
20
21
22
23
24
25

Page 4

1              INDEX OF EXHIBITS
2  DEFENDANT'S   DESCRIPTION              PAGE

3  Exhibit 1    Notice of Taking Deposition    13
4  Exhibit 2    Resume                 13
5  Exhibit 3    Statement of Organizer       31
6  Exhibit 4    First Amended Complaint      35
7  Exhibit 5    Letter of Intent          49
8  Exhibit 6    Asset Purchase Agreement     50
9  Exhibit 7    Agency Staff Agreement      74
10 Exhibit 8    LSP Offer and Commission Calc.   75
11 Exhibit 9    Pre-Appt Agency Agreement      90
12 Exhibit 10   Colvard and Cicciarelli Texts   91
13 Exhibit 11   Stephen Cobb E-mail       122
14 Exhibit 12   Saved Quote Job Aid      131
15 Exhibit 13   Cicciarelli 8/4/2020 E-mail   146
16 Exhibit 14   Hutson HR Complaint Intake Form  152
17 Exhibit 15   Working Leads Correctly T-Doc   152
18 Exhibit 16   Summary of Evidence       156
19 Exhibit 17   Plaintiff's ROG Responses     185
20
21
22
23
24
25

Page 3

1          C O N T E N T S
2  TESTIMONY OF ULISES CICCIARELLI        PAGE

3    Direct Examination by:  Mr. Lian    6
4    Cross-Examination by:  Mr. Hubbard   --
5  CERTIFICATE OF OATH          198
6  REPORTER'S CERTIFICATE        199
7  READ AND SIGN LETTER         200
8  ERRATA SHEET           201
9          – – – – –
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

1        THE VIDEOGRAPHER:  Good morning.  We are
2  now on the record at 9:02 A.M.  It is August
3  3rd, 2022.
4        Please note that this deposition is being
5  conducted virtually.  Quality of recording
6  depends on the quality of camera and Internet
7  connection of participants.  What is seen from
8  the witness and hearing -- heard on the screen
9  is what will be recorded.
10        Audio and video recording will continue to
11  take place unless all parties agree to go the
12  record.
13        This begins Media Unit 1 of the
14  video-recorded deposition of Ulises Cicciarelli
15  as corporate representative for Prestige
16  Insurance Group, LLC in the matter of Prestige
17  Insurance Group versus Allstate Insurance
18  Company.
19        My name is Cameron Hodges; I'm the
20  videographer.  And the court reporter is Debby
21  Kirshen.  We represent Veritext.
22        Will counsel please introduce themselves,
23  after which will the court reporter please
24  swear-in the witness?
25        Thank you.

2 (Pages 2 - 5)

Page 6

1    MR. LIAN:  My name is Bob Lian.  I'm with
2 the law firm of Akin Gump representing Allstate
3 Insurance Company.
4    MR. HUBBARD:  John Hubbard representing
5 the Plaintiffs.
6    THE COURT REPORTER:  Will the witness
7 please raise your right hand?
8    THE WITNESS:  (Complies.)
9    THE COURT REPORTER:  Do you swear or
10 affirm the testimony you're about to give will
11 be the truth, the whole truth, and nothing but
12 the truth?
13    THE WITNESS:  Yes.
14    THE COURT REPORTER:  Thank you.
15    You may put your hand down.
16 THEREUPON,
17         ULISES CICCIARELLI,
18 having been duly sworn by the court reporter, was
19 examined and testified upon his oath as follows:
20         DIRECT EXAMINATION
21 BY MR. LIAN:
22    Q.  Good morning.  My name is Bob Lian and I'm
23 with the firm of Akin Gump and we're here to take
24 your deposition this morning.
25    Could you please state your full name for

Page 7

1 the record?
2    A.  It's Ulises -- José is my middle name --
3 Cicciarelli.
4    Q.  Okay.  And Mr. Cicciarelli, have you ever
5 had your deposition taken before?
6    A.  I do not believe so, no.  This is -- no.
7    Q.  Have you ever testified in any sort of
8 legal proceeding previously?
9    A.  I did once when I was in high school.
10    Q.  Okay.  What kind of legal proceeding is
11 that?
12    A.  I was called in as a witness to two kids
13 getting in a fight in school.
14    Q.  Okay.  Well, let me -- let me just go over
15 some basic ground rules for today's deposition.
16    I assume you've had an opportunity to meet
17 with your counsel.  You probably discussed some of
18 these but I'll -- I'll just go through them quickly.
19    I'll, obviously, be asking you questions.
20 I ask that you answer them truthfully and to the
21 best of your ability.  Is that fair?
22    A.  Sure.
23    Q.  We, obviously, have -- we're doing this by
24 Zoom, which has, I guess, become the new normal in
25 this COVID -- post-COVID era.  So we'll do our best

Page 8

1 to make sure that you can hear me well, you can see
2 me well and everything, and we manage that
3 effectively.
4    But if, at any point, you have any
5 technical glitches, you can't hear me, you don't
6 understand me, you don't understand the question,
7 please don't hesitate and ask me to rephrase it or
8 ask me to repeat it.
9    And, of course, if you do have any
10 technical glitches and you can't see an exhibit that
11 we're using, or have any other issues like that,
12 please, please, do let us know.  Okay?
13    A.  Okay.
14    Q.  Okay.  And we'll just -- we'll assume that
15 if you don't say anything and you answer my
16 questions, you've understood them.  Is that fair?
17    A.  Fair enough.
18    Q.  Okay.  Is there anything that you know of,
19 any medications, any other conditions that you're
20 aware of, that would affect your ability to
21 understand my questions and answer them truthfully
22 today?
23    A.  No.
24    Q.  All right.  Your counsel, Mr. Hubbard, may
25 assert an objection from time to time.  I will try

Page 9

1 and make my questions clear so that that is not
2 necessary.  But to the extent that he asserts an
3 objection, unless he directs you not to answer the
4 question, you still have an obligation to answer my
5 questions.  Is that fair?
6    A.  Yes.
7    Q.  Okay.  I think that's it.  Any other
8 issues, we'll figure out as we go along.  So why
9 don't we jump right in.
10    What is your date of birth,
11 Mr. Cicciarelli?
12    A.  ▮▮▮▮▮▮▮.
13    Q.  And your current home address is what?
14    A.  ▮▮▮▮▮▮▮▮▮▮▮▮
15 ▮▮▮▮, ▮▮▮▮▮▮▮.
16    Q.  Are you currently employed?
17    A.  Yes.
18    Q.  What is your current employment?
19    A.  I own a real estate business.  I'm a
20 broker.  I've been that for 10 or so years and I
21 also -- I own a consulting business for insurance
22 companies.
23    Q.  What is the name of that -- that real
24 estate business?
25    A.  Prestige Real Estate Services, Inc.,

3 (Pages 6 - 9)

1 Incorporated.
2    Q.   How long have you operated Prestige Real
3 Estate Services, Inc.?
4    A.   Over 10 years.
5    Q.   And you said you also operate an insurance
6 consulting service as well?
7    A.   I consult insurance businesses; that
8 business started in March.
9    Q.   March of 2022?
10    A.   Correct.
11    Q.   What is the name of that business?
12    A.   BSD Consulting.
13    Q.   And to whom or what entity does BSD
14 Consulting provide services?
15    A.   To insurance -- to the owners, management,
16 whoever requests services.
17    Q.   What sort of services do you provide?
18    A.   I train agents, help with hiring process
19 to build -- to build a team, and train the team, and
20 train managers.
21    Q.   Training in what sorts of fields or
22 matters?
23    A.   Insurance concepts, property and casualty
24 lines, primarily.
25    Q.   And do -- do you provide consulting

1 services to any agents of Allstate Insurance
2 Company?
3    A.   No.
4    Q.   Does BSD Consulting employ any other
5 persons besides yourself?
6    A.   No.
7    Q.   Does Prestige Real Estate employ any other
8 persons besides yourself?
9    A.   Yes.
10    Q.   How many people does Prestige Real Estate
11 employ?
12    A.   Three.
13    Q.   Does Prestige Real Estate, and I'm just
14 gonna use that for shorthand, if that's okay.
15    A.   (Nods head in the affirmative.)
16    Q.   Prestige Real Estate, does it employ any
17 persons who were previously employed by Prestige
18 Insurance Group, LLC?
19    A.   No.
20    Q.   From where, or what location, does
21 Prestige Real Estate Services physically operate?
22    A.   It's primarily is a -- I would say from my
23 home, but the agents all work remotely in their own
24 homes.
25    Q.   So you do not have --

1    A.   And I find sites.  You know, we're usually
2 meeting on properties and it's what it is.
3    Q.   And just to be clear, Prestige Real Estate
4 does not have a separate physical office, is that my
5 understanding from what you testified?
6    A.   At the moment, correct.
7    Q.   What is the highest level of education
8 that you have received?
9    A.   My four-year degree from University of --
10 of Florida International University.
11    Q.   What year did you graduate Florida
12 International University?
13    A.   '90 -- 1998, I believe.
14    Q.   And what is your degree in?
15    A.   Management Information Systems.
16    Q.   All right.  We're gonna pull up our first
17 exhibit.
18       MR. LIAN:  I'd like to pull up
19    Mr. Cicciarelli's resume.
20 BY MR. LIAN:
21    Q.   If you could tell us, Mr. Cicciarelli,
22 when you see it in the exhibit folder.
23    A.   Is it Exhibit 2?
24    Q.   Yes, it's Exhibit 2.
25       Do you see it?

1       THE COURT REPORTER:  Excuse me.  You're
2    marking that as 2?  Because I don't have in the
3    record where you marked 1.
4       MR. LIAN:  Well, for the record, in our
5    little practice run, Exhibit 1 was the
6    deposition notice for today.
7       So this will be Exhibit No. 2.
8       (Defendant's Exhibit Nos. 1 and 2 were
9    marked for identification.)
10 BY MR. LIAN:
11    Q.   So do you see -- Do you see Exhibit 2,
12 Mr. Cicciarelli?
13    A.   I do.  I saw something just pop up on the
14 screen.
15       Am I looking at the separate Exhibit Share
16 folder?
17    Q.   Yes, please.
18       In the separate Exhibit Share folder, you
19 should see a document that looks like your resume.
20 Is that -- is that -- do you -- are you able to see
21 that?
22    A.  Yes, I am.
23    Q.   Okay.  And this was a -- if you could just
24 take a quick look at this and just confirm that this
25 is in fact your -- your resume prior to becoming an

1 agent of Allstate Insurance Company.
2     A. It looks -- it looks to be, yes.
3     Q. Prior to becoming --
4         MR. HUBBARD: Just for the record, I'm
5     only seeing one page on my Share. Are there
6     more than one page to this or am I just
7     operating it incorrectly?
8         MR. LIAN: There should be two pages,
9     John, on the exhibit we posted.
10        MR. HUBBARD: Okay.
11        MR. LIAN: You can put it up on the Screen
12    Share, Andrew. We're just gonna post it and
13    we'll scroll through it quickly.
14        MR. HUBBARD: Okay. Thank you.
15        MR. LIAN: Are you able to see that, John?
16        MR. HUBBARD: Yeah; I can see the second
17    page now. Thank you.
18        MR. LIAN: Okay. Let's take it off the
19    Screen Share.
20 BY MR. LIAN:
21    Q. All right. I'd like to focus on your
22 employment prior to becoming affiliated with
23 Allstate Insurance Company as an agent, as an
24 exclusive agent.
25        Where were you employed prior to becoming

1 an exclusive agent with Allstate?
2     A. I was the office manager of Paragon
3 Insurance Group.
4         THE COURT REPORTER: Could you repeat that
5     name, please?
6         THE WITNESS: Paragon Insurance Agency.
7         THE COURT REPORTER: "Paragon." Thank
8     you.
9         THE WITNESS: Okay.
10 BY MR. LIAN:
11    Q. And what is -- what is Paragon Insurance
12 Group?
13    A. It's an Allstate agency.
14    Q. Okay. Is it operated by a particular
15 individual who is the elite agent?
16    A. Yes; it's owned by Darren Mock.
17    Q. And when did you become employed by
18 Paragon Insurance Group?
19    A. I believe that agency -- I want to
20 say I started with Allstate in March of 2000 -- let
21 me look back here. At the time, that was -- March
22 of 2019.
23        The way I was -- I actually worked for
24 Paragon with this job was in ProVest Insurance and
25 then we moved and then that's -- we went to Paragon.

1         We were training.
2     Q. I'm not sure I fully understand.
3         They were -- the staff was with a
4 different insurance agency?
5     A. For training.
6     Q. Okay. So let me just make sure I can
7 break this down.
8         Was Paragon Insurance an operating agency
9 at the time you joined it?
10    A. It was in the process of opening.
11    Q. Okay. And you joined at the time that it
12 was -- during that time it was in the process of
13 opening?
14    A. As soon as it opened.
15    Q. Okay. And I don't know that I fully
16 understood your answer when you said the staff was
17 either employed by or training with another agency.
18    A. Allstate -- when you're going through the
19 owner training, it tells you to put your staff
20 somewhere into training.
21    Q. Okay. And in this case the -- the staff
22 that eventually worked at Paragon is being trained
23 elsewhere?
24    A. Correct.
25    Q. And what agency was the staff training

1 with?
2     A. ProVest. I don't know if it's ProVest
3 Insurance Group, but it's ProVest, the person.
4     Q. And were you --
5         Is that spelled P-R-O-V-E-S-T? "ProVest";
6 is that what you're saying?
7     A. P-R-O-V-E-S-T, correct.
8     Q. Okay. And just to be clear, is it a "V"
9 or a "B"? "V" as in "Victor" --
10    A. "V" as in "Victor."
11    Q. Okay. So ProVest Insurance Agency?
12    A. I don't know their other name. I know
13 that ProVest was the first name. Again, I'll have
14 to find that out or look it up or something.
15    Q. Okay. Did you have prior insurance
16 industry experience before joining Paragon
17 Insurance?
18    A. No.
19    Q. And how did -- how was it you became
20 employed with Paragon Insurance?
21    A. My -- Darren Mock is a close friend of
22 mine for -- well, since my IBM days in 1999, so for
23 about 23 years.
24    Q. And you spoke with him about joining him?
25    A. Yeah. Well, I was, you know -- you know,

Page 18

1 I went through ProVest; my brother worked there at
2 the time, in the other agency.
3      And then from there, you know, very
4 quickly, it became -- it made the most sense for me
5 to -- because I was always with the intention of
6 wanting to open up my own agency. So then it made
7 the most sense for me to run and manage his agency.
8      And so the timing worked out that I went
9 with, you know, with Darren in Paragon to run this
10 agency, to be the office and sales manager.
11     Q. So did -- did I understand you to say,
12 Mr. Cicciarelli, that prior to working at Paragon,
13 you worked at ProVest for a period of time?
14     A. If -- we're talking about a month or two.
15 I mean, it was already -- that group was already
16 training for Paragon.
17     Q. And did you work at ProVest to receive
18 training or were you employed there in some other
19 capacity?
20     A. Basically, to train, to learn the
21 position. Learn as many positions as possible so I
22 can gain that experience with the ultimate goal of
23 opening my own agency.
24     Q. Did you receive training while you were
25 affiliated with ProVest?

Page 19

1      A. Level 1 and Level 2 binding through
2 Allstate training and then they also had ASA, which
3 was like Agency Sales Academy, and went through
4 their training courses.
5      Q. And during the time that you were
6 affiliated with ProVest, did you sell any insurance
7 or quote any customers during that period?
8      A. Yes.
9      Q. How many times did you do that while you
10 were affiliated with ProVest?
11     A. I don't know. I have no clue. But,
12 again, you know, I don't -- I don't --
13     I would be guessing; it was several years
14 ago.
15     Q. What --
16     MR. HUBBARD: I just want to, you know,
17 remind you that this is the corporate rep for
18 Prestige, as opposed to you're taking his dep
19 individually later.
20     I don't know why, but it seems to be
21 dove-tailing into his personal experiences
22 versus Prestige. But...
23     MR. LIAN: Understood. Understood.
24 BY MR. LIAN:
25     Q. You were with ProVest for approximately

Page 20

1 one month, did you say?
2      A. You know, I don't recall exactly when the
3 transition took place, but it was -- there was the
4 group there that was already training for Paragon
5 and I, basically, joined in with that group.
6      So however that trans -- I don't know the
7 exact timeline, if it was one month or if it was
8 more to Paragon. I do not know.
9      Q. Okay. And then you left your training
10 period at ProVest and went over to Paragon?
11     A. Yes, I may have on -- when I got there, I
12 may have already been part of Paragon, is my point.
13     I don't know if they included me in the
14 training group quickly because of my licensing and
15 experience in other matters made me a good candidate
16 to run a tight agency.
17     Q. While you were employed with Paragon
18 Insurance, were you also operating Prestige Real
19 Estate Services?
20     A. In a very limited capacity. It was -- was
21 on the back burner and had been since, for the most
22 part.
23     Q. And according to your resume, Exhibit
24 No. 2, you were affiliated with Paragon from March
25 of 2019 through what date approximately?

Page 21

1      A. I want to say maybe March of 2020.
2      Q. And then in March of 2020, what happened?
3      A. I began the process of opening up Prestige
4 Insurance Group and...
5      Q. Okay. Let's -- if you can turn back to
6 Exhibit No. 1, which is the deposition notice for
7 today.
8      Let us know when you have that available
9 to you again.
10     A. I can see it.
11     Q. You can see it. Okay.
12     If you see in this notice that there
13 are -- it consists of 11 pages and it's got several
14 topics.
15     Have you had an opportunity to look over
16 this notice?
17     A. Yes.
18     Q. And you've looked it over prior to today?
19     A. Some parts definitely look familiar to me.
20 I received a lot of notices so -- but I believe so,
21 yes.
22     Q. All right. And you understand that you
23 are appearing today as the representative of
24 Prestige Insurance Group, LLC?
25     A. Yes.

6 (Pages 18 - 21)

Page 22

1    Q.  Do you believe you are capable and
2  knowledgeable to testify to the topics set forth in
3  Exhibit No. 1?
4    A.  "The identity and job functions of all
5  Prestige Insurance support staff"?
6    Q.  Yes, the list of topics that are in
7  Exhibit No. 1.  There are a total of 22 topics that
8  run from page 1 through page -- page 8.
9    A.  Understood, yes.
10       I'll answer them to the best of my
11  ability.
12    Q.  Okay.  Mr. Cicciarelli, can you tell us
13  what you did to prepare for your deposition today?
14    A.  I prepared the documentation that you guys
15  requested of me to supply.  So organize that as much
16  as possible; tried to get a good night's sleep; and
17  just -- I'm here to answer your questions.
18    Q.  Okay.  And did you meet with your counsel
19  to prepare for your deposition today?
20    A.  We spoke about it; yes.
21    Q.  When did you speak about it?
22    A.  Yesterday and -- with two brief meetings,
23  basically, about this where we were asking
24  questions.
25    Q.  Did you speak with anybody else besides

Page 23

1  your counsel in preparation for your deposition
2  today?
3    A.  No.
4    Q.  Was there anybody with whom you spoke to
5  gather any factual information that was not already
6  known to you in regard to the topics in Exhibit
7  No. 1?
8    A.  No.
9    Q.  Let me ask you about your search for
10  documents that were produced in this case or that
11  were requested in this case.
12       Where did you look for documents that
13  Allstate requested in its discovery request in this
14  case?
15    A.  I looked at e-mails -- any e-mails that
16  were sent back and forth prior to -- to the opening
17  and then once in, you know, the same e-mail here.  I
18  looked through e-mails.  I looked through --
19       Well, really, you know, e-mails that I had
20  also taken down once the investigation, you know,
21  sent to myself.  Especially once I got locked out or
22  knew that they were terminating my contract and I
23  said I need this information, so I sent it to
24  myself.
25    Q.  So I'd just like to understand the

Page 24

1  physical locations.  You had your e-mail and that
2  would be your Gmail account; is that correct?
3    A.  No; not my Gmail account.  It would be
4  either PrestigeINSGroup, that, you know --
5  primarily.
6    Q.  Okay.  And that's where you primarily
7  looked for documents for -- to respond to Allstate's
8  discovery requests?
9    A.  Primarily, yes.  That they -- that I sent
10  even from my Allstate e-mail to that e-mail, to the
11  PrestigeINSGroup.
12       And then prior to opening, I believe,
13  Kaylee and Jarius --
14       Because I didn't have my Allstate e-mail
15  yet, so I was using that one primarily.
16    Q.  And the e-mail address associated with
17  that e-mail account you're referring to is what?
18    A.  ███████████████
19    Q.  And were there other locations that you
20  searched, whether they're C drives, one drives,
21  cloud, thumb drives, that sort of thing where
22  documents relating to your time at Allstate
23  Insurance Company would have been kept?
24    A.  You mean like a computer hard drive or
25  something like that?

Page 25

1    Q.  Correct.
2    A.  Yes.
3    Q.  What -- what -- excuse me.  What locations
4  are those, specifically?
5    A.  Another computer that I have and just --
6  well, that's not true.  It was a --
7       Before I lost the computer because they
8  locked you out of the Allstate and put it on a drive
9  and then that's it.  It's just a couple of -- couple
10  of folders, basically, though.  Primarily, my e-mail
11  was the key; it had a lot of my reports.
12    Q.  What were those folders that were on your
13  computer?  What were they called or labeled?
14    A.  "Prestige Insurance," basically.  They
15  have an investigation.  I have my reports that --
16  that I was able to collect, you know, from like what
17  my ECP bonus was supposed to be so when they, you
18  know -- this is where you, you know -- what we're
19  supposed to be paid, essentially.  So those things,
20  the documentations that I had, you know.
21    Q.  Were there any articles or any other
22  information on that file or in that file?
23    A.  It's where, when you request it or your
24  law firm requested that information, I go grab the
25  e-mails that I had and dumping them in there for the

1 investigation.
2    Q.   Okay.  Were there any other places where
3 electronic records, computerized records, were kept,
4 either thumb drives, flash drives, external hard
5 drives, aside from this location on your computer?
6    A.   No; not that I'm aware of.  Not that I
7 recall.
8    Q.   Do you have any physical files, hard
9 copies of documents, in filing cabinets or files, or
10 anything of that nature, in your possession?
11    A.   I do not, no.
12    Q.   Separate from your conversations with your
13 counsel, have you spoken with any other Allstate
14 employee or former Allstate employee within the past
15 six months about the topics of this lawsuit?
16    A.   Yes.
17    Q.   Who have you spoken with?
18    A.   Kaylee Colvard.
19    Q.   When did you speak with Kaylee Colvard?
20    A.   Over the past six months, I've probably
21 only spoken to her once or twice, a couple of times.
22         I was basically letting her know that, you
23 know, that my case is moving forward and that my
24 attorney will be in contact with her.
25    Q.   When did you last speak with Kaylee

1 Colvard?
2    A.   It was probably two weeks ago, to let her
3 know that they would be contacting her.
4    Q.   How long did your discussion with Kaylee
5 Colvard last?
6    A.   Not very long; just a few minutes.
7    Q.   What did you say to her?
8    A.   To the best of my recollection, but,
9 basically, said:  Someone's trying to get in touch
10 with you.
11         And then:  Would you please respond to
12 them?
13    Q.   And what did she say?
14    A.   Okay.  You know, essentially:  Okay.
15    Q.   Prior to this conversation that you had
16 with her approximately two weeks ago, when was the
17 time before that, the last time before that, that
18 you spoke with her?
19    A.   I would guesstimate several months.
20    Q.   And was that prior conversation with
21 Ms. Colvard after the lawsuit in this case was
22 filed?
23    A.   Are you referring to the lawsuit being
24 filed almost a year ago, have we spoken between that
25 point and several weeks ago?

1    Q.   Correct.
2    A.   Yes.  Yes; we have spoken again.
3         We don't have a very close relationship,
4 it was a professional one.
5         I mean, obviously, I got to know -- like,
6 I get to know all my agents, you know, and clients
7 and co-workers, you know, very closely.  I care
8 about each one individually.
9         So from time to time, just checking in on
10 her.  Her father was sick and:  How's he doing?
11 That sorts -- those sorts of things.
12         And, basically, saying:  There's nothing
13 that has come -- you know, it took a long time to
14 get to this point to where we're at today.
15         So every once in a while:  Just checking
16 in on you, making sure you're okay.
17         That sort of thing.
18    Q.   Do you exchange text messages with
19 Ms. Colvard?
20    A.   From -- from time to time.  But not, you
21 know -- again, you know, text seems to be one of
22 these, you know, proved communications at times for
23 some people.  But, you know, we're both -- I imagine
24 she's very busy and I -- you know, so there's
25 sometimes.

1         But to answer your question, again:
2 Here's a picture of my dog.
3         Here's a picture of my dog.
4         You know:  How's everything going?
5         I'm in service the whole day, yeah.
6    Q.   I know -- I know sometimes when my kids
7 say they've "talked" to somebody, they don't mean
8 they've actually talked to them; they mean they've
9 sent a text.
10    A.   "Communicate" is probably a better word.
11    Q.   They have communicated.  They've not
12 actually spoken words, they've sent a text message,
13 which they consider to be "talking."
14         In connection with your discussions that
15 you mentioned with Ms. Colvard, were those actual
16 oral conversations where you were speaking to one
17 another over a telephone or were they text messages?
18    A.   A couple of weeks ago, roughly, give or
19 take, a few days when I told her that my attorneys
20 are trying to get in contact with her, there was a
21 couple of text messages that followed up with a
22 phone call.
23         And then prior to that, again, it was, you
24 know, as we were getting closer to, you know,
25 getting somewhere, maybe once in a while through

1 text message: How are you doing? The case is
2 moving forward.
3      You know, just very --
4      How's it going?
5      You know, just -- just check-ins, if you
6 will, and, that's again, through text messages.
7      Q. When was the last time you saw Ms. Colvard
8 in person?
9      A. I want to say it was January or February
10 of 2020 when I was --
11      I've only met her once.
12      Q. There was a woman by the name Prianca
13 Little who was employed by Prestige Insurance Group;
14 is that correct?
15      A. Correct.
16      Q. When is the last time you were in
17 communication with Ms. Little?
18      A. Like October of 2020 when I -- when I had
19 to let her go.
20      Q. Do you know where Ms. Little is today?
21 Not "today" as in this moment, but where she is now,
22 where she works?
23      A. I have no idea.
24      Q. Do you know the name Joshua Rice?
25      A. Yes.

1      Q. Joshua Rice was employed by Prestige
2 Insurance Group; is that correct?
3      A. That's correct.
4      Q. When was the last time you were in
5 contract with Mr. Rice?
6      A. Likely, the same day that, basically, I
7 had to terminate most of my staff.
8      Q. Same question with regard to Robert
9 Hennessey. Robert Hennessey used to work for
10 Prestige Insurance Group; is that correct?
11      A. That's correct.
12      Same type of situation.
13      Q. Okay. And you've not spoken with
14 Mr. Hennessey at any point since the fall of 2020;
15 is that correct?
16      A. Not that I recall.
17      Q. And the last person I'll ask about is
18 Meileik Williams.
19      A. Same answer.
20      I don't really -- I have not really -- I
21 haven't spoke to him since then, last day.
22      Q. Okay.
23      MR. LIAN: We're gonna go to Exhibit No.
24 3, please.
25      (Defendant's Exhibit No. 3 was marked for

1 identification.)
2      THE WITNESS: Do I hit "refresh" for it to
3 load up or --
4 BY MR. LIAN:
5      Q. I believe so, yes. Give that a try and
6 let us know if that works.
7      A. Okay. Yes; there it is.
8      Q. Okay. It should be a document entitled:
9 Zenbusiness Statement and Resignation of the
10 Organizer of Prestige Insurance Group, LLC.
11      Do you see that?
12      A. I do.
13      Q. And it looks like this is dated April
14 16th, 2020?
15      A. I see that.
16      Q. And it says at the bottom that it
17 identifies yourself as the initial member and/or
18 manager.
19      Do you see that?
20      A. I do.
21      Q. Is Prestige Insurance Group, LLC still in
22 operation.
23      A. It is but not -- it's still -- it's not
24 operating in a business capacity. It's for the sake
25 of this, the resolution of this effort.

1      Q. And you're referring to the lawsuit; is
2 that correct?
3      A. Essentially, yes.
4      I mean, obviously, that wasn't the
5 intention when -- you know, when that contract was
6 terminated, the operation ceased.
7      Q. Have there been any other owners of
8 Prestige Insurance Group, LLC other than yourself at
9 any point since its formation?
10      A. No.
11      Q. When -- when was Prestige Insurance --
12      And I'll just use that as a shorthand,
13 "Prestige Insurance," if that's okay.
14      A. Sure.
15      Q. When was Prestige Insurance formed?
16      A. In April 16, 2020, according to this
17 document.
18      Q. And I asked you about if there had been
19 any other member -- owners of Prestige Insurance.
20      Have there been any other members of the
21 LLC of Prestige Insurance besides yourself?
22      A. No.
23      Q. Have there been any investors in Prestige
24 Insurance?
25      A. No.

9 (Pages 30 - 33)

Page 34

1    Q.  And just to be clear, those are other
2  investors besides yourself.
3    A.  If I'm understanding the question
4  correctly, the answer is "no."
5    Q.  There were no -- just to be clear, there
6  were no other persons that held capital or any other
7  sort of ownership or membership interest in Prestige
8  Insurance --
9    A.  No.
10   Q.  -- other than yourself?
11   A.  That's correct.
12   Q.  Who -- during the existence of Prestige
13 Insurance since the spring of 2020, who have been
14 Prestige Insurance's officers, if any?
15   A.  No, myself.
16   Q.  Nobody other than yourself?
17   A.  Correct; I'm just -- sole member LLC.
18   Q.  Okay.  And what was your role or title
19 within Prestige Insurance, LLC?
20   A.  I was the agency owner.
21   Q.  Did Prestige Insurance Group ever have any
22 physical location that it operated?
23   A.  It would, yes, of course.  In Tamarac,
24 Florida, we had an office there.
25   Q.  And what was that --

Page 35

1      How did Prestige Insurance come to operate
2  that office?
3    A.  That was the office of the Rivas Group,
4  the agency that I ultimately purchased.
5    Q.  Since the termination of Prestige
6  Insurance's R3001 Agreement with Allstate, has
7  Prestige Insurance had any business operations of
8  any nature, aside from this -- this lawsuit?
9    A.  No.
10   Q.  Have you been involved in any insurance
11 sales or insurance business, aside from the
12 consulting business you described, since the
13 termination of your R3001 Insurance Agreement with
14 Allstate?
15   A.  No.
16   Q.  All right.  I'd like to go to -- this is
17 what we'll refer to as Exhibit No. 4 -- 4, which is
18 the First Amended Complaint and Demand for Jury
19 Trial in this case.
20     MR. LIAN:  Andrew, can you pull that up,
21 please?
22     (Defendant's Exhibit No. 4 was marked for
23 identification.)
24 BY MR. LIAN:
25   Q.  All right.  Are you able to see that,

Page 36

1  Mr. Cicciarelli?
2    A.  Yes, sir.
3    Q.  Okay.  Pretty much throughout the
4  remainder of the deposition, at various points I'm
5  gonna be referring back to this document and
6  allegations you have made and ask about them.
7      So if you could scroll down to Exhibit --
8  to paragraph number 13 in Exhibit No. --
9      MR. LIAN:  Well this is 4, correct?
10     MR. GEAR:  Four.
11     MR. LIAN:  Yes.  Sorry, I don't see the
12   stamp in front of me so...
13 BY MR. LIAN:
14   Q.  So Exhibit No. 4, if you could go down to
15 paragraph number 13.
16     Do you see that?
17   A.  I do.
18   Q.  Okay.  And just for the record, it reads:
19 In April of -- April 2020, Cicciarelli was
20 approached by an Allstate Field Sales Leader, FSL,
21 Kaylee Colvard, to become an insurance agent for
22 Allstate.
23     Could you -- could you please describe,
24 for the record, what happened?
25   A.  Sure.  So the one time that I met Kaylee

Page 37

1  face to face, I was, again, the manager for Paragon
2  Insurance Group.
3      And I told her of my intentions of opening
4  an agency.  And she advised me at that time that,
5  unfortunately, Allstate had done away with their ECB
6  contract.
7      So I was -- needless to say, was upset
8  about that because I had been looking forward to
9  opening up my own agency and I put in, you know,
10 quite a bit of time, obviously, a year of, you know,
11 learning this position inside and out.
12     And she approached, by way of Darren Mock,
13 that:  I don't want to take your manager --
14     He was already -- at that point, I had
15 gotten him to the point where he was the Rookie of
16 the Year for Allstate, you know, won of bunch of
17 accolades.
18     And she approached him first because, she
19 said:  I understand that's your manager and you may
20 not want to lose him, but an opportunity has come up
21 where someone wants to sell their book and, you
22 know, I'd like to present it to you.  Can you -- can
23 you have him, you know, if it's okay with you, have
24 him call me.
25     Or something to that extent.  That wasn't

Page 38

1 exactly -- I wasn't exactly involved in that
2 conversation.
3        So that's how that, you know, came about,
4 that number 13.  It may have been March, April, but
5 basically, around that time, you know, that's when
6 it was presented to me.
7    Q.  All right.  You testified that she said
8 that Allstate had done away with the ECP contract?
9    A.  That's what was mentioned when I met her
10 face to face sometime in January or so of 2020.  I'm
11 guesstimating on that.  But, you know, a few months
12 before.  A couple months earlier.  Maybe a few
13 months.
14    Q.  But --
15    A.  Yeah --
16    Q.  -- go ahead.  I'm sorry.  I didn't mean to
17 interrupt you.  Continue.
18    A.  No, that was -- that was it.  Yes, she did
19 mention that day that Allstate was no longer giving
20 you ECP contracts.
21    Q.  And what was your understanding at the
22 time of what the ECP contract was?
23    A.  It's a contract for an agency to be able
24 to start up with zero -- a scratch agency,
25 essentially, with zero customers, and are not buying

Page 39

1 an existing book of business.
2        You know, or if they did, like in my
3 situation, was a very small book, that the ECP could
4 help you to recap some of the expenses that you need
5 to build a book.  That's my understanding of an ECP
6 contract.
7        And Paragon was an example of an ECP
8 contract.
9    Q.  So is it your understanding that it was
10 designed to help agencies, you know, in fact, meet
11 their cash flow needs and -- for a new agency?
12    A.  Correct.
13    Q.  And the agency that you worked for with
14 Mr. Mock, that was an agency that was covered by
15 this ECP contract?
16    A.  Correct.  It was an ECP -- that agency,
17 basically.
18    Q.  Okay.
19    A.  We started with zero customers and we
20 worked our way up.
21    Q.  All right.  What happened after -- after
22 your conversation with Ms. Colvard where she told
23 you that Allstate was no longer making the ECP
24 contract available?
25    A.  I continued -- I mean, obviously, I

Page 40

1 continued doing my day-to-day job with running, you
2 know, Paragon Insurance Group.
3        In March time frame, that's when COVID
4 came into effect.  I believe we were pretty much all
5 told to work from home at that point.  You know, a
6 lot of the offices were closed down and we were,
7 kind of, you know, so...
8        And then that's when I got, you know, that
9 communication.
10        Because we were all working from home at
11 that point in March of -- that's why I was saying it
12 was March/April time frame when I got that call
13 that, you know, that there's an existing book, and,
14 you know, basically, this new way to get an ECP
15 contract was to buy an existing ECP, you know,
16 agency.
17        I believe, there were certain thresholds
18 that they couldn't be as far as production
19 levels, and I don't recall exactly the details.
20        But they presented that offer -- that
21 opportunity to me and then it would start the ECP
22 contract again and allow me to build an agency, to
23 build -- to build a book, if you will.
24    Q.  And who described that arrangement, or
25 that opportunity, to you?

Page 41

1    A.  Kaylee Colvard.
2    Q.  Was that -- describe --
3        When was that discussion you had with
4 Ms. Colvard?
5    A.  Again, sometime March 2020, early April.
6        It was, again, after her conversation with
7 Darren asking if it's okay to approach me, you know,
8 to take his manager.
9        And -- and then she said, you know:  I
10 felt so bad when I spoke to you and told you that we
11 couldn't have a -- you know, their policy was no
12 longer offering the ECP contract, but they are
13 offering this now and here is this opportunity
14 where, basically, for you to buy an agency; and I
15 know someone that is selling one if you're
16 interested.  I can get you in contact with -- with
17 them.
18    Q.  And what agency was that, that she was
19 describing to you?
20    A.  The Rivas Group.
21    Q.  And then what happened after this
22 conversation with Ms. Colvard?
23    A.  In what capacity?
24    Q.  I'm sorry.  Could you repeat that?  I
25 missed that

11 (Pages 38 - 41)

Page 42

1    A.   In what capacity?  Like, what happened
2 with...
3    Q.   Yes.  Sorry.  Let me clarify.
4    A.   What --
5    Q.   Yeah, let me clarify the question.
6         What happened next in the sequence of
7 events leading to your becoming an Allstate
8 exclusive agent after the conversation with
9 Ms. Colvard in which she described the opportunity
10 to purchase the Rivas agency?
11    A.   Right.  I had to then get in contact with
12 Gerard Rivas, we call him Gerry, get in contact with
13 Gerry; went to go visit him; see the office; you
14 know, get an understanding as to -- you know, just
15 to see his operation firsthand.
16         Again, it was a -- it was shut down
17 because of COVID.  But, you know, as far as -- as
18 far as, you know, the -- the doors weren't open for
19 people to come in and out, and they were working
20 remotely as well.
21         But went over there, saw that; spoke to
22 him about --
23         I believe Kaylee also --
24         Once that -- I think once there was -- and
25 again, I -- I don't remember exactly step-by-step,

Page 43

1 but there was a meeting with him and coming up, you
2 know, at some point, like, you know, getting into an
3 agreement, letter of intent, kind of, agreement.
4         And then I believe Kaylee shared some of
5 the financial aspect to it, you know, so that I'd
6 know the size of the book.
7         And that's one thing I don't remember, at
8 what point that came into play, or maybe it was
9 after.
10        You know, again, just letting him know of
11 my intention of potentially wanting to sell this
12 book -- or buy this book, excuse me.
13        You know, and then communication began to
14 try to start to see if we can come to terms, an
15 agreement, for me to purchase the book.
16   Q.   What was the -- what was the size of the
17 Rivas book of business?
18   A.   It was very small.  I don't recall
19 exactly, but it was extremely small.
20   Q.   "Small" as in approximately how many
21 policies?
22   A.   I don't -- it would be -- I don't know.  I
23 don't recall.
24   Q.   How long had the Rivas agency been in
25 operation prior to the time that you first had your

Page 44

1 conversation with him about purchasing the interest
2 in the agency?
3    A.   I don't recall.  Maybe one year.
4    Q.   If you could turn back to Exhibit 4,
5 please, the Complaint, the First Amended Complaint,
6 and go to paragraph number 17.
7    A.   Uh-huh.
8    Q.   Let us know when you're there.
9    A.   I'm there.
10   Q.   Okay.  It says that:  The Enhanced
11 Compensation Plan was delivered to Cicciarelli by
12 FSL Kaylee Colvard via the Allstate Exclusive Agent
13 Opportunity Tool which projects future commissions
14 and bonuses.  See Exhibit A.
15        Do you see that?
16   A.   I do see that, paragraph 17, yes.
17   Q.   Okay.  And then Exhibit A, which is later
18 on in the document, is entitled:  Enhanced
19 Compensation Plan Letter of Understanding.
20   A.   You want me to look for it?
21   Q.   Yeah, would you -- would you mind going to
22 that?  And it appears on -- it's Exhibit A at the
23 back of the document you should have.
24   A.   Not a problem.  I'm looking for it.
25   Q.   Okay.

Page 45

1         It's page 21 of the PDF, if that helps.
2    A.   I'm looking at it now.  Yes, I found it.
3    Q.   Okay.  And is this the document that you
4 indicate in paragraph 17 that Ms. Colvard delivered
5 to you?
6    A.   I don't recall if this is...
7         Make it --
8         I could read through it, but I don't -- I
9 honestly don't recall if this is exactly what was
10 given to me.  It was more of, you know, along the
11 extent that --
12        Let me go back to 17 and reread that, if
13 you don't mind.
14   Q.   Well, just for the record, this was what
15 was attached to the Complaint that was filed in
16 court by your -- by your counsel.
17        So to the best of your recollection, is
18 this the document that Ms. Colvard provided to you?
19   A.   A lot of the points mentioned in this
20 document do look familiar, you know, as far as, you
21 know --
22        Now, did Kaylee provide this to me?  I
23 would have to assume she did.  I would have to
24 assume she did, yes.  But...
25   Q.   Are you aware of any --

12 (Pages 42 - 45)

Page 46

1    Sorry.  Please, go ahead.
2    A.  No.  I -- I'm just trying to think of:
3 Why is it not signed right now?  And that's throwing
4 me off a little bit.
5    But I'm gonna assume, because everything
6 that, you know, I'm seeing some of the things that I
7 just mentioned right now prior, about the -- being
8 able to purchase a book that, you know, and
9 everything I just described, essentially, so, yeah,
10 and this is -- you know, I'm sure that it was drawn
11 from our conversations, as well as maybe this
12 document.
13    Q.  Are you aware of any signed version of
14 this document?
15    And by that, I mean a version of this
16 document that was signed by you.
17    A.  I would have to imagine if, you know,
18 going through --
19    You know, Kaylee was very detailed in the
20 way she was.  She was very good at her job, you
21 know.
22    So I wouldn't be surprised if -- if
23 there's a signed version of this if it was required.
24 And I'm sure it was.
25    Q.  Okay.  And just for the record, we've

Page 47

1 looked and we've not located a signed version of it.
2 So to the extent that you have a signed version and
3 locate it, we'd appreciate you double checking on
4 that, making sure to produce it to us.
5    A.  Okay.
6    MR. HUBBARD:  We'll take a look and see if
7 there's a signed version.
8    MR. LIAN:  Okay.  Thank you, John.
9    MR. HUBBARD:  Okay.
10 BY MR. LIAN:
11    Q.  If you look at -- in the same document
12 that you're looking at, Mr. Cicciarelli, Exhibit
13 No. 4, Exhibit B is a document entitled:  Allstate
14 R3001S Exclusive Agency Agreement.
15    Do you see that?  It's on the next page.
16    A.  I see Exhibit A.
17    So Exhibit B, you're saying?
18    Q.  Exhibit B, correct.
19    A.  Okay.
20    Yes, I see it.
21    Q.  Okay.  And if you go to page 10 of Exhibit
22 B, which is the signature page.
23    Do you see that?
24    It looks like there's an electronic
25 signature for an Allstate representative and then an

Page 48

1 electronic signature for you.
2    A.  Yes, I see that.
3    Q.  And then Exhibit C is a document entitled:
4 Allstate R3001C Exclusive Agency Agreement.
5    Do you see that?
6    A.  Yes, I see it.
7    Q.  And if you go to page 12 of that document,
8 it looks like there is a electronic execution of
9 that by an Allstate representative and by you.
10    You see that?
11    A.  I do see that; yes.
12    Q.  Do you remember executing these two
13 documents electronically, Exhibits B and C?
14    A.  I -- I do remember that these two -- yes.
15 I mean, yes, I do recall.
16    Q.  At the time that you began discussions
17 with Mr. Rivas about purchasing the interest in his
18 agency, had Mr. Rivas been trying to sell the agency
19 for a period of time, to your understanding?
20    A.  I'm assuming so because he must have
21 advised Kaylee, who knew of the opportunity.
22    But I don't know any -- any details to his
23 efforts, so prior to, you know, being approached
24 by -- by Kaylee about the opportunity.
25    MR. LIAN:  If I could -- Andrew, if you

Page 49

1 could post Exhibit -- what is it, Exhibit
2 No. -- the Letter of Intent, which we'll mark
3 as Exhibit No. 5.
4    (Defendant's Exhibit No. 5 was marked for
5 identification.)
6 BY MR. LIAN:
7    Q.  Mr. Cicciarelli, if you could please let
8 us know when you see Exhibit 5 pop up in the exhibit
9 folder.
10    Do you see it?
11    A.  I do, yes.
12    Q.  And if you could -- if you could please
13 state for the record what this -- what this document
14 is.
15    A.  It looks like a Letter of Intent.  My --
16 let's see.  It looks like a Letter of Intent, my
17 intention of it is to purchase his agency.
18    Q.  And this was to purchase the Rivas agency?
19    A.  That's correct.
20    Q.  And this was a signed agreement between
21 you and Mr. Gerardo Rivas; is that correct?
22    A.  Correct.  We both signed this; yes.
23    Q.  And that's on the -- the signatures that
24 appear on the next page, the second page of this
25 document, are for you and Mr. Rivas; is that

1 correct?
2     A.   Right.
3         I believe this was part of the process to
4 start the process, if you will.
5     Q.   All right.  And it looks like the
6 signature was April -- you signed -- you signed it
7 on April 21st, 2020?
8     A.   That does appear to be the date; yes.
9     Q.   All right.
10        MR. LIAN:  Andrew, if you could post the
11 next document, the Asset Purchase Agreement,
12 which we'll mark as Exhibit 6.
13        (Defendant's Exhibit No. 6 was marked for
14 identification.)
15 BY MR. LIAN:
16    Q.   All right.  If you could tell me when you
17 see it.  It looks like it should be up by now.
18    A.   Okay.
19         I see it.
20    Q.   Okay.  And this is the document that
21 memorialized the Asset Purchase of the Rivas agency;
22 is that correct?
23    A.   It looks to me; yes.
24    Q.   All right.  It looks like, with the
25 signatures, that this is dated July 1 of 2020; is

1 that correct?
2     A.   That's correct.
3     Q.   Okay.  If you can just look at the first
4 page of this document, it says that the purchase
5 price was for $30,000?
6     A.   Yes.
7     Q.   And that was for the purchase of what
8 exactly?  What were you purchasing?
9     A.   The policies that he had.  I would be
10 buying any -- basically, the book; and I would be
11 buying the quotes; data; whatever was in his agency
12 at the time of my appointment for August 1st with
13 Allstate.
14    Q.   Who was employed by the Rivas agency
15 or --
16        Actually, strike that.
17        Let me ask it this way:  As part of the
18 Asset Purchase Agreement, was the Prestige Insurance
19 Group bringing over, or employing, any persons who
20 were employed by the Rivas agency?
21    A.   Can you rephrase the question, please?  I'm
22 sorry.
23    Q.   Yes.  Was anybody employed by the Rivas
24 agency going to work for Prestige?
25    A.   On August 1st?

1     Q.   Yes.
2     A.   Sure.  Yes.
3     Q.   Who were the employees of Prestige --
4 excuse me --
5         Strike that.
6         Who were the employees of the Rivas
7 insurance agency who became employed by Prestige?
8     A.   I would say all the agents that began with
9 me on August 1st.
10        In the same way that, you know, Paragon
11 trained their agents in ProVest, Prestige trained
12 their agents in the Rivas Group for a short period
13 of time.
14    Q.   Okay.  Let me just make sure I have the
15 timeline down on this.  So the beginning of April,
16 you enter into a Letter of Intent with the Rivas
17 agency, correct?
18    A.   April 21st, I believe it was.
19    Q.   Okay.  Then in the beginning of July, you
20 signed the Asset Purchase Agreement on July 1, 2020?
21    A.   Yes.
22    Q.   And the plan was for the agency, the
23 Prestige agency, to begin operation on July 1 --
24 excuse me --
25        Strike that.

1         -- on August 1 of 2020?
2     A.   That's correct.
3     Q.   So between August 1 --
4         Strike that.
5         Between July 1 of 2020 and August 1 of
6 2020, is it your testimony that the plan was for the
7 staff, who would eventually become employed by the
8 Prestige agency, to work in the Rivas agency to
9 receive training?
10    A.   Correct.  To get up to Allstate's Level 1
11 Level 2 binding authority, whatever training, you
12 know, was required.
13    Q.   And the reason they were working there was
14 for training purposes; is that correct?
15    A.   Eventually, by -- for August 1st, they
16 were going to be -- all be working from home, so...
17 So there was -- the idea was to make sure technology
18 is working, you know, get everything -- iron out as
19 many details out as possible, more for the staff to
20 be working remotely.
21        We were still in the thick of COVID and
22 you know, what was going on there.  And --
23        THE COURT REPORTER:  I'm sorry.  I missed
24    the end of your answer.  You said, "and."
25        THE WITNESS:  And we were still -- you

Page 54

1     know, COVID was still a reality in operating
2     the business.
3         THE COURT REPORTER:  Thank you.
4         THE WITNESS:  Sure.
5  BY MR. LIAN:
6     Q.  Were there any people employed by the
7  Rivas agency, for purposes other than this training,
8  between July 1 and August 1 -- I'll call them the
9  regular employees of the Rivas agency, who were
10 going to become employed by Prestige?
11    A.  It was, basically, a husband, wife, and I
12 believe that the father, that were the employees.
13       Are you saying the Rivas group's
14 original --
15    Q.  Correct.
16    A.  Let's say the original, let's say in
17 January 2020, those employees?
18    Q.  Correct.
19    A.  Again, it was -- my understanding, it was
20 just Gerry Rivas, his wife, and the father, I
21 believe, some other relative or...
22       So to answer your question:  No; once the
23 transaction was finalized, they were no longer --
24       I honestly don't know what they did after
25 that.  I know they were having a baby.  So...

Page 55

1     Q.  But none of those individuals was going to
2  work for Prestige, correct?
3     A.  Not -- not after -- no.  No.  Not after --
4  No.  No.  Not after August 1st, correct.
5         MR. LIAN:  Why don't we -- we've been
6     going for about an hour 15 minutes.  Why don't
7     we take a short break and go off the record.
8     We'll resume at -- why don't we resume at 10 --
9     10:25, if that's okay.
10        THE VIDEOGRAPHER:  We are off the record
11    at 10:18 A.M.
12        (A break was taken at 10:18 A.M.)
13        (Return from break was at 10:29 A.M.)
14        THE VIDEOGRAPHER:  This begins Media Unit
15    2.
16        We are back on the record at 10:29 A.M.
17 BY MR. LIAN:
18    Q.  Mr. Cicciarelli, I'd like to focus on the
19 period between July 1 of 2020, after the Asset
20 Purchase Agreement was signed, and August 1 of 2020,
21 when the Prestige Insurance Group agency operations
22 began.  Okay?
23    A.  Okay.
24    Q.  The first question I have is:  When we
25 were looking at Exhibit No. 4 -- I guess is 4 the

Page 56

1  Complaint?  Yeah, Exhibit 4.
2         There were two different R3001 agreements.
3  Exhibit B was an R3001S Agreement and Exhibit C was
4  an R3001C Agreement.
5         And I -- I'd appreciate understanding why
6  there were two and why you signed two different
7  agreements.
8     A.  They were provided to me by Allstate.  I
9  believe one is for a corporation is C version of
10 that 3001 Agreement.  And I believe 3001S is under
11 my name as Ulises Cicciarelli.
12    Q.  Okay.  So it looks like this R3001S
13 agreement was last signed by Stephen Gilbert at
14 Allstate on July 27th of 2020.  And then the
15 R3001C Agreement was signed by both you and Stacy
16 Wines from Allstate on August 3rd, 2020.
17    A.  (No response.)
18    Q.  Is that correct?
19    A.  Yes.  Yes.  I believe that's correct.
20    Q.  And it was -- just to be clear, it was
21 always your expectation your Allstate agency would
22 operate through Prestige Insurance Group, LLC; is
23 that correct?
24    A.  That's correct.
25    Q.  It was never your intention to operate the

Page 57

1  agency as a sole proprietor outside of that -- that
2  Prestige Insurance Group, LLC structure?
3     A.  Can you rephrase that question?  I'm just
4  a little...
5     Q.  You had never -- you had intended all
6  along that Prestige Insurance Group, LLC would be
7  the party to the contract with Allstate for the
8  operation of an exclusive agency; is that correct?
9     A.  Yes.
10    Q.  During the period of July 1, 2020 to
11 August 1, 2020, what was the understanding between
12 you and Mr. Rivas with regard to the training of the
13 staff that would eventually work in Prestige
14 Insurance Group?
15    A.  I'm not sure I understand the question
16 entirely.  Can you rephrase it?
17    Q.  What understandings or agreements did you
18 have with Mr. Rivas with regard to the training of
19 your staff, for Prestige Insurance Group?
20    A.  That he would assist in -- in -- you know,
21 provide support for me to -- to, basically, be
22 prepared for August 1st.
23    Q.  Did any of the staff that you eventually
24 employed in the Prestige Insurance Group agency,
25 were they employed by the Rivas agency in any way

Page 58

1 during that one-month period between July 1 and
2 August 1 of 2020?
3     A.  Yes.  They were -- yes.  They were --
4 in -- I wouldn't say on July 1st, but at some
5 point, yes, they were -- they were added into his
6 system so that they could start the training
7 process.
8     Q.  So were they on the Rivas Insurance
9 payroll at that time or were they on Prestige
10 Insurance payroll?
11     A.  They would be on -- they were paid after
12 by Prestige.
13     Q.  So they were not paid by the Rivas agency,
14 to your understanding?
15     A.  I do not recall.  I don't believe they
16 were, though.
17     Q.  Do you understand when I use the term an
18 "appointment" in referring to someone who sells
19 insurance on behalf of Allstate Insurance Company?
20 Do you understand what I mean when I use the term
21 "appointment"?
22     A.  Yes.  They were -- Allstate appoints the
23 agencies after their training.  So, yes, to answer
24 your question.
25     Q.  And by that, an "appointment" means that

Page 59

1 that person has authorization from Allstate to act
2 on behalf of Allstate with respect to the scope of
3 that appointment, correct?
4     A.  Yes.
5     Q.  Between July 1 of 2020 and August 1 of
6 2020, did any persons who eventually became employed
7 by the Prestige agency hold an appointment with the
8 Rivas agency?
9     A.  I do not believe they were actually
10 appointed.  They were in the system to get the
11 training, but not actually appointed at that point,
12 if I remember correctly.
13     Q.  Did you hold an appointment with the Rivas
14 agency at any point individually?
15     A.  No.
16     Q.  What employees of the Prestige agency --
17        Strike that.
18        What employees of Prestige Insurance went
19 through training with the Rivas agency?
20     A.  I don't recall.
21     Q.  Do you remember approximately how many
22 Prestige Insurance employees went through training
23 in the Rivas agency?
24     A.  No, I don't recall.
25        MR. HUBBARD:  And I just want to clarify

Page 60

1     for the record, we're talking about, when you
2     say "Prestige employees," you mean after August
3     1st?
4        MR. LIAN:  Yeah.  Let me --
5        MR. HUBBARD:  Or in between that time
6     period that we're talking about, because that's
7     getting obfuscated.
8        MR. LIAN:  Let me clarify the question,
9     John.
10        MR. HUBBARD:  Okay.
11 BY MR. LIAN:
12     Q.  Mr. Cicciarelli, prior to August 1 of
13 2020, did the Prestige Insurance agency employee any
14 persons?
15     A.  No.
16     Q.  So the first date on which anybody was
17 employed by the Prestige Insurance Group, LLC was on
18 or after August 1st of 2020?
19     A.  If I'm understanding your question
20 correctly, yes.
21     Q.  Between July 1 of 2020 and August 1 of
22 2020, the persons who eventually became employed by
23 Prestige Insurance Group, LLC, what was their
24 relationship with Prestige Insurance?
25     A.  They were -- they were agents that would

Page 61

1 eventually become Prestige Insurance agents once the
2 appointment from Allstate was completed on August
3 1st.
4     Q.  So would it be correct to say that during
5 that one-month period between July 1 of 2020 and
6 August 1 of 2020, that they were, effectively,
7 trainees who were not yet employed by Prestige
8 Insurance Group, LLC?
9     A.  I believe that to be correct.
10     Q.  And those individuals did not hold an
11 appointment from Allstate with either the Rivas
12 agency or Prestige Insurance Group, LLC; is that
13 correct?
14     A.  That is my recollection.
15     Q.  From -- from where or what source did
16 Prestige Insurance Group, LLC hire these individuals
17 that went through this training during the July 1,
18 2020 through August 1, 2020 time frame?
19     A.  Can you rephrase that?  I'm sorry.
20     Q.  Yeah.  Where did you find the people that
21 eventually came to work for you in Prestige who went
22 through the training during that one-month period
23 between July 1, 2020 and August 1, 2020?
24     A.  Sure.  Indeed was one of my -- my
25 resources, as well as, at some point, I was offered

16 (Pages 58 - 61)

Page 62

1 a staff that was gonna be terminated by an agency
2 and, you know, I was able to have some of them agree
3 to work and went into the Rivas Group, I believe,
4 sometime in later July. You know, after July 7th,
5 8th, something, like that. I don't recall the exact
6 date. But not as of July 1st.
7     Q. And what was the agency from which those
8 individuals were drawn?
9     A. I don't recall the name of the agency. I
10 want to say it was a Tampa agency there, an agency
11 in Tampa.
12     Q. Was it a hyphenated last name, Masih-Das?
13 Does that sound familiar?
14     A. I was gonna say Mint but it may have been,
15 yes.
16     Q. The Mint agency?
17     A. I believe so. I believe it was Mint.
18     Q. To the best of your recollection,
19 approximately how many people that eventually came
20 to work at the Prestige Insurance Group, LLC went
21 through training at the Rivas agency between July
22 1 and August 1 of 2020?
23     A. I -- I'm gonna guess 15 to 20, maybe.
24     Q. And who provided them with the training
25 for this -- during this one-month period?

Page 63

1     A. Every agent went through Allstate's Level
2 1 and Level 2 binding training. So some of the
3 experienced ones had already gone through it, but
4 everyone received the training.
5     Q. And by whom -- who provides that Level 1
6 and Level 2 training? Is that training that is
7 provided by someone affiliated with Allstate?
8     A. Yes; Allstate Corporate does that
9 training.
10     Q. What role did Mr. Rivas play, in this
11 one-month period, in regard to training the staff
12 that eventually went to work for Prestige Insurance?
13     A. He added the staffing tool. I believe he
14 registered them for the training, the ones that
15 needed it.
16     Q. Did he provide any training individually,
17 Mr. Rivas?
18     A. No, not directly, not that I'm aware of.
19     Q. So it sounds like Mr. Rivas was,
20 essentially, just making the agency available so the
21 staff could go through this training; is that
22 correct?
23     A. Correct.
24     Q. Because he had an ongoing affiliation with
25 Allstate that enabled that to take place?

Page 64

1     A. I assume so.
2     Q. Did you provide the staff with any
3 training during that one-month time period between
4 July 1 and August 1 of 2020?
5     A. I guess I'm not clear on the question.
6 Can you rephrase it, please?
7     Q. Yeah. My question was: Between July 1 of
8 2020 and August 1 of 2020, during that one-month
9 period prior to Prestige Insurance Group, LLC
10 beginning operations as an Allstate Exclusive
11 Agency, did you provide the staff with any training
12 relating to any topic?
13     A. In a limited capacity.
14     Q. What training did you provide to them?
15     A. The --
16     Let me think about that.
17     I had a manager who would train with them.
18 And we would communicate -- I communicated with the
19 manager on, you know, basically, the progress of the
20 agents. You know, how they are --
21     And I'm trying to think back. Excuse me.
22     You know, anything that needed to be
23 addressed that we felt would be important, we would
24 train on, prior to, you know, them going to be
25 working from home. So anything that was relevant or

Page 65

1 needed to be discussed.
2     Q. Okay. What was the name of this manager?
3     A. Glen.
4     Q. Glen what?
5     A. I believe his last name was Ford.
6     Q. "Hunter" sound familiar?
7     A. That's the one. "Hunter." I'm sorry.
8     Q. How did you know Glen Hunter?
9     A. He was one of the agents or one of the
10 management that was terminated by Mint.
11     Q. And how were you in communication with
12 Mr. Hunter about what training they were -- the
13 agents were receiving, the individuals were
14 receiving, and what the status was of that?
15     A. We -- we had begin -- you know, there was
16 a time where we are -- you know, we want to train on
17 the quoting platform on the leads. You know, the
18 different aspects of the business.
19     And we would, you know, come up with,
20 basically, every day, you know, every morning around
21 9, 9:30, there was a meeting. And we always had
22 this the entire time the agency was open, where we
23 would address, you know, any housekeeping type of
24 thing; anything that needed to be discussed; if
25 there was a role-play; making sure they were, you

Page 66

1 know, explaining the benefits of Allstate and the
2 agents as a carrier; you know, the discounts that
3 they can offer, you know, for, you know, signing up
4 people early; signing up people for a week in
5 advance -- I'm sorry, or binding it a week early.
6 Just anything that needed be addressed. Missed
7 opportunities because they didn't explain something
8 properly, going into coverage explanation, that sort
9 of thing.
10    Q.   These were meetings that you, personally,
11 participated in every day?
12    A.   Not every day, but at times, yes. I
13 wanted to get to know the team.
14    Q.   There were meetings that took place
15 between --
16        Strike that.
17        There are meetings that took place with
18 the staff, or the people who eventually became the
19 staff, of Prestige Insurance; is that correct?
20    A.   That's correct.
21    Q.   And these were meetings that Glen Hunter,
22 typically, hosted each day?
23    A.   That's correct.
24    Q.   And they took place by Zoom, I take it?
25    A.   By Zoom.  And for a short period -- for a

Page 67

1 short period, I had a temp space, though I didn't,
2 kind of, get the technology all worked out, get
3 everything, you know, ready before everyone was to
4 set to start from home, basically.  So for about two
5 and a half, maybe three weeks, we met.
6    Q.   And this was -- these were meetings that
7 either you or Mr. Hunter hosted?
8    A.   That's correct; yes.
9    Q.   Were there written agendas for those
10 meetings?
11    A.   There was just more him and I discussing
12 prior to the meeting.
13    Q.   And just to be clear, during this period
14 of July 1, 2020 to August 1 of 2020, none of these
15 individuals, including Mr. Hunter, were actually
16 employed by the Prestige agency yet; is that
17 correct?
18    A.   That's correct.
19    Q.   With --
20    A.   Everything was contingent on the
21 appointment.
22    Q.   I see.
23        So the understanding was, they would serve
24 in this training role during this one-month period
25 and then, if and when the appointment took place,

Page 68

1 they would then become employed by Prestige
2 Insurance Group, LLC, correct?
3    A.   That's correct.
4    Q.   And there was no compensation paid to them
5 by Prestige Insurance Group, LLC during that
6 one-month period.  The understanding would be they
7 would be paid after; is that correct?
8        MR. HUBBARD:  I'm sorry, Bob; that
9     question seems confusing.  I'll object to form.
10        THE WITNESS:  Yeah; I don't recall
11     exactly --
12        Again, you're -- this -- you know, this
13     didn't start exactly on July 1st so it seems
14     like a longer period because you're using that
15     July 1st date.  It wasn't that long a period
16     that we're talking about.
17 BY MR. LIAN:
18    Q.   Okay.  Let me clarify the question, kind
19 of break it down.
20        I've been using July 1 through August 1 as
21 the period we've been discussing.
22        When did this training period with the
23 Rivas agency actually begin?
24    A.   I would say sometime in July, maybe 6th or
25 7th, something like that.

Page 69

1    Q.   During the month of July, am I correct
2 that Prestige Insurance Group, LLC did not issue any
3 sort of paychecks to any employees or staff who
4 eventually became employed with the agency; is that
5 correct?
6    A.   I don't recall when there was either a
7 first check from Prestige Insurance.
8    Q.   Nevertheless, the idea was they would be
9 in this training period during July and then when
10 they eventually began working for Prestige, that's
11 when they would become employees and become
12 compensated, correct?
13    A.   That's the -- yes, correct.
14    Q.   Just going back to Rivas -- Mr. Rivas for
15 a second.  What role, if any, did he play during the
16 month of July with regard to this training, other
17 than adding them -- adding the individuals to the
18 staff tool and registering them for the purposes of
19 allowing people to undertake the training?
20    A.   To the best of my reco -- recollection,
21 that's it.  He was not really...
22    Q.   Was his agency --
23        Sorry.  Go ahead.
24    A.   I was gonna say he was -- you know, again,
25 it was in the middle of COVID.

18 (Pages 66 - 69)

1    Q.   During that period of time, was --
2         Strike that.
3         During that period of time after you sign
4    the Asset Purchase Agreement with the Rivas agency,
5    was the Rivas agency continuing to sell insurance or
6    was it, essentially, acting as a hub, if you will,
7    for training for the staff that would eventually
8    become employed by Prestige Insurance Group, LLC?
9    A.   I don't recall if he continued selling
10   anything during that period.  I don't recall right
11   now.
12   Q.   Did any of the staff that were receiving
13   training through the Rivas agency during the July
14   time frame bind any insurance through the Rivas
15   agency?
16   A.   No.
17   Q.   Was that a specific plan or instruction
18   that you had given to staff, that there was to be no
19   insurance bound through the Rivas agency during the
20   month of July?
21   A.   They weren't appointed.
22   Q.   So they didn't have the ability to bind
23   insurance during that time frame, correct?
24   A.   Correct.
25   Q.   Was there any understanding or discussion

1    with the Rivas agency that -- that any activity that
2    the staff would be involved in would not involve
3    attempting to bind insurance?
4    A.   Can you restate that one more time?
5    Q.   Did you have any conversations with
6    Mr. Rivas about what would happen if a customer who
7    spoke with one of the staff that was in training
8    wanted to bind insurance at that time?
9    A.   Did I speak with Mr. Rivas about this?
10   Q.   Correct.
11   A.   I do not recall that right now.
12   Q.   Well, is it fair to say that Mr. Rivas was
13   largely out of the picture from the standpoint of
14   operating the Rivas agency during the month of July
15   of 2020?
16   A.   Yes, I would say that he was just there
17   for supporting for the eventual purchase and the
18   training.
19   Q.   What does an appointment with Allstate
20   allow an individual to do?
21   A.   I believe, bind policies.
22   Q.   In the absence of an appointment, what are
23   the limits on what someone is able to do?
24   A.   I'm assuming, a training.  I don't -- I
25   don't know how to answer that question.

1    Q.   Was there any sort of compensation
2    arrangement between you and Mr. Rivas in connection
3    with having the eventual staff of Prestige train in
4    the Rivas agency?
5    A.   No.
6    Q.   Did you have any sort of agreement or
7    understanding with the staff that was going through
8    training about what their compensation would be for
9    what they were doing during the month of July 2020?
10   A.   I would assume so; yes.  Yes.
11   Q.   What were the terms of that compensation
12   arrangement?
13   A.   A -- I'm trying to remember this but I
14   believe it was a monthly draw that was based off of
15   their production, which was an advance on
16   commissions for what they produce for that month.
17   And I believe there was a training pay at the very
18   beginning of the agency --
19       MR. HUBBARD:  I just want to clarify for
20   the record.  Are you talking that
21   arrangement was in place during the month of
22   July or was that an arrangement you made for
23   when they started?
24       THE WITNESS:  Correct, when they started
25   with Prestige on August 1st.

1 BY MR. LIAN:
2    Q.   All right.  Let me just make sure I'm
3    clear on that.
4         So was there -- What was the understanding
5    between you and the staff that was going through
6    training during the month of July as to what their
7    compensation would be for the month of July?
8    A.   That they would be compensated in August
9    at some point, because we couldn't -- they would
10   need to start selling first with -- which began
11   after August 1st.
12   Q.   Let me just make sure I'm clear on that.
13        So the understanding with them was that
14   they would be compensated beginning in August for
15   the work they performed in August, correct?
16   A.   Correct.
17   Q.   So my question was:  Was there any
18   understanding that you reached between the staff
19   that was going through training in July about what
20   their compensation would be for the month of July?
21   A.   It would be that training pay, again, paid
22   in arrears, if you will, in August.  Again, I'm kind
23   of going off of memory here.  But I believe that's
24   what it is.
25       MR. LIAN:  Andrew, can you pull up the

1     Agency Staff Agreement, please?
2  BY MR. LIAN:
3     Q.   Could you let us know, Mr. Cicciarelli,
4  when you see Exhibit 7 posted?
5        (Defendant's Exhibit No. 7 was marked for
6  identification.)
7  BY MR. LIAN:
8     Q.   You see that?
9     A.   I do.
10    Q.   This is a document that was produced to us
11  by the Plaintiffs in this case.  Is this an
12  agreement that your agency used with its staff?
13    A.   Yes.
14    Q.   And on the last page, it looks like
15  there's an acknowledgment from someone by the name
16  of Zachary Deitz dated July 24th, 2020.
17    A.   Uh-huh.
18    Q.   Was Mr. Deitz a -- an employee of the
19  agency?
20    A.   Yes.
21       MR. LIAN:  Andrew, can you pull up the
22    next exhibit number?  The tab is 19, Licensed
23    Sales Producer.
24  BY MR. LIAN:
25    Q.   I'm posting another document,

1  Mr. Cicciarelli.  Can you let us know when you see
2  the other document?
3       MR. LIAN:  This is going to be marked as
4    Exhibit No. 8.
5        (Defendant's Exhibit No. 8 was marked for
6  identification.)
7       THE WITNESS:  Okay.
8  BY MR. LIAN:
9     Q.   Do you see that?
10    A.   No, I don't -- there it is.
11    Q.   You are able to see it?
12    A.   Yes.
13    Q.   Could you tell us what Exhibit No. 8 is,
14  please?
15    A.   This is a -- document that we -- that I
16  provided for the agents to, kind of, explain to them
17  how the draw, training, and that sort of thing, gets
18  paid.
19    Q.   Okay.  And was this -- was this the
20  compensation structure that was made available to
21  all staff in your agency?
22    A.   I believe so.
23    Q.   There's a section here entitled:
24  Education and ramp-up pay.  Do you see that, of $14
25  hourly?

1     A.   Uh-huh.
2     Q.   "Yes"?  I'm sorry, you have to answer
3  "yes".
4     A.   Oh, sorry.  Yes.  Yes; I do see that.
5  Yes.  I'm sorry.
6     Q.   No problem.
7        Yeah.  So that's one of the ground rules
8  that I left out, that if I ask a question, you gotta
9  say "yes" or "no" if you know the answer so that
10  it's clear because Debby won't be able to take
11  grunts or other sorts of other --
12    A.   It makes complete sense.
13    Q.   -- signs of assent or dissent.
14       So was this education and ramp-up pay, is
15  that what was paid to the folks who eventually
16  became Prestige Insurance employees during that July
17  period?
18    A.   I believe it would be.  I don't have much
19  recollection, to be honest with you.
20    Q.   If you needed to, kind of, reconstruct
21  that further, how would you go about figuring out
22  exactly what the terms of compensation were during
23  that -- for folks during that July time frame?
24    A.   Can you repeat that question one more
25  time?

1     Q.   Yes.  So if we wanted to try and get to
2  the bottom of exactly how the folks who eventually
3  became Prestige staff members were compensated
4  during that July time frame, where would you look,
5  besides a document like this?  Is there anyplace
6  else you'd look to, kind of, refresh your
7  recollection of exactly how the compensation was
8  structured?
9       MR. HUBBARD:  Again, Bob, I'm gonna object
10    to the form.  You said they were being
11    compensated "during" July as opposed to "for"
12    July.
13  BY MR. LIAN:
14    Q.   Yeah, so to clarify the question, "for
15  July."
16       I think you testified that they did not
17  receive compensation during July, but for July.
18       I'm just trying to understand the full
19  scope of the compensation arrangement that you had
20  with staff who were undergoing training.  And I
21  think you testified that you believe they were paid
22  $14 per hour for that time frame?
23    A.   Based on this document, that would be an
24  assumption I would make.
25    Q.   Okay.  Was there any discussion or

Page 78

1 arrangement with the staff who were undergoing
2 training about how they would be compensated for
3 business that was quoted during July that was bound
4 in August?
5    A. It would -- if it was --
6       Repeat that one more time. And again, I
7 want to answer it accurately and make sure I
8 understand it correctly, clearly, what you're
9 asking.
10    Q. So my question was: Did you have any
11 discussion or understanding with members of the
12 staff who were undergoing training in July about
13 what compensation they would receive, if any, for
14 business that they quoted during July that was bound
15 in August after the agency opened.
16    A. They would be paid a commission based on
17 their sales.
18    Q. And the sales that you're referring to
19 were the quotes that they were making in the July
20 time frame; is that correct?
21    A. If they were able to bind them in August
22 and it led to, you know, a -- a customer and, you
23 know, at the end of August, they would be
24 compensated for it.
25    Q. There are some documents that I

Page 79

1 understand --
2       Well, strike that.
3       I understand that there were a number of
4 quotes that the staff members who are undergoing
5 training made that were then bound in the first
6 couple of days your agency opened; is that correct?
7    A. That's correct; once I was appointed.
8    Q. Okay. Prior to that appointment --
9       Well, strike that.
10       After that appointment, it seemed like,
11 from the records, that there were a large number of
12 policies that were bound the first or second or
13 first few days of August; is that correct?
14    A. Yes.
15    Q. Do you remember approximately how many
16 were bound by the Prestige agency once it opened in
17 those first couple of days of August?
18    A. I do not recall exactly how many policies,
19 no.
20    Q. And I think the records indicate that
21 August 1st, 2020 was a Saturday. Is that your
22 recollection?
23    A. Yes.
24    Q. So there were quotes that were issued to
25 customers during the days prior to that Saturday,

Page 80

1 correct?
2    A. Correct.
3    Q. And as soon as the agency got its
4 appointment on August 1st, those quotes were then
5 bound, correct?
6    A. That's correct.
7    Q. And is it -- is it -- is it correct to say
8 that in most cases, that it was unnecessary to go
9 back and have a further conversation with the
10 customer, is that correct, before that binding took
11 place?
12    A. No, that's not correct.
13    Q. So with respect to the policies that were
14 bound on August 1st of 2020 by the Prestige
15 Insurance Group, LLC, how many of those, and how
16 many instances, did the agency or staff member go
17 back and talk to the customer again prior to that
18 insurance being bound on August 1st?
19    A. I guess it would depend. But I don't know
20 the answer to that question, as far as the number.
21 I really don't know. I don't know the number, no.
22    Q. But is it correct to say that there was,
23 in effect, a pipeline of quotes that were issued
24 prior to August 1, 2020 that were ready to be bound
25 and that were in fact, bound without a further

Page 81

1 conversation with a customer?
2    A. If we were able to, yes. To answer your
3 question, yes. In some instances, yes.
4    Q. Approximately how many instances were
5 there where that took place?
6    A. I have no idea.
7    Q. So is it correct to say that, in effect,
8 for those where there was no further conversation
9 with a customer that took place on August 1st
10 prior to binding, that the sale of that insurance
11 had already -- had already taken place with the
12 customer, the customer had already agreed to buy
13 insurance pending the binding on August 1st?
14    A. I would say that they have shown interest,
15 and especially if they gave a -- their payment and
16 set the expectation that this policy, it will go
17 into effect on August 1st.
18    Q. Okay. So for the -- for the quotes that
19 agency -- the quotes that the staff was making while
20 under training with the Rivas agency, in how many
21 cases were payments being collected by the staff?
22    A. I don't know the answer to that question.
23    Q. Was it, in fact, the case that payments
24 were collected from customers prior to August 1st,
25 2020?

21 (Pages 78 - 81)

Page 82

1    A.   No.
2    Q.   So no customer paid anything prior to
3 August 1st, 2020?
4    A.   Things are collected at the time you buy
5 the policy, correct?
6    Q.   You tell me.  Is that the case?
7    A.   I guess, if you can further clarify your
8 question.
9    Q.   Yeah, let me ask it this way:  So in how
10 many instances prior to August 1st, 2020 had a
11 member of the -- eventual member of the Prestige
12 staff, essentially, closed a sale for insurance with
13 a -- an agreement that the insurance would be bound
14 on August 1st?
15    A.   I don't think that question is very clear,
16 to be quite honest with you.
17        Again, no payments are done or collected
18 until August 1st going by --
19    Q.   My question wasn't about payment.  My
20 question was:  About in how many instances the
21 insurance --
22        Strike that.
23        In how many instances the staff, who was
24 undergoing training with the Rivas agency, had, in
25 effect, closed a sale for insurance with a customer

Page 83

1 with the understanding that that insurance would be
2 bound on August 1st.
3    A.   I don't remember the number of instances.
4    Q.   You don't know the number of instances?
5    A.   No.
6    Q.   Okay.  That information then would
7 indicate that there were approximately 256 policies
8 bound by the Prestige agency on August 1st, 2020.
9 Is that consistent with your recollection?
10    A.   I don't know the exact number.
11    Q.   Does that sound approximately right, from
12 your recollection?
13    A.   I don't know.  I don't know. I mean, it
14 was -- we got policies on August 1st.
15    Q.   Over 200?
16    A.   Quite possibly.
17    Q.   Tell us how the mechanics of that work.
18 What happened on August 1st that led to these
19 hundreds of policies being bound on that day?
20    A.   The -- again, the way that these
21 businesses -- you know, again, we presented
22 coverages with customers, if they were interested in
23 the policy.  If we took their payment information,
24 put it into the system, and that's the only time
25 that we could, essentially, bind it without their,

Page 84

1 you know, authorization for that day, but with that
2 expectation, again, for:  Your policy will go into
3 effect August 1st.
4        Otherwise, agents would need to get
5 payment information to bind those policies.
6        So I don't know if those 200 or so
7 policies -- I'm not even sure if I'm clearly
8 answering your question because I'm not completely
9 clear on the question, but I'm trying to answer your
10 question for you.
11    Q.   Yeah, so let's -- let's talk about what
12 happened specifically on August 1st of 2020.
13    A.   Uh-huh.
14    Q.   Walk us through, for the record, what
15 happened on August 1st on 2020 beginning, you
16 know, when you first started work that morning that
17 led to more than 200 policies being bound by the
18 Prestige Insurance Group, LLC that morning.
19    A.   All right.  If an agent had discussed with
20 the customer that -- or potential customer, that
21 they, you know -- and, again, if you want to call it
22 "pipeline," but, you know, they bound whatever they
23 had made those arrangements with those customers and
24 moved forward with binding those policies for those
25 that they had maybe information for in the system

Page 85

1 and -- those that did it, and obviously, contact
2 them to get that information.  The information was
3 collected to bind those policies.
4        So obviously, the customer would -- wanted
5 the policy and knew the expectation that we would
6 have to bind this on August 1st.
7    Q.   What was the mechanics of how those
8 policies got bound?
9        So in other words, it sounds like these --
10 the staff that eventually went to work for Prestige
11 was issuing quotes, collecting payment information,
12 and doing all the things to sell insurance to
13 customers and prospective customers and then
14 effective August 1st, there were some steps taken
15 to finally bind those policies.
16        And what my question is, is:  What
17 happened on August 1st that -- mechanically, that
18 wound up with those policies becoming bound?
19        I mean, in other words, didn't -- did the
20 staff pull up a quote that had previously been
21 issued and then just hit a button to effectuate the
22 binding?
23        Walk us through how that worked.
24    A.   The process to the mechanical -- you know,
25 the mechanics behind it were provided by Allstate's

22 (Pages 82 - 85)

Page 86

1 Agency Process Specialist Jarius Hollanger on how to
2 open the quotes that we had under the Rivas Group
3 and bind them under the Prestige Insurance Group.
4      And we documented it so that we can
5 understand how to do that.
6      Q.  Can you tell us about what that process
7 was that Mr. Hollanger provided to you?
8      A.  Open the quote in the Rivas Group.  We had
9 to make -- you know, they had to make some changes
10 to put it under Prestige, and then bind it.
11     Q.  And who was Mr. Hollinger?
12     A.  He is an Agency Process Specialist that
13 was assigned to me by Allstate.
14     Q.  And when did this discussion with
15 Mr. Rivas or Mr. Hollinger take place?
16     A.  I believe he sent the documents the day
17 before August 1st.  Either July 31st, July
18 30th, something to that extent.
19     Q.  And what is this document that you're
20 referring to?  Is it an e-mail, or some other form
21 of communication you received from Mr. Hollinger?
22     A.  It's one of the documents that -- it was
23 an e-mail and it was with an attachment.
24      It's one of the documents I provided to
25 you.

Page 87

1      Q.  Okay.  Did you have a discussion with
2 Mr. Rivas --
3      Excuse me.  Strike that.
4      Did you have a discussion with
5 Mr. Hollinger about this issue?
6      A.  What issue?
7      Q.  About how to take a quote that was issued
8 under the Rivas agency and bind it under the
9 Prestige agency.
10     A.  We had discussed this prior.  I mean, the
11 quoting and everything was very well known from all
12 the sales leaders within Allstate leading up to
13 this.
14     Q.  You're referring to the quoting that was
15 being done by the staff of your agency?
16     A.  Correct.
17     Q.  While they were undergoing training with
18 the Rivas agency?
19     A.  Correct.
20     Q.  Okay.  And by whom was that well known?
21     A.  I would have to -- obviously, Kaylee,
22 Jarius, and anyone in the sales leadership
23 management chain within Allstate who met on quoting,
24 staffing, every week to discuss the numbers.  Char
25 Jordan.

Page 88

1      Q.  It's your testimony that they were all
2 aware that the agency was issuing these quotes prior
3 to August 1st, 2020?
4      A.  I don't understand how they could not know
5 that part.  And it is my understanding that they
6 do -- they were well aware of it.
7      Q.  Tell us about the basis of that
8 understanding, please.
9      A.  In conversations with Kaylee Colvard --
10 and, again, the fact that, you know, again, Jarius
11 provided, you know, detailed instructions on how to
12 do it.  Yeah.  Yeah.
13      That the conversations, you know, Kaylee
14 said, you know, we are both, you know, realize we're
15 getting investigated, we're like:  What is going on
16 here?
17      It's about that everyone knows, everyone
18 within Allstate.  We meet on this every week she had
19 mentioned about staffing, quoting, and understanding
20 where -- you know, what was going on.
21     Q.  When did these conversations with Kaylee
22 Colvard take place?
23     A.  Once the, you know, I told her I'm getting
24 investigated, apparently.  And --
25     Q.  I'm sorry could you repeat that, please?

Page 89

1 I missed that.
2      A.  Once I found out that I was getting
3 investigated and reached out to her and said:
4 What's going on here?  How am I getting
5 investigated?
6      I mean, everything that transpired prior,
7 during, and, you know, was in complete transparency
8 and communication and collaboration with my Allstate
9 counterparts.
10     Q.  So I want to be clear.  It's your
11 testimony that prior to August 1st, 2020, you had
12 conversations with Kaylee Colvard about issuing
13 quotes while individuals were working under the
14 Rivas agency that would be bound after August 1st
15 of 2021, once the --
16     A.  Yes.
17     Q.  -- once the Prestige agency began
18 operations?
19     A.  That's correct.
20     Q.  Okay.  And what I wanted to try to do is
21 understand when those conversations took place,
22 specifically.
23     A.  During July.
24     Q.  How many conversations did you have with
25 her?

23 (Pages 86 - 89)

1    A.  I don't recall.
2    Q.  More than one?
3    A.  My understanding is -- I would -- yes, I
4  would say more than once.
5    Q.  How many conversations total would you say
6  there were?
7    A.  I have no idea.
8    Q.  Was anybody else present during these
9  conversations or is it just the two of you?
10    A.  It was just her and I having a
11  conversation.
12       Remember, I only met her one time face to
13  face, so everything was typically done through, you
14  know, e-mail and that's what it is.
15       MR. LIAN:  Andrew, could you pull up
16  document 14, please?
17       We're gonna introduce another exhibit.  I
18  believe we're on 9 now?
19       THE COURT REPORTER:  Yes.
20       (Defendant's Exhibit No. 9 was marked for
21  identification.)
22  BY MR. LIAN:
23    Q.  This document, Exhibit 9, is titled:
24  Agent Pre-Appointment Agreement for Allstate
25  Exclusive Agency Program.

1       I'd like you to let me know,
2  Mr. Cicciarelli, when you see it posted in the
3  exhibit tool.
4    A.  Okay.  Not yet.
5    Q.  You see it now?
6    A.  Let me refresh.
7       I do now, yes.
8    Q.  Okay.  If you look on the last page of the
9  document, it looks like it's got your electronic
10  signature on there dated May 20, 2020.
11       Do you see that?
12    A.  Yes, I see that.
13    Q.  Is it correct that this is an agreement
14  that you signed that was designed to govern the
15  period of your relationship with Allstate prior to
16  August 1st, 2020 when you became an exclusive
17  agent?
18    A.  I believe so, yes.
19    Q.  Okay.
20       MR. LIAN:  Andrew, could you go to 15,
21  file 15?
22       And we're gonna mark this as Exhibit
23  No. 10.
24       (Defendant's Exhibit No. 10 was marked for
25  identification.)

1  BY MR. LIAN:
2    Q.  All right.  I just posted Exhibit No. 10,
3  which is a series of text messages that I believe
4  were produced by Plaintiffs in this case.
5       Do you see those?
6    A.  It's coming up now.
7       Uh-huh.  I see them, yes.
8    Q.  Okay.  I'd like to make sure I understand
9  how these -- what goes with what here.  So I'm
10  looking at the first page here and it says:  "Do you
11  know when I'll have my own MMS?"
12    A.  Uh-huh.
13    Q.  This is a text from you to Ms. Colvard; is
14  that correct?
15    A.  Yes.
16    Q.  Okay.  And then the response is from
17  Ms. Colvard:  I would think soon, but remember your
18  people can't write business under your MMS until you
19  are UPenn, and then she corrects that and says
20  "open".
21       That was a response from Ms. Colvard?
22    A.  Correct.
23    Q.  And then your response says:  Okay.  That
24  makes sense.  Can they bind -- can they quote as
25  long as they don't bind?

1       And her response is:  "Nope."
2       You see that?
3    A.  Uh-huh.
4    Q.  "Yes"?
5    A.  Yes.
6    Q.  Okay.  That was a response she gave back
7  to you to your request?
8    A.  Yes.
9    Q.  All right.  You write back and you said:
10  "Well that sucks.  Is there a way to quote and build
11  pipeline under Garry's MMS and then bind them on
12  August 1st?"
13       You see that?
14    A.  Yes.
15    Q.  Okay.  What does she say?
16    A.  "Yup."
17    Q.  And it says:  "We can run a safe quote
18  audit under Garry's number and export to Excel and
19  still have sfl ids and quote ids to pull up and bind
20  day one."  Do you see that?
21    A.  Yes.
22    Q.  And then you write back and say:
23  "Perfect."
24    A.  Yes.
25    Q.  Did you have any conversations with

Page 94

1 Ms. Colvard about this topic, other than what's
2 reflected here in the text exchange?
3    A.  I would have to imagine so.
4    Q.  Do you recall any specifically?
5    A.  Not specifically, but there was -- very
6 well known what the intention was here and what I
7 was trying to accomplish.
8    Q.  Why was it well known?
9    A.  It's even taught to you when you're in the
10 industry training.  It was discussed, you know,
11 about hitting the ground running, how important it
12 is, you know, by Jim Uschelbec and all the speakers
13 there.  I believe Bob Sheely was another speaker
14 that was there.  I mean, everyone explained the
15 importance of hitting the ground running.
16    Q.  And you took that to mean that your staff,
17 who were not appointed, could, essentially, sell
18 insurance and then have that insurance bound on day
19 one?
20    A.  They couldn't sell until August 1st when
21 they were Prestige Insurance agents.
22    Q.  And when you use the word "sell" --
23    A.  Bind.
24    Q.  Bind?
25    A.  Yes.  Bind the policy.

Page 95

1    Q.  But, in effect, the -- from what you
2 testified to earlier, all of the customer
3 interaction to accomplish that binding would have
4 taken place prior to August 1st, at least, with
5 regard to a very large number of the quotes that
6 were eventually bound on August 1st; is that
7 correct?
8    A.  Can you repeat that again?
9    Q.  With regard to the vast majority of
10 policies that were bound by the Prestige agency on
11 August 1st --
12    A.  Uh-huh.
13    Q.  -- there was no further customer action
14 that was necessary prior to that binding on August
15 1st.  In other words, your staff had already done
16 all the customer interaction that was necessary to
17 bind the insurance on August 1st; is that correct?
18    A.  I can't speak to -- to all of them, you
19 know, or with -- to all of them regarding that.
20       There was -- maybe they called them back
21 or something.  I don't know the answer to that
22 question.  I don't know.
23       I mean, collected credit card information
24 and put it in the system.  We had a follow-up.
25       I don't know the answer to that question.

Page 96

1       We just knew that, as you can state here,
2 that was the intention.  This is back in June.
3    Q.  The plan was, however, to hold those
4 quotes that were being issued during July until
5 August 1st; is that correct?
6    A.  We had no other choice but to do that.  I
7 didn't have an appointment until August 1st.
8    Q.  And they wouldn't be bound by the Rivas
9 agency or anybody who was appointed by the Rivas
10 agency, correct?
11    A.  Correct.
12       My agents weren't even appointed with the
13 Rivas agency.
14    Q.  If somebody --
15    A.  The future Prestige agency.  Let me
16 clarify that.
17    Q.  If a customer and one of the future
18 Prestige employees was speaking with prior to August
19 1st wanted to bind insurance right away --
20    A.  Uh-huh.
21    Q.  -- what would happen?  What was the plan?
22    A.  They would need to contact Allstate
23 direct.
24       In some instances, that's what they did.
25    Q.  Looking back at Exhibit No. 10, the text

Page 97

1 exchange, was -- I noticed that the second block on
2 the right-hand side of the page that we were just
3 looking at doesn't have a date on it.  Was that also
4 on July 16th, 2020 -- or excuse me, June 16th,
5 2020 that this exchange took place?
6    A.  Does that look like June 16th?
7       I'm sorry.  What was the question?
8    Q.  I guess my question is, is:  Did this
9 exchange take place on the same day, these two text
10 blocks?
11       And I'm just -- we have the date reference
12 on the left-hand text block that is copied here.
13 And I'm wondering if the right-hand text block
14 occurred on that same day.
15    A.  I would have to assume so.  I don't -- I
16 don't know.  I...
17    Q.  Let me just make sure that I understand
18 the timing of all this correctly.
19    A.  Uh-huh.
20    Q.  So we've been talking about the training
21 that your -- that the folks who eventually became
22 employees of Prestige underwent during the month of
23 July, and quotes that were issued during July.
24       This text exchange with Ms. Colvard looks
25 like it took place in mid-June.

25 (Pages 94 - 97)

Page 98

1    A.  Uh-huh.
2    Q.  My question is:  Prior to July 1 of 2020,
3  was any -- were any individuals who eventually
4  became employed by the Prestige agency involved in
5  issuing quotes to customers at any point?
6    A.  Prior to July 1?
7    Q.  Yes.
8    A.  Not for Prestige Insurance.
9    Q.  So to the extent they were, it would have
10  been in connection with some other agency --
11    A.  Correct.
12    Q.  -- who they may have been working with at
13  the time?
14    A.  They were -- that's correct.
15     They were probably still employed by
16  another agency at that point, if they were an
17  experienced hire.
18     Or someone like Tara Ward, who was just
19  trying to get her, again, Level 1, Level 2 bindings,
20  that sort of thing.
21    Q.  Tara Ward is the individual referenced on
22  the text exchange on the Exhibit 10 we were just
23  looking at?
24    A.  Yeah.
25    Q.  You said they were not issuing these

Page 99

1  quotes on behalf of Prestige.  Were there any quotes
2  issued on behalf of the Rivas agency, to your
3  knowledge, prior to July 1, 2020?
4    A.  No.
5    Q.  So you waited until the Asset Purchase
6  Agreement was finalized before starting that
7  process?
8    A.  Yeah.
9     Again, it wasn't even at that point, but
10  yeah.  Yeah, I guess that would be -- it was after,
11  after the Asset Purchase Agreement was signed.
12    Q.  How many of the individuals who were
13  affiliated with the Rivas agency for purposes of
14  training during the month of July had previously
15  worked for another Allstate agent?
16    A.  I have no idea.
17    Q.  I think you said that there were
18  approximately 15 or 20 that went through this
19  training with the Rivas agency; is that correct?
20    A.  Yes.  But I don't know how many were
21  experienced, worked at Allstate agencies before, you
22  know.
23    Q.  You had worked at the Paragon agency prior
24  to becoming affiliated with Allstate as an exclusive
25  agent, correct?

Page 100

1    A.  Correct.
2    Q.  During -- and I think you testified that
3  you went through training for a period of time with
4  the ProVest agency?
5    A.  As a Level 1 and Level 2 so I could get
6  binding authority with Allstate.
7    Q.  Okay.  Was the --
8     And I think you testified that the Paragon
9  agency was a -- an agency that was eligible for the
10  enhanced compensation program?
11    A.  Paragon, correct, yes, it is.
12    Q.  Okay.  During the month or so of time that
13  you were undergoing training at the ProVest Agency,
14  were you involved in the sort of quoting activity
15  that you saw occurring with the Rivas agency?
16     In other words, was -- was the staff that
17  eventually went to work for the Paragon agency
18  involved in issuing quotes that were held and then
19  bound on the first day that the Paragon agency was
20  opened?
21    A.  No.  It was a different situation.
22  ProVest continued to operate as ProVest after
23  Paragon opened.  There were --
24     Where, in my situation, I ended up
25  purchasing the Rivas Group.  There are two different

Page 101

1  scenarios.
2    Q.  Is it your testimony that during the
3  training you received from Allstate, that you
4  received instructions that it was permissible to
5  issue quotes during the training period that you
6  could then bind on day one, once of the agency was
7  open?
8    A.  Which training?  I'm sorry, just to
9  clarify.
10    Q.  In any training that you, Mr. Cicciarelli,
11  you received personally from Allstate, is it your
12  testimony that that training involved instruction
13  that said it was permissible to issue quotes prior
14  to receiving binding authority prior to an
15  appointment from Allstate that could then be bound
16  on the first day that the exclusive agency agreement
17  is effective?
18    A.  I was providing guidance, if that answers
19  your question.  I mean, obviously, the document from
20  Jarius kind of speaks to that, the step-by-step
21  instructions on how to do it.
22     Again, I operated with complete
23  transparency and again, in coordination and constant
24  communication with my Allstate counterparts.  So I
25  don't know if that directly answers your question,

26 (Pages 98 - 101)

1 but that was it.
2        (Off the record discussion.)
3 BY MR. LIAN:
4    Q.   Let me break it down a little bit further,
5 Mr. Cicciarelli.  So during the --
6        Well, let me take a step back.
7        What formal training did you receive from
8 Allstate prior to becoming an exclusive agent?
9    A.   Level 1 and Level 2 training from -- from
10 Allstate to become an agent, you know, to get the
11 appointment to become an agent.
12        And then I also did my Agency Sales
13 Academy, which is an approved Allstate -- you know,
14 at the time, at least, an approved Allstate
15 training.
16        I guess, on a formal level, it was
17 on-the-job training that would be the formal
18 training that I received.
19    Q.   Okay.  With regard to this Level 1 and
20 Level 2 training, was that training that you
21 underwent prior to starting work with the Paragon
22 agency or was that training that you undertook prior
23 to and in the lead-up prior to becoming an exclusive
24 agent?
25    A.   No, that was done prior to Paragon.

1    Q.   And the same question with regard to the
2 Allstate Sales Academy.  Was that training that you
3 undertook prior to Paragon or in the lead-up to
4 opening an R3001 exclusive agency?
5    A.   It's Agency Sales Academy.
6    Q.   Uh-huh.
7    A.   It was an Allstate-approved training and I
8 did that with the ProVest, again, leading up to
9 Paragon, in preparation for Paragon.
10    Q.   Was that Agency Sales Academy, you said it
11 was approved by Allstate.  Is it actually
12 Allstate-provided training or provided through some
13 other source?
14    A.   A third party.  I don't even know if they
15 exist anymore.  At the time, it did.
16    Q.   And then you said that you received
17 various on-the-job training as well?
18    A.   Oh, I worked the position.  I was a sales
19 producer, and then a manager.  So...
20    Q.   And in either of the L1 or L2 training, or
21 the Agency Sales Academy, was there any ever -- was
22 there any training ever given to you by anybody at
23 Allstate that said that it was permissible to issue
24 quotes prior to getting an appointment, prior to
25 having an agency, that would then be bound on the

1 first day that the agency's open?
2    A.   No.  Those trainings are irrelevant to
3 agency ownership entirely.
4    Q.   All right.  I'd like to walk through some
5 of the other text messages that we have here and
6 make sure that I understand what each of these is.
7        So we looked at the first two boxes that
8 looked like they were from the June 16th time
9 frame.
10        The bottom two boxes on the first page of
11 exhibit 10, can you tell us what that exchange
12 reflects?
13    A.   I'm sorry.  Are you saying Exhibit 10?
14    Q.   Yes, sir.
15    A.   I see something to a Hart, Leigh or Leigh
16 Hart to you --
17        Which one are you talking about?  I'm
18 sorry.
19    Q.   There are two boxes on the bottom of page
20 10 and I'm curious what they -- what they are --
21 what that exchange reflects and who it's with.  I
22 guess it's with Kaylee Colvard, the one on the
23 left-hand.
24    A.   Uh-huh.
25    Q.   Okay.  It looks like you text her and

1 asked her for any updates on MMS access.
2        And then below that, you ask about Tara
3 Ward getting Level 1 binding, for some reason.
4    A.   Didn't get into Level 1 binding.
5    Q.   Okay.  Is that a training?
6    A.   That's Allstate's -- that's Allstate's
7 training Level 1 and Level 2 binding.
8    Q.   All right.  And what's the next box over
9 on the right?  What is that?
10    A.   I can't see that, to be very honest with
11 you.  I don't even know if that's from me or --
12        I'll try to zoom in as much as possible
13 here but...
14        Yeah; I don't -- I don't -- I can't make
15 that out.  I don't know if you can, but I'm zoomed
16 in all the way as well.
17    Q.   Okay.  It looks like -- if you go to the
18 next page, it looks like the next various exchanges
19 all seem to relate on this page -- the second page
20 all seems to relate to Tara Ward and getting her --
21 this Level 1 and Level 2 training; is that correct?
22    A.   Let me -- bear with me because I hit the
23 wrong arrow.  I tried to shrink it back down and I
24 went five or six pages in advance.
25    Q.   Okay.

27 (Pages 102 - 105)

1    A.   There's my dog.
2        All right.  So I'll go to the next page?
3  I'm on page 1 of 7.
4    Q.   It would be page 2 of 7.
5    A.   Page 2 of 7.  Okay.
6    Q.   Yes.  And this appears to relate to the
7  Tara Ward training issue.
8    A.   Yeah, it seems like it's conversation, but
9  it seems like it's the conversation -- I don't know
10 what --
11       There's a Tara Ward loaded under -- into
12 Level 1/2, but under another agent.
13       It should be under Garry.
14       "What do I need to do?"
15       So I'm assuming I'm -- I'm on the
16 left-hand side, that I notice.  Yeah, I guess I'm on
17 the left-hand side.
18   Q.   Okay.
19   A.   Hold on, I'm Investigating.
20   Q.   It looks like on the next page, page 3 of
21 7 --
22   A.   To me, it looks like -- sorry.
23   Q.   Go ahead.
24   A.   I was gonna say, these look, because it
25 says:  Please keep me posted on Tara.  We're

1  binding.  Garry's AU -- it looks like these were
2  before the last one.
3        Hold on one second, I went to the wrong
4  page.  Okay.
5        Is it 7?
6        MR. HUBBARD:  Just for the record, it
7    seems like everybody's, kind of, guessing at
8    what these dates are or what their response
9    is --
10       THE WITNESS:  Yeah.
11       MR. HUBBARD:  -- and I just want to
12   clarify that for the record, that there seems
13   to be some speculation in regards to these.
14 BY MR. LIAN:
15   Q.   Yeah, I guess since they're your texts,
16 I'd appreciate you -- if you could tell us
17 whether -- whether, in fact, these days that are
18 reflected on these texts are the dates on which
19 these exchanges occurred.
20       So that's what I was gonna direct you to
21 on page 3.  It looks like there's another date of
22 Tuesday, June 16th.  And it reflects or discusses
23 Monica Hurkett in training and she was supposed to
24 get --
25       Two questions on that.  Is June 16th

1  your best recollection as to when this exchange took
2  place?
3        THE WITNESS:  Yes.  It wouldn't surprise
4    me.
5  BY MR. LIAN:
6    Q.   Okay.  You have no reason to doubt or
7  question whether these conversations were taking
8  place by text on June 16th, 2020, correct?
9    A.   Correct.
10   Q.   And was your -- were the members of the
11 folks who eventually became your staff at Prestige,
12 were they already undergoing some form of training
13 from Allstate as of June 16th of 2020?
14   A.   When -- yes, apparently.  But they were --
15 this was -- this was when the -- yes, to answer your
16 question.
17   Q.   When did -- what was the earliest date on
18 which individuals who eventually became employed by
19 Prestige began undergoing training specifically for
20 the purposes of working with Prestige?
21   A.   I don't know how much sooner than this
22 because -- or how much earlier than this.  It
23 couldn't have been too much earlier.
24       THE VIDEOGRAPHER:  Excuse me, Counsel.  I
25   need to switch media units.  Could we go off

1  the record?
2        MR. LIAN:  Sure.
3        THE VIDEOGRAPHER:  We are off the record
4    at 11:58 A.M.
5        (A break was taken at 11:58 A.M.)
6        (Return from break was at 12:10 P.M.)
7        THE VIDEOGRAPHER:  This begins Media Unit
8    3.
9        We are back on the record at 12:10 P.M.
10 BY MR. LIAN:
11   Q.   Okay.  Mr. Cicciarelli, I want to go back
12 to the text messages that were in Exhibit No. 10 and
13 direct your attention to the fourth page.
14       Tell me when you're there.
15   A.   I'm here.
16   Q.   And if you could just walk us through what
17 it is we're looking at.  What is the communication
18 reflecting with whom?
19   A.   I'm assuming this is with Kaylee. Green.
20   Q.   And you're assuming that why?
21   A.   Because she's asking how my hiring is
22 going.
23   Q.   Okay.  And the black is -- the black in
24 text is your response, the box with a lighter
25 outline is Ms. Colvard's?

1   A.  The green would be Kaylee.
2   Q.  Yeah --
3   A.  And I would be in the --
4   Q.  Yeah.  I have black on my copy, but the
5 green -- the green would be Kaylee's and the other
6 would be yours, correct?
7   A.  Yeah, the:  "How's hiring going?" that
8 would be Kaylee.
9       And then I'd be on the left-hand side.
10   Q.  And then in the next block over, the upper
11 right-hand block, it looks like it's dated Monday
12 July 6, correct?
13   A.  Uh-huh.
14   Q.  "Yes"?
15   A.  Yes, correct.
16   Q.  That would have been Monday July 6, 2020?
17   A.  Correct.
18   Q.  Lower right-hand corner, there's a text
19 that says:  "Has everyone checked their Internet and
20 computers to make sure no issues with their systems
21 at home?"
22       And the answer is:  "Yes they're
23 pre-binding as we speak."
24   A.  Are you on page 5 now or --
25   Q.  No, I'm on page -- page 4 still, in this

1 lower right text box.
2   A.  Okay.  Let me see if I scroll.  Okay.
3 Sorry.  There's more below.
4   Q.  Do see that?
5   A.  Yes.
6   Q.  When did that exchange with Ms. Colvard
7 take place?
8   A.  If this is in order, I'm assuming sometime
9 the beginning of July.
10   Q.  And Ms. Colvard was inquiring about
11 whether people have the right connections and their
12 connections were effective.
13   A.  It seems to be, yes.
14   Q.  What was going on this day that --
15       Was there training going on?
16       Is this all part of the same exchange that
17 we saw on the top part of the page?
18   A.  Yes.  These are people that have already
19 completed at that -- at this point.  Yes, it would
20 be -- they certainly would've completed all of Level
21 1 and Level 2, if they were already experienced and,
22 you know, hired from Allstate.
23   Q.  How are you concluding that?
24   A.  Well, by reading the other messages
25 saying:  "Yes they're pre-binding as we speak."

1   Q.  What is that referring to?
2   A.  Pre-binding is, basically, we would review
3 their -- you know, Glen would review their quote,
4 make sure everything is accurate on the quote and
5 that it is, you know, compliant, if you will.
6   Q.  Was that Glen's job to do that?
7   A.  Among other things, yes, he would do, you
8 know, check pre-binds.
9   Q.  What does that mean exactly?  What does
10 checking pre-binds mean?
11   A.  Pre-binds are, basically, make sure they
12 didn't declare any insurance and if they did, they
13 have a letter of experience from the prior carrier.
14 Just making sure that, you know, there aren't any
15 mistakes, basically, in a quote that would then
16 become a policy at a future date.
17   Q.  Okay.  Did Mr. Hunter have a job
18 description that laid out what his job
19 responsibilities were?
20   A.  It was essentially, I believe, what he had
21 been doing so it was a continuation of, you know,
22 just being a sales manager and, you know, oversee
23 the operations on the sales...
24       THE COURT REPORTER:  I'm sorry.  You
25   drifted off a little bit.  "Oversee the

1   operations."
2       THE WITNESS:  On the sales floor with the
3   sales agents.
4 BY MR. LIAN:
5   Q.  How is he -- You say "on the sales floor."
6 These people were working remotely; is that correct?
7   A.  Yes.  Yes.  Well, you know, as of August
8 1st.  On August 1st.  For a couple of weeks --
9 with a few weeks, there was -- we were training on
10 site at a temp location.
11   Q.  Was this text exchange sent at a time when
12 people were on site at a temporary location?
13   A.  If this was July 7th, yes, it would seem
14 so.  And there was still agents that were remote as
15 well.
16   Q.  Okay.  All right.  And then on the next
17 page of Exhibit No. 10 it looks like there's a text
18 from Saturday, August 1, 5:45 P.M. do you see that?
19   A.  Uh-huh.
20   Q.  "Yes"?
21   A.  Yes.  Yes.  Yes.  Sorry, yes.
22   Q.  And is this with Ms. Colvard again?
23   A.  Yes.
24   Q.  And you text her and say:  "Not a bad
25 first day."

Page 114

1    It looks like -- and she asks how much
2 premium there was, "And did you remember to close
3 out?"
4    And then your response is: About 350,000.
5 "Still have some trickling in. I'll make sure to
6 remit when they finish."
7    A.  Yes.
8    Q.  And she has the question: "Today" with a
9 number of question marks after it.
10    Do you see that?
11    A.  Yes.
12    Q.  Do you know why she had the question --
13 had so many question marks after "today"?
14    A.  I'm assuming she wanted clarification.
15    Q.  Surprised to see 350,000 the first day?
16    A.  I think it was -- I assume so.
17    Q.  Okay.  And then she asks you -- you put a
18 smiley face in and then you say: "Are you serious?"
19    A.  She asked it.
20    Q.  She says: "Are you serious?"
21    And you say: "Of course."
22    A.  Yes.
23    Q.  All right.  And then the next page, it
24 says: "Stay close to your email hoping to have
25 moratorium lifted tomorrow morning."

Page 115

1    What does that refers to?
2    A.  It is a binding moratorium, meaning if
3 there is a named storm, or like a hurricane, they
4 may -- they may restrict -- excuse me -- they may
5 restrict certain coverages that you can give during
6 that named storm.
7    Q.  Okay.  And were there -- is there a
8 binding moratorium put in place on your agency?
9    A.  It's on every agency in -- in that region.
10 It could be Florida, Georgia.  You know, whatever
11 they -- wherever they're projecting a storm path to
12 go.  At a certain point, they say: Okay, there's a
13 binding moratorium.  They don't want to take on new
14 business during that time based on, you know --
15    And again, they might say: Okay, you can
16 bind the business, but without the coverages on
17 there.
18    Q.  And is that -- is that what happened on
19 August 2nd of 2020?
20    A.  To my recollection, there was a binding
21 moratorium on -- on August 1st.  And that
22 continued on.
23    Sometimes they last three or four days.
24    Q.  How is it that you were able to put in
25 350,000 in premium on the first day if there's a

Page 116

1 binding moratorium in place?
2    A.  Because we couldn't give all the coverages
3 that were needed.  We'd have to endorse it after the
4 storm, after the moratorium's lifted.
5    MR. HUBBARD:  Just so I understand,
6    because I'm starting to get confused, is the
7    moratorium on all policies or just portions of
8    policies?
9    THE WITNESS:  It depends on the area
10    that -- let's say the moratorium is in Dade
11    County, for example.  Dade, Broward County, and
12    wherever the path of a storm they're projecting
13    it would go.  It may not be in, let's say, the
14    northeast portion of the state, so it depends.
15 BY MR. LIAN:
16    Q.  What I'm trying to understand is, if there
17 was a moratorium, a binding moratorium, in place on
18 August 1st, how you were able to bind $350,000 in
19 premium on August 1st.
20    A.  Because you can still bind these policies.
21    Q.  Were they different policies than the ones
22 with respect to which there was a moratorium?
23    A.  I don't understand that question.  I'm
24 sorry.
25    Q.  Yeah, I'm not understanding your

Page 117

1 testimony.
2    Because you said that there was a
3 moratorium in place on August 1st and August
4 2nd.  Yet, on August 1st, you bound $350,000 in
5 premium.  And I'm trying to understand how that
6 could have taken place if there was a moratorium in
7 place.
8    A.  We had to restrict some of the coverages.
9 We couldn't give all the coverages based --
10    You know, Allstate would say:  Okay, you
11 can write this policy today but without these
12 coverages.
13    And then after the moratorium passes, then
14 you endorse the policy to put those coverages on.
15    That's, essentially, what we would have to
16 do.
17    Q.  But how did that work then with regard to
18 these policies that had already been sold to
19 customers prior to August 1st?
20    A.  Keep in mind, they were not sold prior to
21 August 1st; they were sold on August 1st.
22    But then, there would have to be a
23 conversation, you know, as part of the process is
24 also calling with the customer and canceling their
25 car insurance for, you know, for the new policy.

30 (Pages 114 - 117)

1 That way, we ensure there's no lapses.
2      We always want to take care of the
3 customer and make sure they don't make a mistake,
4 especially if it's a future-effective policy. We
5 want to make sure that they don't call their
6 insurance company and cancel it that same day when
7 their policy goes into effect, let's say, a week
8 from today. So we call with the customer to cancel
9 that policy effective, you know, the day or day
10 after our policy would go into effect.
11     Q. But you're not saying that your staff
12 talked to all the customers that made up this
13 $350,000 in premium on August 1st, are you?
14     A. No; I'm not because I'm not saying all
15 these customers were affected by that binding
16 moratorium.
17     Q. Do you have a record of what customers
18 were spoken with on August 1st, 2020?
19     A. I -- no, I do not have a record of that.
20     Q. Did you keep records of what customers
21 your staff was speaking with prior to August 1st
22 of 2020?
23     A. I don't believe I have any records
24 regarding customer -- I mean, nothing --
25     No, to answer your question, not to my

1 recollection.
2      Q. Were any customers that made up this
3 $350,000 in premium that was bound on August 1st,
4 2020 affected by the moratorium that was in place on
5 August 1st and 2nd, 2020?
6      A. Oh, I would have to imagine so, yes.
7 That's why you see Kaylee's response
8 there, give me more premium.
9      Meaning, when you endorse those policies,
10 they're gonna go up.
11     Q. Okay. And then you write back on August
12 3rd, 2020: Good morning. I'm checking. Any news?
13     And it doesn't seem like there's a further
14 text exchange after that. What happened after that?
15     A. I have to assume that the moratorium was
16 lifted. I don't recall regarding --
17     I mean, obviously, the moratorium was
18 lifted at some point, but I don't recall.
19     Q. Okay. And then the bottom text box on
20 this page we're looking at, it looks like it's dated
21 September 1st 4:09 P.M.
22     Do you see that?
23     A. I do.
24     Q. And it looks like it's a message -- again,
25 we're assuming Kaylee Colvard; is that correct?

1      A. Correct.
2      Q. And it says: "Mario Castro is going to
3 reach out to you for compliance training. He's
4 going to give you some tips on what to do to stay in
5 good graces."
6      A. Yes.
7      Q. What gave rise to this exchange with
8 Ms. Colvard on September 1st of 2020?
9      A. I requested it. I requested that Allstate
10 come, you know, assign someone to -- someone within
11 Compliance to come look at my -- my book, make sure
12 my policies were written to their standards.
13     It was a proactive request. Saying I
14 know, for example, Jarius had already looked through
15 it and said everything looks fine.
16     Obviously, I knew the asset I was
17 building, the amount of customers I had. I wanted
18 to make sure they were taken care of. And, again,
19 wanted, you know --
20     I was expecting a long-term, very fruitful
21 relationship with Allstate and wanted to just --
22     You know, again, the "good graces" part
23 was my request to Kaylee saying: I just want to
24 make sure everyone's, you know, in alignment here
25 and I wanted to take care of my customers and the

1 agency and the relationship with Allstate.
2      So it was just being proactive.
3      Q. What prompted your inquiry?
4      A. My desire to make sure those
5 afore-mentioned points -- I wanted to make sure I
6 protected the asset. I wanted to make sure I
7 protected the customer and the relationship with
8 Allstate.
9      No other reason other than just knowing
10 that, obviously: I'm running a lot of business for
11 you guys.
12     Q. Had you received any --
13     I'm sorry. I didn't mean to interrupt
14 you, Mr. Cicciarelli.
15     A. No, I just want to protect you guys and
16 the Allstate employees, is what I meant.
17     Q. Okay. Had you received any sort of
18 information or complaints, any other sort of warning
19 signs that there might be compliance concerns with
20 the way your agency was selling?
21     A. No, none at all. Not at all. Nothing
22 that comes to mind. Nothing substantial. Nothing
23 that's, you know, again, out of the ordinary or you
24 know...
25     No, to answer your question.

31 (Pages 118 - 121)

1      MR. LIAN:  Can you get 17, please?
2      MR. HUBBARD:  I'm sorry, Bob.  Where are
3  we going?
4      MR. LIAN:  Were gonna be posting an
5  exhibit, a new exhibit.  I guess this is
6  Number 11.  And it should be appearing in a
7  minute.
8  BY MR. LIAN:
9      Q.  Would you let me know when it comes up and
10  you see Exhibit 11?
11      (Defendant's Exhibit No. 11 was marked for
12  identification.)
13      MR. HUBBARD:  Remember, you gotta hit the
14  mark --
15      THE WITNESS:  Here we go.
16  BY MR. LIAN:
17      Q.  Do you see it, Mr. Cicciarelli?
18      A.  I see it now, yeah.
19      MR. LIAN:  And John, you see it as well?
20      MR. HUBBARD:  Yeah.  Yes.  Thank you.
21      MR. LIAN:  Okay.
22  BY MR. LIAN:
23      Q.  I'm posting Exhibit 11, which is -- it
24  looks like it's an e-mail from a fellow by the name
25  of Stephen Cobb to an Allstate address that looks

1  like it's associated with your name,
2  Mr. Cicciarelli?
3      A.  Yes, it is.
4      Q.  And I ask you, have you seen this e-mail
5  before?
6      A.  I do not recall that e-mail.  But, yeah, I
7  see it now.  Yeah.
8      Q.  Do you remember receiving it on or about
9  August 2nd, 2020?
10      A.  I would have to assume I did.
11      Q.  All right.  And the title of it is:
12  "Customer+Inquiry" and the opening line of the
13  e-mail reads:  "Regarding the fraudulent account
14  that one of your reps opened for me without my
15  permission and opened for me without my knowledge."
16      Do you see that?
17      A.  I do see that, yes.
18      MR. HUBBARD:  Can I interrupt, just for
19  the record?
20      The e-mail address that's on there, is
21  that an e-mail address that you use?
22      THE WITNESS:  Yes.  Yes; "ucicciarelli3,"
23  that's my Allstate e-mail, yes.
24      MR. HUBBARD:  Okay.
25

1  BY MR. LIAN:
2      Q.  That would have been an Allstate e-mail
3  that would've been active on August 2nd, 2020?
4      A.  Uh-huh.  Yes.
5      Q.  "Yes"?
6      A.  Yes.  Sorry.  Yes.
7      Q.  When did that e-mail address first become
8  available to you?
9      A.  I don't recall exactly.  I mean, at some
10  point, probably during my agency-owner training.
11      Q.  And this -- I'm just reading this e-mail
12  today.
13      You know, if you're a business owner
14  operating a business and see an e-mail like this, it
15  would seem to be somewhat alarming.
16      Do you have a recollection of receiving it
17  on or about August 2nd, 2020?
18      A.  Not to that extent.
19      You know, it actually draws up some
20  question, right?  How did they open an account with
21  his banking information if he didn't give it to
22  them?
23      As I'm reading it, if he didn't give it
24  for the purpose, why would he -- you know, he's
25  saying I got an online quote.  But why did he give

1  his banking information, if he didn't have the
2  intention?
3      So I see this as somewhat buyer's remorse.
4  And it says here, he said:  "I went with Geico."
5      So he was still shopping around, but he
6  gave, you know...
7      So, you know, I don't know exactly -- I
8  can't speak to this situation exactly, but, you
9  know, it's unfortunate and there was, you know --
10  you know, obviously, I would address it and I'm sure
11  this policy was canceled and was probably refunded.
12  BY MR. LIAN:
13      Q.  What did you do after receiving this
14  e-mail?
15      MR. HUBBARD:  I'll object.  He doesn't
16  recall receiving it.
17      THE WITNESS:  I don't, really.  I mean,
18  it's...
19  BY MR. LIAN:
20      Q.  I mean, this seems like an e-mail one
21  would remember if it's describing something that
22  went on in the business you're responsible for.
23      You're saying you don't remember this
24  e-mail?
25      A.  I do not specifically remember this

32 (Pages 122 - 125)

1 e-mail, no.
2     Q.  Do you remember directing any sort of
3 inquiry or investigation into a situation involving
4 Stephen Cobb or an allegation that an account was
5 opened without his consent?
6     A.  Can you repeat the question again?  I'm
7 sorry.
8     Q.  Did you -- do you remember directing that
9 anybody on your staff undertake an investigation to
10 determine whether there was an account or policy
11 opened on Stephen Cobb's behalf without his consent?
12     A.  I guess my question is:  How did they open
13 an account without his consent?
14         How do they have his banking information
15 if he didn't agree?
16     Q.  Well, my question to you is, it was just a
17 simple question about your recollection.  Do you
18 recall, as the owner of the Prestige Insurance
19 agency, directing anybody on your staff to inquire
20 or investigate any situation involving Stephen Cobb?
21     A.  I don't recall.
22         But I have to imagine how I would
23 typically handle something like this is to
24 contact -- have the agent contact the customer and
25 address their concerns.

1     Q.  Okay.  And I'm less interested in what you
2 would typically do than in what you specifically
3 recall doing in this situation.
4         Do you recall directing anybody on your
5 staff to inquire or investigate any allegations
6 involving Stephen Cobb and the opening of an account
7 without his consent?
8     A.  I don't recall.
9     Q.  Did you speak with anybody on your staff
10 about any issues involving Stephen Cobb?
11     A.  No, I don't recall.  No.
12     Q.  Did you talk to Stephen Cobb, or anybody
13 else, on or around August 2nd who might have been
14 alleging that there was fraud in your agency?
15     A.  I -- I don't recall, again, this customer.
16     Q.  And you don't know anybody, by the name --
17         Well, strike that.
18         Do you know anybody by the name of Stephen
19 Cobb?
20     A.  No.  No, I don't know him.
21     Q.  Did you ever speak with anybody on your
22 staff about whether he or she had spoken to Stephen
23 Cobb?
24     A.  I don't recall speaking to someone on my
25 staff; no.  No.

1     Q.  Was the e-mail address that is reflected
2 on Exhibit 11, is that one that you personally
3 monitored and had access to?
4     A.  Yes.
5     Q.  Was it an e-mail address that anybody else
6 in your agency had access to?
7     A.  I do not believe so.  Not without -- no, I
8 don't -- I mean, no.  No.
9     Q.  And just to be clear, you don't remember
10 discussing this situation involving Stephen Cobb
11 with anybody from Allstate; is that correct?
12     A.  I don't recall, no.
13     Q.  And, again, just to be clear for the
14 record, you don't have any specific recollection of
15 having read this e-mail during the August 2020 time
16 frame; is that correct?
17     A.  I don't remember this e-mail specifically.
18     Q.  All right.
19     A.  It's not to say I didn't read it; I just
20 don't recall reading it at this point.
21     Q.  Let me ask this:  If you had received an
22 e-mail like this --
23         Strike that.
24         What would you have done typically if
25 you -- upon receiving an e-mail like this?

1     A.  I would contact the customer.
2     Q.  Personally?
3     A.  If I was the agent?
4         We also had, you know, we had customer
5 service so like there's --
6         Are you asking personally if I would reach
7 out to them, if I was --
8         If I was the agent -- I would ask my
9 agent, though, what's going on here?  Let's rectify
10 this.
11         Again, I'm always looking out to take care
12 of my customers.  Again, I'm --
13     Q.  Well, you're the agency owner of Prestige
14 Insurance, correct?
15     A.  Sure.  Yes.
16     Q.  So my question to you is:  August 2nd,
17 2020, this e-mail shows up in your inbox.  What do
18 you do?
19     A.  I probably see it -- well, it shows up on
20 my inbox on August 2nd and I see it, it's sent at
21 2:45 in the morning.  And I immediately find out
22 what agent wrote this policy and reach out to the
23 customer, let me know, you know, what was -- how it
24 was resolved and if they need any assistance with
25 any of the processes, you know, of how to handle

1 that type of call, if they weren't experienced.

2    Q.  And your testimony is you have no
3 recollection of doing any of that with regard to
4 Stephen Cobb; is that correct?

5    A.  8/2 is, I believe, was Sunday almost two
6 years ago today.  I don't recall exactly how this
7 was handled.

8    Q.  Did you ever discuss Stephen Cobb with
9 Kaylee Colvard?

10    A.  I don't recall that either.

11    Q.  Do you know whether Stephen Cobb's e-mail
12 then prompted the text message relating to Mario
13 Castro performing training in your agency on
14 compliance issues?

15    A.  My compliance question was, I believe --
16      But to answer your question, no, it would
17 have nothing to do with this.

18      MR. LIAN:  Okay.  Why don't we go off the
19 record.  We'll take lunch, 45 minutes.  We'll
20 come back here by, let's say, 1:30, if that's
21 okay.

22      THE VIDEOGRAPHER:  We are off the record
23 at 12:41 P.M.

24      (A break was taken at 12:41 P.M.)

25      (Return from break was at 1:31 P.M.)

1      THE VIDEOGRAPHER:  This begins Media
2 Unit 4.

3      We are back on the record at 1:31 P.M.

4 BY MR. LIAN:

5    Q.  All right.  I'm gonna pull up an exhibit
6 now, I guess we'll mark this as Exhibit No. 12.

7      (Defendant's Exhibit No. 12 was marked for
8 identification.)

9 BY MR. LIAN:

10    Q.  You let me know, Mr. Cicciarelli, when
11 that shows up, the exhibit.

12    A.  Yes.

13    Q.  Okay.  Are you seeing it?

14    A.  Yes.

15    Q.  Okay.  This is a document entitled:  "How
16 to access safe quotes?  Job Aid."

17      Do you see that?

18    A.  Yes.

19    Q.  Is this the document you were referring to
20 earlier that Jarius Hollanger gave to you?

21    A.  Correct.

22    Q.  And when did that happen, that he gave you
23 this document?

24    A.  I want to say July 31st.

25    Q.  Okay.  On August 1st, 2020 when Prestige

1 Insurance Group began operation as an exclusive
2 agency of Allstate, how many persons were working
3 for the agency?

4    A.  I don't recall.

5    Q.  Do you have an approximate number of how
6 many were working for the agency on that date?

7    A.  I'm gonna guess 15 to 20.

8    Q.  Had you met all 15 to 20 people
9 individually?

10    A.  Yes.

11    Q.  Did you interview them and hire them
12 yourself?

13    A.  Some came from the --

14      THE COURT REPORTER:  Excuse me.  You said
15 "some came from the" --

16      THE WITNESS:  Some, I interviewed and some
17 came from the agency that they were terminated
18 from.

19      THE COURT REPORTER:  Thank you.

20      THE WITNESS:  No problem.

21 BY MR. LIAN:

22    Q.  And in the case of folks who came from the
23 other agency from which they were being terminated,
24 is it your testimony that those people, you did not
25 interview and hire individually?

1    A.  Not on an individual basis.  That was what
2 that interim period was for.

3    Q.  I'm sorry.  What -- let me see if I can
4 clarify your testimony.

5      For those people who had previously worked
6 at another Allstate agency, did you interview and
7 hire those people?

8    A.  No.  Not exactly, no.

9    Q.  Tell us what you did with respect to those
10 people who previously worked for another Allstate
11 agency.

12    A.  It depends on how long they were with that
13 Allstate agency and their ability to perform the
14 job.

15    Q.  So do I take it from your testimony that
16 there were some number of those folks that you did
17 not interview, that you just simply hired them and
18 offered them a job?

19    A.  I had -- I had met everyone individually
20 at -- at other points.  So I knew some of these
21 agents briefly, just for, you know, one day.

22      But I walked around the room and, kind of,
23 spoke to -- you know, spoke to them and, you know,
24 wasn't completely blind.  I didn't know everyone,
25 but a good portion.

34 (Pages 130 - 133)

1      It was almost recommended to me.
2      Q.   How many folks from your staff, as of
3  August 1st, fell into that category?
4      A.   I'm gonna guess maybe 10 to 12.
5      Q.   So it sounds like the majority of people
6  had previously worked at another Allstate agency and
7  you did not take them through a typical hiring
8  process.  You met them and then offered them jobs;
9  is that correct?
10      A.   That would be pretty accurate, yeah.
11      Q.   Did you conduct any sort of background
12  check on any of the individuals before you hired
13  them?
14      A.   Allstate does.
15      Q.   Okay.  But you didn't separately?
16      A.   No.
17      Q.   Did you check references on any of the
18  individuals that you hired from the other Allstate
19  agencies?
20      A.   They were referred to me.  So, yes.
21      Q.   They were referred to you by this other
22  agent?
23      A.   Yes.
24          I had to terminate my staff and, you know,
25  here's an opportunity to speak to them.

1          And that's, essentially, what I did.
2      Q.   Why did that agent have to terminate his
3  staff, to your understanding?
4      A.   He was not able to produce anymore.
5      Q.   He was not able to produce anymore?
6      A.   Allstate has a cap on ECP, on the ECP
7  Agreement, and you can't exceed a certain amount of
8  production or else you no longer get the ECP bonus.
9      Q.   And so I'm not following why that required
10  that he terminate his staff.
11      A.   If you continue producing, you won't --
12  you won't get the bonus.  You'll never recover your
13  investment.
14      Q.   I see.  So this agent made the
15  determination that it was better to reduce the
16  amount of production and still maintain the ECP
17  bonus eligibility?
18      A.   I don't want to speak for them, but that's
19  my understanding.
20      Q.   Did you personally provided training to
21  any of the staff that you hired prior to August
22  1st of 2020?
23      A.   On that -- on that -- yes.
24      Q.   What was the training that you provided to
25  Prestige Insurance Group staff prior to August 1st

1  of 2020?
2      A.   It would be -- excuse me -- on presenting
3  coverages.  Again, presenting the value of Allstate
4  as a company.  Them as an agent.  The agency, as
5  well as quoting efficiencies.  You know, things like
6  that.
7      Q.   What does "quoting efficiencies" refer to?
8      A.   How to, for example, look at loss reports,
9  you know, and identify opportunities.
10          Like, for example, an accident would fall
11  off after three years and we're at two years and 11
12  months.  You put the effective date out past where
13  that accident ages, you know, then they would
14  qualify for Allstate.  Things like that.
15      Q.   When -- when was this training provided?
16      A.   Ongoing for, roughly, a three-week period
17  based on my availability.
18      Q.   During the --
19      A.   And --
20      Q.   Go ahead, please.  Sorry.
21      A.   I was just gonna say, in our morning
22  meetings, those are the types of things that we
23  also, you know, discussed from...
24      Q.   Were any of those morning meetings
25  recorded in any fashion?

1      A.   No.
2      Q.   Were any of your calls or interactions
3  with Allstate personnel recorded in any fashion?
4      A.   No.
5      Q.   Have you made any audio recordings on any
6  of the issues that are the subject of your
7  litigation?
8      A.   No.
9      Q.   Are you in possession of any audio
10  recordings from the period of time that you were
11  engaged with Allstate regarding any aspect of your
12  work with Allstate?
13      A.   No.
14      Q.   What did you discuss with the personnel
15  who became employed by Prestige Insurance Group
16  prior to August 1st, 2020 about issuing quotes to
17  prospective customers?
18      A.   Can you repeat the question again?
19          I'm sorry.
20      Q.   What I'm -- what I'd like to understand
21  is: What conversations did you have with the folks
22  who eventually came to work for Prestige prior to
23  August 1st, 2020 about reaching out to customers,
24  quoting customers during that period of time that
25  they were undergoing training?

35 (Pages 134 - 137)

Page 138

1    A.  That until August 1st, we didn't have
2 the ability to bind these policies and that someone
3 who did want this policy, they would have to contact
4 Allstate direct.
5    Q.  Did you have --
6        At these morning meetings that you were
7 having with staff prior to August 1st, were you
8 revealing their -- their quotes that they were
9 issuing from the prior day and looking at their what
10 productivity levels were?
11    A.  Personally, I was not.
12       I had the sales manager doing that.
13       Personally, I would not.
14    Q.  Glen Hunter was?
15    A.  Glen Hunter, yes.
16    Q.  And was he giving reports to you as to
17 what the status of that was?
18    A.  If it was something that was -- no.
19       I mean as far as --
20       No, to answer your question.
21    Q.  He was not -- he was not reporting to you
22 what those results were?
23    A.  Meaning, I checked someone's policy and --
24       I'm just trying to understand the
25 question, so I'm asking you.

Page 139

1    Q.  Yeah, well, what I'm wondering about is
2 whether he was reporting to you on one day what
3 happened the prior day by way of the number of
4 quotes that were generated by the staff that
5 eventually came to work for Prestige Insurance
6 Group.
7    A.  Not that I recall.
8    Q.  Were you tracking it in some other means,
9 either by looking on any sort of data or other
10 information you had available to you to see how much
11 was being generated by way of quotes from a prior
12 day?
13    A.  I don't recall exactly.
14       But I, you know, I'm trying to think.  I
15 don't know.  Sorry.
16    Q.  On August 1st, 2020, going into that
17 morning, did you have an awareness at that time of
18 the number of quotes that you were going to be
19 binding that day, approximately?
20    A.  Not the number of quotes; no.
21    Q.  Did you have any idea about the number of
22 policies that were going to be bound that day?
23    A.  I had an idea on the premium amount.
24    Q.  Okay.
25    A.  Not the number of quotes.

Page 140

1    Q.  All right.  Let me ask it this way then:
2 Were you tracking -- during the days leading up to
3 August 1st, 2020, were you tracking the premium
4 amount that staff was quoting and awaiting binding
5 for when your agency opened?
6    A.  Yes.  And -- to a certain extent, yes.
7    Q.  And by what means were you tracking that
8 information?
9    A.  There was a couple of different ways that
10 I could have, but I don't recall exactly what we
11 were doing at that point.
12       Like I mentioned, we did have, like, a
13 pre-bind checklist that we go by and check, you
14 know, and then they would put the premium amount
15 there.  As far as, you know, how much that policy
16 would be worth if we were able to close it after
17 August 1st.
18       There was a technology, but I don't think
19 we were using it.  But once we did bind the policy,
20 then you upload the application and everything.
21 It's called Agency Zoom, that everyone uses, and you
22 know, a lot of agency owners use, to track that sort
23 of thing.
24       It also forecasts, you know, what you
25 would sell if you continued at this pace.  It

Page 141

1 projects.
2    Q.  What was the technology that you were
3 using?  I didn't catch that word that you used.
4    A.  Agency Zoom.
5    Q.  Agency Zoom, Z-O-O-M?
6    A.  Correct.
7    Q.  Okay.  Were you using -- during the month
8 of July 2020, were you using some sort of system or
9 dashboard, or other application that allowed you to
10 track the amount of premium that was being quoted
11 and set for binding on August 1st in your agency?
12    A.  Other than the two I just mentioned
13 earlier, I don't know of any additional technologies
14 or processes.
15    Q.  Would you say that you were keeping track
16 of the amount of premium that was going to bind on
17 August 1st during the month of July 2020?
18    A.  I had a rough estimate.
19    Q.  When did you begin keeping track?
20    A.  As -- as soon as they started to quote and
21 potentially line up sales for August 1st.
22    Q.  And when -- when was that?
23       What was the date on which they started
24 quoting officially?
25    A.  Sometime towards the beginning of July for

36 (Pages 138 - 141)

1 the experienced hires.
2     Q.   Were you keeping track?  And by "you," I
3 mean Prestige Insurance Group.
4           Was Prestige Insurance Group keeping track
5 of the quotes that were being issued to customers
6 for binding on August 1st by sales producer?
7     A.   This would, essentially, be able to do,
8 you know, this checklist as well as Agency Zoom.
9           But again, I don't know if we were using
10 Agency Zoom.  But yes, that's why I said I had a
11 rough idea.
12     Q.   So what I'm imagining is that you were --
13 you had some sort of list or some sort of reports
14 where you were seeing what each individual producer
15 was quoting.  Is that accurate?
16     A.   I know Allstate has technology that, you
17 know, available to agency owners that track the
18 amount of -- I think they're called "serious quotes"
19 or --
20           I haven't seen the technology in almost
21 two years.
22           That would give me an idea as far as the
23 quotes.  And I believe premium is also included
24 there.  I just don't recall.
25     Q.   And my question is:  What specifically

1 were you using at the time, during the month of July
2 of 2020, to track the serious quotes or the quotes
3 that staff were issuing for binding on August 1st?
4           And was that, indeed, organized in some
5 fashion so you could see what each individual staff
6 member was quoting and producing?
7     A.   I would imagine -- I don't recall exactly,
8 to be honest with you.  I'd be guessing.  You know,
9 like if we were using this or that at the time.  I
10 just --
11           You know, typically, after August 1st,
12 it would be Agency Zoom.  Prior to that, I don't
13 recall if we were using Agency Zoom because I don't
14 see how we possibly could.
15     Q.   But is it -- is it accurate that you were
16 tracking it in some fashion because you wanted to
17 see how each individual producer was doing?
18     A.   Likely, through the pre-binds that they
19 were -- you know, we were looking at the policy and
20 they were saying this policy -- this customer wants
21 to move forward with this policy on or after August
22 1st.
23     Q.   During the month of July 2020, how did the
24 operation of your agency differ than after August
25 1st of 2020?

1           In other words, I know after August 1st,
2 2020, you could -- your agency could bind insurance.
3 But before August 1st, 2020, it could not bind
4 insurance.
5           And my question is:  How did the
6 operations differ after August 1st as compared to
7 the month of July of 2020?
8     A.   In the way that you just described.
9           Prior to that, we couldn't bind.  Prior to
10 August 1st, we couldn't bind these policy.  After
11 August 1st -- or on or after August 1st, we
12 could.
13     Q.   So aside from Glen Hunter, was anybody
14 else responsible for managing or overseeing
15 operations of the agency and the staff that worked
16 for the agency, eventually?
17     A.   No, he was my only manager.
18     Q.   During the month of July 2020, how did
19 the -- how did your work, your day-to-day work,
20 compare to what he was doing day-to-day?
21           In other words, maybe another way for me
22 to ask this question is:  What was he doing?  What
23 were you doing during the month of July 2020
24 relative to the establishment of Prestige Insurance
25 Group, LLC?

1     A.   I was still going through agency-owner
2 training so I had a schedule of events that Allstate
3 provided me that I needed to, you know, to do each
4 day.
5           Where Glen would, again, be managing the
6 sales team.
7     Q.   Do you know what Glen was doing to monitor
8 or keep track of what the various producers were
9 doing?
10     A.   Other than checking their -- their quotes,
11 I don't think he was tracking them in that regard.
12     Q.   Okay.  Did you -- did you review any
13 quotes that were -- that staff was producing?
14     A.   Not typically.
15     Q.   Not, typically?
16     A.   Not, typically.  It would be, you know,
17 again, I -- it was not my typical role, if you will.
18     Q.   That was a function you delegated to
19 Mr. Hunter?
20     A.   My sales manager, yeah.
21     Q.   Okay.  Where is Mr. Hunter now, do you
22 know?
23     A.   I haven't spoken to him in --
24           No.  To answer your question, no.
25           MR. LIAN:  Andrew, can I have Document 21,

37 (Pages 142 - 145)

Page 146

1  please?
2      This will be Exhibit 13.
3      (Defendant's Exhibit No. 13 was marked for
4  identification.)
5  BY MR. LIAN:
6      Q.  Mr. Cicciarelli, would you let me know
7  when you see a document posted?
8      A.  Yeah, I'm looking for it right now.
9          I see it.
10     Q.  Okay.  Do you recognize this e-mail?
11     A.  Yes.
12     Q.  Okay.  And this is an e-mail to
13 Ms. Colvard that you sent on or about August 24th,
14 2020?
15     A.  That's correct.
16     Q.  Okay.  What -- what gave rise to your
17 sending this e-mail to Ms. Colvard?
18     A.  I see it.  Again, creating a long-term
19 relationship with Allstate; protecting my agency;
20 our customers; protecting my asset.
21     Q.  Had you been made aware of any customer
22 complaints or compliance deficiencies that led you
23 to make this request?
24     A.  Nothing that was, you know -- that wasn't
25 addressable.

Page 147

1      But it was, again, just realizing I'm
2  building a valuable asset here and want to protect
3  it.
4      Q.  But, specifically, prior to August 24th,
5  2020, had you been made aware of any customer
6  complaints or any other compliance deficiencies that
7  had been noted in regard to Prestige Insurance
8  Group?
9      A.  Other than the e-mail that you just showed
10 me earlier, nothing, you know -- nothing that
11 provoked this e-mail.
12     It was just being proactive to protect the
13 asset and the customers.
14     MR. LIAN:  Can you post this one?
15 BY MR. LIAN:
16     Q.  Okay.  I've posted another document on the
17 exhibit feature.  This one is entitled:  "HR
18 Complaint Intake Form."
19     And this involves a complainant by the
20 name of Kimberly Hutson.
21     Do you recognize that name?
22     A.  No.
23     Q.  If you could go down to the bottom of the
24 first page, complaint -- or the substance of it is
25 as follows:  Insured called CCC for a quote and

Page 148

1  there was a pending policy in the system written by
2  an agency.  The insured initially claimed that she
3  did not request the policy but when I called, she
4  stated her husband had.  According to CCC, couple
5  does not qualify for insurance with Allstate due to
6  husband's IS score and a claim from 2019.  There's
7  the same quote in the system from the agency for
8  4,000 from late July and early August.  Policy was
9  bound eff 8/2 for $1,247.62.  The agency wrote the
10 policy with the husband and wife as separated and
11 Mr. Hutson as "other."  CCC states that if this
12 is corrected to "married," which is the -- which is
13 correct, the policy would cancel, as they are not
14 eligible.  AOR is the one listed on the AH screen as
15 wrote the policy.  I spoke to Mrs. Hutson.  Married,
16 not separated and no plans to divorce.
17     Do you see all that?
18     A.  I do.
19     Q.  Do you know what the acronym "AOR" stands
20 for?
21     A.  Agent of record.
22     Q.  Okay.  And the agent of record for
23 Prestige, for your agency, would be Prestige
24 Insurance Group; is that correct?
25     A.  Can you restate that?

Page 149

1      I'm sorry.  What?
2      Q.  Who is -- let me ask it this way:  Was
3  Ms. Hutson or Mr. and Mrs. Hutson customers that
4  someone from your agency spoke with?
5      A.  I don't know.
6      Q.  Do you have any familiarity with the
7  situation that is described in the complaint that I
8  just read to you?
9      A.  I've never seen this.
10     Q.  Had you ever heard anything about the
11 situation or the -- the allegations that are laid
12 out in the complaint here?
13     A.  Not to my recollection.
14     Q.  Do you know whether anybody in your
15 agency, Prestige Insurance Group, ran a quote for
16 Mr. or Mrs. Hutson?
17     A.  I do not know.
18     Q.  Do you ever remember anybody, or do you
19 remember anybody from your agency, telling you that
20 they had sold a policy or quoted a policy on Mr. or
21 Mrs. Hutson?
22     A.  No.  I do not know that.
23     Q.  Are you aware of any situation in which
24 someone affiliated with Prestige Insurance Group
25 changed someone's marital status from "married" to

38 (Pages 146 - 149)

1  "single," even though the couple was, in fact,
2  married?
3      A.   No.  I did not know of anything of -- to
4  this -- you know, with regards to this.
5      Q.   Are you aware of any situations in which
6  anybody from the Prestige Insurance agency, or
7  became affiliated with the Prestige Insurance Group,
8  LLC, changed someone's marital status in order to
9  qualify them for insurance that they might not
10  otherwise be qualified for?
11      A.   That would not be allowed if it was -- if
12  I had known about this.
13      Q.   Your testimony is that you did not know
14  about the situation involving Kimberly Hutson as
15  described in this HR Complaint Intake Form?
16      A.   I have no recollection of ever seeing
17  this.  I don't know if it was even -- if it was sent
18  to me or --
19          But I have -- the answer is:  No, I don't.
20      Q.   Do you know whether the premium of
21  $1,247.62 was encompassed in the premium that your
22  agency wrote during the month of August of 2020?
23      A.   I don't know.
24      Q.   At any point while you operated the
25  Prestige Insurance Group, LLC agency, did you ever

1  talk to Prianca Little about her compliance with
2  Allstate underwriting and sales guidelines?
3      A.   No, I hadn't -- this wasn't, again,
4  brought to my attention, so I did not -- I do not
5  recall receiving any complaints on Prianca Little.
6      Q.   Did you recall receiving complaints or do
7  you recall receiving complaints on any member of
8  staff or person who became a member of the staff of
9  Prestige Insurance?
10      A.   I do recall, remember -- I do remember one
11  time I received a complaint that someone did not, I
12  guess, clearly identify that they were -- this
13  policy would be with Allstate.
14          Then we write, you know, provided training
15  on to the entire staff.
16          I don't recall which agent it was, but I
17  do remember that we did feel the need, because, you
18  know, that was brought to my attention.
19      Q.   When did that occur?  When was that
20  brought to your attention?
21      A.   I don't recall.  I just remember that we
22  did have a training on it and we had the agents sign
23  off that they received the training afterwards.  The
24  agency has a whole -- you know, they all had to sign
25  it.

1      (Off the record discussion.)
2      THE COURT REPORTER:  Excuse me, Mr. Lian.
3  Did you want that last document marked as 14?
4      MR. LIAN:  Yes.  I'm sorry.  So yes, I'll
5  mark that as 14.
6      Madam Court Reporter, can you confirm that
7  all exhibits up to 14 have been marked and
8  admitted?
9      THE COURT REPORTER:  They have been.  I'm
10  marking them off as we go.
11      MR. LIAN:  If they're not admitted --
12  you're not the Judge, but they've been marked
13  and introduced?
14      THE COURT REPORTER:  Yes, I have them all.
15  I'm marking them off.  That's why I asked about
16  14.
17      MR. LIAN:  Okay.  Thank you.
18      THE COURT REPORTER:  You're welcome.
19      (Defendant's Exhibit No. 14 was marked for
20  identification.)
21  BY MR. LIAN:
22      Q.   I'm showing you, in the exhibit tool,
23  Exhibit No. 15.
24      (Defendant's Exhibit No. 15 was marked for
25  identification.)

1  BY MR. LIAN:
2      Q.   Let me know when that posts and if you see
3  it, Mr. Cicciarelli.
4      A.   Okay.
5          Yes, there you go.
6      Q.   Okay.  Could you tell us what this
7  document is, please?
8      A.   This is after they received training on,
9  basically, again, explaining the benefits of
10  Allstate and being an Allstate customer in the
11  transition, you know, with -- from their current
12  carrier to Allstate, to make sure that they're clear
13  with that information.  That's number one.
14          Number 2, you know, again, the importance
15  of the customer signing their T-docs or the way
16  Allstate handles that matter, and that they will add
17  uninsured motorists, you know, to the highest limit
18  that they can, which is the limits on bodily injury.
19  And then, from the first date of the policy.
20          So again, explaining the importance of
21  getting these documents back.  Now you see it's for
22  rate stabilization.
23          Again, talking about, you know, all the
24  discount features are included...
25          You know, so again, adding bundling and

Page 154

1 renter's policy and the benefit of the renter's
2 policy and the discount that they would receive
3 from -- on the auto policy and the renter's.
4      4, I don't know exactly what the context
5 of that was, "how to follow up."  That might be
6 regarding setting -- I don't want to guess.  But
7 making sure that all those documents -- what your
8 follow-up is to make sure all these documents have
9 been signed by the customer, is my assumption on
10 Number 4.
11      Q.  All right.  When you were testifying prior
12 to my showing you this document, you mentioned that
13 there was some sort of complaint involving staff and
14 that that led to a policy acknowledgment that people
15 signed.  Is this the document you were referring to
16 that --
17      A.  Yes.
18      Q.  That you had staff sign?
19      A.  Yes.
20      Q.  When did this complaint about staff come
21 in?
22      Presumably, it would've been before
23 August -- or October 13th, 2020, correct?
24      A.  I believe it was September 21st or maybe
25 even on the 22nd that you can see it was

Page 155

1 acknowledged by Zachary Deitz on September 22nd,
2 2020.
3      So likely, it was brought to my attention
4 either the 21st and then trained on the 22nd is
5 probably how that played out.
6      I -- I'm making some assumptions has --
7      Q.  Okay.  Do you know why this has -- this
8 document has two dates on it, the date of October
9 13th, 2020 in the upper left-hand corner, and then
10 the date of 20 -- of September 22nd, 2020 as the
11 acknowledgment date?
12      A.  It would be an assumption.  I'm guessing
13 the day that I e-mailed that.  I'm assuming it's the
14 day, you know, of --
15      I don't know.  I honestly don't know.
16      Q.  Where was this particular document stored?
17 This is a document we received from -- from
18 Plaintiffs in this case.  Where was that document
19 stored or located?
20      A.  These documents are signed through Agency
21 HR, which is a function of Agency Zoom, that
22 technology that I mentioned to you earlier.
23      Q.  Where did you find it, such that you were
24 able to produce it in this case?
25      Because you don't have access to Agency

Page 156

1 Zoom anymore; is that correct?
2      A.  That's correct.
3      Q.  Okay.  So where was it stored or
4 maintained among your collection of material such
5 that you were able to pull it up and provide it to
6 your counsel that provided it to us?
7      A.  Likely, an e-mail.
8      MR. HUBBARD:  For the record, I don't see
9 our Bates stamp on it.
10      MR. LIAN:  We actually didn't get Bates
11 stamps on any of the documents you produced,
12 John.
13      MR. HUBBARD:  Oh, all right.  Fair enough.
14 BY MR. LIAN:
15      Q.  Mr. Cicciarelli, can you -- I just want to
16 make sure I got the response to that question.
17      Do you know where the document would've
18 been retained or maintained among your collection of
19 materials?
20      A.  I'm gonna assume it was sent to my
21 PrestigeINSGroup e-mail, but I do not recall.  It's
22 just an assumption again.
23      MR. LIAN:  Andrew, can you post Document
24 No. 22?  It's gonna be 16.
25      (Defendant's Exhibit No. 16 was marked for

Page 157

1 identification.)
2 BY MR. LIAN:
3      Q.  All right.  I'm posting a document now in
4 the exhibit tool that's marked as Exhibit 16.  And
5 it is a cover letter from Izabela Zeglen to Karen
6 Sullivan.  And what follows is a document entitled:
7 Summary of Evidence dated November 3rd, 2020.
8      Do you see that?
9      A.  Uh-huh.
10      Q.  "Yes"?
11      A.  Yes.  I'm sorry.  Yes.  Sorry.
12      Q.  What I'd like to focus on is the second
13 page of this document, the one that has the
14 summary -- that's entitled Summary of Evidence.
15 Could you go to that page, please?
16      A.  Yes.
17      Page 2?
18      Q.  Yes, please, page 2.
19      In the first paragraph, three quarters of
20 the way down, it says:  Further, the audit revealed
21 Mr. Cicciarelli may have falsified at least 27 auto
22 insurance applications and/or directed staff to do
23 the same in order to lower customer premiums or
24 qualify them for coverage they would not otherwise
25 be entitled to receive.

40 (Pages 154 - 157)

Page 158

1      Do you see that?
2      A.  I see that, yes.
3      Q.  Do you have any information about your
4  agency or staff working for your agency falsifying
5  27 auto insurance applications?
6      A.  Absolutely not.
7      Q.  Do you deny that your agency falsified
8  insurance applications?
9      A.  To my knowledge, they did not.
10      I would have terminated them immediately
11  if they did.
12      Q.  All right.  Let me focus you little
13  further down the page.  Under the heading:  Field
14  Business Compliance Consultant -- Field Business
15  Conduct Compliance Consultant Joe Cackowski.
16      Do you see that?
17      A.  (No audible response.)
18      Q.  About halfway down the page.
19      A.  Oh, yes.  Yes.  I see it, yes.
20      Q.  Okay.  There's a discussion about the --
21  the Kimberly Hutson situation that we just looked at
22  briefly in connection with Exhibit 14.  And I think
23  you testified previously that you have no
24  information relative to Ms. Hutson or any
25  application for insurance with Allstate; is that

Page 159

1  correct?
2      A.  Correct.  I personally do not have any
3  recollection of that.
4      Q.  Okay.  And you never spoke with Prianca
5  Little in any way about Kimberly Hutson; is that
6  correct?
7      A.  Correct.
8      Q.  At any point during the time that you
9  operated an Allstate agency, did you ever have any
10  issues with Ms. Little where you determined or it
11  was alleged that Ms. Little was falsifying any
12  application for insurance?
13      A.  No.  It was -- it was -- I was not aware
14  of any of this.
15      Q.  At the bottom of page one, there's a
16  statement here that says:  "During his policy
17  review -- "his" being Mr. Cackowski, "he observed
18  that approximately 17 out of the 22 staff working
19  for Cicciarelli previously worked for EA Michael
20  Masih-Das, whose agency was located approximately
21  200 miles from Cicciarelli's agency location."
22      Do you see that?
23      A.  I do.
24      Q.  Is that a correct statement, that
25  approximately 17 of the 22 staff working for your

Page 160

1  agency previously worked for EA Michael Masih-Das?
2      A.  I would assume that's somewhere around
3  that number, yeah.
4      Q.  And is it also true that Mr. Masih-Das'
5  agency was approximately 200 miles away from where
6  your agency was located?
7      A.  Yes.
8      Q.  And I take it that the individuals that
9  had previously worked for Mr. Masih-Das's agency,
10  they didn't -- they didn't have to move because they
11  were working for you remotely; is that correct?
12      A.  Correct.
13      Q.  If you go to the next page, please.
14      The second bullet down on the first page,
15  it says:  A new business query identified between
16  August 1, 2020 and August 28, 2020, the agency bound
17  808 policies and 264 of those were bound on August
18  1st, 2020, the opening date of the agency.
19      You see that?
20      A.  Yes.
21      Q.  Is that consistent with your recollection,
22  the last point that 264 policies were bound on
23  August 1st, 2020?
24      A.  Based on our conversation, not my
25  recollection, no, of that number.

Page 161

1      Q.  I'm sorry.  Could you repeat that?
2      A.  I did not know that number until today
3  when you mentioned it to me.
4      Q.  If you could go to the next page, please.
5  This is page three of the Summary of Evidence.
6      A.  Okay.
7      Q.  Okay.  And the part I'd like to talk to
8  you about is on the lower corner of the page, under
9  the heading:  Customers.
10      Do you see that?
11      A.  I was on the wrong...
12      THE COURT REPORTER:  I'm sorry.  I didn't
13  hear that.
14      THE WITNESS:  I was on the wrong page.
15      I see "Customers" here, yes.
16  BY MR. LIAN:
17      Q.  Okay.  And it says here:  We spoke with
18  the 12 customers identified within Cackowski's audit
19  who had quotes initiated under the former -- under
20  former EA Rivas' agency and their policies bound
21  under EH Cicciarelli's agency.  All of the customers
22  confirmed that they were aware their policies could
23  not be bound until August 1st, 2020.
24      Do you see that?
25      A.  Uh-huh.  I do.  Yes.

41 (Pages 158 - 161)

Page 162

1    Q.  Do you know whether your staff was telling
2 customers that they could not have their policies
3 bound until August 1st, 2020?
4    A.  Yes.
5    Q.  They were in fact --
6    A.  By us or by Prestige Insurance.  We
7 couldn't bind them until August 1st when Prestige
8 Insurance was officially appointed by Allstate.
9    Q.  There's a reference below that:  Further,
10 customer Tyler Wright, with a number associated with
11 it, told us the following:  Number one -- first of
12 all, he completed his auto application over the
13 phone with a male representative, but could not
14 recall his name.
15   A.  Okay.
16   Q.  And it goes on to say:  He wanted to start
17 his policy immediately, but was told that in order
18 to receive the best rate, he would have to start his
19 policy on a specific date in August.  The male
20 representative told him that insurance companies bid
21 on each day for each certain rates and that the day
22 they provided him was the best rate they could get
23 if he agreed to start his policy on that date.
24       Do you understand what that means?
25   A.  No.

Page 163

1    Q.  Do you understand there to be a practice
2 of insurance companies bidding each day for certain
3 rates?
4    A.  No.
5    Q.  Are you familiar at all with the name
6 Tyler Wright?
7    A.  No.
8       Did you say --
9       No.  Tyler Wright, no.  I'm sorry.
10   Q.  Do you know Tyler Wright to have been a
11 customer of the Prestige Insurance Group, LLC?
12   A.  No.
13   Q.  Do you know whether anybody on the staff
14 of Prestige Insurance interacted in any way with
15 Tyler Wright?
16   A.  I do not know.
17   Q.  At any point prior to today, and besides
18 what you may have discussed with your counsel, have
19 you talked about or been interviewed about any
20 issues involving Tyler Wright?
21   A.  No.  Never.
22   Q.  If you could go down a little bit further
23 on the document, actually on the next page, page 4
24 of the Summary of Evidence, and I'd like you to
25 focus on Daisy Shaffer, customer Daisy Shaffer,

Page 164

1 which is in that second bullet on the -- on page 4.
2       You see that?
3    A.  Yes.
4    Q.  It says:  Customer Daisy Shaffer worked
5 with LSP Little to complete her auto application.
6 She's not aware of, nor did she consent, to a
7 renter's policy and Little did not discuss the
8 multi-policy discount with her (we observed in the
9 audit that Shaffer received the multi-policy
10 discount on her auto policy and the renter's policy
11 was canceled flat after the customer submitted a
12 complaint that she never consented to purchase it.
13 The policy was affiliated with EA Cicciarelli, but
14 contained the sub producer code of LSP Little) end
15 quote -- end parenthesis.
16       Do you see all that?
17   A.  I do see that, yes.
18   Q.  Is this a situation that you're familiar
19 with involving Ms. Shaffer?
20   A.  It has never been brought to my attention.
21   Q.  Have you had any conversations with
22 Ms. Little about Daisy Shaffer, or any situation
23 that sounded like the situation described here?
24   A.  Not that I can recall.
25   Q.  You've never spoken with Daisy Shaffer

Page 165

1 yourself?
2    A.  Not that I recall.
3    Q.  Are you aware of any situation which a
4 person on the staff of Prestige Insurance wrote a
5 policy and gave a customer a multi-policy discount,
6 only to then have one of the policies canceled
7 shortly after the insurance was written?
8    A.  Could you rephrase that?
9    Q.  Yeah.  Let me ask it this way:  Are you
10 aware of any situation in which a member of the
11 staff of Prestige Insurance wrote a policy, or
12 issued a policy, in addition to the one the customer
13 may have asked for and without the customer's
14 consent to try and get that customer a discount --
15   A.  No.
16   Q.  -- an unearned discount?
17   A.  No.  And I'm not aware of -- I do not
18 recall that scenario.  No, to answer your question.
19   Q.  Have you ever heard of that happening,
20 where a producer would talk to a customer about auto
21 insurance, sell that customer an auto insurance
22 policy and say:  Hey, you know, take out a renter's
23 insurance policy for a day, I'll give you a
24 multi-line discount and then you can cancel the
25 policy and you'll still get the discount?

42 (Pages 162 - 165)

1    A.  I would terminate someone if I was aware
2 of that.
3    Q.  Turning your attention to the next bullet:
4 Customer Icilga Lawrence quote: stated she and her
5 husband, Fitzroy Lawrence, were married and although
6 she did not recall being asked about her marital
7 status when she completed her application, she
8 would've told the agency she was married.  She did
9 not complete a homeowner's quote at the time she
10 applied for her auto and the male representative she
11 spoke with did not discuss the multi-policy discount
12 with her.  We observed that the policy was issued
13 with the marital status listed as separated.
14 Numerous consumer reports were run on the insureds
15 and the insurance score was highest when the reports
16 were run for the spouses together.  The multi-policy
17 discount was applied -- was applied using the
18 homeowner's quote, which was never bound.  The
19 policy was affiliated with LSP Rice.
20     Do you -- do you have any familiarity with
21 this situation described in what I just read to you?
22    A.  No.
23     Again, I would've terminated someone if I
24 had known about this.
25    Q.  Did you know LSP Rice?

1    A.  I know that -- yes, I know -- that's
2 Joshua Rice.
3    Q.  Are you aware of the situations that went
4 on in your agency, the Prestige Insurance agency,
5 where LSPs would run multiple credit reports in
6 different configurations on customers trying to
7 figure out a configuration that would entitle a
8 customer to a discount?
9    A.  No.
10    Q.  Did you ever see any situations, or are
11 you aware of any situations, in which Mr. Rice gave
12 a customer a multi-policy discount without that
13 customer actually purchasing more than one policy
14 with a -- with the company?
15    A.  Absolutely not.
16    Q.  When was the last time you spoke with
17 Joshua Rice?
18    A.  The day I -- the day I had to let them go.
19 I would have to imagine he was in that -- in that
20 group.
21    Q.  And I take it you don't know Icilga
22 Lawrence or Fitzroy Lawrence; is that correct?
23    A.  That's correct.
24    Q.  Going on to the next bullet, Troy
25 Misiak -- Misiak.  It says: "Spoke with LSP

1 Hennessey over the phone to complete his application
2 and communicated to him that Kristin Kelly was his
3 fiancée and they were both the registered owners of
4 the Silverado truck on the policy (We observed that
5 Kristin Kelly was not rated on the policy or listed
6 as an operator.  The policy was affiliated with LSP
7 Hennessey)."
8     Do you know anything about this situation
9 described here?
10    A.  No.
11    Q.  Do you know either Troy Misiak or Kristin
12 Kelly?
13    A.  I do not.
14    Q.  Have you ever spoken with LSP Hennessey
15 about this situation?
16    A.  An undisclosed driver?  No.  I --
17     None of these were brought to my attention
18 at any point, even when I asked for, you know, those
19 audits to be done.
20    Q.  The next bullet refers to an individual by
21 the name of Lillian Cromuel.  And it says, quote,
22 that she "Confirmed that her spouse is Quintis
23 Cromuel and that the Dodge Ram on the policy is
24 registered to both of them.  She provided this
25 information at the time of her application through a

1 male named Jonathan (We observed that Quintis
2 Cromuel was not rated on the policy.  The
3 application was affiliated with the bind ID of LSP
4 Hunter but the sub producer code is affiliated with
5 LSP Jonathan Wilks.)"
6     And my question to you with respect to
7 Ms. Cromuel is similar to the ones I asked before.
8 Do you know anything about this situation involving
9 Ms. Cromuel?
10    A.  I do not.
11    Q.  And Jonathan Wilks was someone that worked
12 for the Prestige agency; is that correct?
13    A.  Correct.
14    Q.  This seems to involve a situation also
15 involving an undisclosed driver; is that right?
16    A.  That's a -- yes, that does seem to be the
17 case.
18    Q.  When did you learn that the Prestige
19 agency was under investigation by Allstate?
20    A.  Mid-September, I believe.
21    Q.  What were you told about the fact that the
22 Prestige agency was under investigation?
23    A.  Other than they are investigating me,
24 nothing, really.
25     I felt pretty confident that I would be --

43 (Pages 166 - 169)

Page 170

1 that I was doing everything, again, with my Allstate
2 counterparts to ensure that, you know, something
3 like this wouldn't happen.
4     Q.  Were you told why the agency was under
5 investigation?
6     A.  I don't recall.
7     Q.  Did you ask why the agency was under
8 investigation?
9     A.  I'm sure I did.  But I just don't recall
10 what exactly was the -- the reason given.
11         MR. LIAN:  Andrew, could you please go to
12     the Exhibit 4?
13 BY MR. LIAN:
14     Q.  I'm gonna turn your attention,
15 Mr. Cicciarelli, back to Exhibit No. 4, which is the
16 First Amended Complaint.
17         Do you have that exhibit in front of you,
18 Mr. Cicciarelli?
19     A.  Yes.
20     Q.  Okay.  If you could please scroll down to
21 paragraph 51 of the First Amended Complaint and let
22 me know when you're there.
23     A.  I'm here.
24     Q.  Okay.  It's -- I'll just read it for the
25 record.

Page 171

1         "The information provided by Plaintiffs
2 and corroborated by Allstate's own employees
3 demonstrated that with respect to representations
4 made by Plaintiffs in their application, Allstate
5 was fully aware of and assented to modifications and
6 authorized amendments to Plaintiffs amended
7 operations prior to the time Plaintiffs began
8 business on or around August 1st, 2020 as was
9 common practice with Allstate."
10         My question to you is:  What were the --
11 what is the "modifications and authorized
12 amendments" that is referred to or are referred to
13 here in paragraph 51?
14     A.  My assumption is that what's being
15 referred to here is, again, the -- the quoting that
16 was done in the Rivas agency prior to Prestige
17 Insurance opening, and then the binding of those
18 policies.
19         In speaking with Kaylee, she said:  This
20 is what we've always done.
21         You can ask any FSL.  They spoke about
22 this in a meeting for the whole office that, you
23 know, a bunch of FSLs that are participating in it,
24 that was a very -- it was a common practice.
25         Further, the modifications and authorized

Page 172

1 amendments, I'm assuming those are the documents
2 that Jarius provided on how to open those quotes and
3 bind them under Prestige.
4         That's how I would interpret that.
5     Q.  If you go to the next paragraph, that's
6 52, which, for the record, reads:  "Further, with
7 respect to Policies written by Plaintiff's employees
8 Allstate was fully aware of circumstances that false
9 or misleading information was provided by certain
10 customers to Plaintiff's employees which is
11 commonplace in the insurance industry."
12         My question to you, Mr. Cicciarelli, is:
13 What -- what customers are you referring to here and
14 what circumstances are you referring to in regard to
15 the statement that Allstate was fully aware of such
16 circumstances?
17     A.  I don't know.  I don't know the answer to
18 that at this point.
19     Q.  I'm gonna ask you with respect to
20 paragraph 53.  It says:  Certain customers also
21 provided information to Allstate subsequent to
22 issuance of Policies which contradicted information
23 they previously provided to Plaintiff's employees."
24         My question to you is:  Which customers
25 are you referring to here?

Page 173

1     A.  I don't recall.  I really didn't think
2 about scenarios to -- that would apply to that
3 bullet point.  Off the top of my head, I don't
4 recall.
5     Q.  Are you aware of any --
6         Strike that.
7         Are you aware of any customers for whom
8 Prestige Insurance submitted an insurance
9 application, or bound an insurance application,
10 where that information subsequently contradict --
11 the information in that policy was subsequently
12 contradicted?
13     A.  Can you rephrase that one more time or
14 restate it?  I'm sorry.
15     Q.  That was not a great question; I'll ask it
16 again.
17         Are you aware of any circumstances --
18 really, what I'm asking is:  In this paragraph 53,
19 are you aware of any circumstances where a policy
20 quoted and/or bound by Prestige Insurance contained
21 information that -- from the customer, that was
22 subsequently contradicted in some fashion?
23     A.  I don't recall.  I mean, I -- I don't -- I
24 don't recall.
25     Q.  If you could go to the next page,

44 (Pages 170 - 173)

Page 174

1 paragraph 56. And it reads: "In particular, an
2 Allstate Agency Process Specialist began assisting
3 Cicciarelli because no compliance training was
4 offered by Allstate until at least 45 days after
5 Plaintiff began business found no issues with any
6 policies that Prestige wrote."
7      Do you see that?
8    A.  I do.
9    Q.  I'd like to break that down a bit. It
10 says no compliance -- on the point about "no
11 compliance training being offered until at least 45
12 days after Plaintiff began business."
13      Did you have an expectation that
14 compliance training would be provided sooner than
15 that?
16    A.  That -- that -- I think that should read
17 more "reporting" from Allstate was offered.
18      So I think there's another set of
19 reporting coming from the compliance standpoint that
20 comes along, you know, at least 45 days. But comes
21 along at some point.
22      I don't know or recall how long it took,
23 but, you know, this is, again --
24      I don't know what the question is. I'm
25 sorry. I lost my frame of mind a little bit.

Page 175

1      But compliance training, I know that there
2 weren't reports that are available until later. So
3 that's why I was asking for the assistance being
4 provided about that.
5    Q.  Okay. And when you say here in paragraph
6 56 that "no issues with any of the Policies that
7 Prestige wrote were found," what was the -- what was
8 the scope of that compliance review that you are
9 referring to here and what was -- what was the scope
10 of it?
11    A.  That would be a better question for the
12 two Agency Process Specialists because there was not
13 just one, there was two that actually were looking
14 through my policies and found there were no issues.
15 That was Mario Castro and Jarius Hollinger.
16    Q.  Do you know the name Tammy Slider?
17    A.  I do not.
18    Q.  Are you aware whether an individual by the
19 name of Tammy Slider was a customer of the Prestige
20 Insurance, LLC?
21    A.  I do not.
22      MR. LIAN:  Let's go off the record. We'll
23 take a little break.
24      THE VIDEOGRAPHER:  We are off the record
25 at 2:49 P.M.

Page 176

1      (A break was taken at 2:49 P.M.)
2      (Return from break was at 3:08 P.M.)
3      THE VIDEOGRAPHER:  This begins Media Unit
4 5.
5      We are back on the record at 3:08 P.M.
6 BY MR. LIAN:
7    Q.  Referring you back to the First Amended
8 Complaint we were looking at before. And if you
9 could go to Exhibit No. -- Exhibit B -- actually,
10 let's start with Exhibit D as in "dog."
11      Let me know when you're there,
12 Mr. Cicciarelli.
13      Are you there?
14    A.  I'm working my way down but still on C, I
15 believe.
16    Q.  Okay.
17    A.  There's D. Here we go. I'm here.
18    Q.  After you received this letter, this
19 November 13th, 2020 letter, did you talk to anybody
20 in your staff to try and gain an understanding as to
21 what this letter was referring to?
22    A.  I haven't spoken to --
23      No, to answer your question.
24    Q.  Did you, as the owner of Prestige
25 Insurance Group, undertake any sort of investigation

Page 177

1 to try and ascertain what the letter was referring
2 to?
3    A.  I mean, other than asking for, you know,
4 what the findings were?
5      Again, I was -- on that day, excuse me, I
6 did not have access to anything regarding Allstate
7 from technologies. Even the laptops, anything. It
8 was, basically, you know, big paperweights at that
9 point. And so I -- I --
10      No, my hands were tied.
11    Q.  Okay. Did you ask anybody from Allstate
12 what this referred to? What the issues were that
13 were found in the investigation?
14    A.  I -- yes. Yes, I did ask.
15    Q.  Whom did you ask?
16    A.  I believe, Char. She was the one that
17 told me that, you know, they were terminating my
18 agreement.
19    Q.  What did you ask of Char?
20    A.  You know, I think -- I don't recall
21 exactly what I asked.
22      But, you know, I was upset, obviously. I
23 thought I did everything that I possibly could have
24 done, you know, day-in-day-out from prior to opening
25 until this day. So it was upsetting.

45 (Pages 174 - 177)

1        But, yeah, I don't recall exactly what I
2 asked but, you know, obviously, we had a
3 conversation.  I just don't recall what it was.
4    Q.   Did you contact Char Jordan?
5    A.   She contacted me.
6    Q.   How did she contact you?
7    A.   On the -- on the -- I think she called
8 my -- I think she called me.
9    Q.   She contacted you to communicate the
10 termination; is that correct?
11    A.   That's correct.
12    Q.   Separate and apart from the conversation
13 you had about the termination, did you talk to her
14 about any other issues regarding the findings of the
15 investigation or the basis for the termination aside
16 from what's described in the letter?
17    A.   I don't recall.
18    Q.   Did you ask Char Jordan what the findings
19 of the investigation were that led to the
20 termination?
21    A.   I would assume I did; I just don't recall,
22 you know, the conversation.
23    Q.   There's an allegation in the Complaint,
24 that paragraph 86, that Allstate had not paid the
25 termination payment to your agency.

1        Is it my understanding that you have
2 indeed been paid the termination payment now?
3    A.   I have not been paid.  They -- no; I have
4 not been paid.
5    Q.   You've not been paid the termination
6 payment?
7    A.   It's -- I believe the part of that
8 allegation is they didn't -- I wasn't able to sell
9 my book.
10    Q.   Let me break it down.  Let's divorce it a
11 second from paragraph 86.
12        Have you been paid the termination payment
13 called for under the R3001 Agreement when an agency
14 terminates?
15    A.   I would say -- I did not receive any
16 termination payment.
17    Q.   You've not received any payment, any
18 termination payment from Allstate?
19    A.   What constitutes a "termination payment"?
20    Q.   Well, it's my understanding under the
21 R3001 Agreement that agencies that don't sell an
22 interest in their agencies are entitled to a
23 termination payment based on a formula set forth in
24 the supplement to the R3001 Agreement, which is
25 calculated based on the number of policies that

1 qualify for the termination payment.
2        And my question to you is:  Are you aware
3 of any termination payment that you received or
4 portion of a termination payment that you received
5 from Allstate?
6    A.   I did not receive any termination payment.
7    Q.   Can you please tell us, for the record,
8 what efforts you made as the Prestige Insurance
9 Group to sell the interest in the agency following
10 notification that your agency was terminated?
11    A.   I was assigned an Allstate associate, if
12 you will, Maria Ruether, to help me with the process
13 of selling my book and, I guess, if there was --
14 whatever the opposite of "offering" would be,
15 basically, after termination, you know, I guess,
16 sell the book is really the option that was left.
17        On the termination letter that we just
18 looked at earlier, it said March 1st would be the
19 date that I would need to sell it.  So I -- I asked
20 Maria Ruether for, basically, my business metrics,
21 if you will, so that I could value the book for
22 sale.
23        I want to say it took her 11 days to even
24 respond to that.  No sense of urgency to get that
25 done.

1        When I identified a potential buyer -- and
2 at that point, was looking to move forward on the
3 sale of my book, at the beginning of February, there
4 was another Allstate associate named -- I believe
5 his name is Paul Sylvester, sent an e-mail saying:
6 Oh, you can't sell it anymore; you -- you're past
7 the deadline to sell the book.  And it was February.
8        Not in a termination letter, not in any
9 documentation, was a deadline stated.
10        And, essentially, they took the book and
11 did not give me a termination payment or didn't
12 even -- didn't even go further.
13        I think it was two days past that deadline
14 that, again, was never even brought to my attention,
15 never documented, nowhere, except for that e-mail
16 when I reached out to him.
17        I said:  "What other options are
18 available?"
19        "No other options are available," is what
20 his response was.
21        So they took it.
22    Q.   Who was the -- who was the prospective
23 buyer of the agency that you had spoken with?
24    A.   I was speaking to a few.  I don't recall
25 their names off the top of my head.

46 (Pages 178 - 181)

Page 182

1    THE COURT REPORTER: I'm sorry. You said
2    "I was looking to start that process"?
3    THE WITNESS: Correct.
4    THE COURT REPORTER: Thank you.
5    THE WITNESS: Yes, no problem
6 BY MR. LIAN:
7    Q. You don't remember the names of any of the
8 folks you were speaking with?
9    A. No, I don't. I don't.
10    Q. Had you gotten to the point of having any
11 sort of agreement on terms or agreement on price
12 with any of these prospective buyers?
13    A. I was -- no. Not as of yet.
14    I -- I had advertised the book. I don't
15 recall what price I was trying to get for it. But
16 it really hadn't evolved to that point yet.
17    I guess based on what the communications
18 would've been coming back from Allstate and now from
19 Paul Sylvester, because Maria Ruether had had
20 Mr. Sylvester contact me via e-mail.
21    It would have, you know, provided a -- I
22 was hoping his guidance would help me with that next
23 step to -- to sell the book.
24    Q. Okay. When did you first list the book
25 for sale in an advertisement?

Page 183

1    A. I believe it was right after Maria
2 Ruether -- likely, Maria Ruether -- Maria Reuther
3 gave me the value of the book, as far as, you know,
4 the -- how much premium I had written up to that
5 point.
6    Q. Do you recall at the time what portion of
7 the book of the interest was salable?
8    In other words, was it your understand --
9 What was your understanding as to the number of
10 policies that were available as part of the -- for
11 it to be sold?
12    A. I -- I don't know. I don't remember the
13 number of policies.
14    I think it was based more off the premium
15 amount.
16    And then I think that's -- I believe
17 that's how you value a book is, you know, type of
18 policies, premium amount, the makeup of it, you
19 know.
20    Q. Do you remember what amount of the premium
21 could be factored into the sale of the economic
22 interest in the book?
23    A. I don't recall.
24    Q. Had you discussed with any of the
25 individuals with whom you were speaking the price

Page 184

1 that you might seek for the interest in the agency?
2    A. I -- I don't. I know it was, you know,
3 listed at a price, but, again, I don't even recall
4 what it was listed at. But, you know, it was listed
5 and I had some -- some interested parties, but I
6 don't recall what it was even listed for. No.
7    Q. Do you have a ballpark of what you are
8 listing it for, roughly, what number?
9    A. I don't. I... I don't recall.
10    Q. Was it more or less than the $30,000 you
11 paid for it?
12    A. Much more.
13    Q. Much more twice? Much more three times?
14 Roughly, what do you remember?
15    A. It would probably be worth 30 times that
16 amount at a minimum.
17    Q. "Three zero"?
18    A. Yes. That would -- I believe that book
19 would be worth, you know, roughly, you know, again,
20 I'm --
21    It would be worth more than the $30,000,
22 to answer your question.
23    Q. But sitting here today, you don't know
24 whether you were asking 30 or 60 or 90 or a million,
25 what you had listed it for?

Page 185

1    A. It would probably be in the neighborhood
2 of, roughly, a million dollars.
3    Q. Where did you list it for sale?
4    A. I believe it was on -- I believe there's a
5 website called Allstate For Sale, or something like
6 that. I believe -- I believe it was on that
7 website.
8    Q. Let us know, Mr. Cicciarelli, when
9 Exhibit 17 is posted.
10    A. Okay.
11    (Defendant's Exhibit No. 17 was marked for
12 identification.)
13 BY MR. LIAN:
14    Q. Do you see it?
15    A. I do, yeah.
16    Q. Yeah. I'd like you, if you could, to go
17 through the response to interrogatory Number 13 --
18    A. Okay.
19    Q. -- which is the interrogatory that asks
20 for damages that you claim to have sustained.
21    A. Uh-huh.
22    Q. And there's a chart here.
23    A. Yes.
24    Q. And if you could tell us, how did you come
25 up with this calculation?

47 (Pages 182 - 185)

Page 186

1    A.   The August number where you see the
2 premium of 987,081, that's what I actually wrote.
3        September, I believe, I was right -- I
4 believe I wrote 523.
5        But the issue and then -- my production
6 then, because I had to start terminating my staff
7 because of not getting, you know, policy withholding
8 my ECP bonus, I couldn't continue.  And, you know,
9 my production had to lower.  I had to -- was not
10 "had to lower," I had to get rid of my staff.
11       So, you know -- so if I were to continue
12 and, obviously, you can see the amount that I was
13 producing, I could have continued producing that
14 same amount.  I could have maximized my -- my -- my
15 contract and the value of that book, if I was to be
16 able to continue operations, even as status quo.
17       After four months, I would've, basically,
18 not been able to write until month 13 and just,
19 basically, maintained a book; that cumulative level
20 is under that, you know, $5 million mark.
21       And that's -- that's how -- and this is
22 considering retentions and, you know, 90 percent
23 retention.  You know, different -- different aspects
24 of -- you know.
25       So, you know, in months seven, eight, and

Page 187

1 nine, the policies that I wrote, 1, 2, and 3, and 4.
2 You know, 7, 8, 9, 10 would have renewed, or most of
3 them would've renewed.
4        So just paying attention to, you know, my
5 numbers not to exceed the $5 million cap that
6 Allstate places on ECP agencies.
7        You know, I could have done very little to
8 maintain the value of this book and maximize my
9 contract.
10       Q.   This chart doesn't factor in any expenses
11 associated with operating the agency; is that
12 correct?
13       A.   That's correct.
14       Q.   Let's just make sure we get those down.
15 So the expenses operating the agency would've been,
16 obviously, staff compensation?
17       A.   Yes.  Yes.
18       Q.   And then you had a -- you had an office
19 lease?
20       A.   Uh-huh.
21            Office leads.
22       Q.   What other expenses are there associated
23 with operating the agency?
24       A.   E&O insurance.  You know, staffing and
25 leads are the big ones.  And then you have, you

Page 188

1 know, like you said, rent and just some fixed costs.
2 You know, and I believe I had a power bill,
3 Internet, and things like that.  Yeah.
4        Q.   Did you have a cost of equipment?
5        A.   Did I have a -- yeah.  Well, initially,
6 yes.
7        Q.   What was the rent you were paying in
8 August -- July and August of 2020?
9        A.   God, I -- I -- I don't recall that at this
10 point.
11       Q.   Do you have a ballpark of what the rent
12 was that you were paying?
13       A.   My office space in Tamarac was probably
14 $2600, 20 -- $3,000.  I don't recall the exact
15 number but somewhere in that ballpark.
16       Q.   I think you said about 2300 or 23,000.
17 Was it 2300 --
18       A.   No.  No.  No.  2300 to 2600.
19            Sorry.  That's a big difference.
20       Q.   And then what was your -- what was your
21 monthly staff compensation cost in July -- excuse
22 me -- in August and September of 2020 -- 2020?
23 Excuse me.
24       A.   I don't recall that number off the top of
25 my head.

Page 189

1        It was -- Yeah, I would be guessing.  I
2 don't know.
3        Q.   Can you give us a ballpark of what it was
4 if you had --
5        I think you testified you had somewhere
6 between 15 and 20 people working for you and a
7 combination of --
8        A.   It would probably be in the neighborhood
9 of -- of, you know, 130, 150.  It depends on how
10 much they produced.
11       And August being the bigger month,
12 probably in the hundred and something -- over a
13 hundred thousand dollars.
14       Q.   So 130 to 150 a month?
15       A.   For that first month; not in each of these
16 months.  After four months, my staffing costs were
17 reduced to, basically, nothing.  You know, very
18 little.
19       Customer service reps, that sort of thing,
20 to maintain -- to, you know, maintain the book.  And
21 that would be the bigger expense later on.  I had
22 two customer service reps and would likely need more
23 if, you know, if I was able to continue building the
24 book, maybe another one.  Maybe two.  You know.
25       Q.   What were you paying for leads?

48 (Pages 186 - 189)

1     A.  It -- it -- it fluctuated.  At that point,
2  I was probably spending, roughly, 100,000 for a
3  couple of months, for about two months.
4     Q.  When did you begin purchasing leads?
5     A.  In July.
6     Q.  So is that how your staff was able to call
7  folks and make these quotes, is by using these leads
8  that you were purchasing?
9     A.  Yes.
10     Q.  And then what -- what did E&O insurance
11  run per month?
12     A.  It's -- I don't think it was -- I think I
13  paid in full.  I don't think it was -- it was very
14  little.  It's not expensive at all.  Maybe a
15  thousand dollars.  I don't recall.
16     Q.  What was the cost of the other utilities
17  and Internet and that sort of thing?  What were you
18  paying for that?
19     A.  Minimal.  That wasn't very expensive at
20  all.  You know, a couple of hundred dollars here, a
21  couple of hundred dollars there.  Not -- not
22  substantial.
23     Q.  Let's go back to Exhibit No. 17.  I just
24  want to, kind of, walk through this chart again and
25  make sure that I understand the calculation here.

1        So if we're looking at the New Premium
2  Issued Month 1, 2, 3, 4, 987,081.  Is it correct
3  that that was -- you used that as the actual amount
4  that was issued in that first month?
5     A.  That's correct.
6     Q.  Okay.  And then the 523,539.  Since that
7  repeats over the next four months -- or three
8  months, is that how much was actually issued or is
9  that which you were projecting?
10     A.  I -- to the best of my recollection, I
11  believe that's what I produced in month two.
12     Q.  Okay.  And then you just replicated that
13  across the next two months in October, November?
14     A.  Correct.  I -- on this chart I did.
15        In reality, I did not because when
16  Allstate was not paying me my ECP bonus, my business
17  was, to say the least, you know, I wouldn't say
18  "sabotaged," but, you know, it was hard.  You know,
19  it was unrecoverable at that point, what they had
20  done.
21     Q.  And what -- the rate or commission amounts
22  that you see reflected in the next column over, the
23  78,966 and then the 41,883.  What of those did you
24  actually receive?
25     A.  I probably received those.  I didn't get

1  paid the bonus.
2     Q.  Okay.  The bonus is the second to the last
3  column, the ECP Bonus paid on cumulative book is
4  98,708 652,135.  Is that what you're referring to?
5     A.  Correct.
6     Q.  Did you prepare this chart?
7     A.  Yes.
8     Q.  When did you prepare this chart?
9     A.  While I was running my business.
10        I've updated -- I have updated it, but
11  this was one of the charts that I used.  Yeah, one
12  of my spreadsheets.
13     Q.  And then the last column on the far right
14  side:  Total monthly commission and bonuses is the
15  sum of the regular commissions and then the ECP
16  bonuses; is that correct?
17     A.  That's correct.
18     Q.  And I also want to make sure that I
19  understand your assumptions here.  So the assumption
20  that you're making in this chart is that you would
21  sell policies for the first four months and then it
22  shows that between month five, December, and month
23  12, the following July, there are no -- there's no
24  new premium issue; is that correct?
25     A.  Correct.  I would -- I would have stopped

1  writing, if I would've been able to hit those
2  numbers, which I assume I would have.  You know,
3  there's no reason I couldn't have.
4     Q.  Why would you have stopped selling
5  altogether?
6     A.  Because the ECP bonus would have stopped
7  being paid if I would have exceeded $5 million for
8  the cumulative -- cumulative book value -- book
9  size, what you see there in that column.
10     Q.  I see.
11        So the idea was to build it up to a
12  $5 million level and then, essentially, shut down
13  and stop selling so you could stay below the
14  5 million-dollar premium level to be eligible for
15  the ECP bonus; is that correct?
16     A.  That's correct.
17     Q.  And then your assumption here -- and I'm
18  just referring to your chart now.  Your assumption
19  here is that in month 13, you would begin selling
20  again and sell at a level of approximately $50,000
21  per year to keep the book at or below 5 million and
22  to account for attrition; is that correct?
23     A.  That's -- that's accurate.
24     Q.  Okay.  And then the next column over shows
25  the monthly commissions you had earned on new

Page 194

1 commissions and then the next column after that is
2 renewals?
3    A.  Correct.
4    Q.  And you're assuming a 90 percent retention
5 rate; is that right?
6    A.  That's correct.
7    Q.  The renewal commissions at 8 percent, the
8 next column over?
9    A.  Uh-huh.
10   Q.  "Yes"?
11   A.  Yes.  Yes.  I'm sorry.  Yes.
12   Q.  Okay.  And then the Cumulative Book Size
13 is what is reflected in the next column?
14   A.  Correct.
15   Q.  And I note that you use an 88 percent
16 retention on that column.  Why is that?  Why do you
17 use 88 percent there and 90 percent on the renewal
18 premium?
19   A.  I believe that's, you know, more along
20 the industry, kind of, standard, if you will, or,
21 you know, what -- you know, the retention.
22      But the reason why I use two different
23 numbers, I don't recall.
24   Q.  Okay.  In the ECP bonuses, your
25 calculation of what the bonus is what you believe

Page 195

1 you were entitled to under the ECP program?
2    A.  Yup.  Yes.
3    Q.  Okay.  And then the total in the last
4 column is the sum of the new and renewal commissions
5 and then the total monthly -- and the ECP bonus,
6 correct?
7    A.  That's correct.
8    Q.  Okay.  Okay.
9    MR. LIAN:  Okay.  I'm gonna go off the
10 record.  We can take five minutes or so.  Well,
11 let me take 10 minutes, I think I may be able
12 to wrap up.
13   THE VIDEOGRAPHER:  We are off the record
14 at 3:44 P.M.
15   (A break was taken at 3:44 P.M.)
16   (Return from break was at 4:01 P.M.)
17   THE VIDEOGRAPHER:  We are back on the
18 record at 4:01 P.M.
19   MR. LIAN:  Okay.  We have no further
20 questions, so we'll go off the record.
21      And Mr. Cicciarelli, thank you for your
22 time today.  And Counsel, Madam Court Reporter,
23 and Mr. Videographer, thank you all; I
24 appreciate your time today.
25   THE COURT REPORTER:  How about reading or

Page 196

1 waiving?
2    MR. LIAN:  John, your call.
3    MR. HUBBARD:  I generally don't.  I
4 just -- you know, it's up to you.
5    MR. LIAN:  Yeah, I would expect the
6 witness to read and sign.
7    MR. HUBBARD:  Okay.  That's fine.
8    THE COURT REPORTER:  And do you want this
9 written?
10   MR. LIAN:  I'm sorry.  Which aspect?
11   MR. HUBBARD:  Yeah.
12   THE COURT REPORTER:  Do you want this
13 deposition typed up or hold on to it?
14   MR. LIAN:  Yes.  No, please.  Yes, please.
15   MR. HUBBARD:  We would like to order it
16 too, yes.
17   THE COURT REPORTER:  Okay.  And do you
18 want this in regular delivery?  Because I heard
19 a little rumor that you wanted it ASAP.
20   MR. LIAN:  Yeah, tell us what" regular
21 delivery" versus "ASAP" means.
22   THE COURT REPORTER:  "Regular delivery is
23 10 business days, which equates to about two
24 weeks.
25   MR. LIAN:  And what would be, if we were

Page 197

1 to do --
2    THE COURT REPORTER:  You have rushed,
3 overnight, two days, three days, a week,
4 whatever.  I mean, I can tell you it is almost,
5 200 pages, so it will take me a day or so to do
6 it.
7    MR. LIAN:  Can we do a week?  Would that
8 work?
9    THE COURT REPORTER:  Yes, that's even
10 better.
11      And Mr. Hubbard, do you want it in a week
12 as well or do you want regular?
13   MR. HUBBARD:  A week's fine.
14   THE COURT REPORTER:  Okay.
15   THE INTERPRETER:  Any video orders?
16   MR. LIAN:  Not for now.  I'll let you
17 know.
18   THE VIDEOGRAPHER:  We are off the record
19 at 4:03 P.M.
20   (CONCLUDED AT 4:04 P.M.)
21
22
23
24
25

Page 198

1       CERTIFICATE OF OATH
     VIDEO CONFERENCE PROCEEDINGS
2
3 STATE OF FLORIDA
  COUNTY OF BROWARD
4
5
6      I, DEBRA KIRSHEN, Shorthand Reporter and
7 Notary Public, State of Florida, certify that Ulises
8 Cicciarelli appeared before me via videoconference
9 on the 3rd day of August, 2022 and was duly
10 sworn/affirmed.
11
12      WITNESS my hand and official seal this 9th
13 day of August, 2022.
14
15
16
17   Debra, Notary Public, State of Florida
    My Commission: GG256220.
18    Expires: 10/21/2022
19
20
21 Personally known    _____
22 Produced Identification X
23 Type of Identification Produced: FL driver's license
24
25

Page 199

1    REPORTER'S DEPOSITION CERTIFICATE
2
3      I, Debra Kirshen, Court Reporter, certify
4 that I was authorized to and did transcribe the
5 deposition of ULISES CICCIARELLI, that a review of
6 the transcript was requested; pages 1 through 197 of
7 that transcript is a true and complete record of my
8 notes of the deposition by said witness.
9      I further certify that I am not a
10 relative, employee, attorney or counsel of any of
11 the parties, nor am I a relative or employee of any
12 of the parties' attorney or counsel connected with
13 the action.
14      Sworn to and subscribed before me this
15 9th day of August, 2022.
16
17
18
19
20
21
22
23   Debra Kirshen
   Court Reporter
24
25

Page 200

1 ULISES CICCIARELLI      August 9, 2022
  John Hubbard, Esquire
2 jhubbard@hsplc.com
3
  RE: Prestige Ins.Group vs. Allstate Ins. Company
4   8/3/2022 Witness: ULISES CICCIARELLI
5 The above-referenced transcript is available for
  review.
6
  ULISES CICCIARELLI should read the testimony to
7 verify its accuracy. If there are any changes,
  ULISES CICCIARELLI should note those with the reason
8 on the attached Errata Sheet.
9 ULISES CICCIARELLI should, please, date and sign the
  Errata Sheet and email to the deposing attorney, as
10 well as to Veritext at Transcripts-fl@veritext.com
  and copies will be emailed to all ordering parties.
11
  It is suggested that the completed errata be
12 returned 30 days from receipt of testimony, as
  considered reasonable under Federal rules*, however,
13 there is no Florida statute to this regard.
  If the witness fails to do so, the transcript may be
14 used as if signed.
15
16 Yours,
17 Veritext Legal Solutions
18
19 *Federal Civil Procedure Rule 30(e)/Florida Civil
20 Procedure Rule 1.310(e).
21
22
23
24
25

Page 201

1 Prestige Ins.Group vs. Allstate Ins. Company
  Witness: ULISES CICCIARELLI
2 Job No. 5330229
3     E R R A T A S H E E T
4 PAGE____ LINE____ CHANGE_____
5 _____
6 REASON_____
7 PAGE____ LINE____ CHANGE_____
8 _____
9 REASON_____
10 PAGE____ LINE____ CHANGE_____
11 _____
12 REASON_____
13 PAGE____ LINE____ CHANGE_____
14 _____
15 REASON_____
16 PAGE____ LINE____ CHANGE_____
17 _____
18 REASON_____
19 Under penalties of perjury, I declare that I have
20 read the foregoing document and that the facts
21 stated in it are true.
22
23
24 _____
25   ULISES CICCIARELLI     DATE

51 (Pages 198 - 201)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.