# EXHIBIT 15

Page 1

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
2          FT. LAUDERDALE DIVISION

3

4          CASE NO: 0:21-cv-60515-FAM

5

6    Prestige INSURANCE GROUP, LLC, a Delaware
     Limited Liability Company and
7    ULISES CICCIARELLI, an individual,

8                 Plaintiffs,

9    VS.

10   ALLSTATE INSURANCE COMPANY, an Illinois Corporation,

11

12                Defendant.
     _____

13

14

15                Zoom Videoconference
                  Lakeland, FL
16                August 18, 2022
                  9:38 A.M. - 11:53 A.M.

17

18

19      VIDEOTAPED DEPOSITION OF JOSHUA RICE

20

21       Taken before MARIA FERNANDEZ, RPR, FPR-C
22       and Notary Public for the State of Florida at
23       Large, pursuant to Defendant's Notice of
24       Deposition filed in the above cause.

25

Page 2

1 APPEARANCES:
2 On Behalf of the Plaintiffs:
3 HUBBARD SNITCHLER & PARZIANELIO, PLC
   801 W Ann Arbor Trail, Suite 240
4 Plymouth, MI 48170
   BY:  JOHN HUBBARD, ESQ.
5     jhubbard@hspplc.com
6
7 On behalf of the Defendant:
8 AKIN GUMP STRAUSS HAUER & FELD, LLP
   2001 K Street, NW
9 Washington, DC 20006
   BY:  ANDREW GEAR, ESQ.
10    agear@akingump.com
   BY:  KATHERINE HEISE, ESQ.
11    kheise@akingump.com
12
13 ALSO PRESENT:
14 Derek Schafer, Videographer
   Mary Hale
15
16
17 REPORTED BY:
18 Maria Fernandez, RPR, FPR-C
   Veritext Legal Solutions
19 2 South Biscayne Boulevard, Suite 2250
   Miami, FL 33131
20
21
22
23
24
25

Page 3

1            I N D E X
2
3 Examination              Page
4 Joshua Rice
5 Direct  By Mr. Gear        5
6
7    DEFENDANT'S EXHIBITS MARKED FOR IDENTIFICATION
8
9 Exhibit 18 Subpoena for Depo    13
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1        THE VIDEOGRAPHER:  Good morning.  We are
2 going on the record at 9:36 a.m. on August 18,
3 2022.
4        Please note that this deposition is being
5 conducted virtually.  Quality of recording
6 depends on the quality of camera and internet
7 connection of participants.  What is seen from
8 the witness and heard on screen is what will be
9 recorded.
10       Audio and video recording will continue to
11 take place unless all parties agree to go off the
12 record.  This is media unit one of the
13 video-recorded deposition of Joshua Rice, taken
14 by counsel for defendant in the matter of
15 Prestige Insurance Group, et al versus Allstate
16 Insurance Company, an Illinois Corporation, filed
17 in the United States District Court, Southern
18 District of Florida, Fort Lauderdale Division,
19 case number 0:21-cv-60515-FAM.
20       The location -- this deposition is being
21 conducted remotely using virtual technology.  My
22 name is Derek Schaefer representing Veritext
23 Florida and I'm the videographer.  The court
24 reporter today is Maria Fernandez, also from
25 Veritext Florida.

Page 5

1        I am not authorized to administer an oath,
2 I'm not related to any party in this action, nor
3 am I financially interested in the outcome.
4        If there are any objections to proceeding,
5 please state them at the time of your appearance.
6 Counsel and all present, including remotely, will
7 now state their appearance and affiliations for
8 the record, beginning with noticing attorney.
9        MR. GEAR:  Hi, my name is Andrew Gear.  I'm
10 here with my colleague Kate Heise, and we
11 represent defendant, Allstate Insurance Company.
12       MR. HUBBARD:  John Hubbard appearing on
13 behalf of the plaintiffs.
14 Thereupon:
15        JOSHUA RICE,
16 A witness named in the notice heretofore filed,
17 being of lawful age and having been first duly
18 sworn, testified on his oath as follows:
19       THE WITNESS:  I do.
20        DIRECT EXAMINATION
21 BY MR. GEAR:
22       Q Thanks.  If we're ready to begin.
23       Mr. Rice, can I ask you to state your full
24 name for the record.
25    A  Joshua David Rice.

2 (Pages 2 - 5)

Page 6

1      Q Have you ever been deposed before?
2      A   No.
3      Q Have you ever testified in a legal
4   proceeding before?
5      A   No.
6      Q I want to start by just laying out some
7   ground rules.  I will be asking questions and
8   request that you answer completely and
9   truthfully.
10      The court reporter will be recording your
11   answers.  To help her in her job, I ask that you let
12   me finish my question before you answer.  I'll try and
13   do the same, extend the same courtesy to you.
14      I also ask that you provide verbal
15   responses.  So, you know, to the extent you're
16   answering the question with yes or no, please do so
17   verbally.  Nodding or shaking your head is hard to
18   record in a transcript, so let's try to avoid that to
19   the extent possible.
20      If you don't understand one of my questions,
21   please ask for clarification, otherwise I'll assume
22   you do understand.
23      Mr. Hubbard may offer some objections --
24   objections at times; please let him state his
25   objection, but you can then proceed to still answer

Page 7

1   the question after he states his objection.
2      We can take breaks, all I ask is that you
3   answer any pending question first before we go on a
4   break.
5      We're obviously doing this over Zoom so
6   we'll take our time to make sure it goes smoothly, but
7   if there is any issue with your technology, please
8   speak up and we can address it at that point.
9      A few kind of basic questions before we --
10   before we jump in.  Is there any reason you're not
11   able to understand my questions and testify truthfully
12   today?
13      A   No, no reason.
14      Q Are you taking any drugs or medications
15   that would affect your ability to understand my
16   questions and testify truthfully?
17      A   No, perfectly clear.
18      Q What is your date of birth?
19      A   ███████.
20      Q And what is your current home address?
21      A   ████████████████████████
███████████████████.
23      Q And how long have you lived there?
24      MS. HALE:  One and a half years.
25      THE WITNESS:  One and a half years.

Page 8

1 BY MR. GEAR:
2      Q And can I ask who's in the room with you
3   today?
4      MS. HALE:  I'm his mother.
5      MR. GEAR:  Okay.  Thank you.
6      MS. HALE:  And does he need an attorney for
7   this?  Is this a civil case?  Is this a criminal
8   case?
9      MR. GEAR:  This is a civil case, and he
10   should not need an attorney for this.  You know,
11   I leave that up to him, but this is a civil case
12   between a former Allstate agency and former
13   Allstate agency owner, and Allstate Insurance
14   Company.
15      MS. HALE:  Okay.
16 BY MR. GEAR:
17      Q What's the highest level of education
18   you've completed, Mr. Rice?
19      A   High school.
20      Q And what year did you graduate?
21      A   2007.
22      Q Have you ever been convicted of any crime?
23      A   Yes.
24      Q Can you tell us what that is?
25      A   Shoplifting, misdemeanor.

Page 9

1      MS. HALE:  It was expunged.
2      THE WITNESS:  It was expunged, yeah, but
3   several years ago.  That's the only one.
4      MS. HALE:  He was 19.
5      MR. GEAR:  Excuse me.  Please allow Mr. Rice
6   to answer the questions.  I appreciate your
7   assistance, but yeah, please allow Mr. Rice to
8   answer the questions for us today.
9 BY MR. GEAR:
10      Q Have you ever --
11      A   I can't remember the -- oh, sorry.
12      Q Sorry.  Go ahead.
13      A   I can't remember the exact date, but it's
14   been several years, but that's the only one.
15      Go on, sir.
16      Q Have you ever been accused of a crime
17   involving dishonest or financial misconduct?
18      A   No.
19      Q What e-mail addresses have you used since
20   April 2020?
21      A   April 2020, the one here,
22   ████████████████████████████████████████ is
23   mine.  I think that's it, that I can recall.
24      Q Did you have a Prestige Insurance Group
25   e-mail address?

3 (Pages 6 - 9)

Page 10

```
 1    A   Yeah.  Sir, I did -- I did have a business
 2  address there.  I don't remember the e-mail -- the
 3  exact e-mail, through.
 4        QThat's okay.
 5        Any other e-mail addresses that you can
 6  remember?
 7    A   If we're talking about the corporate
 8  e-mails, there's been, like, four jobs since then I've
 9  had e-mails.  I know I had a USAA e-mail.
10        QOkay.  No worries about getting into those.
11  Thank you, though.
12        What phone numbers have you used since April
13  of 2020?
14    A   [REDACTED] is my primary personal line.
15  I've had a couple of business lines as well.
16        QOkay.  Thank you.
17        What employment did you have prior to your
18  work with any Allstate agency?
19    A   GEICO was the main one there for about three
20  and a half, four years.  Before that was trap --
21  Target, and like Home Depot, some, like, roundabout
22  jobs.  The most permanent was the GEICO right before
23  Allstate for about four years.
24        QAnd when would -- what time frame would
25    that have been?
```

Page 11

```
 1    A   26 March of '16 right up until Allstate,
 2  somewhere in that area, if I'm remembering correctly.
 3        QAnd what previous employment did you have
 4    with an Allstate agency prior to Prestige
 5    Insurance Group?
 6    A   There was another insurance group, I don't
 7  recall their name, but it was an Allstate local agency
 8  as well.
 9        QDo you recall the name of the agency owner?
10    A   I don't.
11        QAnd what time frame would that employment
12    with the previous Allstate agency have been?
13    A   That one was right after GEICO, so you had
14  about three months there.  Right after GEICO, there
15  was a week or two stint between Prestige and -- I
16  still don't know the name of that one -- but Prestige
17  and the former company, and then we went to Prestige
18  -- or I went to Prestige after that.
19        QWas the former agency you worked for --
20    does the name Masih-Das ring a bell for you?
21    A   That's it.  Yeah, it's the Masih-Das agency,
22  that's right.  Mike -- Michael Masih-Das was the
23  manager or the agency owner.
24        QWhat training did you go through while
25    working with Masih-Das agency?
```

Page 12

```
 1    A   A two, three-week process of just like a
 2  hard core sales -- a sales training more than
 3  anything, just like learning the type of person that's
 4  on the phone to try and sell the product, it was like
 5  the main focus.
 6        QAnd how were you compensated with the
 7    Masih-Das agency?  So salary, commissions?
 8    A   Commissions.  It was typically 20 percent of
 9  the premium for the six-month policy, if I'm recalling
10  correctly.
11        QWas the training you received while working
12    with the Masih-Das agency in another agency or is
13    it through Allstate?
14    A   It was through Masih-Das, so he would
15  conduct the training, and then he had like a trainer
16  there assist him with the training.  So it wasn't
17  anybody that I know.  Particularly it was just him
18  that was running the classroom.
19        QAnd what is your current employment?
20    A   Currently a Travelers insurance appraiser --
21  adjuster.  Sorry.
22        QAnd have you had any other employment since
23    Prestige Insurance Group?
24    A   Yes.  I had a Liberty Mutual, was one of my
25  employers previously between there.  You said between
```

Page 13

```
 1  Prestige?
 2        QSince Prestige Insurance Group, yeah?
 3    A   Liberty and USAA.
 4        QFor approximately how long did you work at
 5    each of those companies?
 6    A   And there was a Farmers Insurance agency
 7  there as well.  And those combined, probably three
 8  months each, somewhere in there, totaling.
 9        QWe're going to introduce an exhibit.  This
10    will be marked Exhibit 18, and hopefully it will
11    pop up on your screen shortly, Mr. Rice, so just
12    let us know whenever it does.
13    A   I see it here.
14        (Defendant's Exhibit 18 marked.)
15        MR. GEAR:  And let us know when you're able
16    to access it, John, as well.
17        You might be on mute, John.
18        MR. HUBBARD:  Sorry.  I see it on the
19    screen.  It hasn't popped up on the exhibit list.
20    Let me see if I can -- that's fine.  Just -- it's
21    fine for now.  I'll just work off the screen.
22    Continue if you can, sorry.  Thanks.
23  BY MR. GEAR:
24        QMr. Rice, do you recognize this document?
25    A   I do not.  This is the first time I'm seeing
```

4 (Pages 10 - 13)

Page 14

1  it here.
2      QHow about this page?
3  A   Yes.
4      QDid you recognize this?  Okay.
5  A   Yes.
6      QDid you review the subpoena prior to your
7  deposition today?
8  A   Yes.
9      QDid you search for any documents in
10 response to the subpoena?
11 A   I did.
12     QWhere did you search?
13 A   My garage, which was where I would have kept
14 anything that would have been left over from the move
15 that I made, but I didn't have anything.
16     QDid you search electronically anywhere as
17 well?
18 A   I did not.
19     QWould any of these documents be maintained
20 electronically that you would still have access
21 to?
22 A   Yeah, it is possible that they would still
23 be in my e-mail, yes, sir.
24     QSo we'll ask that you do conduct that
25 search after this deposition, and just please

Page 15

1  provide any documents that are responsive to the
2  items listed in the subpoena.
3  A   Yes, sir.
4      QWhat did you do to prepare for this
5  deposition?
6  A   Nothing.  Just cleared my calendar for work.
7      QDid you review any documents beyond the
8  subpoena?
9  A   I did not.
10     QDid you speak with anyone?
11 A   I did not.
12     QAnd there's nothing else you did to prepare
13 for your testimony today?
14 A   No.  I spoke with -- I did speak with Malik
15 Williams -- he was somebody that worked there at the
16 agency with me -- to confirm if he had gotten one of
17 these.  He confirmed he did not.
18     QAnd did you speak with him in person, on
19 the phone?
20 A   Over the phone.
21     QAnd how long did that conversation last?
22 A   Five minutes.
23     QWas there any other substance regarding
24 this deposition that was discussed in that
25 conversation?

Page 16

1  A   No.
2      QDid you know Mr. Ulises Cicciarelli prior
3  to your hiring by Prestige Insurance Group?
4  A   Prestige, I did not.
5      QHow did you come to be hired by Prestige
6  Insurance Group?
7  A   That I know --
8      MS. HALE:  I think we should get -- I think
9  we're going to get an attorney at this time.
10     THE WITNESS:  But, it's not about me.
11     MS. HALE:  I mean, these are some leading
12 questions and we don't want to get involved with
13 these people.
14     They all have money, they were a prop firm,
15 and we just don't want to get involved with these
16 people.
17     So I think it would be better for him to
18 have legal counsel at this time because of these
19 questions that you're asking.
20     MR. GEAR:  Ma'am, you know, I defer to
21 Mr. Rice on his opinion on whether or not he
22 needs legal counsel.
23     If we would like to go off the record to
24 discuss this, we're happy to do so.
25     Is that okay, with you, John?

Page 17

1      MR. HUBBARD:  Sure.
2      MR. GEAR:  If we could go off the record and
3  we can discuss this off the record, that would be
4  great.
5      THE WITNESS:  Uh, could I have a moment?
6      MR. GEAR:  Yes, Mr. Rice.
7      THE VIDEOGRAPHER:  Should we go off record?
8      MR. GEAR:  Yes, please.  Thank you.
9      THE VIDEOGRAPHER:  The time is 9:54 and we
10 are off record.
11     (Recess was taken.)
12     THE VIDEOGRAPHER:  The time is 10:08 a.m.
13 and we are back on record.
14 BY MR. GEAR:
15     QAll right, sir, I just want to circle back.
16     Did you know Mr. Ulises Cicciarelli prior to
17 your hiring by Prestige Insurance Group?
18 A   I did not.
19     QAnd how did you come to be hired by
20 Prestige Insurance Group?
21 A   At the Masih-Das agency there was a day --
22 there was a day where the leads weren't actually
23 coming in, so we went off to lunch, the usual lunch,
24 and when we returned back from lunch we were notified
25 by Mike Masih-Das that the agency would be closing, so

Page 18

1 that's why we were going to leave that day, but that
2 he did know of another agency that would be open, and
3 if we wanted to throw a ring in the hat there, he
4 would be happy to give us the information of the other
5 agency, and that was Prestige.
6       QAnd around what time frame was that?
7       A   I'd have to -- I'd have to look to see if I
8 have any documentation.  I really wouldn't know.
9       QDo you have your best guess on year even;
10      month, year?
11      A   Oh, the year -- I mean, it wasn't this year.
12 Was it '21?  I think I was there in '21, early '21,
13 like January to -- anywhere between the first -- the
14 beginning of the year somewhere between January, May,
15 somewhere in there of '21, I believe the transition
16 took place.
17      QDid you undergo any interviews with
18      Mr. Cicciarelli?
19      A   Yeah, it was a Skype -- a Skype interview.
20      QAnd what kind of information was
21      Mr. Cicciarelli seeking from you in that
22      interview?
23      A   Not much.  It was a group interview, almost.
24 It was, like, majority.  Not everyone from the
25 previous agency, the Masih-Das agency, but a good

Page 19

1 amount.  Maybe eight, ten of us were in there, and he
2 basically just, you know, said that he had our
3 numbers.  And, you know, it's the same situation over
4 here.  Don't worry the pay.  It's the same situation,
5 so if we wanted to join, you know, join his staff, we
6 could, so there wasn't really much he was looking for.
7       QSo is it correct that you knew many of the
8       other employees that were recruited by
9       Mr. Cicciarelli to join the Masih-Das insurance
10      group?
11      A   Yes, I knew the majority of them.
12      QAnd what position were you hired into at
13      Prestige Insurance Group?
14      A   Insurance sales agent.
15      QHad you previously performed this role for
16      any Allstate agency?
17      A   Yes, the Masih-Das agency with the same
18 role.
19      QAnd for how long did you perform that role
20      with the Masih-Das agency?
21      A   It was just a few months.  I want to say
22 somewhere between three to five months.
23      QHad you performed a similar role in any of
24      your previous jobs?
25      A   Before the Masih-Das agency, no, not for

Page 20

1 insurance sales.  Insurance customer service would be
2 the closest.
3       QWho, if anyone, did you report to at
4       Prestige Insurance Group?
5       A   Prestige.  Prestige would be Ulises some of
6 the time.  The majority of the time there was the
7 agency or the -- yeah, the agency manager, Glenn
8 Hunter if I have his name correct.
9       QDid anyone report to you at Prestige
10      Insurance Group?
11      A   No.
12      QWhat were your job duties as an insurance
13      sales agent at Prestige?
14      A   There were cold calls to numbers we were
15 given there regularly to reach out and see if anyone
16 wanted to get an insurance quote for Allstate
17 policies.
18      There were also warm leads, so the phone
19 would ring and it would be somebody looking to
20 purchase an insurance policy.  So my job was to -- I
21 would sell them the benefits of Allstate and attempt
22 to sell a policy.
23      QWhen did you officially become an employee
24      of Prestige Insurance Group?
25      A   Once -- once -- the Prestige, it was -- it

Page 21

1 was 2021, if I'm still remembering correctly, but I'm
2 not sure of the exact month there.
3       QWe've heard testimony and Allstate's
4       documentation indicates that the Prestige
5       Insurance agency opened on August 1, 2020.  Does
6       that --
7       A   2020.
8       Q-- refresh your recollection?
9       A   Okay.  Yeah, I mean, I'm missing a year it
10 sounds like with COVID, but that does sound correct.
11      QIt's easy to miss a year with COVID these
12      days.
13      So did you officially become an employee of
14 Prestige prior to August 1, 2020, in the opening of
15 the agency?
16      A   August 1st, I would say we were in the
17 office before it was actually opened, so we weren't
18 taking calls but we were setting up, like, the
19 computers and getting the place ready and going over
20 what the expectations were, I believe like two weeks
21 or so before we actually started, being able to bind
22 policies.
23      QAnd you said that you were in the office.
24      Does that mean that you were in person in the
25      office?

6 (Pages 18 - 21)

Page 22

1    A   I was physically in the office when it first
2 started, yes.
3       QAnd did you always work in person for
4 Prestige Insurance Group or did you provide any
5 virtual work?
6    A   It was changed to virtual somewhere in there
7 between, maybe like after the halfway point of my
8 title, so maybe about two months in it changed to
9 virtual.
10      QDid Mr. Cicciarelli inform you that his
11 agency would not be open until August 1, 2020
12 when he recruited you to join his agency?
13   A   Yes.
14      QWere you concerned about the delay in
15 opening?
16   A   No.  They said something about that's kind
17 of, like, the paperwork to go through and be approved,
18 and be able to be a licensed Allstate agency, just
19 going through the red tape process, so I wasn't
20 concerned.
21      QWhat discussions did you have with
22 Mr. Cicciarelli about the delayed opening date?
23   A   Not -- none.  He just advised that it was
24 pretty standard.  In the business you can't just
25 immediately sell right away.  There's some kind of

Page 23

1 delays and everything to be able to become licensed
2 and approved to actually binding policies on
3 Allstate's behalf.
4       So once he has that, we take off.  So he
5 said it should be soon, so that was pretty much the
6 end of that conversation.
7       QWhat training did you receive as a new
8 employee of Prestige Insurance Group?
9    A   Pretty much reiterating the sales training
10 there.  Again, you know, how to close, what to look
11 for.  And the person on the phone, if they're wanting
12 to buy -- pretty much the standard sales training that
13 seemed like a repeat of what I received previously at
14 the other Allstate location.
15      QAnd who provided this training?
16   A   Glenn Hunter.
17      QDid Mr. Cicciarelli himself provide any
18 training?
19   A   Not that I recall.
20      QAnd it sounds like you had undergone
21 similar training before?
22   A   Uh-huh, yes.
23      QDid Gerry Rivas provide any training?
24   A   Gerry Rivas.  I can -- I do not believe I
25 know who that is.  Gerry.  No.

Page 24

1       QDid you receive any training on reporting
2    and/or binding from Mr. Glenn Hunter?
3    A   Quoting or binding from Glenn Hunter.  No, I
4 was not able to bind.  All my binds had to go through
5 Glenn for approval.
6       As far as quoting, it was the same quoting
7 platform at the Masih-Das agency, so it was kind of
8 the same -- the same process.
9       QWhen you say you were not able to bind and
10   your binds had to go through Glenn Hunter, can
11   you just explain what that means for me?
12   A   Yeah.  So if you call and you say -- you
13 know, we go through the whole sales process and you do
14 want to purchase the policy, then I would advise you
15 here, you know, you'd see your ID cards and everything
16 in a few hours once the policy has been reviewed and
17 bound, which makes it an official sale.
18      So until then, it's still just a quote, but
19 once I send it to my manager for approval, you should
20 see your paperwork come through to your e-mail.
21      QAnd why were you not able to bind these
22   policies personally?
23   A   I am not sure on that particular piece.
24 From what -- I mean, we'd just discussed it in the
25 office, all us who couldn't bind, we just felt that it

Page 25

1 was something that you had to be confirmed or accepted
2 to do on Allstate's behalf, and they just had, like,
3 the one person to be able to do it in the office, is
4 what we assumed.
5       QWere you previously able to bind policies
6    when you're working with Masih-Das's agency?
7    A   No, I couldn't.  So same exact setup, so no
8 binding on that side either.
9       QSo to the best of your recollection, on
10   what date did you start working for Prestige
11   Insurance Group?
12   A   Prestige, if we're in 2020, so August would
13 be the day when we can take calls.  I would say like
14 the first week of July, so if I had to guess,
15 July 10th, somewhere in there.
16      QAnd do you recall working in a different
17   Allstate agency prior to August 1, 2020, outside
18   of Masih-Das's agency?
19   A   Oh, no.  Just Masih-Das before Prestige.
20      QSo do you recall working in Gerry Rivas's
21   agency as a placement prior to beginning official
22   work with Prestige Insurance Group on the opening
23   of August 1, 2020?
24   A   No.
25      QCan you explain the work you were doing on

7 (Pages 22 - 25)

Page 26

1 behalf of Prestige Insurance Group during that
2 period?
3     So from the period you started in early
4 July, first week of July through August 1, 2020, can
5 you walk through the work that you were completing?
6    A   Yeah.  Our regular day would just be setting
7 up the office, cleaning the office, getting those
8 electronic desks there in the office, setting up the
9 computers, laptops, all the electronics, kind of
10 cleaning, make sure it stays clean.
11    Once that was done, I was a week there of
12 it.  The rest of the time was practicing by doing cold
13 calls and asking if you were interested in either an
14 insurance quote coming up here on the opening of the
15 agency.
16     QAnd those cold calls, were you performing
17 them on behalf of Prestige Insurance Group?
18    A   Yes, to my knowledge.
19     QAnd who was supervising you during this
20 time period prior to the opening of Prestige
21 Insurance Group on August of 2020?
22    A   The majority of the time in the office would
23 be Glenn Hunter, and there were rare occasions where
24 Ulises came in.
25     QAnd I just want to confirm for the record.

Page 27

1 Do you recall a Mr. Gerry or Gary Rivas
2 supervising you at all during this time period of
3 July 2020?
4    A   No, I'm confident that I don't remember -- I
5 have no recollection of who Gerry Rivas is.
6     QSo I want to take a step back and run
7 through your -- your work during this time period
8 of July 2020 prior to the opening of Prestige
9 Insurance Group on August 1, 2020.
10    So, you know, where were you working from
11 during that time period?  You said you were in office,
12 but what -- where was this office?
13    A   Oh, I could find the address there, but
14 I'm -- I think it was considered Tampa, but I'm not
15 sure of that exact street and address there, but I can
16 locate it there.
17     QHow many other people were also working in
18 person with you?
19    A   I would say in the office around 10, 12 --
20 10 to 12 people.
21     QAnd who were these people working with you
22 in the office?
23    A   The majority were people from the previous
24 agency.  If I -- the specific names I remember would
25 be Malik Williams, Priyanka Little, Brandon Armadale,

Page 28

1 and others kind of -- I don't -- I probably could
2 recall if I see or hear them, but those are, like, the
3 main ones I kind of went to lunch and things with.
4     QAnd was Mr. Glenn Hunter also in the
5 office?
6    A   Yes, yes.  Glenn Hunter was in the office,
7 correct.
8     QI believe you previously stated that
9 Mr. Cicciarelli himself was also in the office at
10 times?
11    A   Occasionally, yeah.
12     QHow frequently was Mr. Cicciarelli in the
13 office during this period?
14    A   One to two times a week, I would say would
15 be a good estimate at that period before the office
16 opened officially.
17     QDid you or other members of the Prestige
18 staff interact with Mr. Cicciarelli during this
19 --
20    A   Yes, sir.
21    Q-- time period?
22    A   Yes, sir.
23     QCan you describe those interactions?
24    A   I mean, he would -- we would just discuss
25 random things or so just casual conversation and he

Page 29

1 bought lunch there a few times at the office,
2 lightened up the mood and, you know, just kind of keep
3 us all calm, because we were kind of based off of
4 commission only so we were kind of ready to sell to
5 make -- so he just -- kind of reassurance and casual
6 conversation.
7     QDid you or other members of the staff have
8 conversations with Mr. Cicciarelli about your
9 training during this time period?
10    A   No.
11     QDid you have discussions with
12 Mr. Cicciarelli about your production during this
13 time period?
14    A   No.
15     QDid you have discussions with Glenn Hunter
16 regarding your production or your cold calls
17 during this time period?
18    A   Ah, yes, yes.  Glenn Hunter was the main
19 one.  He -- the calls are recorded.  The majority of
20 times he would listen.  He'd give you tips or tricks
21 of things that you could have done better or things
22 you could have done differently, so he was the main
23 one that would kind of coach you.
24     QSo these calls were recorded, the calls
25 that you were making prior to August 1, 2020, on

8 (Pages 26 - 29)

Page 30

1 behalf of Prestige Insurance Group?
2 A   Yes.
3     QAnd Mr. Cicciarelli did not have any
4 conversations with you or other staff about these
5 cold calls or these other calls that you were
6 making prior to August 1, 2020?
7 A   After the first, like, Zoom meeting, just
8 advise of pay, which is everything is the same so
9 nothing to talk about there.  And from there it was
10 just kind of casual talk.  There was nothing about
11 calls or anything through him after that.  It was all
12 Glenn after that.
13     QAnd this Zoom meeting you referenced, was
14 this the original group interview or was this a
15 separate Zoom meeting?
16 A   All that same original group interview.
17     QDo you recall when that Zoom meeting took
18 place?
19 A   I do not.  It would -- it was about a week
20 before we went into the office, though, into the
21 Prestige office to start the -- getting everything set
22 up, so I'd say the first week of July, maybe the last
23 week of May.
24     QSo diving into your day-to-day during this
25 time period in July of 2020, prior to the opening

Page 31

1 of Prestige Insurance Group on August 1, 2020,
2 what would your day look like?  So you would --
3 you would wake up.  Would you log -- you would go
4 into the office?
5 A   Yep.  I'd drive into Tampa there, from
6 Lakeland here, into the office.  You'd meet with
7 everyone.  We would just chitchat there.  I mean, from
8 there we would start the process of getting the --
9 getting the agency all set up.  How we ask for, you
10 know, keeps where, back -- side by side, so just all
11 of that.  Making sure that all the equipment is up,
12 installed, software is up, phone ringing and you can
13 hear each other clearly, just things like that.  That
14 part lasted three or four days.
15     Ulises worked mostly half days there for the
16 setups.  And then after everything was set up, the
17 regular days of going in and making hundreds of cold
18 calls, someone answers and you try to attempt to give
19 them a quote to make sure the system was functioning
20 properly and everything from there.
21     QDid you check in with anyone at the
22 beginning of the day to confirm you were there,
23 or was it just, you know, everyone's in the same
24 room and everyone can see when you arrive?
25 A   Everyone's in the same room.  Everyone can

Page 32

1 see when you arrive, yeah.  It's a small group, so
2 it's hard to be missed.
3     QWe've heard testimony from other witnesses
4 that Prestige staff members would participate in
5 morning meetings.  Do you recall attending
6 morning meetings during this July 2020 timeframe?
7 A   Occasionally, if there was something to talk
8 about.
9     QHow frequent were these meetings held?
10 A   To my knowledge, maybe two to -- maybe two
11 times a week.
12     QAnd who led these meetings?
13 A   Typically Glenn Hunter.  If Uli was in
14 there, they kind of tag team it, if he was there that
15 day.
16     QWho was in attendance outside of
17 Mr. Cicciarelli or Glenn Hunter?
18 A   As the -- as the director of the meetings or
19 it's like everyone in the office?
20     QYeah, so you don't have to list names --
21 specific names, but was everyone in the office,
22 all the staff members --
23 A   Yes.
24     Q-- when they did these meetings?
25 A   Yes.

Page 33

1     QAnd what was discussed at these meetings?
2 A   Usually that we're getting ready to go live
3 here soon, and tips and tricks.  And remember once we
4 go live, and things he heard on -- things Glenn may
5 have heard on cold calls that could have been better,
6 that maybe he would try to say, Hey, let's do it this
7 way next time, things like that.
8     QSo would Glenn Hunter provide specific
9 feedback to individuals, including yourself
10 regarding --
11 A   Yes.
12     Q-- your cold calls and other work?
13 A   Yes.
14     QAnd he was doing this prior to the opening
15 of Prestige Insurance Group on August 1, 2020
16 during that -- during that July 2020 timeframe.
17 A   Yes, to get us prepared to be ready for the
18 opening, yes.
19     QDid you discuss levels of quoting or your
20 cold call production at these meetings?
21 A   No.  No, it was -- really there wasn't any
22 kind of set limit of what you were doing.  They would
23 just hope that -- hopefully you were doing it to
24 prepare yourself, so -- because, you know, if you
25 don't sell, then you don't get paid.  So it was kind

9 (Pages 30 - 33)

Page 34

1 of like a personal, usually get yourself ready.  There
2 were no goals or like anything, before the opening.
3         QSo were there any targets for the number of
4    cold calls you were instructed to make or hope to
5    meet during this time period?
6    A   Before August 1st, no.
7         QSo, you know on a day where you had one of
8    these meetings, after this meeting concluded,
9    where did you go from there?
10   A   Outside usually.  A few, group of us would
11 go outside and kind of discuss the meeting, how we
12 think it should have went, or the next step, things
13 like that, the usual, for about 15 minutes there,
14 so -- and come back in and start dialing the cold call
15 numbers.
16        And I'd pretty much do that for a few hours
17 and lunch after that.  And then sometimes when we come
18 back it would be more cold calls, or sometimes we
19 would go home, just depending on Uli or Glenn's
20 decision.
21        QAnd these -- these cold calls, were you
22   selling policies?
23   A   Attempting to quote the policies, if you got
24 lucky enough where someone did say they did want the
25 policy, I would advise them that we would save

Page 35

1 everything and give them a call back on August 1st to
2 bind it.
3         QAnd were you instructed to do that if a
4    customer did desire to bind or purchase a policy
5    immediately?
6    A   Yes.
7         QWho gave you those instructions?
8    A   Glenn Hunter let us know to do it that way,
9 too, because he didn't -- he couldn't bind it.  So,
10 no, we couldn't actually sell the policy until August
11 1st, so he advised us to take the information and to
12 tell them we'll call them there on August 1st.
13        QDo you recall how he provided those
14   instructions?  Was it verbally.  Was it, you know
15   --
16   A   Yeah.
17        Q-- sending an e-mail, phone call?
18   A   Verbally.  Verbally like in a meeting there.
19 We kind of didn't figure it out until someone had a
20 sale, because it was a few days of just no calls.
21        So once we said, Hey, this person actually
22 wants to buy it.  I can't recall who the first person
23 was, but they were, like, Hey, what should we do here?
24 And he just verbally let them know, this is what we're
25 going to do.

Page 36

1         And then after they got off the call, it
2 became kind of like the norm.  Hey, if someone does
3 want to buy a policy, this is the -- these are the
4 steps we take, so it like a verbally -- a verbal
5 meeting.
6         QAnd what exactly were you telling customers
7    who wanted to bind policies immediately?  Just --
8    was it just a wait or -- go ahead, I'll just let
9    you answer.
10   A   No, no worries.  The exact procedure
11 typically is I get your phone -- I write your name,
12 phone number down and your form of payment down, and
13 advise them that this payment is going to process on
14 August 1st, and I'll call you to confirm that the
15 policy is valid and ready to go and issue you your ID
16 cards all on August 1st.
17        QDid you explain why the policy couldn't be
18 bound or go into effect until August 1st?
19   A   Ah, no.
20        QWere there any customers that were
21 interested about why their policy couldn't go
22 into effect until August 1st or couldn't be bound
23 until August 1st?
24   A   Yes.  Typically or very rarely, if the rate
25 was good enough that they wanted to be

Page 37

1 willing to wait that time.  But if they were
2 questioning it, I wasn't -- we weren't advised by
3 anyone, but we as an agency just started asking when
4 the rates become live and that's when you're eligible
5 for this particular rate.
6         QAnd, sorry, I couldn't exactly make out
7    what you said there.  Did you say that it was
8    rare that customers would object to waiting, or
9    was it rare that customers were willing to wait
10   until August --
11   A   It was rare they questioned why they had to
12 wait.
13        QBecause some customers did question?
14   A   Yeah, a few.  A few, yeah.  And then we just
15 decided, as if there wasn't management or anything, a
16 few of us just decided, Hey, you know, just try to let
17 them know it's an exciting kind of venture, these
18 rates become live on August 1st, so that's when I'm
19 able to personally get it bound through our agency and
20 they would just kind of take that.
21        QAnd if a customer was dead set on finding a
22 policy that day, how did you proceed?
23   A   If they were dead set, it maybe happened one
24 or two times, typically just transfer it to the
25 Allstate corporate line.

Page 38

```
 1      QAnd were you instructed to do that by Glenn
 2   Hunter or Mr. Cicciarelli?
 3      A   Yes, because there was no other way to bind
 4   it.  So if they were dead set, it was just a missed
 5   sell, unfortunately.  They would tell us to send it to
 6   Allstate directly.
 7      QHow many customers did you interact with
 8   who wanted to bind prior to August 1, 2020.
 9      A   Maybe -- by wanted to bind, I would say that
10   person, I wrote their information down, so they're
11   giving me payment info so they're really set on
12   binding, maybe 20.
13      QAnd this info, you just recorded the info
14   and held on to it --
15      A   Correct.
16      Q-- until August 1st?
17      A   Yep, wrote it down and held on to it until
18   August 1st.
19      QI want to back up a little bit.
20      How many customers were you calling in a
21   given day during this time period of July 2020 prior
22   to the opening of Prestige Insurance Group on
23   August 1, 2020?
24      A   Depending on how you felt that day.  It
25   could be, you know, as low as 25 or so to show you
```

Page 39

```
 1   were doing it, or if you were actually getting sales
 2   or felt good that day, it can be as many as 75
 3   bow-outs, somewhere in there, 25 to 75.
 4      QAnd where did you get the contact
 5   information or leads for these cold calls?
 6      A   In the -- I don't recall the name of the
 7   actual software for the phone, but there was like
 8   thousands of phone numbers already in the -- in the
 9   phone service we used.
10      QAnd do you know where those numbers came
11   from?
12      A   Some were -- I was told they were requotes.
13   So we talked to them maybe six months ago, maybe a
14   year ago, and some had called and wanted a quote but
15   no one ever reached back out to them so these were
16   recycled phone numbers is what I was told.
17      QWere these customers people you personally
18   knew or have relationships with?
19      A   The cold calls?
20      QYes.
21      A   No.
22      QSo on these cold calls were you quoting
23   policies for customers?
24      A   Attempting to, yes.  This is Joshua,
25   Allstate Insurance agency, and wanted to know if you
```

Page 40

```
 1   wanted to get a quote on your auto insurance,
 2   basically we can save you some money.  It takes, like,
 3   five minutes.  And if they go along with it, just ask
 4   the usual questions, give them the application and
 5   provide them a quote.
 6      QHow many policies did you quote during this
 7   time period?
 8      A   Over -- over a hundred, I would say.  I'm
 9   not sure after -- the actual number after that, but
10   mostly everybody at least got a quote.
11      QDo you have an estimate for how many you
12   personally were doing a day, how many policies
13   you were recording a day during this time period?
14      A   In those couple of weeks leading up to this
15   August 1 opening, I would probably say around 100
16   actual live quotes maybe in the system, maybe a little
17   less.  80 to 100, somewhere in there, live quotes that
18   were saved.
19      QAnd these quotes were coming from the pool
20   of potential customers that were stored in that
21   system that you just previously referenced?
22   These were not people that you knew previously or
23   knew personally?
24      A   Correct.
25      QCompared to your previous work in the
```

Page 41

```
 1   Masih-Das Allstate agency, how did your daily
 2   quoting activity compare during this time period?
 3      A   During that time period the difference
 4   was -- is that at Masih-Das it was mainly people
 5   calling me for quotes, so I didn't have to do the cold
 6   calling.
 7      So this was a -- that was the biggest
 8   change, having to just call people that weren't really
 9   looking or interested.  Whereas at Masih-Das, there
10   were calls coming in saying I would like a quote.
11   That was the -- basically the biggest change.
12      QAnd it sounds like you were collecting
13   customer information as part of this cold call
14   quoting process during the period of July 2020?
15      A   Selecting like a particular phone number to
16   call?
17      QSorry.  Collecting customer information.
18      A   Oh.  Excuse me.  Yes, we were collecting
19   customer information during that time.
20      QAnd what kind of customer information were
21   you collecting?  Things like address, name, what
22   else?
23      A   Yes, address, name, phone number, e-mail,
24   any other drivers in the household.  Any kind of
25   driving activity that you can recall, accidents,
```

11 (Pages 38 - 41)

Page 42

1 tickets, and then your vehicles was about all we
2 needed to get the quote generated.
3     Q  Were you collecting information like
4 marital status as part of this process?
5     A  Yes.  So marital status -- so that would
6 typically involve people in the household, that would
7 come up if you are married, who else is in the
8 household, and I think that would do it.  I think
9 gender may have been a selection there but I can't
10 recall 100 percent.
11     Q  And you during this process would solicit
12 that information from the customer and input it
13 somewhere?
14     A  Yeah, input it into the Allstate quoting
15 platform.  And based on that information it could kind
16 of generate me a quote and I would let them know what
17 it is and we go from there if they're interested.
18     Q  Were you collecting payment information
19 from customers?
20     A  If they were wanting to bind for August 1st,
21 so everything -- if it was phenomenal and they're
22 ready to go, then I would get their payment info so we
23 know it's -- so we can lock it in and we'd let them
24 know and start it on August 1st.
25     Q  How did your quoting activity or day-to-day

Page 43

1 work during this time period for Prestige
2 Insurance Group differ from your previous work
3 with the Masih-Das Allstate agency?  Were you
4 basically doing the same work except for binding
5 policies?
6     A  Yes, it was the same quoting platform, the
7 same questions, so it was the same everything there in
8 the system.  So it wasn't anything else -- new you had
9 to learn.
10     So the only difference between the quoting
11 was that it was inbound calls in Masih-Das and out --
12 cold calls there at the Prestige, but the systems and
13 software and everything, questions, all were the same.
14     Q  And is it correct that, you know, at
15 Masih-Das when a customer sought to bind a policy
16 that day, you were binding a policy that day, but
17 at -- during this time period with Prestige
18 Insurance Group if a customer sought to bind a
19 policy you were informing them that they needed
20 to wait until August 1st or after August 1, 2020
21 to bind that policy?
22     A  Yeah.  Masih-Das could be bound same day,
23 not by me but the manager there in charge at that
24 time, whereas at Prestige we had to wait until
25 August 1st.

Page 44

1     Q  And we touched on this previously but I
2 just want to circle back to be clear for the
3 record, were you provided any instructions on the
4 fact that you could not bind policies until
5 August 1, 2020?
6     A  Yes.
7     Q  And who provided these instructions?
8     A  It was reiterated a few times there with Uli
9 and Glenn that, you know, just for the reasons they
10 advised with the red tape that we weren't able to bind
11 until August 1st.
12     Q  In any of your previous work with an
13 Allstate agency had you been instructed to quote
14 and then hold policies until a certain date?
15     A  No.
16     Q  On what basis did you believe that it was
17 acceptable to quote and then hold policies until
18 August 1, 2020 during this time period?
19     A  Yeah, just from Uli saying simply, we can't
20 bind the policy because he was not affirmed to -- he
21 was okay to quote policies through Allstate.  Allstate
22 gave him the green light to use software, things like
23 that, but it was still going through the last process
24 of making it official where he could put, like, the
25 name out on the front lawn basically and to actually

Page 45

1 hit bind.
2     So in the meantime we'll practice and we
3 don't expect to get any sales because no one wants to
4 wait, but if it comes along, then it's okay to see if
5 they're willing to wait until August 1 and hold it
6 until then.
7     Q  And you testified previously that Glenn
8 Hunter supervised you during this time period?
9     A  Correct.  Yes.
10     Q  Would you say that Mr. Cicciarelli also
11 supervised you during that time period?
12     A  It was -- it was more like he -- anything
13 that he wanted done differently or anything, seemed
14 like it was a discussion -- I can't confirm it or
15 not -- between him and Glenn, and Glenn passes it down
16 to us.
17     So Glenn was more in charge of the agents
18 more than Uli, so he didn't really give any kind of
19 instructions daily, but there were a couple of times
20 where he would, you know, come out and discuss next
21 steps or processes.
22     Q  Have you ever heard of Project 100 or
23 something similar?
24     A  No.
25     Q  Were you instructed to create a list of

12 (Pages 42 - 45)

Page 46

1    family and friends to contact for use for these
2    cold call during the July 2020 time frame for
3    Prestige Insurance Group?
4    A   I don't recall it being like a requirement,
5    but I do remember it happening there in the office
6    with some of our agents.
7         Q Did you personally create a list of family
8    and friends to contact during this time period?
9    A   Yes.
10        Q Did you use that list during that time
11   period prior to the opening of Prestige Insurance
12   Group?
13   A   I did not make those calls, no.
14        Q So is it correct that you were contacting
15   potential customers and leads outside of that
16   list during your time working for Prestige
17   Insurance Group prior to August 1, 2020?
18   A   Contacting leads.  Not on my personal list,
19   right?
20        Q Yes, that's the question.  Yes.
21   A   Okay, yes, I was doing the cold call ones,
22   yeah.  I wrote the list, never actually made calls to,
23   like, my mom or my brother that I put on the list, I
24   never made those calls, but I did write the list.
25        Q And were you instructed to contact

Page 47

1    potential customers in those cold calls outside
2    of your list?
3    A   The calls -- yes, the cold calls were
4    instructed.
5         Q How were you compensated for your work
6    during this time period prior to the opening of
7    Prestige Insurance Group prior to August 1, 2020?
8    A   It was a two -- two $1,000 weekly draws, if
9    I'm remembering -- it was somewhere in that amount so
10   there was not any commission or anything on these
11   payments.  And then we were still compensated from the
12   previous month of work that we did at Masih-Das is how
13   I was personally compensated.  So I was able to carry
14   that over along with the two $1,000 that Prestige
15   corporation provided.
16        Q Were you given any incentives for getting a
17   potential customer to wait to bind a policy until
18   August 1, 2020?
19   A   No.
20        Q Would you have received a commission on any
21   policy that you quoted prior to August 1, 2020
22   and then waited to bind until on or after
23   August 1, 2020?
24   A   Yes.
25        Q Would you have received that same

Page 48

1    commission if you referred that Allstate customer
2    to the Allstate general line to bind their policy
3    prior to August 1, 2020?
4    A   No.
5         Q Were you paid by Prestige Insurance
6    Group --
7    A   Yes.
8         Q -- for your work during this time period?
9    A   Yes.
10        Q Did you have any backdated payments from
11   after August 1, 2020 or were you paid on schedule
12   throughout your work during July 2020?
13   A   Paid -- paid on schedule for the work done
14   there in July.
15        Q And if you had an issue with your payment,
16   who would you have gone to to resolve that issue
17   during that time period?
18   A   Glenn most of the time.  And if it didn't
19   get resolved, I would then try to contact Uli.
20        Q On what date did Prestige Insurance Group
21   officially open?
22   A   To my knowledge, based on the timeline here,
23   now that I recall, August 1st.
24        Q So Saturday, August 1, 2020 would be
25   considered the opening date of the agency?

Page 49

1    A   Yes.  I do recall coming in for a Saturday
2    binds that day, yes.
3         Q And Prestige's hours of operations did not
4    normally include Saturday, correct?
5    A   Correct.  As I recall we decided to all come
6    in, I believe it was a half day, to do all our binds
7    that we had from July.
8         Q And binding those policies that were
9    carried over from July, was that the -- that was
10   the main reason you came in on this particular
11   Saturday, on August 1st?
12   A   That was the whole day there on August 1st.
13   All of us coming in to bind our policies, yes, sir.
14        Q Do you recall having any meeting beforehand
15   to game plan this strategy and approach for
16   August 1, 2020?
17   A   No, I don't recall that.  Kind of like --
18   well, like Thursday -- Thursday or Friday, somewhere
19   in there, it was discussed:  Did you guys want to come
20   in?  It would be best to come in.  We told these
21   people the 1st, and we all agreed to it and we kind of
22   just came in and went down the list from there.  So
23   not really a game plan, but it was confirmed that
24   Glenn would open the doors for us to come in and start
25   the binding process.  That's about what I remember.

13 (Pages 46 - 49)

Page 50

1  Q And was this communicated in a meeting?
2  A   Verbally, yes, in a meeting there, like,
3  Thursday or Friday before the Saturday.
4  Q And who led that meeting?
5  A   Glenn.
6  Q Do you recall if Mr. Cicciarelli attended
7  that meeting?
8  A   I do not recall if he attended that meeting.
9  Q Did all of the other Prestige staff members
10  attend that meeting?
11  A   Yeah, everyone else was there.
12  Q So when this Saturday, August 1, 2020 -- do
13  you recall when you started working?  I just kind
14  of want to walk through that day.
15  A   It was morning, so I believe -- I believe
16  9 a.m. was the start time, so somewhere in there.
17  Q And did you work from this -- this same
18  office that you had previously been working in --
19  A   Yes.
20  Q -- throughout July of 2020?
21  A   The same office, yes, sir.
22  Q Do you recall how many people came in, who
23  came in?  You don't have to name personal names
24  but just generally speaking?
25  A   I can confirm and know of at least -- at

Page 51

1  least eight.
2  Q Did Mr. Cicciarelli come into the office
3  that day?
4  A   I had -- do not recall if Uli was in the
5  office on that Saturday.
6  Q Do you recall if Glenn Hunter was in the
7  office on that Saturday?
8  A   Yes, sir, he had opened the office.  Yes, he
9  was definitely there.
10  Q So I want to walk through that day.  So you
11  woke up, went to work, you said around the 9 a.m.
12  start time.  What did you do then?
13  A   You'd look at the list and you would have
14  the customer's name, phone number, be able to pull up
15  the same quote.  You would just like refresh it to
16  make sure it stayed the same, insert the payment
17  information, get it reviewed by Glenn there to make
18  sure it's okay to bind, either by just sending him the
19  phone number or you can walk over, you know, look over
20  the few tabs and make sure everything looked good, and
21  then hit bind and I would send out your e-mail
22  documents, if you are the customer, and to the next
23  one.
24  Q And this list you referenced was saved
25  quotes that you had made from your cold calls

Page 52

1  during the July 2020 time frame?
2  A   Correct.  A personal list that I wrote out
3  that people were interested in purchasing a policy for
4  August 1.
5  Q Did you reach out to these customers on
6  August 1st before binding their policies?
7  A   No.  It would be either by e-mail or phone
8  call afterwards letting them know their ID cards and
9  everything is on the way, but we felt that discussing
10  it with you there previously, saying, Hey, the payment
11  is going to come out August 1, would suffice.
12  Q And you had collected all the necessary
13  information, the customer information, the
14  payment information in order to be able to bind
15  without talking to the customer again?
16  A   Correct.  Yes, sir.
17  Q How did your work on August 1, 2020 differ
18  from the work you had previously been doing on
19  behalf of Prestige Insurance Group prior to
20  August 1, 2020?
21  A   The biggest difference, August 1st was that
22  we're actually able to start the policies or have them
23  reviewed and bound by Glenn, and then actually have an
24  official policy, so that was the only difference, was
25  being able to start the policy.

Page 53

1  Q So your work in July of 2020 for Prestige
2  Insurance Group was basically the same as your
3  work on and after August 1, 2020 for Prestige
4  Insurance Group except you could then bind the
5  policies on or after August 1, 2020; is that
6  correct?
7  A   And then Monday moving forward after that
8  Saturday, the calls then became inbound as well.
9  Those were the two differences between July and
10  August, yes.
11  Q But before that Monday, so on Saturday,
12  August 1st, was the only difference between your
13  previous work in July of 2020, just that you were
14  able to bind policies at that point?
15  A   Yes.
16  Q Did you contact any potential customers on
17  August 1st?
18  A   Not that I recall.  I do know that somewhere
19  in there, there was some kind of binding restriction,
20  I'm not sure if it was Saturday, some kind of weather
21  restriction.  If that -- if it was that Saturday, then
22  we did call them and let them know it had to be, you
23  know, pushed out, and it does feel like it was
24  Saturday.  There were a few that were in binding
25  restriction areas, so we did have to reach out and let

14 (Pages 50 - 53)

Page 54

1 them know it wouldn't be bound until the restriction
2 was lifted.
3        QWere you contacting any potential customers
4     with cold calls to quote policies on that
5     August 1st?
6     A   No, I don't believe we had time, but it was
7 just -- there was so many binds that we had to put
8 through that we were not really focused on cold
9 calling at that time.
10       QAnd all these binds were the ones that you
11     had previously saved from July 2020, and it was
12     just binding them on that day?
13    A   Correct.  Yes, sir.
14       QDo you recall how many policies you bound
15     on August 1, 2020?
16    A   I want to say -- I don't know the exact
17 number but anywhere between 15 and 20.
18       QDo you know how many policies your
19     colleagues and Prestige Insurance Group as a
20     whole bound as of August 1, 2020?
21    A   I don't know the exact number.  It was a
22 celebratory number.  I know we were happy there in the
23 office.  Maybe 15 to 20 was the average per person.
24       QIn your experience with Allstate agencies,
25     was this an abnormal amount of policies to bind

Page 55

1 in a single day?
2     A   Yeah.  Yeah.  I think it was announced
3 something about a record amount of policies in a day,
4 you know, because -- so it was definitely a lot.
5        QAnd how did you have so many policies to
6     bind on that August 1, 2020?  How were you able
7     to get that celebratory number?
8     A   It was two weeks of policies into one day.
9 Two weeks of quoting, two weeks of cold calling lots
10 of people, overall in the office, so it was just two
11 weeks of contacts put into one day there.
12       QDid you bind any policies on August 1, 2020
13     that were not these holdover quotes from quotes
14     previous to August 1, 2020?
15    A   I do not believe so.  As of the calls that
16 weren't coming in yet, so there were no inbound people
17 asking for quotes, and it was just too many binds to
18 stop to try to bind, try to make a cold call just to
19 be rejected most likely, so it was just everyone going
20 in to bind policies.  There were no new calls being
21 made as far as new sales.
22       QAnd you mentioned you may have had to call
23     a few customers to inform them of this binding
24     moratorium -- weather related binding moratorium.
25    A   Yes.

Page 56

1        QDo you recall how many customer policies
2     you bound on August 1, 2020 without speaking to a
3     customer on that date?
4     A   Yeah, the majority.  Me personally probably,
5 if there's 15 or 20 binds, probably 85 to 90 percent
6 were no contact.
7        QWho is responsible for managing the
8     day-to-day operations at Prestige Insurance
9     Group?
10    A   Day-to-day in charge that I was to answer to
11 would be Glenn Hunter and Brandon Armadale.
12       QDid Mr. Cicciarelli supervise your daily
13     work at Prestige Insurance Group?
14    A   To my knowledge it was usually just passed
15 up from him from the people -- Glenn and Brandon, and
16 he would -- they -- whenever we had any kind of
17 meetings starting in August, Hey, Uli, advising we
18 need to do more of this or more of that, so we kind of
19 got it from them not -- Uli didn't directly do it the
20 majority of the time.
21       QAnd how were you supervised by Glenn Hunter
22     and -- sorry, is it Brandon?
23    A   Yes.  Mainly their job was just to review
24 the quote for accuracy and bind it from there.  That
25 was the number one job of them, and then the second

Page 57

1 job is really just listen to our recorded calls and
2 say we could have had a transition or a chance to make
3 a sale, they would just discuss that with us.  So
4 those were the two main purposes that they were there
5 in the office.  Everything else we kind of knew how to
6 do.
7        QIs it correct that your calls after
8     August 1, 2020 -- on or after August 1, 2020, so
9     after the opening of -- the official opening of
10     Prestige Insurance Group, were those calls also
11     recorded?
12    A   Yes.
13       QAnd Glenn or Brandon or Mr. Cicciarelli
14     would occasionally discuss those recorded calls
15     with you?
16    A   With the recorded calls, only Glenn or
17 Brandon.  95 percent of the time it was going to be
18 Glenn that just listens to your call and discusses it
19 with you.  And if I wanted to listen to the call
20 myself, I could pull it up and listen to it as well.
21 So mainly just me and Brandon would listen to the call
22 and discuss it.
23       QAnd that process continued after the
24     opening of Prestige Insurance Group on August 1,
25     2020?

15 (Pages 54 - 57)

Page 58

1    A   Yeah, usually a daily or every other day
2  process.
3        QDid you attend Prestige Insurance Group's
4    staff meetings on or after August 1, 2020?
5    A   Yes.
6        QHow frequently did you attend those
7    meetings?
8    A   Staff meetings, just to go over the usual
9  basic things in the office was probably daily to every
10 other day as well.
11       QAnd who led these meetings?
12   A   The majority of the time would be Glenn or
13 Brandon.  There were occasional times Uli would run
14 the meeting.
15       QWho was in attendance at these meetings?
16   Again you don't have to list out all the personal
17   names, but generally speaking, who was in
18   attendance at these meetings?
19   A   Generally speaking if everyone -- you know,
20 no sick days or anything, everyone.  Just the regular
21 amount of people in the office.
22       QDid Mr. Cicciarelli attend these meetings?
23   A   Occasionally.
24       QAnd what was discussed at these meetings?
25   A   More sales.  More -- a little more cold

Page 59

1  calls, e-mail the inbounds that come in, still try to
2  focus on outbounds, a possibility of getting sales
3  there.  The production of that -- it looks like the
4  office is heading, like, $75,000 that month or
5  whatever the goal was for the month, as agents for
6  sale, and where we are, and what we can do on that day
7  to be on track, those were the daily discussion.
8        QWere policy issues or customer issues ever
9    discussed at these meetings?
10   A   No, not that I recall.  It was really just a
11 sale -- sales meeting.
12       QAnd if I remember correctly, you said that
13   at some point you transitioned to remote work for
14   Prestige Insurance Group?
15   A   Yes.
16       QWhen was that?
17   A   Oh, I felt like we weren't in the office
18 very long.  A month maybe in the office, maybe more, a
19 little less, so.
20       QDo you recall what drove that transition to
21   virtual work?
22   A   It was told to us for COVID safety protocol.
23 Before we actually made the transition we had to get
24 the temperature at the door and things like that, and
25 they decided virtual from there.

Page 60

1        QWe are all used to the COVID precautions at
2    this point.
3    A   Yeah.
4        QHow did supervision of your work change
5    following the transition to virtual work?
6    A   The same, the same concept.  Glenn would --
7  I believe we used Skype and Glenn would just listen to
8  calls there and kind of Skype to you what he thought
9  about the call, so that was the training aspect.  He
10 could play it back when he calls me on the phone and
11 listen to this part, so that was the training.
12       As far as the binds, I would just Skype him
13 the name of the person for review and he would review
14 it and then send back like a thumbs up or a thumbs
15 down.
16       QAnd were they still supervising you by
17   listening to recorded calls or were they
18   monitoring your work in realtime?  How was that
19   working?
20   A   Yeah, recorded calls and I would send the
21 information over to Glenn for review or I could do a
22 Skype share and we could see the bind realtime.
23       QHow were you compensated while working with
24   Prestige Insurance Group after August 1, 2020?
25   Did it differ at all from your compensation prior

Page 61

1  to August 1, 2020?
2    A   Yes.  Yeah, after the opening you would
3  receive -- would have to try to locate the e-mail
4  there, but I believe it was 20 percent of the
5  six-month premium twice for the year, I believe is how
6  it was calculated.
7        QAnd who paid you?
8    A   Prestige, to my knowledge, so we would
9  assume it came from Uli.
10       QHow frequently were you paid?
11   A   There was a check on the 15th, which was a
12 drawer, so $1,000 to you on the 15th, but that's like
13 a borrow from yourself from your commissions that you
14 would get on the last day of the month.
15       QHow did your compensation under Prestige
16   Insurance Group after August 1, 2020 differ from
17   your compensation when you were working for
18   Masih-Das's Allstate agency prior?
19   A   The concept was the same.  If we're talking
20 about the concept of how it was set up, and I guess
21 the -- and it depends on the month how many binds we
22 did, actual amount, but the concept was the same,
23 20 percent of the premium for the year.
24       QDid you have any different incentives at
25   Prestige Insurance Group or the same incentives?

16 (Pages 58 - 61)

Page 62

1   A   No, everything was the same there.
2       Q So I want to just walk through the quoting
3   and binding process a bit to get some more detail
4   there. Generally speaking, you know, if you
5   start at the top, let's say you're cold calling a
6   customer, what happens next?
7       A   Cold calling a customer, the first question
8   that we would want to know there, just to see if it's
9   actually worth it, is how much do you pay now, so we
10  get that out of the way. And then we ask, you know,
11  just their information and try to make a little bit of
12  conversation. What you're looking for. How long
13  they've been with the current carrier. What coverage
14  they have, which sometimes the system could show me
15  that already, go over marital status, other occupants,
16  drivers, and then vehicles and come up with a rate.
17      Q You listed a few of these, but I just want
18  to confirm some so I'll list them out.
19      What personal information were you required
20  to attain from a customer during the quoting and
21  binding process. So I assume name, address --
22      A   Name, address.
23      Q Sorry. Go ahead.
24      A   Yeah, sorry. Name, address, date of birth.
25  Who's in the household, which then would uncover

Page 63

1   marital status, other drivers. How long have you
2   lived at that address is typically a piece, and then
3   the vehicles on your current policy.
4       Q Would you uncover information such as prior
5   insurance history?
6       A   Yes, the claim platform or the quoting
7   platform usually brought that up there, it's something
8   that the system could bring up for me.
9       Q Were you personally responsible for
10  collecting and inputting this information
11  somewhere?
12      A   The previous history?
13      Q Overall, all the information.
14      A   Yeah, all the information I was responsible
15  for putting in there to the quoting platform, yes.
16      Q And this quoting platform, is it Allstate
17  specific, is it something that you've used at
18  other agencies?
19      A   Only for Allstate -- the Masih-Das and
20  Prestige agency was the same. Up at top it did say it
21  was an Allstate quoting platform.
22      Q How would you confirm that the customer
23  information that you collected and input was
24  accurate?
25      A   Only from the information that the customer

Page 64

1   gave me. So if they provided it, I would assume it
2   was accurate.
3       Q During the quoting and binding process,
4   would you examine customers' previous to Allstate
5   policies, if those existed?
6       A   That was rare, so I can't recall an actual
7   moment of that, but I don't think so, no.
8       Q Do you recall if you had access to previous
9   Allstate policies during this quoting and binding
10  process?
11      A   No, I don't -- I don't remember ever pulling
12  up a prior Allstate policy to ID or anything.
13      Q Do you recall something called the Current
14  Carrier Database or something similar?
15      A   If it's -- if that's the part that brings
16  over the information in the quoting platform, like who
17  they're currently with and their coverages, then I
18  recall that, but I don't -- if that was the name of
19  it, I didn't know that was the name, but that's what
20  it sounds like it was.
21      Q And did you have access to this source of
22  information, we can call it the Current Carrier
23  Database, or we can just, you know, go with your
24  description, but did you have access to this
25  source of information in this database while you

Page 65

1   were quoting and binding policies?
2       A   Yeah, I would put in your information and
3   says this party has GEICO with 100/300,000 limits.
4   Also it tells me the limits. And it would tell me how
5   long they have been with them, typically, so I can see
6   that part, yes.
7       Q And would you refer to that database and
8   that source of information while you were
9   collecting customer information and quoting and
10  binding policies?
11      A   Yes. Yes. And then, I see you have GEICO
12  with this amount of coverage. I'm going to quote the
13  same there, and discuss why I couldn't change it if
14  they were interested.
15      THE VIDEOGRAPHER: Counsel, pardon the
16  interruption. This is the videographer. I am in
17  need of doing a media change. I don't need to
18  take a break. I just need to go off the record
19  and back on real quick.
20      MR. GEAR: Sounds good.
21      THE COURT: Just for five seconds.
22      MR. GEAR: Thank you.
23      THE VIDEOGRAPHER: If that's all right with
24  everyone?
25      MR. GEAR: That's perfectly fine with us.

17 (Pages 62 - 65)

Page 66

1 Thank you.
2      THE VIDEOGRAPHER:  And thank you.  The time
3 is 11:14 a.m.  This is the end of media unit
4 number one, and we are off record.  Stand by.
5      (Recess was taken.)
6      THE VIDEOGRAPHER:  The time is 11:14 a.m.
7 This is the beginning of media unit number two,
8 and we're back on record.  And, again, I
9 apologize for the interruption.
10 BY MR. GEAR:
11      Q Mr. Rice, would you crosscheck information
12 listed in this database for this source of
13 previous insurance information with customer
14 information you attained to confirm its accuracy?
15      A   No.  If I put in, like, your name and phone
16 number and address and it brought it up, it's usually
17 good enough.  If I said, Hey, you have GEICO?  They
18 said yes, I put -- that's -- it's like a confirmation,
19 so no other confirmation checks were needed.
20      Q Did you have to run a credit report for
21 potential customers as part of the quoting and/or
22 binding process?
23      A   I was told that was one of the factors.  I
24 don't get to see any kind of report or anything, but I
25 think they said there's like a number that can kind of

Page 67

1 tell you if they have good credit or not, and it is
2 ran in the background.  That was just information I
3 was told there in the office.
4      Q So would you personally run that credit
5 report?  Would someone else run that credit
6 report?  How did that work?
7      A   When you go to the next steps there of the
8 policy or of the quote, I believe, like, right before
9 they give you the quote, there's a pop-up that you
10 advise the customer a credit check will be performed.
11 And if they say yes, then you just hit yes and it's
12 done there in the system.
13      Q It sounds like you may not have had access
14 to them so you may not -- you may not be able to
15 answer this question, but would a credit report
16 include the above solicited customer information
17 things like address and marital status?
18      A   Oh, yeah, I didn't see the actual report.
19      Q To the best of your knowledge, would the
20 results of a credit report potentially change if
21 they were done with a customer as married or
22 unmarried?
23      A   Not to my knowledge, I don't think so, or I
24 wouldn't know.
25      Q Were you ever instructed by anyone at

Page 68

1 Prestige to run multiple credit reports for
2 potential customers?
3      A   Yes, in certain scenarios.  The main one
4 benefit, if there's going to be five people on a
5 policy, you can see who has the best rate based on the
6 reports.
7      Q And you say who has the best rate, so if
8 you found one of the people in the policy has a
9 better rate, what would you do then?
10      A   Yeah, if there's, you know, a husband and
11 wife and child and they all have their own vehicle and
12 they own -- they have ownership in the vehicle, then I
13 had the ability to run the rate with each one
14 separately as the named insured and the others is just
15 listed drivers.
16      And if there's a preferable rate, I could
17 explain to them why I set it up that way, the policy,
18 to give them a more favorable rate, the customer.
19      Q And were you instructed by anyone at
20 Prestige Insurance Group to do that?
21      A   I recall a meeting there about it with Glenn
22 to say that there's a better way to get a rate there
23 and nothing -- no issue there with it if everyone has
24 ownership in the vehicle, and it can be the insured,
25 so at least you give the customer the best rate you

Page 69

1 can, so it was confirmed by Glenn verbally that this
2 is an option for us to take.
3      Q You were trained on the quoting and binding
4 process; is that correct?
5      A   Yes, the quoting process.  And the bind, I
6 would send over, just our training method.
7      Q And when were you trained?
8      A   The majority of the system knowledge was at
9 Masih-Das agency, but then there are a few tips and
10 tricks added there at the Prestige agency.
11      Q So there was some specific training
12 provided by Prestige Insurance Group on the
13 quoting and/or binding process?
14      A   Like the option there to switch out drivers.
15 You know, just options that would find for savings,
16 maybe higher limits on property damage compared to
17 bodily injury.  Just, like, tips to get more coverage
18 there for the insured and let them know they're
19 getting a better value, things like that to discuss,
20 but as far as the system method, I knew how to do the
21 system from Masih-Das.
22      Q And do you recall if this training was --
23 was it a formal training session?  Was this
24 information passed on in meetings that you had
25 with a Prestige insurance staff?

18 (Pages 66 - 69)

Page 70

1    A   Yeah, just informal regular morning
2 meetings.  Just, Hey, just heads up, guys, for more
3 sales, more binds.  You can try this as an option.
4 Everything was, you know, very casual, so just
5 informal verbal meetings.
6        Q Did Mr. Cicciarelli or anyone else from
7    Prestige review your policies to make sure they
8    were accurate and completed correctly?
9    A   Yeah, everyone -- all the policies had to be
10 sent to Glenn.  And if for any reason he was, you
11 know, backed up there you can send it over to Brandon
12 to review there and bind it.
13       Q Do you know the extent of their review,
14    what they were looking for?
15   A   I do not.  I know they would click through
16 every, you know, each tab of the quote, but I'm not
17 sure exactly what they are looking for.  They would
18 just let me know if it was yes or no.
19       Q And is it correct that they were reviewing
20    every policy you -- you quoted and were set to
21    bind?
22   A   Yeah, before I could issue payment, it had
23 to be reviewed.
24       Q Do you recall if they ever found any issues
25    with any policies of yours?

Page 71

1    A   A few of the policies or the main issue that
2 was actually found on a couple of mine if the
3 insurance report wasn't quoted automatically.  You
4 tell me you're with GEICO and you tell me what your
5 limits are and I put that in.  They told me I can't
6 bind them until they actually send me a copy of that,
7 or I call GEICO and get confirmation of those limits,
8 so that was like the main couple of issues I saw when
9 I didn't get the go-ahead.
10       Q Anything else stand out?  Just that?
11   A   Just that to my -- to my recollection.
12       Q Do you recall ever encountering any
13    specific issues with customer policies that you
14    or another Prestige staff member quoted or bound
15    under Prestige Insurance Group?
16   A   Not issues with policies that I can recall.
17 There were a few customer service ladies that would,
18 like, handle any issues once the policy was bound to
19 try to correct it, but they usually didn't come to me
20 for any information if it was already a policy.
21       Q For those issues that you mentioned, it
22    sounds like you had some customer service
23    representatives to handle them, but what was
24    Prestige's response, generally, to those policy
25    issues?

Page 72

1    A   With the customer, I'm not sure once it was
2 a bound policy what the -- I just know that those two
3 kind of had a lot of things going on, so they would
4 handle all the issues but they wouldn't kind of
5 discuss what they were.
6        Usually like payment issues or payment
7 unsuccessful, that was a bigger one, but nothing that
8 came back to us on the sales floor to discuss.
9        Q Do you recall if Mr. Cicciarelli ever got
10    involved with those customer issues?
11   A   No, I don't recall that.
12       Q So just to clarify, did you ever encounter
13    situations where policies were bound that
14    customers did not want?
15   A   Personally?  No.
16       Q And would you agree that quoting or binding
17    a customer policy that they did not ask for or
18    consent to would be a violation of Allstate
19    policy?
20   A   Yes.
21       Q Did you ever encounter situations where
22    policies were bound with discounts that customers
23    were not entitled to?  So, you know, for example
24    applying a multi-policy discount when a customer
25    did not want or buy an additional policy?

Page 73

1    A   I have heard of those situations in the
2 office, yes.
3        Q Can you explain those situations?
4    A   Typically, the ones that I remember is if
5 your auto is 300 bucks a month, if you add a renter's
6 policy to it, a renter's policy is 5 or 7 bucks a
7 month, or whatever the case is, but it drops the auto
8 down so much that it just makes sense to give you
9 both.  But if you don't, yeah, acknowledge that with
10 the customer, they can still kind of call and be upset
11 as to why it happened that way.  There's a few that
12 I've heard, issues there in the office, with the
13 multi-policy discount.
14       Q So did you hear of issues where Prestige
15    staff members were applying that multi-policy
16    discount adding on the homeowner's policy or
17    whatever extra policy without confirming with the
18    customer and getting their confirmation to do so?
19   A   I don't know if those were done without
20 their consent or if they, you know, they didn't hear
21 the conversation correctly, so I don't know there.
22       But the customer calling back in, I did hear
23 that they did not know about the renter's policy when
24 they called back, yes.
25       Q And is it correct that you personally don't

19 (Pages 70 - 73)

1  recall having any issues like this?

2  A   No, I don't personally recall that.

3  QWould you agree that providing a customer

4  with a multi-policy discount they were not

5  entitled to would be a violation of Allstate

6  policy?

7  A   Yes.

8  QIf you did not obtain the customer's

9  consent?

10  A   Yes, I can see it.  Yeah, I can agree with

11  that.

12  QDid you ever encounter situations where

13  incorrect customer information was included in

14  quotes?  So, for instance, putting a customer

15  listed as separated when they were actually

16  married?

17  A   Not personally, I don't recall hearing

18  anything about that.

19  QAnd if you were speaking to a customer and

20  the customer reported they were married but you

21  input their marital status as something other

22  than married, say, separated, where it is,

23  would you agree that doing so would be a

24  violation of Allstate policy?

25  A   Yes, I can agree with that.  Yes, sir.

1  QAnd would you also agree that a staff

2  member not asking about a customer's personal

3  information such as marital status and binding a

4  policy by simply taking their best guess at what

5  the marital status is, would that also be a

6  violation of Allstate policy?

7  A   Yes, sir.

8  QHow long does it take an employee to obtain

9  a homeowner's insurance quote or complete a

10  homeowner's insurance application?

11  A   Homeowners for Allstate, I've been through

12  like a couple of companies here since, so I don't

13  recall if -- if we did homeowners for Florida, or if

14  we did, we kind of stayed away because it's a longer

15  process.  It was mainly like auto and if you had a

16  renter's -- or if your renter was more in line with a

17  homeowner's policy.  I don't recall ever writing a

18  homeowner's quote, to my knowledge.  But if I did, it

19  was very few.

20  QCan you, to the best of your recollection,

21  walk me through what steps go into obtaining a

22  quote or completing an application for a

23  homeowner's policy?

24  A   Typically just the same information.  For

25  the auto you would just put it into the homeowner's

1  quote, and I'm trying to -- I don't recall there doing

2  it, but I think that would be the most -- all you need

3  is their information that you got from the auto, and

4  you can still get a homeowner's quote with that same

5  information.

6  QAnd if you were adding on another policy,

7  say a homeowner's policy or a renter's policy in

8  order to obtain a multi-policy discount, can you

9  walk me through the process of adding on that

10  extra policy?

11  A   Renter's, if I'm still remembering

12  correctly, I've been through a few systems since 2020,

13  but I believe it was a click of a button there where

14  you can click renter's multiline.  It pulls up a box

15  of how much that you want renter's for, for the other

16  party.  And you would usually put it in.  The easiest

17  way is letting them know it just makes more sense

18  financially for them to have both policies.  You have

19  $5,000 for personal property inside your residence and

20  your vehicle, and this is the rate for both come back.

21  QAnd what makes the customer eligible for

22  the multi-policy discount?

23  A   A second -- a second policy, I believe the

24  umbrella, and in addition to the auto that we're

25  selling would be like umbrella and renter's and

1  homeowner policies.

2  QBut it sounds like they would need to have

3  another Allstate policy in effect in order to be

4  eligible for the multi-policy discount?

5  A   Yes, you do have to have a second policy,

6  yes, sir.

7  QAnd if they didn't have more than one

8  Allstate policy, would you agree with me that it

9  would be against company guidelines to issue a

10  single policy but provide the customer with a

11  multi-policy discount?

12  A   Yes.

13  QWhat instructions, if any, were provided to

14  Prestige employees about quoting with the

15  multi-policy discount?

16  A   To add the renter's multi-policy onto the

17  quote to see if it made sense to even bring it up.

18  Sometimes you can do it and it would save four bucks a

19  month, the renter's, seven.  They're not going to do

20  it because it's going up.  But if it saves such a huge

21  amount, then you bring it up in passing, like I did

22  there, Hey, it just makes financial sense for you to

23  have both policies.  There's a renter's policy

24  included that covers things in your household and your

25  vehicle for this much for both total per month.

Page 78

1        QAnd who provided those instructions?
2        A   I was trained there to do it that way from
3  the Masih-Das agency, and it kind of just stuck and
4  carried over there the same way we proceeded with
5  Prestige.
6        QDid you receive any instructions from
7  anyone specifically at Prestige on that process
8  and pushing multi-policy discounts?
9        A   Brandon was usually more in charge there of
10 the day-to-day discussions of best practices.  So I'd
11 say Brandon.  Brandon there was mainly deciding that.
12       QDo you recognize the name Isilda Lawrence?
13       A   I don't.
14       QDo you recognize the name Vince Roy
15 Lawrence?
16       A   No.
17       QDo you have any recollection of speaking
18 with and assisting Mr. and Mrs. Lawrence in
19 obtaining insurance in July of 2020?
20       A   No.
21       QIf Allstate's company data show that you
22 personally interacted with and assisted Mr. and
23 Mrs. Lawrence with obtaining insurance in July
24 and August of 2020, would you have any reason to
25 doubt that information?

Page 79

1        A   No, sir.
2        QAnd do you recall any issues with any
3  policies of Mr. and Mrs. Lawrence's bound by
4  Prestige Insurance Group?
5        A   No, sir.
6        MR. GEAR:  Okay, I think it might make sense
7  to take a quick break.  It's 11:32 right now.
8  Maybe we can take ten minutes and resume at maybe
9  is 11:45.  Does that work for everyone?
10       MR. HUBBARD:  That's fine.
11       THE VIDEOGRAPHER:  The time is 11:32 a.m.
12 and we are off record.
13       (Recess was taken.)
14       THE VIDEOGRAPHER:  The time is 11:49 a.m.
15 and we are back on record.
16 BY MR. GEAR:
17       QMr. Rice, on what date did your employment
18 with Prestige Insurance Group end?
19       A   A few months after it started, so I want to
20 say October.
21       QAnd who communicated the end of your
22 employment with Prestige Insurance Group with
23 you?
24       A   Uli.
25       QWhat did Mr. Cicciarelli say to you?

Page 80

1        A   To the best of my knowledge, he wasn't -- he
2  wasn't getting paid from Allstate, so he couldn't
3  continue to pay us there because everything he's
4  paying is out of pocket with no reimbursement.
5        QWere you personally fully compensated for
6  your work with Prestige Insurance Group?
7        A   There were some discrepancies but they
8  believed it to be accurate.
9        QCan you describe those discrepancies for
10 us?
11       A   Yeah, some policies near the end weren't
12 paid for.  Just because, as he mentioned, he wasn't
13 getting paid from Allstate for those last policies
14 that we were selling, so, you know, he couldn't pay us
15 for those policies were the main discrepancies.
16       QAnd to the best of your knowledge, can you
17 give me an amount of -- that was in question?
18       A   $2,000.
19       QHave you spoken with Mr. Cicciarelli since
20 you ceased employment with Prestige Insurance
21 Group?
22       A   Yes.
23       QWhen did you speak with him?
24       A   I want to say it was November or December,
25 somewhere in there, in a Skype room like this, with

Page 81

1  prior employees that were also asking about pay.
2        QSo pay was the subject.  Was there anything
3  else discussed?
4        A   No.  Just pay.
5        MR. HUBBARD:  Can you tell me what year,
6  November, December that we're talking?
7        THE WITNESS:  Oh, yes.  2020.
8        MR. HUBBARD:  Thank you.
9        MR. GEAR:  Thanks, John.
10 BY MR. GEAR:
11       QHave you spoken with any other former
12 Prestige staff members since you ceased
13 employment with Prestige Insurance Group?
14       A   Yes.  They -- about half or so of them, we
15 worked at a different agency together again after
16 that.
17       QWhen did you speak with these people?
18       A   Daily at work at the new agency for, like,
19 Farmers Insurance for a couple of months after the
20 Prestige employment ceased.
21       QDid you have any discussions with those
22 former Prestige employees about your former
23 employment with Prestige Insurance Group?
24       A   Just to kind of reiterate everything about
25 never get that extra pay we all felt we were entitled

21 (Pages 78 - 81)

Page 82

1 to, but that was the depth of the conversation after
2 we left Prestige.
3      MR. GEAR:  I think that concludes my
4 questions for now.
5      Mr. Hubbard, I'll defer to you.
6      MR. HUBBARD:  I don't have any questions.  I
7 appreciate your time today, sir.
8      MR. GEAR:  Thank you very much.
9      THE VIDEOGRAPHER:  I'm sorry.  My apologies.
10 I was just going to ask Maria if there's anything
11 she needs to discuss on record before I sign us
12 off?
13      COURT REPORTER:  Just if anyone is ordering?
14      MR. GEAR:  We will be ordering.
15      MR. HUBBARD:  We will as well.
16      THE VIDEOGRAPHER:  Any videos today?
17      MR. HUBBARD:  Not for us.
18      MR. GEAR:  No, thank you.
19      THE VIDEOGRAPHER:  Got it.  All right, if
20 there's anything else -- not anything else, I'm
21 going to sign us off.  Stand by.
22      We are off the record at 11:53 a.m., and
23 this concludes today's testimony given by Joshua
24 Rice.
25      The total number of media units used was two

Page 83

1      and will be retained by Veritext Florida.
2      Thank you, everybody.
3      (Deposition adjourned at 11:53 a.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 84

1      CERTIFICATE OF OATH
2
3
4 STATE OF FLORIDA   )
5 COUNTY OF BROWARD  )
6
7 I, the undersigned authority, certify that
8 JOSHUA RICE, remotely appeared before me and
9 was duly sworn.
10 WITNESS my hand and official seal this 22nd day
11 of August 2022.
12
13
14
15      MARIA E. FERNANDEZ, RPR, FPR
      Notary Public, State of Florida
16      My Commission No. HH 087475
      Expires: 4/10/2025
17
18
19
20
21
22
23
24
25

Page 85

1      CERTIFICATE
2
3 STATE OF FLORIDA   )
4 COUNTY OF BROWARD  )
5
6 I, MARIA E. FERNANDEZ, RPR, FPR, do hereby
7 certify that I was authorized to and did
8 stenographically report the foregoing
9 deposition of Joshua Rice; that a review of the
10 transcript was not requested; and that the
11 transcript is a true record of my stenographic
12 notes.
13 I FURTHER CERTIFY that I am not a relative,
14 employee, attorney, or counsel of any of the
15 parties, nor am I a relative or employee of any
16 of the parties' attorney or counsel connected
17 with the action, nor am I financially
18 interested in the action.
19 Dated this 22nd day of August 2022.
20
21
22      MARIA E. FERNANDEZ, RPR, FPR
      and Notary Public
23
24
25

22 (Pages 82 - 85)

Page 86

```
1              CERTIFICATE OF NOTARY PUBLIC
2
3
4     STATE OF FLORIDA   )
5     COUNTY OF BROWARD  )
6
7     I, Maria Reeder, Notary Public for the State of
8     Florida, DO HEREBY CERTIFY, that Joshua Rice,
9     remotely appeared before me, presented a
10    Florida Driver's License, and was duly sworn by
11    me to tell the truth on the date of August 18,
12    2022.
13          WITNESS MY HAND AND SEAL in the City of
14    Fort Lauderdale, Broward County, State of
15    Florida, this 22nd day of August, 2022.
16
17
18
19    MARIA E. FERNANDEZ, RPR, FPR
      Notary Public, State of Florida
20    My Commission No. HH 087475
      Expires: 4/10/2025
21
22
23
24
25
```

Veritext Legal Solutions

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.