# EXHIBIT 16

1          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
2            FT. LAUDERDALE DIVISION
3
4          CASE NO: 0:21-cv-60515-FAM
5
6   PRESTIGE INSURANCE GROUP, LLC, a Delaware
    Limited Liability Company and
7   ULISES CICCIARELLI, an individual,
8               Plaintiffs,
9   VS.
10  ALLSTATE INSURANCE COMPANY, an Illinois Corporation,
11
12              Defendant.
    _____
13
14
15              Zoom Videoconference
                Tampa, FL
16              August 19, 2022
                9:31 A.M. - 10:45 A.M.
17
18
19     VIDEOTAPED DEPOSITION OF JONATHAN WILKS
20
21     Taken before MARIA FERNANDEZ, RPR, FPR-C
22     and Notary Public for the State of Florida at
23     Large, pursuant to Defendant's Notice of
24     Deposition filed in the above cause.
25

Page 2

1  APPEARANCES:
2  On Behalf of the Plaintiffs:
3  HUBBARD SNITCHLER & PARZIANELlO, PLC
   801 W Ann Arbor Trail, Suite 240
4  Plymouth, MI 48170
   BY:  ERIC PARZIANELLO, ESQ.
5     eparzianello@hspplc.com
6
7  On behalf of the Defendant:
8  AKIN GUMP STRAUSS HAUER & FELD, LLP
   2001 K Street, NW
9  Washington, DC 20006
   BY:  ANDREW GEAR, ESQ.
10    agear@akingump.com
   BY:  ROBERT G. LIAN, ESQ.
11    blian@akingump.com
12
13 ALSO PRESENT:
14 Michael Peterman, Videographer
15
16
17    REPORTED BY:
18    Maria Fernandez, RPR, FPR-C
      Veritext Legal Solutions
19    2 South Biscayne Boulevard, Suite 2250
      Miami, FL 33131
20
21
22
23
24
25

Page 3

1       I N D E X
2
3  Examination              Page
4  Jonathan Wilks
5  DirectBy Mr. Gear         5
6
7     DEFENDANT'S EXHIBIT MARKED FOR IDENTIFICATION
8
9  Exhibit 19 Subpoena for Depo    8

Page 4

1       THE VIDEOGRAPHER:  We're now on the record.
2  The time is 9:31 a.m. on August 19, 2022.  This
3  is media unit one, letter A, of the videotaped
4  deposition of Jonathan Wilks.
5       In the matter of Prestige Insurance Group,
6  et al versus Allstate Insurance Company, filed in
7  the United States District Court, Southern
8  District of Florida, Fort Lauderdale Division,
9  Case Number 0:21-cv-60515- FAM.
10      This deposition is being held by Veritext
11 virtual deposition by Zoom.  My name is Michael
12 Peterman, I'm the videographer.  The court
13 reporter is Maria Fernandez with Veritext Legal
14 Solutions.
15      Will counsel please introduce themselves.
16      MR. GEAR:  Andrew Gear and my colleague Bob
17 Lian on behalf of defendant, Allstate Insurance
18 Company.
19      MR. PARZIANELLO:  Eric Parzianello on behalf
20 of the plaintiffs.
21      THE VIDEOGRAPHER:  Would the court reporter
22 please swear in the witness.
23 Thereupon:
24           JONATHAN WILKS,
25 A witness named in the notice heretofore filed,

Page 5

1  being of lawful age and having been first duly
2  sworn, testified on his oath as follows:
3       COURT REPORTER:  I didn't hear you.
4       THE WITNESS:  Yes.
5            DIRECT EXAMINATION
6  BY MR. GEAR:
7     Q    First off, Mr. Wilks, I want to say thank
8  you for being here today.  I know these are -- this is
9  never convenient but we appreciate you taking the time
10 and we're going to try and be as efficient as possible
11 for you.
12      Can you please provide your full name for
13 the record, please.
14    A    Jonathan Wilks.
15    Q    Have you ever been deposed before?
16    A    No.
17    Q    Have you testified in a legal proceeding
18 before?
19    A    No.
20    Q    I'm going to go over a few ground rules just
21 to try and make this run as smoothly as possible.  I
22 will be asking questions and request that you answer
23 completely and truthfully.
24      The court reporter is going to be recording
25 your answers, so please allow me to finish my question

2 (Pages 2 - 5)

Page 6

1  before answering the question and I'm going to try and
2  extend you the same courtesy.
3      Please also provide verbal responses, so if
4  your answer is yes or no, please say yes or no.
5  Unfortunately it's hard to pick up nods or shaking of
6  the head on the transcript, so please try and provide
7  those verbal responses for us.
8      If you don't understand one of my questions,
9  please ask for clarification, otherwise, I'll assume
10 you understood the question.
11     Mr. Parzianello may offer objections at
12 times. Please just allow him to state the objection
13 for the record, and then you can still proceed to
14 answer the question.
15     We can take breaks if you need them, just --
16 all I ask is that you answer any pending questions
17 that I have first before we go on that break.
18     We're obviously doing this over Zoom, which
19 makes things a bit more difficult, but we'll try to
20 take our time to make sure it goes smoothly, but if
21 there is any issue with your technology, just let us
22 know and we can get that figured out for you.
23     Is there any reason you're not able to
24 understand my questions and testify truthfully today?
25  A  No.

Page 7

1  Q  Are you taking any drugs or medications that
2  would affect your ability to understand my questions
3  and testify truthfully today?
4  A  No.
5  Q  What is your date of birth?
6  A  [REDACTED]
7  Q  And what is your current home address?
8  A  [REDACTED]
9
10 Q  How long have you lived there?
11 A  Three -- three to four years.
12 Q  What's the highest level of education you've
13 completed?
14 A  Associate's degree.
15 Q  And where did you obtain that associate's
16 degree?
17 A  International College of Broadcasting.
18 Q  And what year did you obtain that degree?
19 A  Maybe 2012.
20 Q  Have you ever been convicted of any crime?
21 A  No.
22 Q  Have you ever been accused of a crime
23 involving dishonest or financial misconduct?
24 A  No.
25 Q  Prior to your employment with any Allstate

Page 8

1  agency, can you -- can you run through your employment
2  for us?
3  A  I was with MetLife for about six years.
4  Before MetLife I was with Conner Warner Cable for
5  about three to four years.
6  Q  And have you held any previous Allstate
7  employment prior to your employment with Prestige
8  Insurance Group?
9  A  No.
10 Q  And what is your current employment?
11 A  I work for Progressive.
12 Q  How long have you worked for Progressive?
13 A  As a specialist.
14 Q  Sorry.
15 A  It will be two years next year -- next
16 month. I'm sorry.
17 Q  Have you held any other employment since
18 your employment with Prestige Insurance Group?
19 A  No.
20 Q  I'm going to introduce an exhibit. This
21 should be numbered Exhibit 19.
22     (Defendant's Exhibit 19 marked.)
23     MR. GEAR: Give me one second and I'll
24 hopefully get it up on the screen for you all.
25

Page 9

1  BY MR. GEAR:
2  Q  Are you able to see my screen?
3  A  Yes, I can see it.
4  Q  Do you recognize this document, Mr. Wilks?
5  A  Yep. That's the one that tells me how to
6  get into the Zoom.
7  Q  Did you review this subpoena prior to the
8  deposition today?
9  A  I looked over it.
10 Q  Did you search for any documents in response
11 to this subpoena?
12 A  I have the documents to look for Ulises.
13 Q  Where did you search for any documents?
14 A  I searched through my e-mail. Other than
15 that, I wouldn't have any documents 'cause they have
16 -- all the computers was provided by Ulises.
17 Q  What did you do to prepare for this
18 deposition today?
19 A  Not that much.
20 Q  Were there any documents you reviewed beyond
21 the subpoena that I just had up on screen?
22 A  No. It was -- like I -- we would talk
23 before, I was only with them for about a month or two,
24 so there weren't really any documents I would have.
25 And once again, all of our documents was on computers

3 (Pages 6 - 9)

Page 10

1 provided that we had to turn back in after employment.
2  Q   Understood.
3      Outside of our conversation yesterday
4 confirming your attendance for this deposition, was
5 there anyone you spoke with about this deposition in
6 advance of it today?
7  A   No. I mean, my wife knows that I have a
8 deposition today, but...
9  Q   Was there anything else you did to prepare
10 for your testimony?
11  A   Nope. Just being prepared to tell the truth
12 on whatever questions you have for me today.
13  Q   That's all we ask. Thank you.
14      Did you know Mr. Cicciarelli prior to your
15 hiring by Prestige Insurance Group?
16  A   No.
17  Q   How did you come to be hired at Prestige
18 Insurance Group?
19  A   He took over an agency that I was working
20 for before.
21  Q   So you had worked for a prior Allstate
22 agency prior to your time with Prestige Insurance
23 Group?
24  A   Right. It was -- I mean, they just -- he
25 came in and bought it, but I guess you can say so,

Page 11

1 yes.
2  Q   And do you recall the name of that other
3 Allstate agency?
4  A   I know it started with an M, but I can't
5 really remember how to pronounce his name.
6  Q   Does Masih-Das ring a bell?
7  A   There we go. Masih. There we go.
8  Q   How long did you work for the Masih-Das
9 Allstate agency?
10  A   Honestly, I felt like all -- with me being
11 with Allstate the whole time was less than six months,
12 maybe five. I want to say four, but five months in
13 total, so I'm not sure when they split it up, but I
14 was with an Allstate agency at least five months, I
15 think.
16  Q   Do you recall the year that you started with
17 Masih-Das?
18  A   Yeah, it was right in the pandemic, so it
19 would be 2020.
20  Q   What training did you go through with the
21 Masih-Das Allstate agency?
22  A   There was an Allstate -- the first week and
23 a half I think there was an Allstate program we had to
24 go through. Of course I had to get my license at the
25 time, but -- before you start. I did that on my own,

Page 12

1 but actually with Allstate there was an onboarding
2 program that you had to go through. I think it lasted
3 for about a week. And then after that you was able to
4 take calls.
5  Q   And was that training provided by Allstate?
6  A   Yeah. Yeah, you had to sign it through
7 Allstate, yes, sir.
8  Q   Did you undergo any training specifically
9 through Masih-Das?
10  A   He had, like, senior reps that would show
11 you how to work the system, so you can actually do
12 things of that nature, be it the selling points, but
13 nothing of the facade of Allstate onboarding.
14  Q   How were you compensated while working at
15 the Masih-Das Allstate agency?
16  A   It was commission, so it was based off your
17 totals for the month. I think it was 20 percent of
18 the commission.
19  Q   So jumping back to your hiring at Prestige
20 Insurance Group, can you explain how you ended up
21 transitioning from the Masih-Das Allstate agency to
22 your employment with Prestige Insurance Group?
23  A   One day they said if you were selling and if
24 you want to stay, you can stay. If you don't, you can
25 go.

Page 13

1  Q   And you said you were told that. Who were
2 you told that by?
3  A   It was by -- I mean, they were both there,
4 Masih and -- I'm not sure if I'm saying his name
5 right -- and Ulises was there together.
6  Q   Did you undergo any interviews with
7 Mr. Cicciarelli?
8  A   Huh-huh. He just took on the team that was
9 already there.
10  Q   What position were you hired into at
11 Prestige Insurance Group?
12  A   Just sales rep.
13  Q   And was that your official job title?
14  A   I mean, sure. I mean, it wasn't really
15 titles but, correct, it was sales.
16  Q   Had you previously performed that role with
17 an Allstate agency?
18  A   Right, with Masih -- the Masih-Das.
19  Q   So it was the same role that you had
20 performed previously with the Masih-Das agency?
21  A   Correct. Nothing really changed except for
22 the name. They did move to a different building
23 before the shutdowns happened.
24  Q   Who, if anyone, did you report to at
25 Prestige Insurance Group?

Page 14

1  A  It was just Ulises. Yeah, it was just
2  Ulises.
3  Q  Does the name Glenn Hunter ring a bell to
4  you?
5  A  Glenn -- did Glenn switch over? I do
6  remember Glenn. He probably switched over. He might
7  have switched over with us. I know he was at
8  Masih-Das. He was brought in but, I mean, he was
9  brought in towards the end of Masih-Das and then he
10 was supposed to be helping with more of a coaching.
11     Basically, like, if you listen to calls,
12 just things that you can do better, but I think he was
13 separate from Ulises, from what I was told.
14 Q  Did Glenn Hunter work at the Prestige
15 Insurance Group agency with you, to the best of your
16 recollection?
17 A  Yeah, he did. We mentioned him. He did
18 help out with coaching, but from what I was told, he
19 was separate from Ulises.
20 Q  Did anyone report to you at the Prestige
21 Insurance Group agency?
22 A  No. No.
23 Q  Generally speaking, can you describe your
24 job duties at Prestige Insurance Group?
25 A  Basically taking incoming calls, offering

Page 15

1  them insurance with Allstate, of course. Going
2  through coverages for cars. We sell mostly cars,
3  insurance, auto insurance. Going over coverages and
4  then trying to sell the policy getting all the binding
5  payment information.
6      Then once you did get a customer who did
7  want to switch over, you would take their information,
8  send it over so it can be reviewed by Ulises or I
9  think he had someone else to review the documents to
10 make sure everything was there, and then at that time
11 to be able to bind the policy.
12 Q  When did you officially become an employee
13 of Prestige Insurance Group?
14 A  That's a good question. I don't have a date
15 in mind from them.
16 Q  And it's okay if you don't have a specific
17 date, but your best estimation.
18 A  I want to say maybe -- I want to say maybe
19 June or July.
20 Q  But prior to August -- sorry, go ahead.
21 A  Yes, prior to -- definitely, yeah, prior to
22 August, because I left in August, so...
23 Q  Just to make the record clear, you became an
24 employee of Prestige Insurance Group prior to
25 August 1, 2020?

Page 16

1  A  Correct.
2  Q  Did Mr. Cicciarelli inform you that his
3  agency would not be officially opened until August 1,
4  2020?
5  A  Correct. In the month prior, we did take
6  calls, but we wasn't allowed to bind until the
7  August 1st date, so pretty much it was, again,
8  promises, letting them know that we can give them this
9  rate, but we cannot process until August the 1st. So
10 I think of that weekend, that's when we did our
11 callbacks. And then if customers still wanted to move
12 forward, that's when we bind it. If they didn't, we
13 just lost a sale.
14 Q  Were you concerned about the delay in
15 opening to August 1, 2020?
16 A  Well, I never worked for an independent
17 agent before, but I was told when you -- when they
18 switch -- Ulises told me when they switch there's
19 usually a 30-day hold.
20 Q  What discussions did you have with
21 Mr. Cicciarelli about the delayed opening date?
22 A  No, I mean, like I said, never really worked
23 for an independent agent before, so I was told that's
24 what happens on a 30-day hold. ==I was told once we are==
25 ==able to just get those customers to understand that we==

Page 17

1  ==can't start the policy until the August 1st date, that==
2  ==we would still be paid for those sales, so it was left==
3  ==at that.==
4  Q  And when you say you were told, who told you
5  that information?
6  A  About not being able to bind until August
7  the 1st?
8  Q  Yeah, who told you that you would not be
9  able to bind policies --
10 A  Ulises.
11 Q  -- until August 1, 2020?
12     Ulises?
13 A  Ulises, yeah.
14 Q  When did you have that conversation with
15 Mr. Cicciarelli?
16 A  He announced it to the team.
17 Q  Do you recall where that conversation took
18 place?
19 A  It was in the office.
20 Q  And do you recall when that conversation
21 took place?
22 A  I'm pretty sure it was when the switch
23 happened, so if it was August the 1st was the date
24 that the binding started, it had to be in July, so
25 that means Ulises took over in July.

5 (Pages 14 - 17)

Veritext Legal Solutions
800-726-7007                                    305-376-8800

Page 18

1  Q   And when you said that there was a 30-day
2  hold on the opening of a new agency, can you explain
3  what you mean by a 30-day hold?
4  A   Just that we wasn't allowed to bind until
5  all his paperwork was processed with Allstate to
6  switch the team over, so we wasn't allowed to bind
7  until the August 1st date.
8  Q   And what was your understanding of that
9  30-day hold?  Was that something that was, you know, a
10 mandate of Allstate?  Was that something else?  What
11 was your understanding?
12 A   That's how long it takes for the paperwork
13 to process for our team to switch over.
14 Q   Understood.
15     What training did you receive as a new
16 employee of Prestige Insurance Group?
17 A   There was no more training of that.
18 Q   So you did not receive any additional
19 training from Mr. Cicciarelli or Prestige Insurance
20 Group upon your transition to Prestige Insurance Group
21 in July of 2020?
22 A   No.  I think we did, like I said, some
23 sales.  There was always a little bit of sales things,
24 like I said earlier, you know, sale pointers of how to
25 ask for a sale, close on policies, things of that

Page 19

1  nature, but, no, there was no additional training past
2  that.
3  Q   Do you recognize the name Joshua --
4  A   I do remember -- sorry, sorry.
5  Q   Go ahead.
6  A   I do know we did have to get new log-ins as
7  well, so I do remember that process, we had to get the
8  log-in for Allstate.
9  Q   Do you recognize the name Joshua Rice?
10 A   Uh-huh.  He was one of the --
11 Q   Who is Joshua Rice?
12 A   -- people there.  He worked there.
13     I'm sorry.  He's one -- I'm sorry.  Go
14 ahead.  I'm sorry.
15 Q   Go ahead, go ahead.  I apologize.
16 A   He's one of the coworkers at the agency.
17 Q   And when you say "the agency," was he a
18 coworker at the Masih-Das agency?
19 A   Uh-huh.  Correct.
20 Q   And then was he also a coworker of Prestige
21 Insurance Group?
22 A   Correct.
23 Q   Did you know Mr. Rice prior to your
24 employment with the Masih-Das Allstate agency?
25 A   No.

Page 20

1  Q   But you did work with Mr. Rice at Prestige
2  Insurance Group?
3  A   Correct.
4  Q   Did you work with Mr. Rice in person at
5  Prestige Insurance Group?
6  A   Yeah, because sometimes when we was at the
7  office, correct.
8  Q   Did you attend meetings at which Mr. Rice
9  was present at Prestige Insurance Group?
10 A   Yeah.  Yeah, we had morning meetings.
11 Q   Did you otherwise interact with Mr. Rice
12 outside of work?
13 A   Maybe go out on lunch break.
14 Q   Have you spoken with Mr. Rice since your
15 employment with Prestige Insurance Group?
16 A   I talked to him once.  It was a -- we had
17 some documents from Allstate questioning my actual
18 licensing, so I had to do an interview out there.  We
19 talked about that, but since then, I haven't had
20 conversations.
21 Q   When did those conversations happen?
22 A   Probably October or November of 2020.
23 Q   Of what year?
24 A   2020.
25 Q   2020?

Page 21

1  A   Uh-huh.
2  Q   Have you had discussions with Mr. Rice about
3  your deposition today?
4  A   No.
5  Q   Mr. Rice has previously participated in a
6  deposition yesterday in this matter, in fact, and he
7  testified under oath that he began working for
8  Prestige Insurance Group in approximately the first
9  week of July 2020.
10     Did you start working at Prestige Insurance
11 Group at approximately the same time, the first week
12 of July 2020?
13 A   Right.  I would say, like you said, it
14 wasn't for binding for August the 1st, I know it had
15 to be exactly that 30-day mark, so I would say yes.
16 Q   Mr. Rice testified that he did not recall
17 the name Gerry Rivas.  Do you recall the name Gerry
18 Rivas.
19 A   Was that his -- Gerry Rivas?
20 Q   Gerry Rivas, yes.
21 A   No.
22 Q   I'm sorry, was that no you don't recall the
23 name Gerry Rivas?
24 A   I'm sorry.  No, I do not recall the name
25 Gerry Rivas.

Page 22

1  Q   Do you know who Gerry Rivas is?
2  A   No.
3  Q   Mr. Rice testified that during the week of
4  July 2020, prior to August 1, 2020, he was working for
5  Prestige Insurance Group in person alongside Glenn
6  Hunter and other Prestige staff members.
7      Were you working for Prestige in person in
8  July of 2020?
9  A   Correct.  There was a time where in that
10 pandemic we worked from home a little bit, so it may
11 have been -- well, I know there was a time we worked
12 from home, because I know when I quit I had to take my
13 appointment back, so, yes, we were probably in the
14 office in July.
15 Q   Do you recall when you -- what time period
16 you worked from home or when that transition occurred?
17 A   I know binding August 1st was in office,
18 because I remember -- I think it was like a Saturday.
19 So it had to be prior to August when we started
20 working from home, during the pandemic.
21 Q   Where was the office that you were working
22 in for Prestige Insurance Group?
23 A   It was after -- I know it was after Martin
24 Luther King.  Give me one second.
25 Q   And to the best of your recollection is all

Page 23

1  we're asking for here today, Mr. Wilks.
2  A   Okay.  Yeah, I know it was -- I think it was
3  off Martin -- Frazerberg.  Fransisberg.  I know it was
4  out there.  I know it was towards Brandon off of
5  Martin Luther King.  I think it was called Frazenberg,
6  off Frazenberg, somewhere around there, but it was an
7  office.  It was across from the -- I knew it was
8  across from the Lay's plant, I can tell you that for
9  sure, but it was an office in that section.
10 Q   And what city was this office in?
11 A   I think it was still Tampa.  You know, we
12 got -- big street city lines all run together so, but
13 I think it's still Tampa, yeah.
14 Q   Did you go into the office every day in
15 July 2020 you were working for Prestige Insurance
16 Group?
17 A   Correct.  We did Monday through Friday,
18 sometimes a Saturday.  Depending on our sales work,
19 but mostly Monday through Friday.  I think it was from
20 8 to 7, and then we got off early on Fridays.
21 Q   Who else was in the office with you during
22 that time period?
23 A   I can't really remember names because it's
24 two years ago.  I was -- I'm a little bit -- if you
25 look at birth dates, from my acknowledgment, I was a

Page 24

1  lot older than a lot of other coworkers, so, but --
2  Q   And just to be clear, I'm not asking for,
3  necessarily, specific names.  I know you're not going
4  to remember all of the staff members, but generally
5  speaking were the Prestige staff members, all the
6  Prestige Insurance Group staff members in attendance
7  in the office?
8  A   Oh, yes, yes.
9  Q   Was Glenn Hunter in attendance in the office
10 during the July 2020 time frame?
11 A   Yeah, I think he had a -- he was there.  He
12 had his own separate office.
13 Q   Did you see Mr. Cicciarelli in the office
14 during the July 2020 timeframe?
15 A   Yeah, he was there every day.
16 Q   Did you interact with him?
17 A   I mean -- I mean pep talks on sales, you
18 know, but, I mean, it wasn't more of a -- I mean, we
19 have like pizza days.  I mean, I am not sure what you
20 really mean by interaction, but I mean...
21 Q   Did Mr. Cicciarelli lead meetings during
22 that July 2020 time frame?
23 A   Oh.  Yeah, so basically -- you ask like
24 day-to-day was.  So, yeah, I mean, we have a morning
25 meeting, you know, try to see where we are at with

Page 25

1  numbers, projections, pep talks.  Like I said, we
2  would have -- if we have a good day we may have a
3  pizza day or something of that nature or get some
4  food, but nothing outside of work, no.
5  Q   So you mentioned these morning meetings.
6      Did you attend these morning meetings during
7  July 2020?
8  A   Yeah, I mean, morning meetings would just be
9  like -- it probably be like a 15-minute, where we at
10 standing, who got the highest sales, where you are
11 with sales, things of that nature.
12 Q   And who led those meetings?
13 A   Mostly Ulises.
14 Q   Who was in attendance at these meetings?
15 A   It could be the staff.
16 Q   All the staff, including yourself?
17 A   Correct.
18 Q   And did these meetings take place every
19 day --
20 A   Yes.
21 Q   -- that you were in the office?
22 A   Yes.
23 Q   You mentioned that, you know, sales would be
24 discussed at these meetings.  Was Mr. Cicciarelli
25 leading those discussions of sales during the

Page 26

1 July 2020 time frame?
2  A  I mean, yes. I mean, he was the -- the head
3 of -- I mean, he was the -- I guess you'd say your
4 boss so, yes. There was no like no -- there wasn't
5 nobody else to lead the meetings. I mean, it was the
6 staff. Glenn might have led some meetings sometimes.
7     I know Ulises was on the phone -- was on the
8 phone a lot with his other -- doing whatever he was
9 doing, but it would either be Glenn or Ulises saying
10 where we were at sales and what we were going to look
11 at towards August.
12  Q  And these meetings took place not only after
13 the opening of the agency on August 1, 2020, but took
14 place in July of 2020, prior to the official opening
15 of the agency on August 1, 2020?
16  A  Correct.
17  Q  Did you get your marching orders for the day
18 in terms of work that you were assigned for July of
19 2020 at these meetings?
20  A  No, it was incoming call sales. It was
21 mostly an incoming call center, so it was not really
22 work assigned.
23  Q  I'm sorry, by that I mean was
24 Mr. Cicciarelli describing or instructing staff
25 members on what his expectations for July 2020 and

Page 27

1 your work during July 2020 at these meetings?
2  A  Can you clarify?
3  Q  Sure.
4     During these meetings -- during the time
5 frame of July 2020, was Mr. Cicciarelli instructing
6 staff members on the work that he expected them --
7 expected them to perform during this time frame?
8  A  Right, that's what I'm confused about
9 because it was incoming calls. So what work are you
10 referring to?
11  Q  Just your -- just your general day to day
12 work, or were these meetings mostly discussions of
13 sales updates and that sort of thing?
14  A  Right. So, I mean, it was sales. That's
15 all we did was sales.
16  Q  Mr. Rice testified that during the period of
17 July 2020, prior to the opening of the Prestige
18 Insurance Group agency on August 1, 2020, he was
19 operating under the supervision and guidance of Glenn
20 Hunter and Mr. Cicciarelli.
21     Were you similarly operating under the
22 supervision and guidance of Mr. Hunter and
23 Mr. Cicciarelli during this July 2020 time frame?
24  A  Yes. I want to say yes.
25  Q  And how were they supervising your work

Page 28

1 during this time period?
2  A  I mean, like I said -- well, during those
3 sales for July, it was just normal, like I said,
4 taking down information for binding. But if you
5 were -- after August 1st those, either Ulises or Glenn
6 would have to approve and make sure we had all the
7 required documents before binding.
8     So July was really just, as I said, prep,
9 coaching, getting ideas on how to, you know, try to,
10 you know, do sales so we can get people to accept
11 that, you know, we can't start until August the 1st,
12 different tactics that way. I mean, we did lose a lot
13 of sales during that month because a lot of people
14 didn't want to wait 30 days to start policies, but
15 things of that nature.
16     But normally it was full go. We had the
17 system, we would have our documents, and everything
18 that we filled out, they reviewed it, made sure we
19 didn't miss anything and give okays about binding.
20  Q  Mr. Rice testified that during the July 2020
21 period, prior to the opening of Prestige Insurance
22 Group agency on August 1, 2020, he conducted cold
23 calls to reach out to potential customers.
24     It sounds like you conducted similar cold
25 calls. Was that your experience during this August

Page 29

1 2020 time frame?
2  A  I didn't call out to anybody. All my calls
3 were inbounds.
4  Q  All of your calls were incoming during the
5 July 2020 time frame?
6  A  Uh-huh. Yeah, I never had to -- I never
7 really had to dial out to anybody.
8  Q  And these incoming callings, were they just
9 customers contacting Allstate generally?
10  A  From what I understand, yes, and then they
11 used a feeder system, I guess, where people --
12 somebody would call out -- well, I guess -- well,
13 somebody else would call out, and if they would say,
14 yes, we want a call, then they transfer it to our
15 lines.
16  Q  When you say somebody else would call out,
17 do you know who that somebody else is?
18  A  No, I don't know what company they used to
19 do their -- to do their -- to get people to call -- to
20 do calls for us, no.
21  Q  Were they other Prestige Insurance Group
22 staff members calling out?
23  A  No.
24  Q  Can you describe your day-to-day work then
25 during the July 2020 period in further detail for me?

8 (Pages 26 - 29)

Page 30

1   A   It would be inbound calls, still trying to
2 sell them an Allstate insurance for auto. Give them a
3 rate, let them know that we cannot bind until the
4 August 1st date. Set up callback times for them, and
5 then write down their information for, like, name,
6 telephone number, quote number, so I would have those
7 calls ready for the August 1st dates.
8   Q   How many customers were you speaking with a
9 day, in your best guess?
10   A   On a hot day, maybe 20 to 30, maybe. Maybe.
11   Q   And that number, did that -- how did that
12 differ compared to your previous kind of daily number
13 when you were working with the Masih-Das agency?
14   A   I would say it was about the same. I don't
15 feel like there was a difference.
16   Q   So during this July 2020 time frame, prior
17 to the official opening of Prestige Insurance Group on
18 August 1, 2020, would you say that you were, for the
19 most part, working in -- at full capacity?
20   A   Uh-huh. I mean, I don't feel like it was --
21 I mean, I don't feel like we was as high as before,
22 but, I mean, we would get calls. I mean, it would be
23 slow days, like any other day. I mean, I don't feel
24 like it was any type of days of -- like we were just
25 sitting there doing nothing.

Page 31

1   Q   But outside of not being able to bind
2 policies until on or after August 1, 2020, how did
3 your work during this July 2020 time frame differ from
4 your previous work with the Masih-Das Allstate agency?
5   A   I would say that's about it. We could not
6 sell no policy during that month.
7   Q   Were you otherwise performing all of the
8 same tasks that you were doing for the Masih-Das
9 Allstate agency during this July 2020 time frame?
10   A   Similar tasks as in -- like take a call?
11 Like, I mean literally, understand you have to charge
12 these details literally. Get the call, try to sell
13 it, it might take some time, wait for the next call to
14 come in.
15       There was really no task. Now, there was,
16 like, doing followup work, so let's say you get
17 assigned your documents. We would get e-mails from
18 Allstate saying these documents wasn't signed so you'd
19 follow up and reach out to customers about that.
20 Other than taking calls and sell them, no, there was
21 not really much followup to do.
22   Q   Just to clarify, during July of 2020, prior
23 to the official opening of Prestige Insurance Group on
24 August 1, 2020, you were selling policies?
25   A   Say that again?

Page 32

1   Q   Just to clarify, during July 2020, prior to
2 the official opening of Prestige Insurance Group on
3 August 1, 2020, you were selling policies?
4   A   For the day of August the 1st, no payments
5 had been taken. All of -- I'm sorry, what's your
6 first name?
7   Q   Andrew.
8   A   "Andrew, hey, I got this great deal for you.
9 I won't be able to actually start the policy until
10 August 1st? Is that okay for you."
11       If you say yes, I will take down your name,
12 your telephone number and your quote level. Those
13 was -- that's pretty much all that was being done.
14       If you said no, I would say, "Well, Andrew,
15 I will try to reach out to you since we got a great
16 deal, but I understand the process of it, waiting for
17 30 days to start the policy."
18   Q   So my understanding is that you were going
19 through all of the motions of selling policies, just
20 not binding those policies until on or after August 1,
21 2020; is that correct?
22   A   That's correct.
23   Q   Sorry to kind of break this down. I know
24 you've mentioned a bit of this already, but were you
25 collecting customer information as part of this

Page 33

1 process during the July 2020 time frame?
2   A   Myself, yes. I would get your name, your
3 telephone number, and maybe write a note, something
4 that this is up in, you know, and give you something
5 to remember me by, and then the quote level.
6   Q   Were you collecting information such as
7 prior insurance history?
8   A   Depending on if you -- I think it's
9 depending on if you have like a lapse or something,
10 but, yes, we will ask if you currently have insurance
11 or not, correct.
12   Q   Were you collecting information such as
13 marital status?
14   A   Uh-huh. Those are one of the questions.
15   Q   Were you collecting payment information from
16 customers?
17   A   Payment information, myself, no. I would
18 write down what you would want to pay with, like if it
19 was a checking account or a credit card, but, no. I
20 couldn't bind nothing until August the 1st.
21   Q   Was anyone at Prestige Insurance Group
22 collecting payment information during this July 2020
23 time frame?
24       I know that you were not able to bind until
25 August 1, 2020, but were you collecting customer

9 (Pages 30 - 33)

Page 34

1 payment information in preparation for binding in
2 August 1, 2020?
3   A   I'm not really sure because it was spread
4 out, because it was still COVID time, so it was still
5 spread out.  He got us a bigger office where there
6 might have been two to three people to a station, so
7 basically like it was spread out.
8       I mean it was a small team.  I think it was
9 only eight to ten people, and he had a building big
10 enough for at least 25, so...
11   Q   Mr. Rice testified that he was obtaining
12 consent from customers to purchase Allstate policies
13 on his calls, but was just not officially binding
14 those policies until on or after August 1st of 2020.
15   A   Correct.
16   Q   Were you similarly obtaining consent from
17 customers to bind their policies on or after August 1,
18 2020?
19   A   Right.  I would -- I would make sure they
20 wanted to purchase the policies and I let them know
21 that I will call them just to make sure in that time
22 frame.  And if I can't get in touch with them, I would
23 just move on to the next customer.
24       Yeah, I mean, like I said, it was more of
25 just making sure you understood that we can't start

Page 35

1 until August 1st, you said yes, that was a sale, that
2 I was trying my hardest to get after that bind date.
3   Q   And based on your earlier testimony,
4 Mr. Cicciarelli is the one who informed you that you
5 could not bind policies until August 1, 2020; is that
6 correct?
7   A   Right.
8   Q   Do you recall when you received those
9 specific instructions about not being able to bind
10 policies until August 1, 2020?
11   A   It had to be either late June, July 1st.  I
12 mean, we knew about it before the transition, so I
13 know we talked about it before making a decision to
14 move from one agency to the other agency, so, I mean,
15 it had to be probably late June, July 1st-ish.
16   Q   While working for Prestige during this
17 July 2020 time frame, prior to the official opening on
18 August 1, 2020, did you ever interact with customers
19 who wanted to bind their policy prior to August 1,
20 2020?
21   A   Uh-huh.
22   Q   How many customers -- oh, sorry --
23   A   Yes, I'm sorry.  Yes, I'm sorry.
24   Q   How many customers did you interact with
25 that wanted to bind their policies prior to August 1,

Page 36

1 2020?
2   A   I couldn't give you a number, honestly.
3   Q   Was it a lot, a few?
4   A   I mean, yeah, I mean, you would get -- I
5 mean, I say mid.  I mean, you would -- I mean, you get
6 nos, you get the yeses, and you get the ones, I need
7 insurance now.  So, I mean, there's nothing we could
8 do with the ones that said we need insurance now.
9   Q   And what did you tell those customers who
10 wanted to bind their policies before August 1, 2020?
11   A   That I just couldn't actually get the policy
12 started until August the 1st.
13   Q   Did someone tell you to respond in that
14 fashion?
15   A   To my recollection, no.  I mean, just like
16 the -- I mean, yeah, you had to let the customers know
17 that you couldn't bind that day.  I mean, it was
18 definitely that no binding can be done before
19 August 1st.
20   Q   Were you given instructions on what to say
21 to customers who wanted to bind prior to August 1,
22 2020?
23   A   I was just trying to get that rate to lock
24 in until August the 1st.
25   Q   And who gave those instructions?

Page 37

1   A   I would say probably both Ulises and Glenn.
2   Q   Did you direct any customers that you spoke
3 to in July of 2020 to other Allstate agencies or to
4 Allstate's general customer line to bind their
5 policies?
6   A   No.
7   Q   Mr. Rice testified that in July of 2020 he
8 did not bind any policies prior to August 1, 2020 for
9 any customer for whom he provided a quote for
10 insurance prior to August 1, 2020.
11       In July 2020, did you bind any policies
12 prior to August 1, 2020?
13   A   No.
14   Q   In July of 2020, how many policies did you
15 get a customer to agree to buy with a policy effective
16 date on or after August 1, 2020?
17   A   Twelve to 16 maybe.
18   Q   How were you paid for those policies?
19   A   The same way, commission.  So basically it
20 was -- it was -- I think it was -- he gave us a -- he
21 paid us a sign-on bonus to help out for that month,
22 but commissions ran based off that number.
23       So it was still -- we still had to wait
24 until the binding of August to get those numbers and
25 then it was paid up.  That means you can't bind until

Page 38

1 August the 1st date.
2  Q  So your commission for those policies, you
3 did not receive or lock in those commissions until
4 they were bound on or after August 1, 2020?
5  A  To my best recollection, yes.  I think they
6 came out -- instead of waiting until the end of month,
7 I think they came out mid month.
8  Q  And would your compensation have been
9 impacted if a customer bound with Allstate directly or
10 with another Allstate agency prior to August 1, 2020?
11  A  Right, you only get paid for what you sell.
12  Q  Mr. Rice testified that his calls with
13 customers that he made during July 2020 were recorded.
14     Do you recall your cold calls being recorded
15 or your incoming calls being recorded?
16  A  Yes, we was told that the calls were
17 recorded.
18  Q  Mr. Rice further testified that Glenn Hunter
19 would at times listen to his recorded phone calls and
20 provide him feedback on his technique and performance.
21     Did Glenn Hunter provide similar feedback to
22 you with respect to your recorded phone calls?
23  A  Yes, I said that earlier.
24  Q  Did anyone else provide feedback to you,
25 Mr. Cicciarelli, perhaps?

Page 39

1  A  I don't remember him ever providing feedback
2 on calls.
3  Q  Based on what you just said a few moments
4 ago, it sounds like you were paid by Mr. Cicciarelli
5 and/or Prestige Insurance Group for your work
6 completed prior to August 1, 2020 during that
7 July 2020 time frame; is that correct?
8  A  No, he was paying prior -- yes, he was
9 paying the month of July.  It wasn't a commission, I
10 think it was.  We got our regular base, so-called base
11 pay, which came out of our commissions, but we just
12 wasn't -- wanted to get it taken out, so it was like
13 the bare minimum for that month of July.  I think it
14 was like 3,000 maybe.
15  Q  And that pay came from Mr. Cicciarelli or
16 Prestige Insurance Group?
17  A  From my best knowledge, yes.
18  Q  If you had an issue with your payment during
19 that July 2020 time frame, who would you have gone to?
20  A  Ulises.
21  Q  On what -- on what date did Prestige
22 Insurance Group officially open?
23  A  To actually sell policies?
24  Q  Yes.
25  A  I will go with the August 1st date.

Page 40

1  Q  And that's August 1 --
2  A  That's 2020.
3  Q  Thank you.
4  A  No problem.
5  Q  And you previously mentioned that you recall
6 this being a Saturday?
7  A  I just -- it had to be a Saturday because I
8 remember just being there, so, yeah, I want to say
9 it's a Saturday.
10  Q  And Prestige's hours of operation did not
11 normally include Saturday as a workday; is that
12 correct?
13  A  Correct.  Normally we were closed on the
14 weekends, like I said, unless it was like a slow day,
15 or something like that, but normally we was closed on
16 Saturdays.
17  Q  Why did you work on that particular
18 Saturday?
19  A  Because it was pretty much the first date to
20 get those sales in.
21  Q  And by "get those sales in," do you mean
22 bind the policies that you had held over from
23 July 2020?
24  A  Correct.
25  Q  Do you -- do you recall when you started

Page 41

1 working, what time on that particular Saturday?
2  A  Maybe 9 -- 9 a.m.
3  Q  And where did you work from on that
4 Saturday, August 1, 2020?
5  A  It was in the office.
6  Q  Do you recall who else was in the office
7 that day, generally speaking?
8  A  It was the staff, so it would be the staff,
9 Ulises.  I'm pretty sure maybe Glenn might have been
10 there.  I'm not sure.  He might have been on vacation.
11 I'm not sure.
12  Q  Mr. Rice testified that on August 1, 2020,
13 he did not continue calling customers, but instead
14 spent the day binding those customer policies that he
15 had held over from his cold calls during the July 2020
16 period.
17     It sounds like you also spent August 1, 2020
18 binding those holdover policies that you had lined up
19 from your July 2020 calls; is that correct?
20  A  Correct.  I mean, I was calling customers,
21 yeah.  I wasn't taking new calls, no.
22  Q  You said that you were calling customers.
23 What were you calling customers for on August 1, 2020?
24  A  Because it had been 30 days, so I wanted to
25 make sure that they still wanted to actually have the

Page 42

1 policy and get the payment information.
2  Q  So you were just calling to confirm that
3 they wanted to bind their policy on that date?
4  A  Correct.
5  Q  How many policies did you bind on August 1,
6 2020?
7  A  It was the same number from earlier.  I
8 think it's still around 12 to 16.
9  Q  How many policies did your colleagues at
10 Prestige Insurance Group bind on August 1, 2020?
11  A  That, I cannot tell you.  I'm not sure.
12  Q  Do you recall if it was --
13  A  It was --
14  Q  -- a lot of policies?
15  A  Yes, it was a lot of policies.
16  Q  Was it an abnormal amount of policies for a
17 single day compared to your past experience with
18 Allstate agencies?
19  A  Well, yes, due to that everybody was holding
20 policies for a month, so...
21  Q  Did you contact all of the customers that
22 you had previously spoken with and held over policies
23 from July 2020, did you contact all of them on
24 August 1, 2020 to confirm that they wanted to bind
25 their policy on that date?

Page 43

1  A  Yes.
2  Q  Who was responsible for managing the
3 day-to-day operations at Prestige after the official
4 opening of the agency on August 1, 2020?
5  A  I will still say Ulises and Glenn.  I know
6 there was one person that came from Masih-Das
7 sometimes check in, I can't remember his name either,
8 but it wasn't like he was there every day.  He would
9 pop in maybe like once a blue moon.
10  Q  I don't have a last name but does the name
11 Brandon ring a bell?
12  A  Yes.  Yes.
13  Q  Do you recall his last name?
14  A  No.  Honestly until you say his name -- I
15 just know he was a younger cat.  I know he was
16 younger, but no, I couldn't -- when you say Brandon,
17 that does ring a bell.
18  Q  I understand.  It has been a few years and I
19 can't remember people I met yesterday, so.
20     How were you supervised during this period
21 after the official opening of Prestige Insurance Group
22 on August 1, 2020?
23  A  So, I mean, I want to feel like I was only
24 in the office for probably like a week or two, and
25 that's when the pandemic got really bad where

Page 44

1 everybody had to go home, so basically we would work
2 from home.  But the way the office was set up, it was
3 an open floor plan, minus maybe like an eating area
4 and an office to the side.
5     And then, like I said, it was already spaced
6 out where Ulises would sit, stand like in the middle.
7 He had one of those tables that would go up and down,
8 and that's pretty much how it works.
9  Q  Once you transitioned to virtual work, did
10 your supervision change at all or how you were
11 supervised change at all?
12  A  We was on, like, a -- I think we used Zoom
13 at the time.  I don't think Teams was out then, but I
14 think we used Zoom.  So we would all sign into a Zoom
15 meeting and then signed to our regular work, so we
16 would all be in a Zoom call still, but past that, I
17 mean, that's the only supervision you were able to get
18 during that time.
19  Q  When you say you were signed into a Zoom
20 meeting, were you signed into that Zoom meeting all
21 day?
22  A  Yeah, it would be all day.  We would have it
23 minimized, or you'd have it up, but, I mean, it just
24 depending on all that was going on.
25  Q  You had previously mentioned having morning

Page 45

1 staff meetings during July 2020 for Prestige Insurance
2 Group.
3     Did Prestige continue to have morning staff
4 meetings after its official opening of August 2020?
5  A  Correct.
6  Q  And these meetings took place every workday?
7  A  That's correct.
8  Q  Did you attend all of those meetings?
9  A  Yes, unless I was running late, I mean.
10  Q  It happens to the best of us.
11  A  Yeah.
12  Q  Who led these meetings?
13  A  I would still say it was probably most
14 Ulises and Glenn sometimes, but I think it was mainly
15 Ulises going over stuff, unless he was, like, on a
16 call or something.
17  Q  And were all of the Prestige staff members
18 who were in attendance at these meetings?
19  A  Uh-huh.
20  Q  And what was discussed at these meetings?
21  A  Still day-to-day, you know, how your sales
22 going, what objections are you running into, things
23 like that.
24  Q  Were policy issues or customer issues ever
25 discussed at these meetings?

12 (Pages 42 - 45)

Page 46

1  A   We would get a report, like I said earlier.
2  The only followup work is like if somebody didn't sign
3  documents, or if there were documents that Allstate
4  wanted to have more clarification on, maybe like a
5  registration or proof of insurance, something like
6  that, we would get those sent in and then upload it to
7  their file for them.
8      Q   And how were you compensated while working
9  for Prestige Insurance Group after August 1, 2020?
10     A   The same, commission.
11     Q   At this point you were getting -- you were
12 able to bind policies so you were getting the
13 commissions earlier; is that correct?
14     A   Well, at -- at that point it was more of --
15 yeah, I mean, we wasn't getting commissions earlier.
16 It was still the same. I think we got the one
17 commission from July early, and then August
18 commissions was paid out in September, but that's
19 where I'm on transition time, so I wasn't really
20 focused that much more because I already knew I was
21 leaving. But yeah, it was -- I mean, the pay -- the
22 actual pay cycle was still the same.
23     Q   And I'll rephrase my question.
24         At this point after August 1, 2020, you were
25 not having to wait to bind policies as you were in

Page 47

1  July of 2020; is that correct?
2      A   Ah, yes, correct.
3      Q   Did your compensation differ at all from
4  your compensation working for Prestige during the
5  July 2020 time frame?
6      A   No. Not to my recollection, no.
7      Q   And was your compensation structure at
8  Prestige Insurance Group similar to your past
9  experience and compensation structure while working
10 for the Masih-Das Allstate agency?
11     A   Yes, the compensation was actually the same.
12     Q   I want to take a step back and quickly walk
13 through the quoting and binding process generally.
14         The types of personal information that you
15 were required to obtain from a customer during this
16 process, can you walk through what kind of
17 information. It sounds like name, address, and what
18 else?
19     A   Name, address, age. Of course the vehicle
20 information, prior history, claims, household members,
21 and then coverages, payment.
22     Q   And the marital status, was that one of the
23 things you had to collect?
24     A   Marital status, yes.
25     Q   Were you personally responsible for

Page 48

1  collecting and inputting this information somewhere?
2      A   Yes, in auto space, correct.
3      Q   How would you confirm that the information
4  that you collected from a customer was accurate?
5      A   I mean, the same way you would collect our
6  information, just -- you would have to take their word
7  for it.
8      Q   If a customer had a previous Allstate
9  policy, would you examine that policy during the
10 quoting and binding process in order to confirm
11 information?
12     A   If they have a previous Allstate policy, we
13 weren't allowed to bind because we wouldn't get -- we
14 wouldn't get paid off a previous Allstate policy. If
15 they're already with Allstate you can't switch to --
16     Q   Sorry. Sorry. By that I mean if, you know,
17 say five years ago they had a previous Allstate
18 policy, they had since switched to another insurance
19 agency and now they were hoping to return. Would
20 you --
21     A   No, we didn't have -- we didn't have access
22 to servicing at Allstate.
23     Q   During the quoting and binding process did
24 you have information on customers' current and
25 previous insurance policies?

Page 49

1      A   Like we would take down their information,
2  like who the -- who are you currently insured with.
3  We might take down the policy number. I can't really
4  remember because, I mean, I know my sales process now.
5  But I do know if there was a question, because all of
6  our policies was reviewed, that's the reason for the
7  30-day hold, Allstate still had to approve, go through
8  their own binding information, so there would be
9  uploads and then you still get stuff that was kicked
10 back.
11         So at that time that's when we would reach
12 out to customers, ask them to send proof of
13 information, so Allstate double-checked all of our
14 work.
15     Q   Understood.
16         Did you have to run a credit report as part
17 of the quoting and/or binding process?
18     A   That I can't remember.
19     Q   Do you recall receiving instructions on
20 running credit reports during the quoting and binding
21 process while working for the Prestige Insurance
22 Group?
23     A   That I can't remember. I don't remember --
24 I don't remember getting socials at Allstate, but I
25 can't remember. I can't say yes or no.

13 (Pages 46 - 49)

Page 50

1  Q   Were you trained on the quoting and binding
2  process at Allstate?
3  A   Past that onboarding, no.
4  Q   Or including that onboarding.
5  A   Right, the onboarding through Allstate and
6  then, like I said, just, you know, somebody would
7  probably sit with you that first week off and on just
8  making sure how you're handling everything, but past
9  that, no.
10  Q   So did you not receive any specific training
11  from Mr. Cicciarelli or Prestige Insurance Group
12  regarding the quoting and binding process?
13  A   In the past they just listened to calls and
14  just coaching; no, I don't remember any other
15  training.
16  Q   How did Prestige and Mr. Cicciarelli ensure
17  that you were complying with Allstate standards for
18  quoting and binding?
19  A   Well, like I said to bind, Ulises or Glenn
20  would have to review it. Upon the review on binding
21  it, once again, Allstate would still have to review it
22  as well, so it would get checked twice.
23  Q   And all of your policies were reviewed prior
24  to binding?
25  A   Anything that Allstate paid on, Allstate had

Page 51

1  to review, correct.
2  Q   And Glenn Hunter or Mr. Cicciarelli also
3  reviewed them; is that correct?
4  A   That is correct.
5  Q   Do you recall there ever being any issues
6  with your policies?
7  A   I probably had a couple of registrations
8  that I had to get uploaded but, no.
9  Q   More generally speaking, do you recall ever
10  encountering any issues with customer policies quoted
11  or bound under Prestige Insurance Group?
12  A   Huh-huh, no.
13  Q   So just to break this down a bit, did you
14  ever encounter situations where policies were bound
15  that customers did not want?
16  A   I didn't, no.
17  Q   **Would you agree that quoting or binding a**
18  **customer policy that they did not ask for or consent**
19  **to would be a violation of Allstate policy?**
20  A   **That would be a violation of any policy, but**
21  **yes.**
22  Q   Did you ever encounter situations where
23  policies were bound with discounts that customers were
24  not entitled to?
25      So, for example, applying a multi-policy

Page 52

1  discount when the customer did not buy or want an
2  additional policy?
3  A   No.
4  Q   **Would you agree that providing a customer**
5  **with a discount such as a multi-policy discount they**
6  **were not entitled to would be a violation of Allstate**
7  **policy?**
8  A   **Correct.**
9  Q   Did you ever encounter situations where
10  incorrect customer information was included in quotes
11  and policies, so things like incorrect marital status?
12  A   No.
13  Q   If you spoke to a customer and the customer
14  reported they were married but you would put their
15  marital status as something other than married, say
16  separated or not married, would you agree that doing
17  so would be a violation of Allstate policy?
18  A   Right. Yes. If they're saying that they
19  are married and not saying they are separated.
20  Q   Would you also agree that not asking about a
21  customer's personal information, such as marital
22  status and binding a policy by simply inputting your
23  best guess would also be a violation of Allstate
24  policy?
25  A   I mean, I would say -- I mean, yes. I mean,

Page 53

1  if you're not asking directly on purposely, yeah.
2  Q   Do you recognize the name Lillian Cromuel?
3  A   Say it again.
4  Q   Lillian Cromuel. And that's spelled
5  C-r-o-m-u-e-l.
6  A   Was she a worker?
7  Q   She was not. No, she was not an employee at
8  Prestige Insurance Group.
9  A   No.
10  Q   Do you recognize the name Quintis Cromuel?
11  A   No.
12  Q   Do you have any recollections of speaking
13  with or assisting Mr. and Mrs. Cromuel in obtaining
14  insurance in July of 2020?
15  A   No.
16  Q   If Allstate company data showed that you
17  interacted with and assisted Mr. and/or Mrs. Cromuel
18  with obtaining insurance in July and August of 2020,
19  would you have any reason to doubt that information?
20  A   I mean, if you state it -- I mean, like I
21  said, it's two years ago, lots of customers, but if
22  you're stating it, sure. I mean, I would have to take
23  a look at it. I would like to see documents on it,
24  but if you're saying so.
25  Q   But is it correct to state that you don't

14 (Pages 50 - 53)

Page 54

1 recall any issues with any policies of Mr. or
2 Mrs. Cromuel done by Prestige Insurance Group?
3   A   No.  The only thing I remember, because like
4 I said, we also had an investigation through actual
5 licensing, there was a policy that they questioned,
6 where it was a mother and daughter, and the reason why
7 it was a separate policy, is because the daughter's
8 car was in the daughter's name, so she had to have a
9 separate policy.
10   Q   Understood.
11       Well, it's 10:41 right now.  It might be
12 good to take a quick break, maybe just five minutes or
13 so.
14   A   Nah.  Like I said, I have a portal meeting,
15 so let's keep it rolling, then.
16   Q   Okay.  Are you happy to continue, then,
17 Mr. Wilks?
18   A   Yeah.  Because, like I told you, I have a
19 meeting.
20   Q   Understood.  Understood.  Well, we can keep
21 it going then.
22       On what date did your employment with
23 Prestige Insurance Group end, Mr. Wilks?
24   A   I want to say a little bit after Labor Day,
25 because I wanted to take some time before I started

Page 55

1 working with my new job.  And then Ulises -- I wanted
2 to stop at August, but since I had policies to bind, I
3 stayed on just to make sure there was no followup work
4 on my policies.  So I wasn't really working at the
5 time, just making sure nothing came up that Allstate
6 wanted me to follow up on the policies that I sold in
7 the month of August.  I'm pretty sure it was after
8 Labor Day.
9   Q   And this is Labor Day 2020; is that correct?
10   A   Yeah, correct.
11   Q   It sounds like you had a conversation with
12 Mr. Cicciarelli stating your intent to leave Prestige
13 Insurance Group.  Do you recall when that conversation
14 happened?
15   A   I think I got the -- I think I got the offer
16 in August.  And then I let them know -- let them know
17 that I would be finishing up the month, but he asked
18 me to stay on just to do paperwork on my followup
19 work, so I did my followup work during that time frame
20 and I relaxed a couple of weeks before I started my
21 new position.
22   Q   Mr. Rice testified yesterday that he was not
23 fully paid by Prestige Insurance Group for his work
24 and policies sold.
25       Were you fully compensated for your work at

Page 56

1 Prestige Insurance Group?
2   A   Yeah, to my -- I had no problems when I left
3 Prestige.
4   Q   Have you spoken with Mr. Cicciarelli since
5 you ceased employment with Prestige?
6   A   I talked to him one time.  That's when I got
7 that letter about that investigation through my
8 licensing, but other than that, I cut -- I haven't
9 talked to really anybody.
10       When I got that investigation by the
11 licensing, I pretty much stopped talking to everybody
12 at that agency.
13   Q   And when was that conversation with
14 Mr. Cicciarelli?
15   A   I want to say the same time around with
16 Josh, so maybe October, November of 2020.
17   Q   How long did that conversation last?
18   A   Not long.  Maybe like five, ten minutes.
19   Q   Have you spoken with any other Prestige
20 staff members since you ceased employment with
21 Prestige?
22   A   Nope.  I think I might have talked to some
23 people like on Instagram, like you know, comment, Hey,
24 what's up.  Cool, on the pictures or something like
25 that, but actual phone conversations, no, or text

Page 57

1 messages.
2       MR. GEAR:  I think I have no further
3   questions at this time.  Mr. Parzianello, do you
4   have anything to ask Mr. Wilks?
5       MR. PARZIANELLO:  No, I have no questions.
6   Thank you.
7       MR. GEAR:  Thank you, Mr. Wilks.  I do
8   appreciate you taking the time this morning.
9   Hopefully we didn't take too long for you, but we
10  really do appreciate you speaking with us and --
11      THE WITNESS:  No problem.
12      MR. GEAR:  And answering all our questions
13  truthfully.
14      THE WITNESS:  No problem.
15  Thank you guys so much.  Am I good to go?
16      MR. PARZIANELLO:  Yes, sir.
17      THE WITNESS:  All right.  You all have a
18  great day.
19      THE VIDEOGRAPHER:  This concludes today's
20  deposition.  Going off the record at 10:45 a.m.
21      (Deposition adjourned at 10:45 a.m.)

15 (Pages 54 - 57)

Page 58

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF BROWARD )

I, the undersigned authority, certify that JONATHAN WILKS, remotely appeared before me and was duly sworn.
WITNESS my hand and official seal this 22nd day of August 2022.

MARIA E. FERNANDEZ, RPR, FPR
Notary Public, State of Florida
My Commission No. HH 087475
Expires: 4/10/2025

Page 59

CERTIFICATE

STATE OF FLORIDA )
COUNTY OF BROWARD )

I, MARIA E. FERNANDEZ, RPR, FPR, do hereby certify that I was authorized to and did stenographically report the foregoing deposition of Jonathan Wilks; that a review of the transcript was not requested; and that the transcript is a true record of my stenographic notes.
I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.
Dated this 22nd day of August 2022.

MARIA E. FERNANDEZ, RPR, FPR
and Notary Public

Page 60

CERTIFICATE OF NOTARY PUBLIC

STATE OF FLORIDA )
COUNTY OF BROWARD )

I, Maria Reeder, Notary Public for the State of Florida, DO HEREBY CERTIFY, that Jonathan Wilks, remotely appeared before me via Zoom Video Teleconference, and was duly sworn by me to tell the truth on the date of August 19, 2022.
WITNESS MY HAND AND SEAL in the City of Fort Lauderdale, Broward County, State of Florida, this 22nd day of August, 2022.

MARIA E. FERNANDEZ, RPR, FPR
Notary Public, State of Florida
My Commission No. HH 087475
Expires: 4/10/2025

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.