# EXHIBIT 18

Kaylee Colvard
August 04, 2022

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

PRESTIGE INSURANCE GROUP and      )
ULISES CICCIARELLI,               )
                                  )
            Plaintiffs,           )
                                  )
vs.                               )
                                  )
ALLSTATE INSURANCE COMPANY        )
            Defendant.            )
_____ )

DEPOSITION OF KAYLEE COLVARD

Pages 1 through 106

AUGUST 4, 2022
9:30 a.m. to 12:22 p.m.

APPEARING REMOTELY FROM
LEE COUNTY, FLORIDA

REPORTED BY:
DANIELLE AHREN, FPR
Florida Professional Reporter

REMOTE APPEARANCES

On Behalf of the Plaintiff (s):

Akin Gump Strauss Hauer & Feld LLP
Robert South Strauss Tower
2001 K Street NorthWest
Washington, DC 20006- 1037
202-887-4565
kheise@akingump.com
By: Katherine Heise, Esquire

On Behalf of the Defendant (s):
HUBBARD SNITCHLER & PARZIANELLO PLC
999 Vanderbilt Beach Road, Suite 200
Naples, Florida 34108-3512
Office: 313-672-7300
zthompson@hspplc.com
By: Zane Thompson, Esquire

INDEX OF PROCEEDINGS

| Deposition of Kaylee Colvard | PAGE |
|---|---|
| Direct Examination by Mr. Thompson | 4 |
| Cross-Examination by Ms. Heise | 74 |
| Redirect by Mr. Thompson | 100 |
| Certificate of Oath | 105 |
| Certificate of Reporter | 106 |

EXHIBITS

| Number | Description | Page |
|---|---|---|
| Exhibit 1A | Text message conversation | 20 |
| Exhibit 2A | Text message conversation | 21 |
| Exhibit 3 | Summary new agent education team | 31 |
| Exhibit 4 | July 10, 2020 email | 37 |
| Exhibit 5 | April 20, 2020 email | 38 |
| Exhibit 6 | August 21, 2020 email | 39 |
| Exhibit 7 | October 13, 2020 email | 40 |
| Exhibit 8 | Email to all new agents | 46 |
| Exhibit 9 | Email dated September 3, 2020 | 49 |
| Exhibit 10 | Email dated August 1, 2020 | 53 |
| Exhibit 11 | Weekly Production Report | 57 |
| Exhibit 12 | Email dated August 19, 2020 | 60 |
| Exhibit 13 | Enhanced Compensation Plan | |
| Exhibit 14 | Exclusive Agency Agreement | |
| Exhibit 15 | Exclusive Agency Agreement | |
| Exhibit 16 | November 13, 2020 Letter | |
| Exhibit 17 | November 17, 2020 Letter | |
| Exhibit 18 | September 17, 2020 email | 70 |
| Exhibit 19 | Email dated August 24, 2020 | 102 |

Deposition taken before Danielle Ahren, Notary Public in and for the State of Florida at Large, in the above cause.

* * * * *

THE COURT REPORTER: Do you swear the testimony you are about to give will be the truth, the whole truth, and nothing but the truth?
THE WITNESS: Yes.

THEREUPON,
KAYLEE COLVARD:
having been first duly sworn, was examined and testified as follows:

THE COURT REPORTER: Counsel, can I trouble you to state your appearances for the record?
MR. THOMPSON: Good morning. Zane Thompson here on behalf of the plaintiffs.
MS. HEISE: Good morning. Katherine Heise on behalf of the defendants.
THE COURT REPORTER: Thank you.
DIRECT EXAMINATION

BY MR. THOMPSON:
Q Ms. Colvard, we are here today on the matter of Prestige Insurance and Ulises Cicciarelli versus Allstate Insurance. Case number is 021-CV-60515-FAM. Now I know you stated your name for the record, but if you can please spell your last name for the record?
A C-O, L as in Larry, V as in Victor, A-R, D as in David.
Q Thank you. And before I start asking you questions, I'd like to go over what I'd like to call the ground rules of the deposition. If you don't understand a question, please ask me to clarify and I gladly will. We do have a court reporter here and she's transcribing everything that I say and that you say and so, please no head nods. Again, she can't transcribe a head nod.
A Okay.
Q And also, we cannot speak at the same time so all that I ask, if I ask you a question, please let me finish my question and when you're answering, I will let you finish your answer.
A Okay.
Q Also, if you need a comfort break, please let us know and we can take a break at any time.

Kaylee Colvard
August 04, 2022

Page 6

1   All that I ask if there's a pending question, please
2   finish the question first.
3       A    Okay.
4       Q    Okay.  In my next line of questioning I
5   ask all witnesses.  Have you ever been convicted of
6   a felony?
7       A    No.
8       Q    Have you ever been convicted of a crime of
9   dishonesty?
10      A    No.
11      Q    And where are you currently located?
12      A    In West Palm Beach, Florida.
13      Q    And is there anyone in the room with you?
14      A    My dog.
15      Q    Ma'am, where are you currently employed?
16      A    USI Insurance Services.
17      Q    How long have been employed with USI
18  Insurance Services?
19      A    Seven months.
20      Q    Where did you work prior?
21      A    Allstate Insurance Company.
22      Q    When did you first start your employment
23  with Allstate Insurance Company?
24      A    August of 2007.
25      Q    And when did your employment end with

Page 7

1   Allstate?
2       A    Friday the 13th of October 2020.
3       Q    You've been there for about, give or take,
4   13 years?
5       A    Yes.
6       Q    What was your position at Allstate?
7       A    All of my positions or my last position?
8       Q    Let's run through all of your positions
9   starting when you first started in 2007.
10      A    Okay.  I started as a, I believe the title
11  was a marketing -- something similar to a marketing
12  consultant.  Within one year I was promoted to a
13  senior marketing consultant.  Within about a
14  year-and-a-half to two years I was promoted to a
15  regional associate marketing manager.  I was moved
16  to a different part of the country.  Then I was
17  promoted into the sales organization as a field
18  sales associate, promoted to a field sales leader
19  and then I was promoted to a new agency field sales
20  leader.
21      Q    When were you promoted to the new agency
22  field sales leader?
23      A    I believe January of 2020.
24      Q    Okay.
25      A    It might have been December of 2019, but

Page 8

1   effective January of 2020.
2       Q    Okay.  And what were your daily duties as
3   a new agency field sales leader?
4       A    The best way to describe my job is I was a
5   recruiter and a business consultant.  I worked
6   exclusively with brand new Allstate agency owners,
7   whether opening their doors brand new or purchasing
8   an agency and becoming a new Allstate agency owner.
9   I helped them run their business, track cash flows,
10  billed business plans.  From a consultative
11  standpoint, run their business from an effective and
12  business standpoint.
13      Q    And did you undergo any training for this
14  position?
15      A    Yes.  Lots of training.
16      Q    And if you can just summarize the training
17  that you went through.
18      A    It was a lot of on-the-job training with
19  my senior leadership team as territory sales leader
20  and I had multiple territory sales leaders over my
21  career.  There were regional leadership meetings,
22  sales kickoff meetings where processes were
23  undergone and taught and best practices were shared.
24      Q    Okay.  And as a new agency field sales
25  leader, do you also assist new owners with placement

Page 9

1   of staff?
2       A    I would connect them with our recruiting
3   team who would help them find staff.  My job was to
4   make sure that they -- in order to open up their
5   doors, they had to have a minimum of four licensed
6   sales staff.  So my job was to insure that they had
7   the right amount of staff.  I had an education
8   partner, which is probably the best way to describe
9   him.  I worked with Mario Castro and with Jerry
10  Collinger.  They worked with our education team to
11  insure that the staff were -- that they underwent
12  binding authority, which is the Allstate training of
13  getting someone up and ready to be able to do
14  business on the Allstate front.
15      Q    Okay.  And did you also assist new agency
16  owners with the development and adjustment of
17  business plans?
18      A    Yes.
19      Q    Do you know an individual named Ulises
20  Cicciarelli?
21      A    Yes.
22      Q    And just going forward, I may refer to him
23  as Uli.
24      A    That's fine.
25      Q    So, how do you know --

Kaylee Colvard
August 04, 2022

Page 10

1     MR. THOMPSON:  And, Danielle, just for the
2  record, Cicciarelli is spelled
3  C-I-C-C-I-A-R-E-L-L-I and his first name is
4  Ulises is spelled U-L-I-S-E-S.  And if I refer
5  to Uli, that's spelled U-L-I.
6     THE COURT REPORTER:  Thank you.
7     MR. THOMPSON:  Thank you.
8  BY MR. THOMPSON:
9     Q   And sorry, Ms. Colvard, I don't know if I
10 asked this question.  Do you know an individual
11 named Ulises Cicciarelli?
12    A   Yes.
13    Q   And how do you know Uli?
14    A   Uli worked for a new agency owner that
15 acquired on my team in January of 2020 by the name
16 of Darren Mock.  I cannot remember what his agency
17 name was.  He was the office manager for Darren.
18 When I met with Darren the beginning of the year, he
19 brought Uli to the meeting as his office manager as
20 we were going through goals, making sure Darren
21 understood his compensation plan, what his goals and
22 trajectory was.  He shared that Uli's aspiration was
23 to become an agency owner so we talked about the
24 agency ownership opportunity.  Uli was interested in
25 the same compensation plan that Darren was on which

Page 11

1  was the enhanced compensation program.  There were
2  no agencies available for purchase at the time so
3  Darren and Uli both asked if something became
4  available, that I would let both of them know.
5  Because the protocol was that they would never reach
6  out to a staff directly.  You know, I am the
7  corporate representative.  Darren is the independent
8  contractor and Uli was an employee of the
9  independent contractor.  So when an agency became
10 available for purchase, I reached out to Darren.
11 Dareen had the conversation with Uli who was
12 interested and then Darren put Uli in touch with me
13 directly.
14    Q   And approximately -- I'm sorry.
15    A   And I helped Uli go through the approval
16 process, the on boarding process and opening up the
17 agency.
18    Q   Okay.  And approximately when did you
19 first come into contact with Uli in regard to
20 opening his own agency?
21    A   Honestly, I cannot confirm that.  I don't
22 remember.  Probably May, maybe April.  I don't
23 remember to be honest with you.
24    Q   Okay.  And so let me ask you this.  When
25 you were in contact with Uli, did you, you know, did

Page 12

1  you then, you know, assist him with his development
2  and adjustment of his business plan?
3     A   Yes.
4     Q   Does Allstate -- you know, because at this
5  point in time your position is the new agency field
6  sales leader, correct?
7     A   Yes.
8     Q   And does Allstate, you know, put in place,
9  you know, the new agency field sales leader put you
10 in position to disclose information to Uli regarding
11 Allstate's operations?
12    A   I'm not sure I understand the question.
13 What kind of operations?
14    Q   Yeah.  Well, are you there to inform and
15 make sure that Uli is aware of Allstate's policies?
16    A   During the business planning process, no.
17 We talked very high level about running an insurance
18 agency.  We'd go through the compensation program
19 and how the compensation program works.  At that
20 point in time they are approved to become an agency
21 owner.  Then they go through the intricacies and
22 details of the contract and whatnot as they go
23 through training with our regional corporate office.
24    Q   Okay.  And whose agency did Uli purchase?
25    A   He purchased the agency of Gerry Rivas,

Page 13

1  R-I-V-A-S.
2     Q   And did he purchase Mr. Rivas' agency on
3  August 1, 2020?
4     A   That was his official start date, yes.
5     Q   Did you have the opportunity to work with
6  Gerry Rivas in any capacity while at Allstate?
7     A   Yes.
8     Q   How so?
9     A   I inherited him on my team in January of
10 2020 when I became a new agency.  Gerry had opened
11 up his agency a few months prior, I believe.  Did
12 not -- he had staffing issues.  He wasn't a
13 successful business owner and he was looking at
14 selling his agency.
15    Q   Now, you testified earlier that you did
16 assist Uli in his agency with the development and
17 adjustment of his business plan.  Can you go into
18 more detail of how you assisted Uli with the
19 development and adjustment of his business plan?
20    A   Absolutely.  So, during the approval
21 process, the agent, the person who is applying to
22 become an agent, is given a business plan template.
23 What is your mission and what is your vision.  What
24 do you stand for.  What are your goals.  Your three
25 five, ten-year goals and then it gets into details

Kaylee Colvard
August 04, 2022

Page 14

1  that piggyback from the cash flow you developed as
2  to how much business do you want to write, how many
3  quotes do you need to do.  What are you going to
4  spend on marketing.  How many staff are you going to
5  have.  So, the agency candidate fills out that
6  business plan to the best of their ability and then
7  I would get together with that agency candidate and
8  we would merge the cash flow and the business plan
9  together to, as I refer to it, Allstate-ize it to
10  make sure that they were details that Allstate would
11  be looking for to insure that he was -- his business
12  plan was approached.
13         For example, Allstate was in the market of
14  financial services.  It's not something that is
15  necessarily on the mind of a property and casualty
16  insurance agent.  So my job would be to make sure we
17  reference, we acknowledge that there are financial
18  services goals that are out there.  We would look to
19  partner up, if we find someone that we like, to work
20  with a financial services agency to help with
21  financial services.
22     Q    Okay.
23     A    And that's just one example.
24     Q    Okay.  And are there other examples of how
25  you assisted Uli with the development adjustment of

Page 15

1  the business plan?
2     A    I would have to really go through the
3  business plan, but I do a lot of -- I do a lot of
4  reviewing and making sure the numbers match up with
5  cash flow.  Making sure we have the correct
6  marketing investment.  Allstate always wanted to
7  insure that there was ex amount of dollars spent per
8  month from a marketing capacity.  We had to have, as
9  I mentioned earlier, a minimum of four staff.
10  Making sure that the closed rate that was the
11  averaged close rate in the market place matched what
12  was typed into the business plan.  So, again,
13  merging the two documents just to make sure there
14  was consistency within the documentation.
15     Q    And so if -- so, did Uli in this
16  circumstance, did he -- did he fill out the Allstate
17  template?
18     A    Yes.
19     Q    And did he then, before he submitted it to
20  Allstate, did he send it to you to review?
21     A    Yes.
22     Q    And did you make any revisions or any
23  proposed edits?
24     A    Yes.
25     Q    And do you know, did Uli submit the

Page 16

1  proposed business plan to Allstate?
2     A    Yes.
3     Q    And did Allstate accept the proposed
4  business plan?
5     A    Yes.
6     Q    Okay.  And do you know, the proposed
7  business plan that Uli submitted to Allstate, did it
8  also include your recommended edits?
9     A    Yes.
10     Q    I want to touch on -- you testified
11  earlier that you did not assist Uli's agency with
12  the placement of staff, correct?
13     A    Correct.
14     Q    And, so, but I believe you mentioned that
15  you put him in contact with an individual?
16     A    Yes.  We had internal -- so, LSP, a
17  licensed sales professional or staff that worked in
18  the agency, we had LSP recruiters in our region that
19  worked directly with our new agents to help them
20  find additional staff.
21     Q    Who is the LSP of Uli's region?
22     A    I don't recall.
23     Q    And you also mentioned earlier that Uli
24  was interested in how he was a manager at Darren's
25  agency and he was interested in Darren's -- the

Page 17

1  Allstate's exclusive comp.  So, are you familiar
2  with Allstate's exclusive compensation agreement?
3     A    Yes.
4     Q    Okay.  And if you could just summarize
5  what that is for me, please?
6     A    The enhanced compensation program was an
7  incentive compensation program to reward new agency
8  owners based on the amount of business that they
9  wrote from a premium standpoint.  Fact funded them
10  up front to give them additional capital to be able
11  to reinvest within their agency.
12         So, an agency owner would receive base
13  compensation of 10 percent for their new business,
14  ten percent for their renewal business and then they
15  would receive an overall percentage each month of
16  the total premium that was enforced within the
17  agency based on that total premium.
18         Just to be clear, this has been more than
19  two years since I've talked about this, so, I might
20  be missing a little detail here or there so this is
21  to the best of my knowledge.  Best of my memory.
22     Q    Okay.  In March of 2020, did you deliver
23  to Uli Allstate's exclusive compensation plan?
24     A    We probably spoke high level about it, but
25  at that point in time there wasn't an agency for

Kaylee Colvard
August 04, 2022

Page 18

1   sale so I don't recall if we got in depth to what
2   the program looked like, but he was the office
3   manager for an agency that was on that enhanced
4   compensation plan.  So, I would ask if that agency
5   owner disclosed how the contract works.
6       Q    And when Uli's agency opened on August 1,
7   2020, was his agency under the enhanced compensation
8   plan?
9       A    Yes.
10      Q    And to your knowledge, did Allstate
11  develop internal policies intended to reduce
12  commissions and bonuses paid to its agents?
13      MS. HEISE:  Object to form.
14  BY MR. THOMPSON:
15      Q    You can answer the question if you can,
16  Ms. Colvard?
17      A    I know that there were compensation
18  changes that were being made in 2020.  Do I remember
19  what they were?  No.  Let me also add to that.
20  There were changes that were put in place I believe
21  at the beginning of 2020 on the enhanced
22  compensation plan where once an agency owner reached
23  $5 million in total premiums, then they would
24  graduate from the ECP Compensation Plan and become
25  an established quote, unquote, agency owner no

Page 19

1   longer receiving the enhanced compensation bonus.
2       Q    All right.  And I know you mentioned
3   earlier that you did work with Gerry Rivas and so
4   did you and Gerry Rivas ever communicate through
5   text messages?
6       A    Yes.
7       Q    And did you ever communicate with
8   Mr. Rivas regarding Uli?
9       A    Yes.
10      Q    Now, I did provide you with exhibits.  I
11  don't know if you have them.  If not I can share my
12  screen.
13      A    I have them.
14      Q    Okay.
15      MR. THOMPSON:  And, Kate, if there's any
16      exhibits you'd like me to share, just let me
17      know.
18      MS. HEISE:  Okay.
19  BY MR. THOMPSON:
20      Q    I'd like to take you to plaintiffs Exhibit
21  1A.  Please let me know once you're there?
22      MS. HEISE:  Just for the record, can you
23      tell us what Exhibit 1A is?
24      MR. THOMPSON:  Yeah.  So this is -- how
25      about this.

Page 20

1       MS. HEISE:  We can hold off.  We can wait
2       a second.
3       MR. THOMPSON:  So it's a text message
4       conversation between Ms. Colvard and Gerry
5       Rivas regarding Uli.
6       MS. HEISE:  Thank you.
7       (Whereupon, document was marked as Exhibit 1A for
8   identification.)
9   BY MR. THOMPSON:
10      Q    Ms. Colvard, please let me know once you
11  have Exhibit 1A in front of you.
12      A    I have it up.
13      Q    Okay.  Ms. Colvard, do you recognize
14  Exhibit 1A?
15      A    Yes.
16      Q    And I know I just mentioned this, but can
17  you briefly tell me what Exhibit 1A is?
18      A    Test messages between myself and Gerry
19  Rivas.
20      Q    Thank you.  And is the first text
21  message -- excuse me.  I can't speak.  The first
22  text message dated June 2nd?
23      A    Yes.
24      Q    And is that June 2nd of 2020?
25      A    Yes.

Page 21

1       Q    And in that text message, what were you
2   and Gerry Rivas discussing?
3       A    We were discussing having him add Uli to
4   his MMS, which was the Manage My Staff portal which
5   is where agency owners added their staff in order to
6   the staff having access to the Allstate systems
7   under that particular agency owner.
8       Q    Okay.  So then -- so that would be under
9   Gerry Rivas' agency, correct?
10      A    Correct.
11      Q    Okay.  And still on the same -- actually,
12  please turn to -- no.  Still on Exhibit 1A on the
13  right under June 2nd, do you see the text where it
14  states, please check for Ulises' account giving us
15  issues?
16      A    Yes.
17      Q    What was giving Mr. Rivas issues?
18      A    He was not able to add Uli into his
19  system.  And the reason -- he wasn't able to add Uli
20  into the system.
21      Q    And was there any reason why he couldn't
22  add Uli to the system?
23      A    Yes.  Once Uli became approved to become
24  an agency owner -- let me back up.  The Manage My
25  Staff is based on, I believe, Social Security number

Kaylee Colvard
August 04, 2022

Page 22

1  and so once Uli was put in the system to become an
2  agency owner, our system would not allow an agency
3  owner to be listed in another agency owner's Manage
4  My Staff.
5      Q    Okay.  And still on the same exhibit at
6  the bottom.  Do you see the text message dated June
7  16th?
8      A    Yes.
9      Q    And did you ask Mr. Rivas to check on
10 Tara's appointment.
11     A    Yes.
12     Q    And why did you ask Mr. Rivas to check on
13 Tara's appointment for level one and level two?
14     A    So, any time we had a new agency owner
15 that had to have four staff revising authority ready
16 to write business day one.  If they were purchasing
17 an agency, the upcoming staff would work in the
18 selling agency's agency until they would have to be
19 listed in the selling agent's Manage My Staff own
20 system.  Because Uli could not access Jerry's
21 system, Gerry had to add the staff.  Gerry was the
22 only one who had access to be able to add them into
23 the system and check the status to insure that their
24 training, which is level one and level two, was
25 complete.

Page 23

1      Q    So, any staff that was added was added
2  under Gerry Rivas' agency; is that correct?
3      A    Correct.
4      Q    So, for example, Tara -- is Tara added
5  under Gerry Rivas' agency?
6      A    I believe so.  Do I recall 100 percent,
7  no.
8      Q    Okay.  If you can please pull up Exhibit
9  1B.  This is just a continuation of Ms. Colvard's
10 conversation with Gerry Rivas?
11     A    I have it up.
12     Q    Ms. Colvard, do you recognize Exhibit 1B?
13     A    Yes.
14     Q    And can you tell me what Exhibit 1B is?
15     A    More text messages between myself and
16 Gerry Rivas.
17     Q    And looking at Exhibit 1B if you can just
18 summarize what these conversations are about?
19     A    Continuing checking the status of the
20 staff being in the system and completing training
21 levels one and level two.  And then there were some
22 personal notes between myself and Gerry.  And then
23 also asking Gerry to add Uli into his agent program.
24 The agent is a CRM system.  It can take, I believe
25 it was three to four months, for the agent system to

Page 24

1  transfer over from a selling agent to a buying
2  agent.  So, we were trained that the selling agent
3  needed to be added to the selling agent E agent so
4  that they would have access to all of the notes
5  regarding any client interactions.
6      Q    And this is all under Gerry Rivas' agency,
7  correct?
8      A    Correct.
9      Q    And let's talk more about Gerry's agency.
10 So Uli purchased Gerry's on August 1, 2020,
11 correct?
12     A    Correct.
13     Q    Prior to August 1, 2021, was Gerry Rivas
14 doing the quoting for his agency?
15     A    Yes.  He was -- before he and Uli came to
16 an agreement for Uli to purchase the agency, Gerry
17 and his wife Kimberly were working in the agency.
18 They might have had one other staff member at
19 different points in time but it was predominantly
20 Gerry and his wife.
21     Q    And Uli was not quoting prior to August 1,
22 2020, correct?
23         MS. HEISE:  Object to form.
24 BY MR. THOMPSON:
25     Q    You can answer the question if you can,

Page 25

1  Ms. Colvard?
2      A    Uli would have quoted when he worked in
3  Darren's office.  When he was in training he would
4  have done -- he would have done live quoting while
5  he was in training, but Uli would have not quoted --
6  Uli would have not personally quoting business in
7  Gerry's office because he could not get into the MMS
8  system.  Only people that are in MMS can quote under
9  an agent's number.
10     Q    And did Uli have access to -- was Uli able
11 to quote once his agency opened on August 1, 2020?
12     A    Yes.  Uli was able to quote in his agent
13 number on his start date of August 1, 2020.
14     Q    Okay.  And was Uli's agency being opened
15 on August 1, 2020 contingent upon Uli becoming an
16 agent?
17     A    Yes.
18     Q    Are you aware once Uli's agency opened on
19 August 1, 2020 did he close all of Gerry Rivas'
20 accounts?
21         MS. HEISE:  Object to form.
22         THE WITNESS:  I don't know because I don't
23     know how many -- you're using the term
24     accounts.  He purchased policies that were in
25     force so those policies would have moved from

Kaylee Colvard
August 04, 2022

Page 26

1     Gerry to Uli.  Any quoting that was done either
2     by Gerry or Kimberly or Uli's staff while they
3     were working in Gerry's agency, though quotes
4     then moved to Uli for Uli and his team to be
5     able to quote and bind business.
6  BY MR. THOMPSON:
7     Q     And did you have Uli's cell phone number?
8     A     Yes.
9     Q     And did you and Uli ever exchange text
10 messages?
11    A     Yes.
12    Q     If you can please pull up plaintiff's
13 Exhibit 2A.
14    MS. HEISE:  I'm going to ask that you
15    share your screen just so we can be sure we're
16    all looking at the same thing, if you don't
17    mind.
18    MR. THOMPSON:  Yeah.
19    MS. HEISE:  Thank you.
20    MR. THOMPSON:  Uh-huh.
21    THE WITNESS:  I'm going to apologize.
22 What number?
23    MR. THOMPSON:  2A.
24    THE WITNESS:  Okay.  Thank you.
25    MR. THOMPSON:  Can you see it?

Page 27

1     MS. HEISE:  We can see it.  Thank you.
2  BY MR. THOMPSON:
3     Q     And Ms. Colvard, looking at Exhibit 2A, do
4  you recognize this exhibit?
5     A     Yes.
6     Q     And what is this exhibit?
7     A     Test messages between myself and Uli.
8     Q     Okay.  If you can please just summarize
9  what your text message conversation is about with
10 Uli.
11    A     I am asking him how his hiring is going
12 for staff.  He is -- he's asking for a training
13 update on where his staff stands.  So, again, this
14 would be something that only Gerry can see in
15 Gerry's Manage My Staff.  I provided him with Jarius
16 Hollinger's contact information.  And Jarius was my
17 education counter part.  His position is called an
18 agency process specialist.  And I was checking to
19 insure that his staff had all of their programs and
20 computer and equipment set up and ready to go for
21 his day one.
22    Q     Okay.  And going back when you asked Uli
23 how hiring is going, did Uli inform you that he had
24 added six people to Gerry's MMS?
25    A     Yes.

Page 28

1     MS. HEISE:  Form.
2  BY MR. THOMPSON:
3     Q     And just to be clear, so the six people
4  that were added to Gerry Rivas' MMS, that's under
5  Rivas' agency, correct?
6     A     That is correct.
7     MS. HEISE:  Object to form.
8  BY MR. THOMPSON:
9     Q     Okay.  And were the people that were added
10 to Gerry Rivas' agency being trained at Rivas'
11 agency?
12    MS. HEISE:  Object to form.
13    THE WITNESS:  Some were, some were not.
14    During this timeframe -- well, actually, anyone
15    with a 220 or 2044 insurance license does not
16    have to work within the confines of the agency
17    location in the presence of a 220 licensed
18    individual.  So, 220 license is the property
19    and casualty license.  I know that Uli did have
20    some employees that I believe came from a USAA
21    layoff in Tampa and he was doing training in
22    Tampa with those team members.
23 BY MR. THOMPSON:
24    Q     And just to clarify, you said that Uli had
25 employees, but at the present time these were

Page 29

1  employees working or operating under Gerry Rivas'
2  agency; is that correct?
3     MS. HEISE:  Object to form.
4     THE WITNESS:  Correct.  They were Uli's
5     employees and they were operating in the
6     selling agent Gerry Rivas' agency.
7  BY MR. THOMPSON:
8     Q     Okay.  And Ms. Colvard, if you could
9  please turn to Exhibit 2B, which I also have on the
10 screen as well.  Do you recognize Exhibit 2B?
11    A     Yes.
12    (Whereupon, document was marked as Exhibit 2B for
13 identification.)
14 BY MR. THOMPSON:
15    Q     And what is Exhibit 2B?
16    A     Text messages between myself and Uli.
17    Q     And if you can please briefly summarize
18 the conversation of what's depicted on Exhibit 2B?
19    A     He is asking when his Manage My Staff
20 access and profile is going to open so he can add
21 staff into his Manage My Staff.
22    Q     And what was your response?
23    A     Soon.
24    Q     And just to be clear.  Uli could not write
25 business under his MMS until his agency opened?

Kaylee Colvard
August 04, 2022

Page 30

1      A    That is correct.
2          MS. HEISE:  Object to form.
3          THE WITNESS:  His agent number is not live
4    until day one.  He does not sign his exclusive
5    agency contract until August 1st therefore his
6    agent number is not live and cannot do any
7    business under his agent number.
8          MS. HEISE:  I want to make sure.  I
9    objected to form on that.  I just wanted to
10   make sure you heard that.
11         THE COURT REPORTER:  Yes, ma'am.  Thank
12   you.
13         MS. HEISE:  Okay.  Perfect.  Thank you.
14         THE COURT REPORTER:  You're welcome.
15   BY MR. THOMPSON:
16     Q    Ms. Colvard, does Allstate have an
17   education team?
18     A    Yes.
19     Q    And does the, or does Allstate's education
20   team generate reports with staffing information?
21     A    Yes.
22     Q    How would the reports be sent?
23     A    Typically by email.
24     Q    And in the emails, would there also --
25   would the emails also include a summary of the

Page 31

1    reports?
2      A    Yes.  I have to pull one up to look again.
3    It's been two years.
4      Q    Here, let's take a look at Exhibit 3.
5          (Whereupon, document was marked as Exhibit 3 for
6    identification.)
7    BY MR. THOMPSON:
8      Q    Ms. Colvard, can you see my screen?  Do
9    you have Exhibit 3 pulled up?
10     A    I can see your screen.
11     Q    Do you recognize Exhibit 3?
12     A    Yes.
13     Q    And what is this?
14     A    This is a summary from the new agent
15   education team with a snapshot of where new agents
16   who are getting ready to open, who are required to
17   have a minimum of four staff.  They're showing four
18   staff listed in their Manage My Staff that have
19   already gone through level one and level two binding
20   authority.  It's show where they stand prior to
21   opening to insure that they have the four staff
22   ready to go day one.
23     Q    And what is the date of this email?
24     A    July 16th.
25     Q    And this is before Uli's agency opened,

Page 32

1    correct?
2      A    That is correct.
3          MS. HEISE:  Object to form.
4          THE WITNESS:  That is correct.
5    BY MR. THOMPSON:
6      Q    And under the table of agent appointments,
7    is Uli's name in the chart?
8      A    Yes, it is.
9      Q    Just to be clear, even though Uli's name
10   is in the chart, this is under, or is this under
11   Gerry Rivas' agency?
12     A    No.  This is under Uli's name.
13     Q    So then if you could just go through
14   what -- so what is the binding granted, what does
15   the three mean next to Uli's name?
16     A    Binding authority granted means that that
17   is the number of staff that are in Uli's Manage My
18   Staff that have completed level one and level two
19   binding authority.  There would have been more
20   information on this chart to show how many people
21   were loaded into the Manage My Staff System and how
22   many people were currently in the process of going
23   through level one and level two binding authority.
24   Those are the notes that you would see referenced
25   above where it states Uli added 25 LSP's into the

Page 33

1    MMS.
2      Q    Okay.  So then is this really -- it's
3    preparing for the opening on August 1st?
4      A    That is correct.
5      Q    Okay.
6      A    These numbers would be discussed in a -- I
7    believe it was either a weekly or every other week
8    staffing call that happened every Friday, I believe,
9    at ten a.m -- nine a.m. or ten a.m -- with the
10   territory leader, with the deployment leader, with
11   the on boarding team with all of my counterparts,
12   the new agency leaders and the field sales leaders,
13   to go through and insure who is in binding authority
14   who is already completed binding authority.  How
15   many people were working in the selling agent's
16   office.  How many people still needed to be moved
17   over.  There are lots of check boxes that had to
18   happen before someone would show up in MMS.
19         For example, an LSP would have to sign a
20   non-compete form.  And until they signed the
21   non-compete form, they would not show up in the
22   Manage My Staff system.
23     Q    Let's go to the next email which is, I
24   believe, July 24th.  We're still on Exhibit 3.
25   Please look at the email dated July 24, 2020.  Do

Kaylee Colvard
August 04, 2022

Page 34

1  you recognize this email?
2      A    Yes.
3      Q    And what is this email?
4      A    This is another update from our education
5  team on how many staff each of the agents that are
6  starting August 1st have that have already gone
7  through and have binding authority with Allstate
8  under the new agent with anticipated to open
9  August 1st.
10     Q    Okay.  And so for Uli then the 2020 --
11 excuse me.  The 22 next to his name under binding
12 granted, these are individuals that have passed an
13 exam and are ready to start on August 1st?
14     MS. HEISE:  Object to form.  I'm going to
15     ask that since it's your witness that you don't
16     lead her, please.
17     MR. THOMPSON:  That's fine.
18 BY MR. THOMPSON:
19     Q    So, if you could just explain to me again
20 what the 22 means next to --
21     A    So, the 22 means that there were 22
22 individuals that were listed in Uli's Manage My
23 Staff who had gone through level one and level two
24 Allstate binding authority.  And based on your
25 question, I am going to clarify one point.  These

Page 35

1  individuals did have to have an insurance license in
2  order to go through level one and level two binding
3  authority in order to write insurance business.  So,
4  it could have been a mixture of the 220 license, the
5  2044 license or the 440 license.  Anyone with a 440
6  would have to work in the confines of the agency
7  under the watchful eye of a 220.  However, as I say
8  that, I am going to disclose -- I can't remember the
9  exact dates, due to Covid, the governor did loosen
10 restrictions on a 440 license and allowed them to
11 work remotely due to Covid for an extended period of
12 time.
13     Q    Let's go to the next email.  Do you see
14 the email dated July 30, 2020?
15     A    I do.
16     Q    And do you recognize this email?
17     A    I do.
18     Q    And what is this email?  Just briefly.
19     A    It is another update from the education
20 team for the August 1st hires showing how many staff
21 each August 1st agency hired as that had gone
22 through binding authority that are licensed and
23 ready to write business day one.  And I'm sorry, in
24 the new agent agent's number.
25     Q    And do you see the numbers next to Uli's

Page 36

1  name?
2      A    Yes.
3      Q    I know we discussed binding granted.  If
4  you can just explain and go through -- or can you
5  please explain to me what the license 25 number
6  means?
7      A    Bear with me for a second.  I'd like to
8  open this up and zoom in a little bit further.  I'm
9  sorry.  What exhibit are we on again?
10     Q    We are still on Exhibit 3.  The last page.
11 An email dated July 30, 2020.
12     A    Okay.  The columns next to binding granted
13 says staffing progress.  The 20 -- reading from left
14 to right, the first column licensed 25, that means
15 there are 25 people that are listed in MMS that have
16 an insurance license with the State of Florida.
17         Then the next column, level two completed,
18 that is those individuals of the 25.  Twenty-three
19 of them had completed the second level of Allstate
20 binding authority.  DFS is appointments.  Appointed
21 is Department of Financial Services.  That is once
22 an individual is -- a 440 license has to be
23 appointed to a 220 license individual.  So that
24 would be those appointments.  Our education team and
25 our licensing team would have appointed those with

Page 37

1  the 220 or a 2044 license because a 220 license does
2  not need to appoint a 220 license.  The company
3  would take care of that.
4      Q    Okay.  Lets talk about the 220 and the
5  2044 licenses.
6      A    Okay.
7      Q    If you can, please -- I'll share my
8  screen.  Would you please pull up Exhibit 4?
9          (Whereupon, document was marked as Exhibit 4 for
10 identification.)
11 BY MR. THOMPSON:
12     Q    Looking at Exhibit 4.  Is this an email
13 from Uli to you dated July 10, 2020?
14     A    Yes, it is.
15     Q    Do you recognize this email?
16     A    Yes.
17     Q    And did Uli have an inquiry?
18     A    Yes.
19     Q    And what was Uli's inquiry?
20     A    Uli was asking for clarification on
21 licensing and requirements based on information he
22 heard from regional sales leader Jim Eschelbach
23 during new agent training.
24     Q    Okay.  Did you respond to Uli's email?
25     A    I did.

Kaylee Colvard
August 04, 2022

Page 38

1    Q    What was your response?
2    A    As I previously stated, a 220 or a 2044
3  license can be housed anywhere.  They can work
4  remotely.  That is the Department of Financial
5  Services State of Florida law agent they do not have
6  to work in the confines of the office.  And I say
7  office, the agent location.
8    Q    And, so, before or after Uli's agency
9  opened on August 1, 2020, if Uli had a question,
10  would he typically come to you and ask you for
11  guidance?
12        MS. HEISE:  Object to form.
13        THE WITNESS:  He did come to me and ask me
14        multiple questions.  Am I the only person he
15        ever asked the question to, I would assume
16        probably not.  I would assume that -- I'm
17        assuming that he would have reached out to
18        Darren, the agency owner that he had been
19        working for and other people as he had been
20        within the Allstate system and knew people that
21        worked for Allstate.
22  BY MR. THOMPSON:
23    Q    Do you know an individual named Char
24  Jordan?
25    A    Char, yes.

Page 39

1    Q    Char.  Sorry.
2    A    That's okay.
3    Q    Who is Char Jordan?
4    A    Char Jordan was the territory sales leader
5  when Uli was opening his agency.
6    Q    Okay.  And does Ms. Jordan have, or did
7  she have the authority to approve or disapprove an
8  individual becoming an agency owner?
9    A    Yes.
10    Q    Did Ms. Jordan approve Uli in becoming an
11  agency owner?
12    A    Yes.
13    Q    Is there any checklist that Ms. Jordan
14  needs to complete in order for an agency owner to
15  become an owner?
16    A    Yes.
17        MS. HEISE:  Object to form.
18        THE WITNESS:  Yes.
19  BY MR. THOMPSON:
20    Q    To your knowledge, did Ms. Jordan complete
21  the checklist for Uli?
22        MS. HEISE:  Object to form.
23        THE WITNESS:  Yes.
24  BY MR. THOMPSON:
25    Q    And let's pull up -- if you can please

Page 40

1  turn to -- and I'll share my screen -- Exhibit 6.
2        (Whereupon, document was marked as Exhibit 6 for
3  identification.)
4  BY MR. THOMPSON:
5    Q    Before I ask you questions about the
6  specific emails.  I see an arrow and an X through
7  the emails.  Did you make these markings, Ms.
8  Colvard?
9    A    Yes, I made the markings.
10    Q    Okay.  Still looking at Exhibit 6.  Do you
11  recognize this exhibit?
12    A    I do.
13    Q    If you can briefly summarize what Exhibit
14  6 is?
15    A    Exhibit 6 are communications between
16  myself and Char regarding Uli's production once he
17  became an agency owner.
18    Q    And looking at -- we're going to the
19  second page, page two, which actually it says page
20  one.  So are these multiple emails between --
21    A    Yes.
22    Q    And on page two, do you see -- do you see
23  Ms. Jordan's email dated August 7, 2020 at 12:05
24  p.m.?
25    A    Yes.

Page 41

1    Q    And does she refer -- does she
2  reference -- she wants to make sure that we are
3  getting credits for his production.  Do you see
4  that?
5    A    Yes.
6    Q    I want to clarify.  When she says just
7  want to make sure we are getting credit, who does
8  she mean by we?
9        MS. HEISE:  Object to form.
10        THE WITNESS:  That the territory is
11        getting credit for Uli's new business
12        production.
13  BY MR. THOMPSON:
14    Q    Okay.
15    A    If you scroll down to the next page --
16  this is actually the easiest way to read this chain.
17  Char received communication with an updated daily
18  production for everything that was going on in the
19  Florida region based on by market.  She then took
20  that report and would forward it to the field sales
21  leader and the new agency leaders.  I asked her are
22  Uli's numbers included in this report.  She then
23  asked me to have Ann -- Ann was -- let me pause and
24  explain the way that the structure worked.
25        As a new agency leader, I had a market

Kaylee Colvard
August 04, 2022

Page 42

1  number assigned to me, but that market number was
2  not necessarily a recognized market number by the
3  company.  There would be a, what I refer to a
4  tenured market.  Once an agent would graduate from
5  the My Program, which is typically they were with me
6  for one to two years as a new agent.  They would
7  then go into another market and be working with
8  another leader.
9         So, any production reports did not include
10 new agency markets because my agents were still
11 assigned to the graduated field sales leader market.
12 So Uli's production numbers would have been in Ann
13 Morrison's market.  So, Char is asking me, have Ann
14 look at her production report to see if she sees
15 Uli's production calculating and showing in her
16 market in and for the territory.  Where then I -- I
17 confirm with Ann at some point in time and I tell
18 Char that those numbers are not showing in Ann's
19 market report, which means that he was probably
20 coded to my market number alone, which was never
21 shown as a reporting structure for production.  More
22 internal coding than anything else.
23     Q    Okay.  Next I want to share.  If you can
24 pull up Exhibit 7.
25         (Whereupon, document was marked as Exhibit 7 for

Page 43

1  identification.)
2         MS. HEISE:  I want to confirm all of the
3     exhibits that you're showing today have been
4     produced to us; is that correct?
5         MR. THOMPSON:  Yes.  It's in the Dropbox
6     link.
7         MS. HEISE:  Okay.
8         MR. THOMPSON:  It was sent to you
9     yesterday.  I can forward it to you again now.
10        MS. HEISE:  Oh, got it.  That's okay.  I
11    just wanted to make sure.  Thank you.
12 BY MR. THOMPSON:
13    Q    Ms. Colvard, I'm now showing you Exhibit
14 7.
15    A    Yes.
16    Q    And similar to before, is it multiple
17 email chains or is it two emails chains?
18    A    Yes, it is.
19    Q    At the bottom of page four of the first
20 email chain, do you see the email from -- wait.
21 Sorry.  Page four going on page five.  Do you see
22 the email from Misty?
23    A    Yes.
24    Q    Who is Misty?
25    A    She's a member of the agency staff

Page 44

1  recruiting team.  So she would have been one of the
2  individuals who were on the LSP recruitment program
3  for agency owners.
4     Q    And Misty's email, does she send -- or was
5  this email sent to Uli?
6     A    Yes, it was.
7     Q    And were you CC'd on the email?
8     A    Yes, I was.
9     Q    Okay.  And if you could explain what her
10 email entails?
11    A    There are two staff members with a 440
12 license who are appointed to the LLC.  Uli's LLC.
13 These licenses needed to be corrected and appointed
14 to his 220 instead of the LLC.
15    Q    Did you respond on August 3rd?
16    A    Yes, I did.
17    Q    And if you summarize your response?
18    A    My response to Misty was "All of Uli's 440
19 staff were appointed to his LLC license.  Licensing
20 changed their rules at the start of the year and we
21 were told that everyone needed to be appointed under
22 the corporation name and not under Uli as an
23 individual 220 license.
24    Q    And do you know an individual named Jarius
25 Hollinger?

Page 45

1     A    Yes.
2     Q    Who is Jarius Hollinger?
3     A    Jarius Hollinger was my agency process
4  specialist.  So my education counterpart, for better
5  lack of terms.
6     Q    Okay.  We're still on Exhibit 7.  On the
7  first page of Exhibit 7 do you see an email from
8  Jarius Hollinger dated August 4, 2020?
9     A    Yes.
10    Q    Does Mr. Hollinger reference a centralized
11 distribution team?
12    A    Yes.
13    Q    And what does that mean?
14    A    A centralized distribution team, if I
15 remember correctly, is where all the contracts are
16 sent for storage and approval by the corporation.
17 So day one Uli would have signed his contract as an
18 individual.  Once he has his LLC or corporation --
19 however he decides or chooses to operate his
20 business as an independent contractor, he can then
21 amend that contract to be under the corporation name
22 instead of under his name as an individual.  So this
23 is where those contracts would be sent.  And I'm
24 sure they probably had other functions and forms.
25 This is the only one that I remember and am aware

Kaylee Colvard
August 04, 2022

Page 46

1  of.
2      Q    Now I want to share with you Exhibit 8.
3      (Whereupon, document was marked as Exhibit 8 for
4  identification.)
5  BY MR. THOMPSON:
6      Q    Do you recognize Exhibit 8?
7      A    Yes, I do.
8      Q    And what is Exhibit 8?
9      A    Exhibit 8 is an email to all of the new
10 agents who were getting ready to start August 1st,
11 with a laundry list of items that they need to make
12 sure they had completed prior to their start date.
13 The email goes to all of the August 1st agents
14 copying Jurius, my agency process manager. Dalgis
15 and Maria who were the other market leaders and
16 graduated market leaders and territory leader, Char
17 Jordan.
18     Q    Who sent the July 17, 2020 email?
19     A    I did.
20     Q    We're still on Exhibit 8.  Do you see the
21 email from Jarius Hollinger dated July 22, 2020?
22     A    Yes.
23     Q    And was this email sent to Uli and the
24 other new agency owners that were opening on
25 August 1st?

Page 47

1      A    Yes.
2      Q    Were you copied on Jarius Hollinger's July
3  22nd email?
4      A    Yes.
5      Q    And if you can summarize Mr. Hollinger's
6  email for me, please?
7      A    Jarius was scheduling additional training
8  past level one and level two binding authority on
9  different products that Allstate writes, other
10 business that Allstate writes.  He was listing out
11 all of the training that was available for him to do
12 and he could do it either one on one or in a group
13 training.  In a group setting.
14     Q    Do you know if Uli completed the training
15 with Mr. Hollinger?
16     A    No, I don't know.  I would assume yes, but
17 I don't know.
18     Q    Still on Exhibit 8.  Do you see the email
19 from Jarius Hollinger dated July 31, 2020?
20     A    Yes.
21     Q    And who did he send this email to?
22     A    He sent this email to me.
23     Q    Is Uli referenced in this email?
24     A    Yes.
25     Q    How so?

Page 48

1      A    He's referencing that he has a minimum of
2  four staff, which all email states is ready.
3  Meaning that he's ready to open and he has a minimum
4  of four that are licensed and appointed and ready to
5  write business day one.
6      Q    Who determined that Uli and his agency
7  were ready to open on August 1, 2020?
8      A    It is a combination of the senior
9  leadership team at Allstate.  So it would have been
10 Mike Sheeley, who is the field senior vice
11 president.  Jim Eschelbach the regional sales
12 leader.  Char Jordan, the territory sales leader.
13 The deployment leader, Steve Gilbert and his team.
14 Again, during our weekly or the every other week
15 staffing calls.  We would discuss making sure do
16 they have staff that are licensed through binding
17 authority and appointed ready to go.  If that agency
18 owner did not have four staff ready to go, they
19 would not be able to open their doors and their
20 start date would have been pushed back to the
21 following month.
22     Q    And the upper leadership, do they also
23 review the business plan for new agencies?
24     A    Yes.
25     MS. HEISE:  Object to form.

Page 49

1      THE WITNESS:  The senior leadership team
2      reviews the entire candidate file and they make
3      the determination if someone is approved or not
4      approved to be a new agency owner with
5      Allstate.
6  BY MR. THOMPSON:
7      Q    Okay.  Now I want to show you Exhibit 9.
8      (Whereupon, document was marked as Exhibit 9 for
9  identification.)
10 BY MR. THOMPSON:
11     Q    Do you recognize Exhibit 9?
12     A    Yes.
13     Q    What is Exhibit 9?
14     A    It is an email chain between myself and
15 agency process specialist, Mario Castro, regarding
16 compliance training with Uli.
17     Q    Are you aware if Uli underwent compliance
18 training?
19     A    Yes, he did.
20     Q    And the compliance training, do you know
21 when it occurred?
22     A    This one particular training would have
23 taken place, I believe, Thursday September 3rd.
24 There were multiple compliance trainings that are
25 done with new agency owners?  This particular

Kaylee Colvard
August 04, 2022

Page 50

1   compliance training takes place a month after an
2   agency opens their doors which is when all of their
3   compliance documents from a T-doc, like the legal
4   stuff making sure that we have all of the
5   documentation we need on policies.  I believe
6   they're updated monthly.  So an agency has to be
7   open for a month in order for us to be in and see
8   their compliance score card and that's what this
9   review was with Mario Castro and Uli.
10      Q    Okay.  And looking at Exhibit 9, do you
11  see Mario Castro September 3rd email that he sent
12  on, or at 12:41 p.m.?
13      A    Yes.
14      Q    And who did he send that email to?
15      A    That was an email sent to Uli and copying
16  myself and Jarius.
17      Q    And in Mario Castro's September 3rd email,
18  did he -- is there any indication in Mario Castro's
19  email that Uli's agency has -- there's an issue with
20  Uli's agency within compliance?
21      MS. HEISE:  Object to the.
22      THE WITNESS:  No.  Uli stated concerns
23      making sure that he wanted to make sure he was
24      doing everything he should be doing to insure
25      that he was in compliance with the T-docs.  So

Page 51

1   again, documentation that is required to have a
2   policy in force.  State of Florida
3   documentation.
4   BY MR. THOMPSON:
5       Q    And were suggestions provided by Mario
6   Castro?
7       A    Yes.
8       Q    And do you see the Uli's email from
9   September 3, 2020 at 1:23 p.m.?
10      A    Yes.
11      Q    And is his email in response to Mr.
12  Castro's recommendations?
13      MS. HEISE:  Object to form.
14      THE WITNESS:  Yes.
15  BY MR. THOMPSON:
16      Q    Okay.  And what was Uli's response?
17      A    That he will implement all the
18  recommendations that Mario has laid out for him.
19      Q    And do you know if Uli implemented Mario's
20  recommendations?
21      A    Yes.
22      Q    And did Uli implement Mario's
23  recommendations?
24      A    Yes, he did.
25      MS. HEISE:  Form.

Page 52

1   BY MR. THOMPSON:
2       Q    Just briefly, can you explain to me what
3   T-docs are?
4       A    T-docs are legal documents that the State
5   of Florida requires for predominantly an auto
6   policy.
7           For example, an uninsured motorist.  A
8   policyholder, no matter what carrier you're with,
9   either accepts or rejects uninsured motorists.  A
10  carrier is required to have that signed
11  documentation on file for each policy.  It's an
12  example of one of the T-docs.
13          Additional Allstate T-docs would have been
14  if you are marked as being a homeowner to get the
15  homeowner discount.  In the State of Florida with
16  Allstate we didn't necessarily write Allstate
17  Homeowner's insurance.  So, we gave a homeownership
18  discount to someone who owned a home.  So documents
19  would be to go into a property appraiser's website
20  showing that Zane owns a property and is a property
21  owner showing the address.  Just to document that
22  proves that the homeowner's discount is warranted to
23  that client.  Those are some examples of what T-docs
24  are.
25      Q    Okay.  Now I would like to show you

Page 53

1   Exhibit 10.
2           (Whereupon, document was marked as Exhibit 10 for
3   identification.)
4   BY MR. THOMPSON:
5       Q    Do you recognize this?
6       A    I do.
7       Q    And what is this?
8       A    This is an email from Jarius to Uli with
9   all of the audits of the agency that Uli was
10  purchasing.  Jarius sent this same email out to
11  every new agent that purchased an agency.  Audits of
12  the book of business, list of terminated policies,
13  list of the book of business, quote audits, et
14  cetera.
15      Q    Next I want to take you to Mr. Hollinger's
16  August 21st email.  Do you see Mr. Hollinger's
17  August 21, 2020 email?
18      A    Yes.
19      Q    And if you can summarize this email in
20  regards to Uli.
21      MS. HEISE:  Object to form.
22      THE WITNESS:  Jarius is sending me a
23      weekly recap of every interaction.  What he has
24      worked on predominantly with all of the
25      August 1st new hires.  I apologize it's not

Kaylee Colvard
August 04, 2022

Page 54

1    just August 1st.  All of the new agents that he
2    had been working with.  Bullet points saying
3    any hot topics or things that I needed to be
4    made aware of from a training capacity what he
5    was working on.  For Uli he said there's no
6    issues, no problems.  Everything is going
7    great.  And Jarius, you know, is working with
8    him and checking on quotes and making sure
9    production is showing up.
10   BY MR. THOMPSON:
11        Q    And so who would check with Uli in regards
12   to quotes?  Jarius?
13        A    Jarius and myself and, you know, any
14   senior leader could have.  Jarius was the one that
15   was, I'm going to say in the weeds when it came to
16   working with staff, working on quoting.  Making sure
17   that every I was dotted and T was crossed.  And
18   everything rolled up to me so my responsibility was
19   going back to the business plan and cash flow.  Are
20   we hitting or exceeding the goals that they had set
21   forth.  If someone had a quote goal every single
22   day, are we hitting that quote goal that we need to.
23   Do we have a number of calls that each staff is
24   supposed to be making.  Are we monitored the number
25   of calls.  So, kind of as a business consultant like

Page 55

1    an accountability partner.  Making sure that the
2    goals that they set forth are holding them
3    accountable to insure those goals were met.
4        Q    Still on Exhibit 10.  Go to the last page.
5    Before I ask you details about this email, it looks
6    like there are redactions in blue ink.
7        A    Yes.
8        Q    Did you make these redactions?
9        A    Yes, I did.  It's personally identifiable
10   information.  Consumer name, policy number so I
11   redacted those.
12        Q    Okay.  Take a look at Exhibit 10.  We're
13   on the last page.  Do you see the email from Norbert
14   Garner dated September 2, 2020?
15        A    Yes.
16        Q    Would you please summarize this email?
17        A    This email was to myself regarding some
18   pend bound policies and Gerry Rivas' agency.  This
19   is where somebody would have said we're going to
20   close this business, but they never finished pushing
21   the button, so, either the person never called back
22   with a credit card number, whatever it might be.
23   But these policies were, for lack of a better term,
24   floating in outer space and they needed to be
25   cleared out.  Because they were from Gerry's agency

Page 56

1    under Gerry's name, we were not able to do that.
2        Q    And why couldn't you do that?
3        A    Because that agent number was no longer
4    live.  I didn't have access to go in and clear those
5    policies out, which now is under the terminated
6    agent number so I had to ask another member of the
7    team to go and clear those out because I didn't have
8    access to do that and nor did Uli.
9        Q    Okay.  Next I want to take you to your
10   August 2nd or August 7th email.
11        A    Yes.
12        Q    Are you with me?  I apologize.
13        A    Yes.
14        Q    Let's take a look at Exhibit 12.  I'm
15   sorry.  Let's jump to Exhibit 11.
16             (Whereupon, document was marked as Exhibit 11 for
17   identification.)
18   BY MR. THOMPSON:
19        Q    Do you recognize this?
20        A    Yes, I do.
21        Q    What is this?
22        A    This is a weekly production report that I
23   generated to all of the new agents that were on my
24   team copying the other sales leaders, Char Jordan
25   and some of our other counterparts showing

Page 57

1    production on a weekly basis for my producers.
2        Q    As I mentioned before, looking at the
3    August 7th email, can you please explain to me what
4    the items mean in A61 weekly line?
5        A    Yes.  So A61 was my market number.  So,
6    again, as a new agent these new producers were
7    assigned to be on my team.  And then in each bucket
8    it shows a line is a type of product.  So, for
9    example, standard auto would have been in line 10
10   auto policy.  Commercial would have been a
11   commercial insurance policy.  Homeowners would have
12   be a capital key homeowners policy.  So it is
13   showing for that particular week.  And if I remember
14   correctly, our production week ran from Thursday to
15   Wednesday, I believe.  I don't recall 100 percent
16   but it showed on a seven-day basis what the
17   production was, who are the top producers on my team
18   each week.
19        Q    And how did Uli's agency typically perform
20   each week?
21             MS. HEISE:  Object to form.
22             THE WITNESS:  Uli was as shown on the
23   report has the highest number in total casualty
24   policies and the highest number of standard
25   auto policies and nonstandard auto policies.

Kaylee Colvard
August 04, 2022

Page 58

1  BY MR. THOMPSON:
2      Q   Still on Exhibit 11.  Do you see an email
3  dated September 14, 2020?
4      A   Yes.
5      Q   And who is the email from?
6      A   Email is from territory leader, Char
7  Jordan.
8      Q   If you can please summarize Ms. Jordan's
9  email?
10     A   She is congratulating the new producers
11 that are writing a tremendous amount of new
12 business.
13     Q   And at this point in time is it your
14 belief that Uli and his agency, they were complying
15 with Allstate's policies and procedures?
16     A   Yes.
17         MS. HEISE:  Object to the form.
18 BY MR. THOMPSON:
19     Q   And at this point in time -- actually,
20 strike that.  And to your knowledge, did Allstate
21 perform compliance reviews on Uli's agency?
22     A   August 14th, no.  He would have been, not
23 even open for two months.  Compliance score card,
24 like I said, is only updated once a month.  When
25 this score card came out, that's when Mario Castro

Page 59

1  came in to do compliance training.
2      Q   So just to clarify.  How often does the
3  compliance training occur?
4      A   It occurs as much as needed.  They were as
5  much warranted as there is an agent that's out of
6  pattern whose scores are not within the acceptable
7  range.  A compliance training would be held, but
8  every new agency owner had one-on-one compliance
9  training with their first score card to insure that
10 they saw any potential areas that they needed to
11 focus on.  As a new, brand new agency that's
12 opening, you've got typically new staff working in
13 there so we wanted to make sure that everyone was
14 doing things the proper way.
15     Q   And was, to your knowledge, was Uli and
16 his agency doing things the proper way?
17         MS. HEISE:  Object to form.
18         THE WITNESS:  Yes.
19 BY MR. THOMPSON:
20     Q   Okay.  I will share Exhibit 12.
21         (Whereupon, document was marked as Exhibit 12 for
22 identification.)
23 BY MR. THOMPSON:
24     Q   During your time at Allstate, were agency
25 owners encouraged to drive volume?

Page 60

1      A   Yes.
2      Q   Drive in volume?  Excuse me.
3      A   Yes.
4      Q   In looking at Exhibit 12, do you recognize
5  this?
6      A   Yes.
7      Q   And let's go to -- do you see your email
8  from August 19, 2020 that was sent at 6:05 p.m.?
9      A   Yes.
10     Q   Are there tables in your email?
11     A   Yes.  There are charts that show, quote,
12 volume for two -- the two ECP agency owners that
13 started August 1st.
14     Q   And how is Uli's agency performing?
15     A   Outstanding.
16     Q   Now, are you aware that on November 13,
17 2020 that Allstate is sending Uli a Notice of
18 Termination?
19     A   Yes.
20     Q   Okay.  Were you involved in any
21 investigation into Uli or his agency?
22     A   Yes.
23     Q   All right.  And how so?
24     A   I was interviewed by Investigative
25 Services regarding Uli's practices.

Page 61

1      Q   And to your knowledge were there any
2  issues with Uli's practices?
3      A   No.
4      Q   To your knowledge, did Uli provide false
5  information to Allstate?
6          MS. HEISE:  Object to form.
7          THE WITNESS:  No.
8  BY MR. THOMPSON:
9      Q   And to your knowledge, did Uli fail to
10 issue policies according to Allstate's guidelines?
11         MS. HEISE:  Object to form.
12         THE WITNESS:  No.
13 BY MR. THOMPSON:
14     Q   To your knowledge, did Uli make any
15 misrepresentations to Allstate?
16         MS. HEISE:  Object to form.
17         THE WITNESS:  No.
18 BY MR. THOMPSON:
19     Q   And to your knowledge, did Uli violate any
20 of Allstate's policies?
21         MS. HEISE:  Object to form.
22         THE WITNESS:  No.
23 BY MR. THOMPSON:
24     Q   And is there, or at Allstate is there a
25 distinction between brand new owners opening a

Kaylee Colvard
August 04, 2022

Page 62

```
 1  scratch agency versus an outside owner purchasing an
 2  agency?
 3       A    Yes.
 4       Q    And if you can please just tell me what
 5  the distinction is.
 6       A    It would be the contract that the producer
 7  signs based on how they're paid.  So, for example, a
 8  brand new agency owner would have started on the
 9  enhanced compensation program, whereas someone
10  buying a large agency -- and I'm going to make a
11  distinction.  There are three ways to become an
12  agency owner.  First was to open up your doors brand
13  new.  You would have been on the enhanced
14  compensation program at that point in time.
15            The second way would have been to purchase
16  an agency and there were two outlets.  One was to
17  purchase a small agency under a specific amount of
18  policies or revenue which would allow that agency,
19  that individual to receive the enhanced compensation
20  contract or you would purchase a large agency which
21  then would have cut you into a different
22  compensation program which was variable
23  compensation.  Which the programs themselves had
24  different levels of commissions and bonuses that
25  were taken out.
```

Page 63

```
 1       Q    And does Allstate have new agency owners
 2  partake in training sessions?
 3       A    Yes.  All new agency -- I apologize.
 4       Q    I was just going to ask what the training
 5  sessions entailed.
 6       A    To the best of my recollection, there were
 7  multiple weeks of training.  Some training was held
 8  at the regional office.  Then typically the team
 9  would go to the corporate office for approximately
10  10 days for home office training and then they would
11  come back to the region and they would be in a
12  region for an additional three weeks for in depth
13  quoting, training and running of the system
14  training.
15       Q    Okay.  And do you have knowledge of
16  project 100 list?
17       A    Yes.
18       Q    And what is that?
19       A    Project 100 is -- think of it as your
20  friends and family list.  Who are the first 100 in
21  it.  The project -- the number can vary.  project
22  100, project 500, project 250.  It's who are those
23  first individuals that you are going to reach out
24  that you have a relationship with.  The project 100
25  was a requirement for new agents.  All new agents
```

Page 64

```
 1  had nothing differentiating between what contract
 2  they were on, where they had to have 100 individuals
 3  that they were going to quote while they were in
 4  training.
 5       Q    Now, who made that requirement?  Is that
 6  by Allstate?
 7       A    That was by Allstate.  I don't know if it
 8  was a Florida region.  I don't know if it was a
 9  corporate initiative but it was something that came
10  down from senior leadership that we had to require
11  our team to come with a list of at least 100 names
12  to quote.
13       Q    Just to clarify, does the training take
14  place prior to the opening of the new agencies?
15       A    Yes, it does.
16       Q    Okay.  Who from Allstate participates in
17  the training?
18            MS. HEISE:  Object to form.
19            THE WITNESS:  All new agency owners as
20       well as staff are able to attend the regional
21       training.  If an agency owner were to bring a
22       staff member with them.
23  BY MR. THOMPSON:
24       Q    Sorry.  I'll clarify.  Who runs the
25  training for the new agency owners?
```

Page 65

```
 1       A    The regional training is done by the
 2  education team.  The corporate training is -- the
 3  corporate training the home office is done by the
 4  corporate education team.
 5       Q    Okay.  In January of 2020, was there a
 6  sales leadership meeting?
 7       A    Yes.
 8       Q    And where was that meeting?
 9       A    It was held in the Florida regional office
10  in Tampa.
11       Q    What occurred during the sales leadership
12  meeting?
13       A    It was a meeting where best practices were
14  shared, goals for the year were shared, recruiting
15  practices were shared.  How to motivate producers,
16  agency owners.  How to get them to generate more
17  activity.
18       Q    Were there -- was there any discussions
19  about having agents quote and save any new
20  perspective clients through project 100?
21            MS. HEISE:  Object to form.
22            THE WITNESS:  Yeah.  So, Nidia Pita who
23       was a sales leader, she had the most successful
24       new agents in 2018 and 2019.  She was asked by
25       Jim Eschelbach, who was a regional sales
```

Kaylee Colvard
August 04, 2022

```
 1      leader, to present to the team best practices
 2      on insuring new agents who were ready to open
 3      their doors and be successful day one.
 4           The process was, as I previously stated,
 5      if you are purchasing an agency, have your
 6      staff work in the selling agent's office.  Have
 7      them quote their personal project 100 or
 8      project 250 or project 500, whatever it might
 9      be.  Have them quote and those quotes would be
10      ready to be bound day one if the person wanted
11      to bind the policy.
12 BY MR. THOMPSON:
13      Q    And, I'm sorry, did you say Nidia Pita?
14      A    Nidia Pita.  N-I-D-I-A.  Pita, P-I-T-A.
15 She presented with her two agency process specialists.
16 First one was Mario Castro who did the compliance training
17 we referenced earlier and Erica James, who was also a
18 process specialist.
19      Q    Do you know who organized this meeting in
20 Tampa in January of 2020?
21      A    Regional sales leader, Jim Eschelbach.
22      Q    And were Allstate's leaders in attendance?
23      A    All field sales leaders, new agency
24 leaders, agency process specialists, field senior
25 vice president, Mike Sheely, territory leader, Char
```

```
 1 Jordan, other regional leaders, the head of
 2 education all would have been in attendance.  There
 3 have been some people who were absent absolutely.
 4 Someone is sick, someone has a death in the family
 5 and whatnot.  Do I remember exactly 100 percent who
 6 was in attendance?  No.
 7           MR. THOMPSON:  Right.  I don't think --
 8      let's take a five-minute break so I can go
 9      through my notes, but I think I shouldn't have
10      anymore questions for you, but if I do, it will
11      be brief.  We'll just take a five-minute break.
12           (Off the record.)
13 BY MR. THOMPSON:
14      Q    Ms. Colvard, going back.  I want to
15 clarify some of your testimony.  Did you -- did Uli
16 place staff in Gerry Rivas' agency prior to
17 August 1, 2020?
18      A    Yes.
19      Q    And Uli's staff, did they quote through
20 Gerry Rivas' agency prior to August 1, 2020?
21      A    Yes.
22      Q    Were there staffing reports generated
23 under Gerry Rivas' agency prior to August 1, 2020?
24      A    Yes.
25      Q    And would the staff that Uli placed into
```

```
 1 Gerry Rivas' agency, would they have been reflected
 2 in the staff reports?
 3      A    Yes.
 4      Q    Were there quote volume reports that
 5 showed quote volume under Gerry Rivas' agency?
 6      A    Yes.
 7      Q    And where there quote volume reports that
 8 showed the quote volume by Uli's staff that was
 9 placed in Gerry Rivas' agency?
10           MS. HEISE:  Object to form.
11           THE WITNESS:  Yes.
12 BY MR. THOMPSON:
13      Q    So, let's first talk about the -- so, were
14 there -- who would have seen the staffing reports?
15      A    Jim Eschelbach, the regional sales leader,
16 Mike Sheely, the senior vice president, Char Jordan,
17 the territory sales leader, Steve Gilbert, the
18 deployment leader.
19      Q    Who would have seen the quote volume
20 reports?
21      A    Same people.
22      Q    Okay.  And does Allstate have a
23 requirement to update business plan?
24      A    No.
25      Q    And based on Uli's staff placement and
```

```
 1 Gerry Rivas' agency and their quote volume, was
 2 there a deviation from Uli's original business plan?
 3      A    Yes.
 4      Q    Okay.  And was Uli informed that he had to
 5 update his business plan?
 6      A    No.
 7      Q    And I briefly want to share my Exhibit 10.
 8 Going back to Exhibit 10.  So I'm not -- we're on
 9 Exhibit 10.  Can you see Ulises' email that he sent
10 on September 2, 2020?
11      A    Yes.
12      Q    And is the email sent to you?
13      A    Yes.
14      Q    Now, does Uli reference Gerry's Alliance?
15      A    Yes.
16      Q    What is that?
17      A    Alliance is the quoting system.
18      Q    Okay.  And so is it fair to say that Uli
19 did not have access to the quoting system until his
20 agency opened August 1, 2020?
21           MS. HEISE:  Object to form.
22           THE WITNESS:  He would have had access
23      prior while in training, but he would only have
24      access to his own Alliance system.  Prior to
25      that he would have had access to Darren's
```

Kaylee Colvard
August 04, 2022

Page 70

1    alliance system when he worked for Darren.
2          MR. THOMPSON:  Okay.  I have no further
3    questions at this time.
4          MS. HEISE:  Okay.  Before we start, Zane,
5    do you have access to our exhibit share folder
6    from yesterday?  We have a couple of exhibits
7    we were going to refer to and we can share them
8    on our screen as well, but I didn't know if you
9    wanted to take a quick break to log in or if
10   you're comfortable with a screen sharing.
11   We're happy to proceed either way.
12         MR. THOMPSON:  I can try to get access to
13   it.  If not we might have to screen share.
14         MS. HEISE:  That's fine with us.
15         MR. THOMPSON:  How about a ten-minute
16   break and then we can come back?
17         MS. HEISE:  That sounds good.  Thank you.
18         (Off the record.)
19         MR. THOMPSON:  I'm sorry.  I do have a few
20   more questions.
21   BY MR. THOMPSON:
22   Q    Going back I know you touched on, or you
23   testified how prior to August 1, 2020 that there
24   were staffing reports and quote volume reports and I
25   asked you who would have seen those reports prior to

Page 71

1    August 1, 2020 and you mentioned the senior
2    leadership.  So that's where I'm going with this.
3    So, were there any discussions among the senior
4    leadership regarding the staffing and quote volume
5    reports under Gerry Rivas' agency prior to August 1,
6    2020?
7          MS. HEISE:  Object to form.
8          THE WITNESS:  Not that I was privy to.
9    BY MR. THOMPSON:
10   Q    Okay.  And --
11   A    If I can add to that.  If there had been a
12   concern or a question, since Gerry reported to me,
13   senior leadership would have brought that question
14   to me if there was any question or concern; however,
15   in those Friday staffing meetings we discussed the
16   number of staff that were in Gerry's office that Uli
17   had hired.  We discussed quoting activity.
18   Q    Okay.  And next I want to share my screen.
19   Do you see it said in an email versus how to access
20   saved quote?
21   A    Yes.
22   Q    Just scroll down.  And do you see the
23   email from Jarius Hollinger dated July 31, 2020?
24   A    Yes.
25   Q    And so my question for you -- and I will

Page 72

1    open this.  So when I opened the attached Word
2    document, do you see the Word document on your
3    screen?
4    A    Yes, I do.
5          MS. HEISE:  Is this an exhibit you're
6    entering?
7          MR. THOMPSON:  No, this is -- I will, yes.
8          MS. HEISE:  Okay.
9          MR. THOMPSON:  You do not have this
10   exhibit, just to be clear.
11         MS. HEISE:  But you'll enter it?
12         MR. THOMPSON:  Yes, yes.  Absolutely.
13         MS. HEISE:  Thank you.
14         MR. THOMPSON:  So this will be Exhibit 18.
15         (Whereupon, document was marked as Exhibit 18 for
16   identification.)
17   BY MR. THOMPSON:
18   Q    And so, Ms. Colvard, do you see this
19   document?
20   A    Yes, I do.
21   Q    And do you know if Mr. Hollinger created
22   this document?
23   A    I don't know.
24   Q    And have you seen this document before?
25   A    Not to my recollection.

Page 73

1    Q    Okay.  I'd like to take you to paragraph
2    six.  Do you see paragraph six?
3    A    Yes.
4    Q    Selecting corresponding control number to
5    access Alliance?
6    A    Yes.
7    Q    And have you seen this before?
8    A    Yes.  Yes.
9    Q    Okay.  And if you can just explain to me
10   what paragraph six means.
11   A    Paragraph six is showing the control
12   number for a quote.  So think of that as the IT
13   number for that individual quote.  So this is how an
14   individual would go into Alliance, into the quoting
15   system, to be able to pull up a quote that was
16   already done.
17   Q    Okay.  And is this something that Uli and
18   Mr. Rivas would have done?
19   A    Yes.  Every agent at Allstate would have
20   done this.
21   Q    Okay.  So this document, is this something
22   that was discussed or provided in the January 2020
23   meeting in Tampa, Florida?
24   A    Not to my knowledge.
25   Q    Okay.

Kaylee Colvard
August 04, 2022

Page 74

1    A    This would have been an ongoing document
2   for any agency owner.  Any time someone were to go
3   in -- if a consumer were to call any Allstate agent
4   and ask to get a quote, producers are trained to
5   first look to see if there's an existing quote in
6   the system as you don't want to be rerunning an
7   individual's credit.  You don't want to be rerunning
8   a motor vehicle report.  So, this probably would
9   have been a training, a document that every agent
10  was taught on how to access and find those quotes in
11  the system.
12        MR. THOMPSON:  Thank you.  I have no
13      further questions.
14        THE WITNESS:  If I can before you start, I
15      think I -- I misspoke I believe in the
16      beginning.  I think I said my last day with
17      Allstate was October 13th, but it was
18      November 13th.  Just to clarify.  I want to
19      make sure I said November and not October.
20        MS. HEISE:  Okay.  Thank you.  No problem.
21        CROSS-EXAMINATION
22  BY MS. HEISE:
23    Q    Good morning, Ms. Colvard.  My name is
24  Kate Heise and I represent Allstate Insurance.
25  You're familiar with the Allstate agency

Page 75

1   Pre-appointment Agreement; is that correct?
2    A    Yes.
3    Q    Okay.  And what is your understanding as
4   to the purpose of that agreement?
5    A    Well, the Pre-appointment Agreement -- I'm
6   not sure if it's an actual document, but the
7   pre-appointment process would be while you're going
8   through training -- so your file quote, unquote has
9   been approved.  Your business plan, your cash flow,
10  your liquid capital.  So at that point in time once
11  you're approved you go into the pre-appointment
12  process.  That can be while you're going through
13  training.  While you're hiring staff and while
14  you're preparing your agency to open your doors.
15    Q    Okay.  And is it fair to say that the
16  pre-appointment period is to facilitate training for
17  a prospective agent and the agent staff prior to the
18  effective date of the EA Agreement?
19    A    Yes.  You know what, let me clarify that.
20  It's to prepare the agency owner because they're the
21  independent contractor.  The staff work for the
22  independent contractor so there's still that
23  delineation between the staff working for the
24  independent contractor and not directly for
25  Allstate.

Page 76

1    Q    Okay.  Is the goal of this training period
2   during the pre-appointment time so that the agent
3   can hit the ground running on the EA once the EA
4   agreement goes into affect?
5    A    Yes.
6    Q    Would you agree that the purpose of the
7   pre-appointment period is not to simply have a
8   perspective EA running an agency and selling
9   policies before the EA Agreement actually takes
10  effect?
11    A    Correct.
12    Q    Would you also agree that the purpose of
13  the policy that take places during the
14  pre-appointment period is intended principally for
15  training purposes?
16    A    Not necessarily.
17    Q    What do you mean by that?
18    A    So, as stated in the January meeting for
19  training, it's also to set the agent up for success
20  to have quotes from their project 100, project 250
21  and the staff project numbers so that their policy
22  is ready to be bound day one.
23    Q    Okay.  Let's talk about project 100.  I
24  believe you testified earlier, and please correct me
25  if I get this wrong, but that project 100 is

Page 77

1   designed to have a list of family and friends to
2   quote during their training period; is that correct?
3    A    Yes.
4    Q    And the intent with project 100 was not to
5   purchase leads to quote with, correct?
6    A    Correct.
7    Q    And the intent of project 100 was meant to
8   be under the supervision of the selling agent; is
9   that correct?
10    A    That's correct.
11    Q    And it wouldn't have been under the
12  supervision of the purchasing EA; is that correct?
13    A    Correct.  However, the staff are -- the
14  new staff that would be working for the purchasing
15  agent, they technically are reporting to the new
16  agent and not the selling agent.  They are operating
17  under the confines of the selling agents business
18  but for the purchasing agent.
19    Q    And would it be permissible with the
20  project 100 quotes to do everything for the sale
21  except for buying the policy prior to day one?
22    A    That is correct.
23    Q    Okay.  And so that means to pre-bind, take
24  payment information and to have it --
25    A    Correct.

Kaylee Colvard
August 04, 2022

Page 78

1    Q    Is the purpose of project 100 to
2  effectively have the agency running, up and running,
3  prior to the agency opening date?
4    A    No.
5    Q    Okay.  And it's not designed or intended
6  to facilitate the sort of sales that an agency would
7  do once the EA Agreement takes effect; is that
8  correct?
9    A    I'm sorry.  Repeat that.
10    Q    It's not designed or intended to
11  facilitate the sort of sales that an agency would do
12  once the EA Agreement goes into effect, correct?
13    A    It would be because you are setting that
14  agency up so that day one they're writing business.
15    Q    Okay.  Let me just clarify.  It's intended
16  to quote family and friends only; is that correct?
17    A    Correct.
18    MS. HEISE:  Andrew is going to share his
19  screen.  Bear with us for one moment.
20    THE WITNESS:  Okay.
21  BY MS. HEISE:
22    Q    Ms. Colvard, do you recognize this
23  agreement?
24    A    I actually do not.
25    Q    This is the agent pre-appointment

Page 79

1  agreement that Mr. Cicciarelli entered into with
2  Allstate Insurance.  And the reason why I bring it
3  up is I'd like to turn your attention to paragraph
4  two, subsection 2E.  I'm just going to read it in
5  the record.
6    Section 2E of the Pre-appointment
7  Agreement states for educational purposes only,
8  applicant and those employees of applicant that
9  intend to be licensed and appointed to sell the
10  company's products and services will participate in
11  the selling and services of Allstate policies prior
12  to the entry in the R3001 -- 3001 Agreement.
13  Standard new business commission interest and
14  economic interest for the business written by the
15  applicant during a predetermined education phase
16  will be granted to the applicant only upon immediate
17  entry into the R3001 Agreement.
18    The expectation is that no more than five
19  to ten policies be bound during the pre-affiliation
20  practice and those policies are bound in the
21  presence of the licensed and appointed Allstate
22  representative.
23    Does this provision reflect the company's
24  policy that the pre-appointment period is intended
25  for obtaining rather than the end level quoting that

Page 80

1  would take place after an agency agreement goes into
2  place?
3    A    Yes.  May I elaborate on this a little
4  bit?
5    Q    Yes.
6    A    So this is referencing doing quoting
7  within the new agent number.  It is stating that
8  anything that is quoted and bound, so business has
9  gone into effect for the new agent number, is five
10  to ten policies.  This is different than the staff
11  doing quotes in the selling agent agent number.
12    Q    Is it permissible for an agent to hold
13  quotes?
14    A    I don't understand the term hold quotes.
15  Sorry.
16    Q    I'll rephrase.  Is it permissible for
17  agents to quote policies and hold them and bind them
18  until their agency is open?
19    A    It's at the request of the consumer.  If
20  the consumer wants a policy to be bound, typically
21  you want to give -- you would want to write a policy
22  seven days future effective so that they would get
23  an additional discount on their policy, but if a
24  consumer wanted to have a policy, I want that policy
25  in effect today, that policy would go into effect

Page 81

1  today.  But that's why the quoting and selling
2  agent's agent number is that project 100.  These are
3  your closest family and friends.  So if you can have
4  the conversation on, we're going to be opening, you
5  know, my agency opens in two weeks and we're trying
6  to get experience under our belt to be prepared to
7  write business day one.
8    Q    I see.  Okay.  And so these are not
9  like -- these aren't leads that you're calling that
10  you would be able to ask to hold for a fee?
11    A    No.  This is your mother, your brother,
12  your veterinarian, your kids' second grade teacher,
13  your neighbor, et cetera.
14    Q    Okay.  Ms. Colvard, I'm showing you what's
15  was marked as Exhibit 10 from our deposition
16  yesterday.
17    Do you recognize what's on the screen?
18    A    Yes.
19    Q    And can you tell me what it is?
20    A    Text messages between myself and Uli.
21    Q    Okay.  All right.  Ms. Colvard, what's
22  showing on the screen is what you've identified as
23  text message conversations between you and Mr.
24  Cicciarelli and I'm just going to read it into the
25  record.

Kaylee Colvard
August 04, 2022

Page 82

1      What I believe is from him from
2  Mr. Cicciarelli it says "Not a bad first day."
3  That's Mr. Cicciarelli said that; is that correct?
4      A    That is correct.
5      Q    Okay.  And then the green text is what you
6  said?
7      A    Yes.
8      Q    So you wrote "Premium."  And did you
9  remember to close out, question mark."  And this
10  would have been his first day, correct?  The text
11  message, the date on it is Saturday, August 1st; is
12  that correct?
13     A    Yes, that is correct.
14     Q    So he responds "About 350K.  Still have
15  some tricking in.  I'll make sure to remit that when
16  they finish."  And you respond, "Today" with seven
17  question marks behind it.  Why did you have so many
18  question marks after today?
19     A    That was a huge amount of premium.
20     Q    Okay.  So it was -- is it fair to say it
21  was a surprise to you that he had gotten so many
22  policies on the first day his agency was open?
23     A    I'm going to say not policies, but so much
24  premium.
25     Q    Okay.  Why was it a surprise?

Page 83

1      A    Three hundred and fifty thousand is a lot
2  of premium.
3      Q    Is that typical for the first day of an
4  agent, new agent opening?
5      A    No.
6      Q    Is it fair to say it's out of pattern --
7      A    Yes.
8      Q    -- for the first day?
9      A    Yes.
10     Q    Were you aware of the level of quoting
11  activity that Prestige Insurance was undertaking
12  prior to the effective date of August 1, 2020 of the
13  exclusive agency agreement?
14     A    Yes.
15     Q    What was your understanding of what the
16  quoting activity was prior to the first day?
17     A    I know they were doing a lot of quoting
18  but he had 20 plus employees or 20 plus staff
19  working in Gerry's office.  Do I recall the exact
20  numbers?  I don't.
21     Q    Okay.  Is it fair to say that your
22  understanding was that they were under the project
23  100 kind of guidance with the 28 agents they had?
24     A    Yes.  And again, I say project 100 with
25  quotes around it.  It could be 250.  If you had

Page 84

1  someone who was local and had a lot of connections
2  it could be more or less.  Every individual is going
3  to be different.  There could be some staff who
4  they're new to the area and they maybe have a
5  project 10.
6      Q    Was it your understanding that with the
7  exception of binding policies, Mr. Cicciarelli was
8  effectively running his Allstate agency prior to his
9  effective date of his EA Agreement?
10     A    No.  The staff were in Gerry Rivas' office
11  working under Gerry Rivas' agency.
12     Q    Was Mr. Rivas involved in the staff
13  working under his agency?
14     A    Yes.  He had to put them into the Manage
15  My Staff System.  He would have to click the remit
16  button at the end of the day.  If anything had been
17  sold, he would have seen on the daily report that
18  pops up when they would log into -- and I apologize,
19  it's been two years -- the system that shows them
20  everything they did yesterday.  He would see all of
21  the numbers of the quoting activity.  He would have
22  access to all of the quotes that would be there.  He
23  would not have had access to any of that information
24  because it was Gerry's agency, not his, prior to
25  August 1st.

Page 85

1      Q    Prior to August 1st, would Mr. Rivas,
2  since it is his Allstate agency, would he be
3  responsible for supervising and overseeing the
4  activity that goes on in his agency?
5      A    Yes.
6      Q    And would it be consistent with your
7  understanding of the training and binding prior to
8  August 1, 2020 that Mr. Rivas would have been
9  involved with the training aspect of the staff that
10  would later become Mr. Cicciarelli's employees?
11     A    No, he would not have.  That would have
12  been the job of Jarius Hollinger and Mario Castro,
13  the agency process specialists.  And that was common
14  for any agency owner, agency process specialist
15  typically did the training for the producers after
16  they had completed the level one and level two
17  binding authority classes.
18     Q    Okay.  Just so I understand correctly.
19  The training that goes on during the training, the
20  quoting and binding period, when they were the staff
21  that later became Cicciarelli's staff was doing in
22  Mr. Rivas' agency.  It's your understanding that was
23  done under the supervision of Jarius Hollinger and
24  Mario Castro?
25     A    They would have been involved in it, but

Kaylee Colvard
August 04, 2022

Page 86

1  it would have been done under -- the overarching
2  umbrella would have been Gerry Rivas, but the staff
3  would have been working hand in hand with Jarius
4  Hollinger and Mario Castro.
5      Q   I understand.  So Mr. Rivas was ultimately
6  responsible for the activities going on in his
7  agency during that training period; is that correct?
8      A   Yes, that is correct.
9      Q   Okay.  Would you agree with me any
10 policies that were quoted during this training
11 period that the customer wanted to bind immediately
12 would then have gone through Mr. Rivas' agency?
13     A   That is correct.
14     Q   Okay.  They would not have gone to be
15 referred out to the Allstate direct line; is that
16 correct?
17     A   Correct.
18     Q   And that's because the policies quoted
19 under Mr. Rivas' agency, if the customer wanted to
20 bind would have been part of the quoting and binding
21 in Mr. Rivas' agency, correct?
22     A   Correct.  However, if a consumer could
23 call your Allstate agency, then they could the next
24 day call Zane's Allstate agency and they could bind
25 the agency using Zane's agency.  It's whatever the

Page 87

1  consumer requested to bind the policy.  At that
2  point in time is when they bind the policy.
3      Q   Is it correct that if a customer wanted to
4  bind a policy under Mr. Rivas' agency, that
5  Mr. Cicciarelli, the purchasing agency wouldn't
6  receive the credit for that sale under their
7  enhanced compensation plan; is that correct?
8      A   Not technically.  It wouldn't be counted
9  as new business commission, but the premium would
10 have been purchased from the selling agency to the
11 buying agency.  So that premium would have kind of
12 been an aside bucket, but it would not have gotten
13 the ECP payment.  It would have been the 10 percent
14 new business and the 10 percent of the renewals
15 after August 1st.
16     Q   Okay.  This is same exhibit.  Scrolling
17 up.  Can you see the text on your screen?
18     A   Yes, I do.
19     Q   This is a text message conversation, I
20 believe, between you and Uli and Mr. Cicciarelli on
21 Tuesday June 16th; is that correct what we're
22 looking at?
23     A   I'm going to assume in that timetable.
24 There's no date posted, but I'll assume in that
25 general area, yes.

Page 88

1      Q   Okay.  So we're looking at the same thing.
2  I'm looking at the top of the upper left corner.
3      A   Yeah.  Sorry.
4      Q   That's okay.  Now, Mr. Cicciarelli asks,
5  "Can his staff quote as long as they don't bind."
6  And you answer, "No."  What did you mean by that?
7      A   His staff cannot quote under his agent
8  number until August 1st because his agent number is
9  not live and they were not allowed to quote prior to
10 day one under his agent number, which is what I
11 stated in the text message above that.  Remember,
12 your people can't write business under your MMS
13 until you open.
14     Q   Okay.  And then the next -- then he
15 answers, "Well, that stucks."  And then he writes
16 "Is there a way to quote and build a pipeline under
17 Gerry's MMS and bind them on August 1st?  And you
18 answer, "Yup.  We can run a stage profile under
19 Gerry's number and export to Xcel or have SMI IDs
20 and quote IDs to quote and bind on day one."
21     A   Yes, correct.
22     Q   Is it correct that -- my understanding is
23 that you're referring to the project 100 process
24 where they can quote friends and family before they
25 open and then write, is that correct?

Page 89

1      A   That is correct.  They also would receive
2  all of the quotes that have been done in Gerry's
3  agency from day one when Gerry opened.  They're
4  receiving all quotes that had been done that were
5  not closed in Gerry's office but were not sold.
6  They received that full audit that goes over day
7  one.
8      Q   And that's standard, correct, on an
9  agency?
10     A   Yes, that's standard operating procedure.
11     Q   It's standard operating procedure when a
12 new agency opens they receive -- it would be
13 standard to pull up all of the quotes from the
14 purchasing agency and have that information?
15     A   Yes, that is correct.  One of the
16 additional exhibits -- and I apologize.  I don't
17 know which number it is, but an email that Jarius
18 had sent to Uli that showed all of the different
19 audits that were sent over.  Saved quotes, the
20 policy audits, a book of business audits.  Different
21 ways to cross sell.  It might be customers who limit
22 to 250, 500 on bodily injury.  Those would be
23 targets.
24         All of those audits, that is a template
25 that is sent to every single new agent day one with

Kaylee Colvard
August 04, 2022

Page 90

1  the appropriate audit of the agency that they're
2  purchasing.
3      Q    Okay.  Would you agree that if you had an
4  idea of the type of quotes outside of project 100,
5  prospective staff was quoting, for example,
6  purchasing leads, you never would have suggested or
7  implied doing this was okay; is that correct?
8      A    That is correct.
9      Q    Did Mr. Cicciarelli ever disclose to you
10 the level of quoting activity?  For example,
11 purchasing leads that was taking place at his agency
12 prior to the effective date of the EA Agreement?
13     A    No.
14     Q    Do you have or did you have any authority
15 in your role with Allstate during the time period in
16 2020 that we're referring to to modify -- strike
17 that.  Did you have any authority in your role at
18 Allstate to modify or amend written agreements
19 between Allstate and other parties?
20     A    No.
21     Q    Did you have any authority to modify or
22 amend the Pre-appointment Agreement?
23     A    No.
24     Q    And the same thing is true with regards to
25 the R3001 Agreement.  You had no authority to modify

Page 91

1  or amend that agreement either, correct?
2      A    That is correct.
3      Q    And you also had no authority to modify or
4  amend the R3001 exclusive agent independent
5  contractor manual or the supplement for R3001
6  agreement; is that correct?
7      A    That is correct.
8      Q    Okay.  Is it accurate to say that an
9  exclusive agent is responsible for insuring that the
10 quotes for the insurance that the agency issues and
11 the insurance policy that it binds are done in
12 accordance with Allstate rules and guidelines?
13     A    Correct.
14     Q    Is it accurate to say that an exclusive
15 agent is responsible for the actions of the staff he
16 decides to employ in the agency?
17     A    Yes.
18     Q    If a member of an exclusive agent, support
19 staff violates Allstate's guidelines or rules with
20 regard to quoting, writing or binding of insurance,
21 is that the responsibility of the exclusive agent?
22     A    Yes.
23     Q    Did you at any point review whether the
24 Prestige Insurance agency was quoting and binding
25 insurance policies in accordance with Allstate's

Page 92

1  rules and guidelines?
2      A    No.  Sorry.  Let me go back.  That would
3  have been the role of Jarius Hollinger and Mario
4  Castro, the agency process specialists.
5      Q    Okay.  During your time as a field sales
6  manager at Allstate, did you encounter any
7  situations in which an exclusive agent or members of
8  the staff manipulated customer data to sell policies
9  for which a particular customer might not be
10 eligible for?
11     A    Yes.
12     Q    Can you provide some example of some of
13 the situations you encounter?
14     A    I became aware years prior when I was a
15 field sales leader there was an agent who he and his
16 staff were binding personal lines policies as
17 commercial policies because the commercial premium
18 was cheaper than the personal lines premium.  So I
19 was involved in the termination process of that
20 agent.  That agent had operated under another field
21 sales leader and I had acquired them and so I was
22 not involved in the investigation because those
23 actually took place when they were not within my
24 market place.
25     Q    Okay.  And so is it correct to say that if

Page 93

1  an agent were to sell a personal lines policy where
2  it should have been a commercial policy, that would
3  be grounds for termination?
4      A    Yes.
5      Q    Okay.
6      A    Let me restate that.  I don't know what
7  the rules are.  If it is a training situation or a
8  training issue versus if it's a once or twice
9  episode.  I don't know what corporate does behind
10 the scenes.  I know in this case it wasn't a once or
11 twice situation.  I believe there were hundreds of
12 policies.
13     Q    Okay.  Would it be a violation -- is it
14 fair to say it's a violation of Allstate policy to
15 write personal auto insurance for a commercial
16 policy?
17     A    Yes.
18     Q    Would you also agree with me that it would
19 be a violation of an Allstate policy to manipulate
20 customer data to get a better rate to more qualify
21 an individual for insurance they might not be
22 eligible for?
23     A    Absolutely.  Yes.
24     Q    Okay.  Did you ever encounter any
25 situations in which an agency classified married

Kaylee Colvard
August 04, 2022

Page 94

1  persons as single in order to sell policies for
2  which the couple would not be qualified for if they
3  were treated as married?
4      A    Possibly.  Do I remember?  Absolutely, no.
5  I can say that there was an agent I was involved in
6  their investigation that a staff was manipulating
7  the homeownership discount saying that people were
8  homeowners which gave them a discount and they
9  technically were not homeowners.  At that point in
10 time the staff were terminated, but the agent was
11 not terminated.
12     Q    Okay.  Did Mr. Cicciarelli ever tell you
13 that members of his staff were engaged in any
14 activity that, for example, classifying married
15 persons as single?
16     A    No.
17     Q    For example, did he ever come to you with
18 any concerns that his staff was engaged in any
19 activity of falsifying policies?
20     A    No.
21     Q    Ms. Colvard, can you see what's -- sorry.
22 Ms. Colvard, we put on the screen as Exhibit 11
23 what's been marked as Exhibit 11 from our prior
24 deposition.  Can you see it?
25     A    Yes.

Page 95

1      MS. HEISE:  Can you see it as well, Zane?
2      MR. THOMPSON:  Yes.
3  BY MS. HEISE:
4      Q    Ms. Colvard, have you ever seen this email
5  before?
6      A    No, I have not.  Not that I recall.
7      Q    Okay.  It's an email that was sent from a
8  customer named Steven Cobb to what I understand to
9  be Mr. Cicciarelli's email address with Allstate.
10 And I'm just going to read the first part of the
11 email to you.  It says "Regarding the fraudulent
12 account that one of your reps opened for me without
13 my permission and opened for me without my
14 knowledge."  And then the email goes on, but are you
15 aware of the circumstances that are described in
16 this email?
17     A    No.
18     Q    Have you ever discussed Mr. Cobb's
19 complaint with Mr. Cicciarelli?
20     A    No.  Not that I recall.
21     Q    In your capacity as a field sales leader,
22 what would you expect the agency to do when it
23 receives a customer complaint accusing an agency of
24 fraud?
25     A    The agency owner should address.  They

Page 96

1  should -- what I would have advised is, first of
2  all, pull up the quoting activity, pull up any
3  documentation that was listed as the agent.  Have a
4  one-on-one conversation with the producer that
5  closed this policy and then I would have sent this
6  directly to one of the Allstate's internal teams
7  that helps customers complaints.
8      Q    Do you know whether Mr. Cicciarelli did
9  any of those things?
10     A    I don't know.
11     Q    Did he report this situation to you?
12     A    No, not that I recall.
13     Q    Would it also be -- is it fair to say that
14 if an EA received a complaint like this that they
15 should report it to Allstate?
16     A    Yes.
17     Q    And just to clarify.  Did you report any
18 other situations involving customer complaints
19 against the Prestige Insurance agency?
20     A    Not that I recall.
21     MS. HEISE:  Can we just take a quick
22 five-minute break.  I'm nearly done.  I just
23 need five minutes.
24     (Off the record.)
25

Page 97

1  BY MS. HEISE:
2      Q    Ms. Colvard, when was the last time you
3  were in touch with Mr. Cicciarelli before today?
4      A    Maybe a couple of weeks ago.  I'd have to
5  look at my phone to confirm.
6      Q    Do you recall what you discussed the last
7  time you spoke with him?
8      A    We talked about how we were both doing.
9  How our lives were going.  He told me that I was
10 going to end up being subpoenaed at some point in
11 time.  That he had a lawsuit that I was going to be
12 listed on.  That was really the extent.
13     Q    Was that over the phone or text messages?
14     A    Probable both.
15     Q    Do you still have those text messages?
16     A    I can check.  One moment.  Yes.
17     Q    All right.  Did you ever speak with his
18 counsel --
19     A    Yes.
20     Q    -- aside from the deposition today?
21     A    Yes.
22     Q    Okay.  How many times did you speak with
23 his counsel?
24     A    Maybe three times.  They called to let me
25 know I was going to receive a subpoena.  They wanted

Kaylee Colvard
August 04, 2022

Page 98

1  to confirm my contact information.  They called --
2  they might have called twice about deposition dates
3  and what dates would work and then we had -- they
4  called back to rechange dates.  And then I reached
5  out regarding how to send some of the documents they
6  requested in the subpoena.
7       Q    Is there anything else discussed during
8  those calls?
9       A    No.  I take that back.  I did ask -- I've
10  never been subpoenaed before.  I never had a
11  deposition before so I did ask some questions about
12  what does this process look like.
13       Q    Was there any discussion about questions
14  you might be asked or what kind of responses or
15  anything like that?
16       A    No.  I asked what type of information are
17  you looking for and they said anything that would
18  have been between you and Uli or anything regarding
19  the purchase of Gerry's agency to Uli.
20       Q    Okay.  And did you give them the text that
21  we just spoke about from a couple of weeks ago?
22       A    No, because this was after I had spoken
23  with the attorney.
24       Q    Is it fair to say that everything before
25  that time you spoke with the attorney between you

Page 99

1  and Mr. Cicciarelli you handed over to them?
2       A    No.  Because it was personal -- nothing
3  regarding anything.  Talking about how I was -- I
4  had canceled trips because of Covid.  I'm traveling
5  here and there, you know.  Those kinds of messages.
6  He had said -- you know, there are some text
7  messages my attorney is going to be reaching out to
8  you.  I had, at one point in time asked I got a
9  voice mail, but I couldn't hear the voice mail.  It
10  didn't come through.  Is this the possible phone
11  number.  How are you?  Let's catch up.  It's been a
12  while.  Those kind of text messages.
13       A    Nothing or anything uncommon with the
14  agents that I worked with and I supported.
15       Q    Do you recall the name of the lawyer you
16  spoke with?
17       A    Zane Thompson and then his assistant -- I
18  believe it was Jessica.  I believe.
19            MR. THOMPSON:  Mr. Rentner, R-E-N-T-N-E-R.
20            THE WITNESS:  Thanks.  Sorry, Zane.
21            MR. THOMPSON:  Not a problem.
22  BY MS. HEISE:
23       Q    And how long would you say each
24  conversation lasted?
25       A    Five minutes maybe.  Not long.

Page 100

1       Q    That was all over the phone; is that
2  correct?
3       A    Yes.
4            MS. HEISE:  I don't have any further
5       questions at this point.
6            MR. THOMPSON:  I just have a brief
7       follow-up, Ms. Colvard.
8            THE WITNESS:  Okay.
9            REDIRECT EXAMINATION
10  BY MR. THOMPSON:
11       Q    I know there was some testimony about
12  project 100 training.
13       A    Yes.
14       Q    Did Uli participate in the project 100
15  training?
16       A    He did not.  Uli was opted out of a large
17  majority of the quoted training since he had been a
18  producer in an agency.  This was a common practice.
19  Any time we had someone who was already working as
20  an Allstate agent, they didn't need to be retrained
21  on how to write an auto policy since they had
22  already been writing auto policies.
23            So, for example, if I look at -- just
24  looking at the email that I had sent out that shows
25  the production reports, Ryan Barsbec had worked in

Page 101

1  an agency who opted out of training.  Alyssa Delgado
2  was opted out of training.  Franco Diago was opted
3  out of training.  Oscar -- no.  Jesse Gomez was
4  opted out of training.  When I say opted out of
5  training, they still went to the beginning part of
6  the training.  They would go to corporate training.
7  They got the Run Your Business training, but
8  anything regarding how to quote, there was a test
9  that those producers were able to take regarding
10  doing a quote and as long as they scored X percent,
11  then they were able to be opted out of training.
12  And that opt out was granted by the regional sales
13  leader, Jim Eschelbach.
14       Q    While working with Uli, was he proactive
15  in assuring that he was -- that his agency was
16  following Allstate's policies?
17       A    Yes.
18            MS. HEISE:  Object to form.
19            THE WITNESS:  We spoke multiple times
20  about making sure everything was compliant.  He
21  initiated those conversations.  I told him when
22  he started, based on the staff he was putting
23  up and especially the new business that he was putting
24  up, I told him, I said, you need to make sure
25  that we are double checking everything,

Kaylee Colvard
August 04, 2022

Page 102

1    crossing every I and dotting every T.
2    Corporate is going to look into you because
3    those numbers are not common for an agency.
4  BY MR. THOMPSON:
5    Q    Okay.  And I just want to briefly share my
6  screen.  This is not an exhibit.  I will attach it
7  after so I'll make this -- I believe we're now on
8  19.  I'll mark this Exhibit 19.
9         (Whereupon, document was marked as Exhibit 19 for
10  identification.)
11  BY MR. THOMPSON:
12   Q    Do you see this email, Ms. Colvard, from
13  Mr. Cicciarelli to you?
14   A    Yes, I do.
15   Q    If you could just please summarize this
16  email?
17   A    It is Uli reaching out to myself and
18  copying our agency process specialists, Jarius
19  wanting to make sure that everything is compliant
20  within his agency.  And he's not missing anything on
21  the prebind process.  He's expressing an approval
22  that he's doing everything the right way.
23   Q    And was Jarius Hollinger cc'd on this
24  email as well?
25   A    Yes, he was.

Page 103

1    Q    In this email does he reference how Jarius
2  Hollinger reviewed his policies and everything
3  looked okay?
4    A    Yes, he does.
5         MR. THOMPSON:  I have no further
6  questions.
7         THE WITNESS:  Can I jump back in and
8  clarify something?
9         MR. THOMPSON:  Sure.
10        THE WITNESS:  Kate, the email that you
11  shared from that customer, it says could Uli
12  have -- I've been racking my brain since we
13  took our five minutes.  I truly, when I say I
14  don't recall, I don't recall.  I consistently
15  got emails like that from my team and so we
16  would go through the process, so, I just want
17  to be very clear.  He might have shared that
18  with me, I just truly don't recall.  A lot of
19  times we would get emails like that from a
20  spouse and maybe the other spouse found the
21  policy and didn't tell the other spouse.  So it
22  wasn't anything uncommon, but yeah, any time
23  there was some type of complaint like that we
24  go through the process so I want to be very
25  clear.  I just don't recall that particular

Page 104

1    customer/client individual situation.
2         MS. HEISE:  I just have one follow-up
3    question.
4  BY MS. HEISE:
5    Q    The Jarius Hollinger email that
6  Mr. Thompson just referenced with discussing the
7  review of his policies, that was done by
8  Mr. Hollinger and not by you, correct?
9    A    That is correct.
10   Q    Were you involved with that review at all?
11   A    No.  The agency process specialist's role
12  is to work in the agencies, so, really working on
13  the actual quoting, the policies, the dollars, the
14  premiums, the discounts.  My job just like the
15  agency owner is to work on the agency.  So, you
16  know, making sure everything is running effectively.
17  Again, we're working on our business plan.  We've
18  got a plan in place.  We're working on our cash flow
19  making sure that everything is lining up as that
20  agency owner sees fit for their business.
21        MS. HEISE:  Okay.  No further questions on
22   our end.
23        MR. THOMPSON:  Ms. Colvard, thank you.
24        THE WITNESS:  Thank you.
25        MS. HEISE:  I'll order.

Page 105

1         MR. THOMPSON:  I'll take a copy.
2         (Deposition concluded at 12:22 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Kaylee Colvard
August 04, 2022

Page 106

```
1
2                   CERTIFICATE OF OATH
3
4    STATE OF FLORIDA
5    COUNTY OF LEE
6           I, Danielle Ahren, Court Reporter and Notary
7    Public, State of Florida, certify that Kaylee Colvard
8    personally appeared before me on the 4th day of August,
9    2022, and was duly sworn.
10          Signed this 17th day of August, 2022.
11
12
13          DANIELLE AHREN,
            Notary Public, State of Florida
14          Commission No: GG 342881
            Commission Expires: July 28, 2023
15
16
17
18
19
20
21
22
23
24
25
```

Page 107

```
1
2                  CERTIFICATE OF REPORTER
3
4    STATE OF FLORIDA
5    COUNTY OF LEE
6           I, Danielle Ahren, Court Reporter and Notary
7    Public, certify that I was authorized to and did
8    stenographically report the deposition of KAYLEE COLVARD
9    pages 1 through 104 that a review of the transcript was not
10   requested; and that the transcript is a true record of my
11   stenographic notes.
12          I further certify that I am not a relative,
13   employee, attorney, or counsel of any of the parties, nor am
14   I a relative or employee of any of the parties' attorneys or
15   counsel connected with the action, nor am I financially
16   interested in the action.
17          Dated this 17th day of August, 2022.
18
19
20          DANIELLE AHREN, Notary Public
21
22
23
24
25
```