# PLAINTIFFS' EXHIBIT 3

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

**PRESTIGE INSURANCE GROUP, LLC,**
a Delaware limited liability company, and
**ULISES CICCIARELLI, individually,**

      **Plaintiffs,**

                                        **Case No.: 0:21-cv-60515-FAM**
                                        **Hon. Federico A. Moreno**

**vs.**

**ALLSTATE INSURANCE COMPANY,**
an Illinois corporation,

      **Defendant.**

### FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Prestige Insurance Group, LLC, a Delaware limited liability company ("Prestige"), and Ulises Cicciarelli ("Cicciarelli"), individually, (Prestige and Cicciarelli are collectively referred to as "Plaintiffs") state as follows for their First Amended Complaint against Allstate Insurance Company ("Allstate"):

1.      Prestige is a Delaware limited liability company authorized to do business in Florida, with its principal place of business located in Tamarac, Broward County, Florida.

2.      Cicciarelli is an individual who is domiciled in Florida.

3.      Cicciarelli is the sole owner of Prestige.

4.      Allstate is an Illinois corporation with principal place of business in Illinois which does business throughout the State of Florida.

5.      This Court's jurisdiction in this matter arises under 28 U.S.C. § 1332(a)(1) and 28 U.S.C. § 2201 and damages exceed $75,000.00.

6.      Venue is proper under 28 U.S.C. § 1391(a)(l) and (2).

7. Cicciarelli has held professional licenses with the State of Florida since 2006 when he was employed as a real estate broker associate with Florida Realty of Miami.

8. In that capacity, he interacted regularly with buyers and sellers on their real estate transactions including contract negotiations, coordination of closing processes and post-purchase support; worked closely with attorneys, title companies, lenders and property management companies, in an effort to facilitate the closing process; and had extensive experience with short sales and foreclosures in the Miami Dade and Broward County Florida areas.

9. In 2010, Cicciarelli, became President/ Broker of Prestige Real Estate Services Inc. where he oversaw brokerage operations for a real estate brokerage which he owned.

10. Cicciarelli also held a mortgage brokers license.

11. In those 14 years of Florida professional licensure, Cicciarelli never had any complaint or even a formal investigation instituted against him.

12. In March 2019, Cicciarelli began working with Allstate as a Producer in order to learn the insurance business and ultimately become an Agency Owner.

13. In April 2020, Cicciarelli was approached by an Allstate Field Sales Leader ("FSL"), Kaylee Colvard, to become an insurance agent for Allstate.

14. Cicciarelli had many discussions with Allstate employees, representatives and agents, who made representations regarding the benefits of becoming an Allstate agent.

15. These representations and inducements resulted in Cicciarelli executing an Agent Pre-Appointment Agreement For Allstate Exclusive Agency Program in March of 2020 and ultimately, as described below, agency agreements.

16. Part of the material inducements made to Cicciarelli by Allstate was an Enhanced Compensation Plan "designed to provide additional compensation that rewards new agency

owners for profitable growth and helps them deliver on the customer value proposition through the trusted advisor model."

17.     The Enhanced Compensation Plan was delivered to Cicciarelli by FSL Kaylee Colvard via the Allstate Exclusive Agent Opportunity Tool ("EAOT"), which projects future commissions and bonuses. See **Exhibit A**.

18.     Subsequently, Cicciarelli was guided through the process of becoming an Allstate agent by numerous individuals representing Allstate's interests including Kaylee Colvard and Char Jordan, Territory Sales Leader ("TSL").

19.     In or around April of 2020, Cicciarelli made application to Allstate for an exclusive agency agreement.

20.     Allstate assigned Cicciarelli an FSL in order to guide Cicciarelli through the application process, provide Cicciarelli with information about Allstate and its operations and provide Cicciarelli with substantive information to include in his application.

21.     Allstate put the FSL in a position of trust to Cicciarelli.

22.     Allstate put the FSL in a position to disclose information to Cicciarelli regarding the operations of Allstate.

23.     In particular, Allstate's FSL provided financial information to Cicciarelli to utilize as projections for Cicciarelli's business plan which was required for the application and would ultimately be provided to Allstate.

24.     Cicciarelli drafted a business plan and provided it to Allstate's FSL for review and comment.

25. Allstate's FSL provided Cicciarelli with significant advice, significant revisions to the business plan and ultimately with all of the financial information to be used by Cicciarelli in his business plan.

26. Because of Cicciarelli's trust in the FSL, Cicciarelli relied upon the FSL's guidance and advice in all stages of the application process.

27. In trust and confidence, Cicciarelli accepted all of the FSL's advice and recommendations and ultimately submitted the business plan as revised by the FSL to Allstate for approval.

28. Cicciarelli made representations in the application with the advice, assistance and encouragement of those acting on behalf of Allstate which, unbeknownst to Cicciarelli, would form the basis of his subsequent termination by Allstate.

29. Cicciarelli and Prestige were in regular communication with Allstate from the time of application through the execution of the agency agreements discussed below and subsequently regarding all aspects of Cicciarelli and Prestige's operations.

30. On July 23, 2020, Cicciarelli executed Allstate's R3001S Exclusive Agency Agreement ("R3001S") in his individual capacity. See **Exhibit B**.

31. On July 27, 2020, Stephen Gilbert, on behalf of Allstate, countersigned the R3001S.

32. The R3001S purports to govern the independent contractor relationship between Allstate and Cicciarelli.

33. On August 3, 2020, Prestige executed Allstate's R3001C Exclusive Agency Agreement ("R3001C") in its corporate capacity. See **Exhibit C**.

34. Both the R3001S and the R3001C purport to incorporate several supplements as part of the terms of the agreements including the Supplement for the R3001 Agreement

("Supplement"), Exclusive Agency Independent Contractor Manual ("EA Manual") and the Allstate Agency Standards ("Agency Standards").

35.     From the commencement of operations, Cicciarelli and Prestige, by all objective calculations, was the most successful Allstate agent in the country.

36.     These efforts earned substantial profit for Allstate and, under the terms of the agreements, were to result in Cicciarelli and Prestige earning commensurate commissions for the same.

37.     Unbeknownst to Cicciarelli and Prestige, during and after their onboarding process and concealed by Allstate, Allstate was developing internal policies and procedures intended to reduce the commissions and bonuses paid to agents regardless of contractual obligations, and to increase the profits kept by Allstate on premiums.

38.     Among other initiatives, which were not disclosed to Cicciarelli and Prestige, Allstate began a "Direct Channel Pricing" initiative prior to contracting with Cicciarelli and Prestige.

39.     Allstate also did not disclose to Cicciarelli and Prestige that, in approximately June of 2020, Allstate introduced a "channel of bind" in the District of Columbia and upon information and belief, intended to do so elsewhere.

40.     Allstate further did not disclose that it intended to undercut Cicciarelli and Prestige on pricing of insurance policies ("Policies") by offering Policies at an approximate 7 percent discount to agents' pricing through direct sales.

41.     Through this direct sales initiative, which Allstate failed to disclose to Cicciarelli and Prestige, customers bound through Allstate approved websites and mobile applications or an Allstate call center would receive lower cost Policies.

42.     Allstate failed to disclose to Cicciarelli and Prestige that it intended to be essentially a direct competitor to Cicciarelli and Prestige for sales of Policies.

43.     Aside from this initiative, upon information and belief, Allstate intended to reduce commissions and bonuses paid to its contracted agents including Cicciarelli and Prestige, by contrived default of their agency agreements.

44.     Although Cicciarelli and Prestige constantly and proactively communicated with Allstate regarding its operations, Allstate took notice of the immediate substantial success of Cicciarelli and Prestige.

45.     Allstate determined that Plaintiffs' success, while benefiting Allstate's profits, would require substantial commissions and bonuses to be paid to Plaintiffs under the terms of their compensation structure as set forth in the agreements with Plaintiffs, including the Enhanced Compensation Plan.

46.     In order to ascertain some inconsequential basis to terminate the agreements with Plaintiffs, Allstate began an "investigation" to determine the veracity of representations made by Plaintiffs in their application.

47.     Allstate contemporaneously began a simultaneous investigation regarding the Policies written by Plaintiffs' employees and agents.

48.     After refusing to grant a reasonable extension of interviews demanded by Allstate for its "investigation", Allstate conducted interviews of Plaintiffs and their employees on October 12, 2020, to achieve a result which Allstate had already pre-determined.

49.     During fully cooperative interviews of Prianca Little, Meileik Williams, Glen Hunter, Jose Rijos and Cicciarelli, Allstate was provided full explanations and documentation of all relevant information regarding the alleged basis for the "investigation".

50.     Plaintiffs and their employees fully complied and participated in Allstate's sham investigation providing details, e-mails and text messages of all relevant communications and even provided further information subsequent to the interviews, which substantiated the Policies were written to Allstate's standards.

51.     The information provided by Plaintiffs and corroborated by Allstate's own employees demonstrated that, with respect to representations made by Plaintiffs in their application, Allstate was fully aware of and assented to modifications and authorized amendments to Plaintiffs' intended operations prior to the time Plaintiffs began business on or around August 1, 2020 as was common practice with Allstate.

52.     Further, with respect to Policies written by Plaintiffs' employees, Allstate was fully aware of circumstances that false or misleading information was provided by certain customers to Plaintiffs' employees which is commonplace in the insurance industry.

53.     Certain customers also provided information to Allstate subsequent to issuance of Policies which contradicted information they previously provided to Plaintiffs' employees.

54.     Even assuming Plaintiffs' employees issued Policies outside of Allstate's guidelines, Cicciarelli had no knowledge of such issuance and was not afforded any opportunity by Allstate to take any corrective actions regarding such alleged practices.

55.     Furthermore, Cicciarelli proactively sought assistance to ensure Allstate compliance.

56.     In particular, an Allstate agency process specialist who began assisting Cicciarelli because no compliance training was offered by Allstate until at least 45 days after Plaintiffs began business found no issues with any of the Policies that Prestige wrote.

57.     Indeed, from the date it began its "investigation" through November 13, 2020, Allstate allowed Plaintiffs to continue to pay overhead costs for operations while Allstate continued to profit by collecting premiums for customers who bound coverage because of Plaintiffs' efforts.

58.     On November 13, 2020, Allstate terminated the R3001C Agreement with Prestige. See **Exhibit D** ("Termination Letter").

59.     In a less than personalized letter, Plaintiffs were advised that:

"This letter is notice that Allstate Insurance Company is terminating the Allstate R3001C Exclusive Agency Agreement ("Agreement") with [INSERT AGENCY NAME], ("Agency") effective immediately."

60.     The Termination Letter purported that it was sent pursuant to Section XVII.B.3 of the R3001C Agreement and alleged that:

"Allstate is taking this action for reasons that include providing false information to the company and failing to issue policies according to Allstate guidelines."

61.     Section XVII.B.3 of the R3001C Agreement provides that "This Agreement may be terminated . . . by Company, with cause, immediately upon providing written notice to Agency. Cause may include, but is not limited to, breach of this Agreement, fraud, forgery, misrepresentation or conviction of a crime. The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination."

62.     In correspondence dated November 17, 2020, Allstate published a letter to the Florida Office of Insurance Regulation communicating that Cicciarelli had been terminated for cause for providing false information to the company and failing to issue Policies according to Allstate guidelines.

63.     That November 17, 2020, correspondence was known to be false by Allstate at the time it was sent.

64. That November 17, 2020, correspondence offered to provide the Florida Office of Insurance Regulation "supporting documentation."

65. Plaintiffs subsequently requested and were refused the supporting documentation or any additional information regarding the termination. In correspondence dated December 14, 2020, Allstate stated: "We will not provide you with any of the internal investigation material that you requested."

66. Allstate further communicated in the December 14, 2020, correspondence, that despite profiting from Plaintiffs' performance under the Agreements both before and after the commencement of the "investigation", it would not pay any bonus commissions to Plaintiffs earned from the inception of the relationship on August 1, 2020:

> "The Supplement for the R3001 Agreement, which Mr. Cicciarelli had access to, outlines any bonus commission guidelines. The supplement states that if the Company has terminated the R3001 Agreement immediately for cause, an Agent shall not be eligible for bonus compensation starting with the year in which the incident occurred that led to the termination through the year in which the Company has terminated the R3001 Agreement immediately for cause. Therefore, Mr. Circciarelli [sic] is not eligible for any bonus compensation for 2020."

67. The Agreements and the Supplement afforded Allstate substantial discretion to determine the existence of a possible ground for termination with cause and withhold commissions earned.

68. There was no valid basis for Allstate to terminate the Agreements for cause and to withhold payment of bonuses earned in 2020 under the Enhanced Compensation Plan.

69. Plaintiffs did not provide false information to Allstate as it was in constant communication regarding all aspects of its business operations and Allstate assented to all changes to Plaintiffs' proposed operations.

70.   Allstate leadership was immediately aware of all aspects of Plaintiffs' business model as it meets weekly to discuss staffing levels and quoting volume in the region which are monitored and compiled in daily and weekly reports.

71.   These communications, at a minimum, constituted amendments to any information provided by Plaintiffs to Allstate.

72.   Plaintiffs did not fail to issue Policies according to Allstate's guidelines.

73.   Moreover, to the extent that any particular policy was incorrect or issued improperly, Allstate selectively enforced its "guidelines" against Plaintiffs for the purpose of avoiding the payment of significant commissions to Plaintiffs.

74.   Subsequent to sending the Termination Letter, Allstate has otherwise acted in bad faith and breached its obligations to Plaintiffs.

75.   The Termination Letter and the Supplement provided that if Plaintiffs elected to sell their economic interest in their book of business, Allstate has the right of approval of the buyer.

76.   However, Allstate imposed an arbitrary and capricious March 1, 2021 transfer deadline which it knew was an impossibility for Plaintiffs to meet.

77.   Further, Allstate never advised Cicciarelli that there was a deadline to submit any documentation to Allstate for a proposed sale.

78.   On February 3, 2021, when Cicciarelli contacted Allstate's assigned representative, Maria Reuthers, to discuss the sale of Plaintiffs' book to a potential buyer, he was advised that he could no longer transfer his interest because the submission deadline had passed.

79.   Allstate had never previously advised of any such deadline.

80.   Additionally, Allstate delayed sending Plaintiffs reports that were needed to sell the interest, further making it impossible for any transfer to have occurred.

81.     Moreover, Allstate's actions are consistent with an intent that it will not process any termination payment to Plaintiffs as required by the Agreements and Supplement.

82.     The Termination Letter forewarned that "the termination payment is conditioned upon, for example, compliance with the confidentiality and non-solicitation provisions that survive the termination of the Agreement and the immediate return of all Allstate property."

83.     Indeed, on February 8, 2021, Allstate sent another letter to Plaintiffs falsely alleging that Plaintiffs "misappropriated Allstate confidential and proprietary information, including customer names and contact information."

84.     Plaintiffs immediately responded through counsel, denying the allegations and requesting that Allstate provide:

a.  Any information to help identify the specific confidential and proprietary information Allstate believes was misappropriated;

b.  Specific names and authors of the documents involved and the dates they were created, the format of the documents, the number of customers listed on such documents, and how Allstate first generated this customer list; and

c.  Specific dates on which Allstate believed Cicciarelli gained access, how Allstate believed he gained access, and the specific actions Allstate believed constituted misuse and the dates such actions occurred.

85.     Allstate refused to provide any such information.

86.     The allegations in Allstate's February 8, 2021, correspondence were contrived by Allstate to avoid approving any transfer of Plaintiffs' interests or paying Plaintiffs any termination payment.

87.     Allstate's actions against Plaintiffs are not isolated actions as the National Association of Professional Allstate Agents, Inc., has raised similar claims in litigation originally filed in the United States District Court for the Northern District of Illinois and later refiled in Cook County, Illinois on August 6, 2021.

## COUNT I

## BREACH OF CONTRACT

88.     Plaintiffs reincorporate paragraphs 1-87 of the First Amended Complaint as if restated herein.

89.     Valid agreements exist between Plaintiffs and Allstate.

90.     Plaintiffs complied with all provisions of their agreements.

91.     Allstate was advised of and assented to any modifications to Plaintiffs' application and their agreements with Allstate.

92.     Allstate is in breach of those agreements by, among other things, falsely alleging a contrived reason for termination with cause.

93.     Allstate's purpose in alleging a basis for a termination with cause is to avoid paying Plaintiffs commissions and bonuses due under the agreements and the Enhanced Compensation Plan.

94.     Allstate is also in breach of their agreements by failing to provide sufficient time for Plaintiffs to transfer their interest.

95.     Allstate is also in breach of their agreements by failing to pay the termination payment due to Plaintiffs.

96.     Plaintiffs were damaged by Allstate's breach.

## COUNT II

## FRAUDULENT CONCEALMENT

97.     Plaintiffs incorporate paragraphs 1-87 of the First Amended Complaint as if restated herein.

98.     Allstate's assignment of an FSL to Cicciarelli removed any existence of an arm's length transaction and put Allstate in a position of trust and confidence to Cicciarelli as set forth in paragraphs 20-29 of the First Amended Complaint.

99.     Allstate undertook to disclose facts regarding Allstate and its operations and thereby was obligated to disclose all facts about Allstate.

100.    As a result, Allstate had a duty to disclose the material facts that:

a.   Allstate was developing internal policies and procedures intended to reduce the commissions and bonuses paid to agents regardless of contractual obligations, and to increase the profits kept by Allstate on premiums;

b.   Allstate began a "Direct Channel Pricing" initiative prior to contracting with Cicciarelli and Prestige;

c.   Allstate introduced a "channel of bind" in the District of Columbia and upon information and belief, intended to do so elsewhere in order to undercut agents;

d.   Allstate intended to undercut Cicciarelli and Prestige on pricing of Policies by offering Policies at an approximate 7 percent discount to agents' pricing through direct sales;

e.   Through this direct sales initiative, customers bound through Allstate approved websites and mobile applications or an Allstate call center would receive lower cost Policies;

f.   Allstate intended to compete with Cicciarelli and Prestige for sales of Policies; and

g.   Allstate intended to reduce commissions and bonuses paid to its contracted agents including Cicciarelli and Prestige, by contrived default of their agency agreements.

101.   Allstate had exclusive and/or far superior knowledge and access to the facts than Cicciarelli and Prestige.

102.   Allstate knew or should have known that the facts above should have been disclosed.

103.   Allstate intentionally concealed these facts from Cicciarelli and Prestige.

104.   Allstate knew that its concealment or nondisclosure would induce Plaintiffs to act and its assignment of an FSL to work was intended to induce Plaintiffs to act.

105.   Plaintiffs detrimentally relied on the misinformation by expending significant costs to start their business operations and to enter into the Agreements.

106.   As a result, Plaintiffs have suffered and will continue to suffer injury.

## COUNT III

## BREACH OF IMPLIED DUTY OF GOOD FAITH

107.   Plaintiffs incorporate paragraphs 1-87 of the First Amended Complaint as if restated herein.

108.   There exists within the Agreements between Allstate and Plaintiffs an implied covenant of good faith and fair dealing.

109.   The terms of the Agreements afforded Allstate substantial discretion to promote its own self-interest.

110.   Because Allstate has broad discretion in terminating its Agreements, its discretion must be exercised with good faith and fair dealing.

111.    Plaintiffs reasonably expected that under the Agreements, Allstate would not terminate the Agreements for arbitrary and capricious reasons, or for minor infractions that are corrected and that are common under the ordinary course of dealing.

112.    Plaintiffs had reasonable and justifiable expectations in light of their express Agreements with Allstate.

113.    Allstate was obligated to not do anything that would injure the right of the Plaintiffs to receive the benefits of their contracts.

114.    Allstate was limited in its ability to negatively impact the value of the Agreements to the Plaintiffs.

115.    Even if Allstate did not breach the terms of the Agreements in a technical sense, its conduct nevertheless deprived Plaintiffs of the benefit of their bargain.

116.    Allstate pursued its own self-interest instead of engaging in cooperative behavior by deferring to Plaintiffs' contractual interests.

117.    Allstate acted consciously, deliberately and capriciously to contravene the reasonable contractual expectations of Plaintiffs.

118.    Allstate unfairly frustrated the agreed common purpose of the Agreements and the reasonable expectations of Plaintiffs thereby depriving them of the benefits of the Agreements.

119.    Plaintiffs suffered damages as a result.

## COUNT IV

## VIOLATION OF FLORIDA FRANCHISE ACT

120.    Plaintiffs incorporate paragraphs 1-87 of the First Amended Complaint as if restated herein.

121.    Plaintiffs and Allstate had a commercial relationship of definite duration or continuing indefinite duration.

122.    Plaintiffs were granted the right to offer, sell, and distribute services organized and directed by Allstate.

123.    Plaintiffs' independent business constitutes a component of Allstate's distribution system.

124.    The operation of Plaintiffs' business is substantially reliant on Allstate.

125.    Plaintiffs are "franchisees" under the Florida Franchise Act (the "Act"), Fla. Stat. Ann. 817.416, who were granted the right to sell Allstate insurance products pursuant to Allstate's standards and requirements.

126.    Allstate's assignment of an FSL to Cicciarelli removed any existence of an arm's length transaction and put Allstate in a position of trust and confidence to Cicciarelli as set forth in paragraphs 20-29 of the First Amended Complaint.

127.    Allstate intentionally concealed the prospects or chances for success of Plaintiffs' proposed agency.

128.    Allstate concealed that:

a.    Allstate was developing internal policies and procedures intended to reduce the commissions and bonuses paid to agents regardless of contractual obligations, and to increase the profits kept by Allstate on premiums;

b.    Allstate began a "Direct Channel Pricing" initiative prior to contracting with Cicciarelli and Prestige;

c.    Allstate introduced a "channel of bind" in the District of Columbia and upon information and belief, intended to do so elsewhere in order to undercut agents;

d.  Allstate intended to undercut Cicciarelli and Prestige on pricing of Policies by offering Policies at an approximate 7 percent discount to agents' pricing through direct sales;

e.  Through this direct sales initiative, customers bound through Allstate approved websites and mobile applications or an Allstate call center would receive lower cost Policies;

f.  Allstate intended to compete with Cicciarelli and Prestige for sales of Policies; and

g.  Allstate intended to reduce commissions and bonuses paid to its contracted agents including Cicciarelli and Prestige, by contrived default of their agency agreements.

129.  Allstate's actions as set forth in the preceding paragraph have reduced Plaintiffs' ability to sell their book of business for fair value, if at all, in violation of the Act.

130.  Allstate's failures to disclose are violations of the Act.

131.  Plaintiffs suffered damages as a result of Allstate's actions and omissions.

## COUNT V

## DEFAMATION

132.  Cicciarelli incorporates paragraphs 1-87 of the First Amended Complaint as if restated herein.

133.  Allstate's correspondence to the Florida Office of Insurance Regulation was a publication. See **Exhibit E.**

134.  The statements that Cicciarelli provided false information to Allstate and failed to issue Policies according to Allstate guidelines were false.

135.  The totality of Allstate's contrived investigation and determination of non-compliance was a sham.

136.     Cicciarelli was in full communication with Allstate and in complete compliance with Allstate's internal policies, never provided false information to the company, and did not fail to issue Policies according to Allstate guidelines.

137.     Allstate's actions evidence express malice against Cicciarelli.

138.     Allstate acted with ill-will, hostility, and an evil intent to defame and injure Cicciarelli as to the falsity of these matters in the letter to the Florida Office of Insurance Regulation which were defamatory.

139.     Allstate acted with knowledge or reckless disregard as to the falsity of these matters in the letter to the Florida Office of Insurance Regulation which were defamatory.

140.     Cicciarelli has suffered and will suffer damages as a result.

## COUNT VI

## DECLARATORY RELIEF

141.     Plaintiffs incorporate paragraphs 1-87 of the First Amended Complaint as if restated herein.

142.     The agreements between the parties purport to impose various covenants upon Plaintiffs subsequent to termination of the R3001C Agreement, including non-competition agreements.

143.     As a result of the breaches of the agreements by Allstate and its otherwise inequitable and bad faith conduct, Plaintiffs should be relieved of all post-termination obligations to Allstate.

WHEREFORE, Plaintiffs request this Court to:

a.      Award Plaintiffs all damages to which they are entitled including costs, interests and attorney fees;

    b.       Declare that all post-termination obligations of Plaintiffs are null and void;

           and

    **c.**       Grant other such relief as the Court deems equitable and just.

## DEMAND FOR JURY

Plaintiffs request a trial by jury on all claims so triable.

                        Respectfully submitted,
                        **HUBBARD SNITCHLER & PARZIANELLO PLC**

                        */s/ Eric A. Parzianello*
                        Eric A. Parzianello (FL Bar No. 161225)
                        John A. Hubbard (FL Bar No. 100925)
                        Attorney for Plaintiffs
                        999 Vanderbilt Beach Road, Suite 200
                        Naples, FL 34108
                        239.325.1802
                        eparzianello@hspplc.com
                        jhubbard@hspplc.com

Dated: October 14, 2021

## CERTIFICATE OF SERVICE

       I hereby certify that on October 14, 2021, I electronically filed the *First Amended Complaint and Demand for Jury Trial* with the Clerk of the Court by using the CM/ECF system which shall serve a copy of the same on all attorneys and parties of record.

INGRID H. PONCE, ESQ. FBN:166774
STEARNS WEAVER MILLER WEISSLER
ALHADEFF & SITTERSON, P.A.
Attorney for Defendants
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
iponce@stearnsweaver.com
305.789.3200

                        */s/ Eric A. Parzianello*
                        Eric A. Parzianello
                        Attorney for Plaintiff

# EXHIBIT A

**Enhanced Compensation Plan Letter of Understanding**

The Enhanced Compensation Plan is a discretionary program designed to provide additional compensation that rewards new agency owners for profitable growth and helps them deliver on the customer value proposition through the trusted advisor model.

It is critical that you carefully consider what you must do in order to succeed and remain compliant within Allstate's R3001 Exclusive Agency Program. There are a variety of criteria that you must satisfy, and those criteria include but are not limited to creating an appropriate business plan as well as ensuring that you appropriately staff your agency. EA Candidates should have sufficient liquid capital to invest and adequate cash flow to sustain the agency. While you are solely responsible for deciding how to recruit, hire and manage your employees, you should know the Enhanced Compensation Plan has been designed for agency owners who employ at least three licensed sales professionals. Given Allstate's desire to ensure you take all necessary steps to place your agency in the best position to succeed, Allstate will not appoint you as a new agent until you complete all onboarding tasks which include, but are not limited to the steps highlighted below:

- Must complete the Agent Selection Questionnaire (ASQ) and obtain a pass score (if applicable);
- Must have results on the background check which are satisfactory to the Company;
- Must read the Form U-4, Uniform application for Securities Industry Registration or Transfer, and must read and sign the Letter of Understanding;
- Must obtain the appropriate individual resident (and non-resident, if applicable) licenses and an agency license and/or registration, where required by law, if signing the C version of the R3001 Agreement;
- No later than 7 days prior to entering the education phase:
  - Must submit an acceptable Business Plan that includes goals for P&C Growth, Allstate Life and Retirement, and Profitability
  - Must complete Demographic survey
  - Must have access to Allstate Systems
    - NTID
    - 2 Factor Authentication

*Please note that while Allstate may provide you with access to an Exclusive Agency onboarding portal to provide resources to assist you with the onboarding process, completion of onboarding tasks and status updates in the portal do not constitute confirmation that you have completed all of the requirements for qualifying to become an Allstate R3001 Exclusive Agent. Allstate retains the sole and exclusive discretion to determine whether and when you have satisfactorily completed the requirements for qualifying to become an Allstate R3001 Exclusive Agent which will be confirmed only upon execution of the R3001 Agreement.*

- **All** Licensed Sales Professionals (LSPs) are entered into the staff tracking tool no later than 15 days prior to appointment date and a minimum of 3 LSPs are required to be appointed with Allstate on the effective date of your R3001 Agreement.

02/20/2020

- o All LSPs processing sales transactions on behalf of the agency must be disclosed to Allstate by declaring them in the staff tracking tool - MMS (manage my staff), even if only employed for a short timeframe.
- o LSPs must be licensed and appointed (if required by law) in the state of the agency location and must be declared in the Manage My Staff tool.  Agency staff are **not** permitted to bind business outside of the state of the agency location (even if licensed) unless granted binding authority via approval by Allstate's ECP Governance Committee (your sales leader will support your submission for approval).
  - ▪ LSPs approved by the ECP Governance Committee to bind outside of the state of agency location are required to obtain binding authority for each state that has been approved prior to binding new business.
- o Additional LSPs working on behalf of the agency owner after appointment date must be added to MMS prior to binding new business and approved by Allstate

You must adhere to all provisions of the R3001 Agreement and its incorporated materials.  This includes, but is not limited to the following:

- You must disclose any and all ownership interests in your agency (i.e. shareholders, LLC members).  Ownership of the agency corporation is limited to the individual signing the agreement (key person) and any "declared" shareholder or LLC member approved by Allstate. *No silent equity owner(s) are ever permitted*.
- Sharing of individual passwords for access to Allstate systems is never allowed.  Each LSP agency staff must only use their personal and assigned system access NTID and their own password
- Licensed activity must never be performed by any unlicensed and/or unappointed individual
- If you have a family member that is an existing Allstate Exclusive Agent, please note that you are prohibited from shifting business that originated in your agency to your family member's Allstate agency.  Likewise, your family member may not shift business to your agency.

By signing this letter of understanding, I am acknowledging that **effective May 1, 2019:**
1. All ECP agencies who reach $5 million in total ECP eligible written premium will be graduated to the Established agency compensation program; AND
2. An 18-month waiting period will be implemented for any former Exclusive Agent (includes family members as defined by FINRA) to open a new ECP agency; AND
3. Agencies that terminate their primary location will lose their ECP eligibility. The ESA will be converted from the ECP program the month following the termination of their Established location.
4. ECP eligible agencies who purchase more than the end point of their premium month curve will be converted to the established agency compensation program
5. If I am purchasing an Enhanced Compensation Plan book under $1.5 million (or appropriate curve duration end point based on cash flow market), I am confirming that I have reviewed the Exclusive Agency Opportunity Tool (EAOT) and that I acknowledge the premium base is separated and does not advance the ECP curve.

In addition, by signing this letter of understanding, I am acknowledging that **effective May 1, 2020:**

02/20/2020

1. Start-up / scratch Enhanced Compensation Plan (ECP) agency owners will no longer be appointed into the scratch opportunity on ECP after April 1, 2020.

2. ESAs will only be ECP eligible in the scenario as outlined here:

- If the agency owner that is selling is currently on ECP, and the book of business is less than $1.5M (or appropriate end-point of the mid-tier ECP curve for their market), a current EA could be eligible for an ECP ESA, pending regional approval.
- If the current agency owner that is selling is not currently on ECP, and the book of business is less than $1.5M (or appropriate end-point of the mid-tier ECP curve for their market), the book would not be eligible to be purchased as an ECP ESA.
- Splitting books to create ECP eligible purchases is not allowed.

By signing below, I understand that in order to be offered the opportunity to become an Allstate R3001 Exclusive Agent, I must complete to Allstate's satisfaction all requirements which Allstate deems are necessary to be eligible for the Exclusive Agency opportunity. Failure to properly disclose staff and agency ownership may jeopardize my relationship with Allstate. Further, Allstate retains the sole and exclusive discretion to determine whether and when I have satisfactorily completed the requirements for qualifying to become an Allstate R3001 Exclusive Agent.

Agency Owner (printed): _____

Agency Owner (signature): _____ Date: _____

By signing below, I have reviewed this acknowledgement with agency owner candidate.

Field Sales Leader (printed):_____

Field Sales Leader (signature): _____ Date: _____

02/20/2020

EXHIBIT B

# ALLSTATE R3001S EXCLUSIVE AGENCY AGREEMENT

This Agreement is between ALLSTATE INSURANCE COMPANY and such affiliates and subsidiaries as are named in the Supplement for the R3001 Agreement (referred to in this Agreement as "the Company") and _____Ulises Cicciarelli_____(referred to in this Agreement as "you").

The Company and you agree as follows:

I.   **AUTHORITY:**

A.   Effective_____ 8/1/2020 _____, the Company appoints you as its agent to represent the Company in the Exclusive Agency Program.  You are authorized on behalf of the Company, during the term of this Agreement, to receive and accept, subject to such restrictions on binding authority as may be established by the Company, applications for insurance covering such classes of risks located in the state(s) of____Florida_____ as the Company may from time to time authorize to be written.  You are also authorized to sell products specified by the Company and through the companies specified in the Supplement for the R3001 Agreement (referred to in this Agreement as "Company Business").  The Company will own all business produced under the terms of this Agreement.  You will not represent yourself as having any authority other than that specifically granted to you by the Company.  You will not alter any contract or incur any expense or obligation for the Company without prior written approval from the Company.

B.   This Agreement is the sole and entire agency agreement between the Company and you, and it supersedes and replaces any prior employment, agency, or other agreement between the Company and you.  This Agreement also supersedes any prior oral statements and representations by the Company to you and any prior written statements and representations by the Company to you in letters, manuals, booklets, memoranda, or any other format.

C.   The Supplement for the R3001 Agreement ("Supplement") and the Exclusive Agency Independent Contractor Manual ("EA Manual"), and the Allstate Agency Standards ("Agency Standards") as they may be amended from time to time, are expressly incorporated in their entirety as part of this Agreement.  The Company reserves the right to amend the Supplement, EA Manual, and Agency Standards at any time without prior notice to you, except that notice regarding changes to commission amounts will be given as indicated in Section XV.

D.   You are an independent contractor for all purposes and not an employee of the Company.  You will have full control of your time and the right to exercise independent judgment as to the time, place, and manner of performing your duties, which are defined in this Agreement and the incorporated Supplement, EA Manual, and Agency Standards.  You will not represent that you have authority to act on behalf of the Company or enter into any contract on behalf of the Company, except for contracts of insurance or other contracts as expressly authorized by this Agreement.

E.   You will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of the Company.  You may, however, write applications for insurance under an assigned risk, cooperative industry, or government established residual market plan or facility in accordance with the Company's rules and procedures.

1

F.  The Company will determine in its sole discretion all matters relating to its business and the operation of the Company including, but not limited to, the following:

1.  The determination of contract forms and provisions, premiums, fees, and charges for insurance and other Company Business;

2.  The acceptance or rejection of any application;

3.  The termination or modification of any contract or the refusal to renew any contract;

4.  The limitation, restriction, or discontinuance of the writing or selling of any policies, coverages, lines, or kinds of insurance or other Company Business;

5.  The obtaining of any licenses of the Company or the Company's withdrawal from any state, jurisdiction, or territory; and

6.  The type and quality of customer service received by Company policyholders.

## II.   DUTIES AND CONDITIONS:

A.  You will act as an agent of the Company for the purpose of soliciting, selling, and servicing insurance and other Company Business in accordance with the provisions of this Agreement.  As an agent of the Company, you will provide customer service, including the collection of payments, for any and all Company policyholders and you will assist in claims administration in accordance with the Company's rules and procedures.

B.  You will meet certain business objectives established by the Company in the areas of profitability, growth, retention, customer satisfaction and customer service.  You will build and maintain a profitable book of business, assist the Company in its efforts to achieve market penetration for all forms of insurance offered by the Company and other Company Business, and service the Company's customers in a manner consistent with the Company's goodwill, reputation, and overall business strategy.

C.  You will record, transmit, and process insurance and Company Business in the manner prescribed in the then current provisions of the Supplement.

D.  You agree to maintain any required agent license in the state or states in which you are appointed to represent the Company and to comply with any and all applicable federal, state, or local laws, rules, regulations and ordinances affecting your operation.

E.  The Company recognizes that you may, in your sole discretion, arrange to have business conducted at your sales location in your absence by your own employees or other persons and that the time during which you are physically present at your sales location is entirely in your sole discretion.  You must, however, remain actively involved in the conduct of business at your sales location.

F.  You agree that the Company will have the authority to use your name and signature, or facsimile thereof, on policy documents and customer communication materials.

G.  You agree to maintain a professional business relationship with the Company, and, when requested, to meet with Company representatives at mutually convenient times to discuss various business topics.  You also agree that, because you are conducting business with the public under the Allstate name, Company representatives shall be permitted access to your agency to review compliance with this Agreement during agency business hours.

H. You agree that, as requested by the Company, you will demonstrate your knowledge of the Company products you are authorized to sell, as well as of federal, state, or local laws, rules, regulations and ordinances affecting your operation.  If you are unable to demonstrate your knowledge of any product, the Company reserves the right to deny you the authority, or withdraw your existing authority, to sell that product until you demonstrate such knowledge.

## III.   YOUR EMPLOYEES:

A. You have no authority to employ persons on behalf of the Company, and no employee of yours will be deemed to be an employee or agent of the Company, such employees at all times remaining your employees.  You have sole and exclusive control over your labor and employee relations policies, and your policies relating to wages, hours, and working conditions of your employees.  You have the sole and exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, and discharge your employees.

B. You are solely responsible for all salaries and other compensation of all your employees and will make all necessary salary deductions and withholdings from your employees' salaries and other compensation.  You are solely responsible for the payment of any and all contributions, taxes, and assessments, and all other requirements of the federal Social Security, federal and state unemployment compensation, and federal, state, and local withholding of income tax laws on all salary and other compensation of your employees.

C. You will comply with all other contracts, federal, state or local laws, ordinances, rules, or regulations regarding your employees, including federal or state laws or regulations regarding minimum compensation, overtime, and equal opportunities for employment. This includes, but is not limited to, your warranty and agreement to comply with the terms of the federal and state civil rights acts, Age Discrimination in Employment Act, Americans With Disabilities Act, Occupational Safety and Health Act, Immigration Reform and Control Act, and the Fair Labor Standards Act.

D. You agree and warrant that your employees, while working in connection with this Agreement, will comply with any and all applicable federal, state, or local laws, rules, regulations, and ordinances.

## IV.   COMPANY PROPERTY, CONFIDENTIALITY:

A. The Company will furnish you such signs, forms, manuals, records, and other materials and supplies as the Company deems advisable to assist you.  All such property and information furnished by the Company will remain the property of the Company.  In addition, the Company will offer, at your expense, such additional materials and supplies as the Company feels may be helpful to you.

B. You agree that you will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information or any information containing trade secrets concerning any matters affecting or relating to the pursuits of the Company, except upon direct written authority of the Company.  Furthermore, upon termination of this Agreement, you agree to treat as confidential and not to disclose, either directly or indirectly, to any third party any confidential information or trade secrets of the Company.

C. You agree that you will not disclose or grant access to any confidential information or trade secrets to any of your employees or other persons providing services for you in connection with this Agreement, unless such employee or other person has signed a copy of the Confidentiality and Non-Competition Agreement attached as Appendix A.  Appendix A is a sample copy of the electronic version of the document that must be transmitted to the Company.

3

D. Confidential information includes, but is not limited to:  business plans of the Company; information regarding the names, addresses, and ages of policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public.  All such confidential information is wholly owned by the Company.  Such confidential information may be used by you only for the purposes of carrying out the provisions of this Agreement.

E. Any confidential information or trade secrets recorded on paper, electronic data file, or any other medium, whether provided by the Company or by you, is the exclusive property of the Company, as is any such medium and any copy of such medium.

F. You recognize that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure.  You agree that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and you waive any defense to an application for such order, except that the violation did not occur.  You agree that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

## V.  SALES LOCATION:

A. You may select your sales location, within a geographical area specified by the Company, subject to Company approval. Initially, you have selected the location at 5850 Hiatus Rd, Ste D, Tamarac, FL 33321 and such sales location has been approved by the Company.  You agree that you will not establish any additional sales location without the prior written approval of the Company.  You understand that you have no exclusive territorial rights in connection with your sales location.

B. You agree to keep your sales location open for business as appropriate in the market to provide a proper level of customer service.  As a minimum, you agree to operate your sales location consistently with the Agency Standards.

C. You are authorized to sell insurance offered by the Company and Company Business only in the state containing your sales location and other states in which you are properly licensed and appointed as an agent by the Company.

## VI.  ADVERTISING:

A. The Company will advertise its products and provide promotional material in accordance with its advertising policies.  You may also advertise in your sole discretion, subject to the requirements in paragraph B. below.

B. You will submit all signs and advertising copy, including, but not limited to, sales brochures, display advertisements in telephone directories, newspaper advertisements, radio and television commercials, electronic media displays, all sales promotional plans and devices, and all other materials to the Company for approval, if they use or contain any reference to any service mark or trade name of the Company.  You will not use any such advertising material or sales promotional plan or device without obtaining prior written approval from the Company.  The Company has the right to disapprove any or all of the aforesaid advertising forms and other materials insofar as they, in the exclusive judgment of the Company, do not conform to Company policy regarding use of Company service marks or trade names; may subject the Company to liability or loss of goodwill; may damage the reputation of the Company or Company customer relations; may fail to adhere to the requirements of any federal, state, or local governmental rules, regulations, or laws; may fail to

4

conform to community or Company standards of good taste and honest dealing; or may be detrimental to the business interests of the Company.

**VII.     SERVICE MARK AND TRADE NAME PROTECTION:**

A. You agree to cooperate fully in the quality control program conducted by the Company relating to the use of its service marks and trade names and the nature and quality of services rendered and goods distributed under its service marks and trade names.  The Company will have the right to specify, delineate, or limit the services or goods in connection with which you may use any of its service marks or trade names.  In the event that the nature or the quality of the services or goods in connection with which you use any of the service marks or trade names of the Company is not acceptable to the Company, then the Company will have the right to require you to institute appropriate procedures to correct any deficiencies noted by the Company.

B. You agree, at the request and expense of the Company, to assist the Company in protecting and enforcing the rights of the Company in and to any and all of its service marks and trade names which you may then be using.

C. You will not in any manner encumber, alienate, license, or transfer to any other entity any right whatsoever concerning the service marks or trade names the Company authorizes you to use in the performance of this Agreement, except as permitted in Section XVI.

D. You recognize that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure.  You agree that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and you waive any defense to an application for such order, except that the violation did not occur.  You agree that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

**VIII.    EXPENSES:**

You will be responsible for the payment of all expenses that you incur in the performance of this Agreement including, but not limited to:  expenses for your sales location, supplies not furnished by the Company, compensation of your employees or other assisting persons whom you engage, telephone, postage, and advertising expenses incurred at your direction, and all other charges and expenses.

**IX.     TELEPHONE:**

All telephone numbers used in connection with business conducted pursuant to this Agreement are the property of the Company.

**X.     INDEMNIFICATION:**

A. The Company will defend and indemnify you against liability, including the cost of defense and settlements, imposed on you by law for damages sustained by policyholders and caused by acts or omissions of the Company, provided that you have not caused or contributed to cause such liability by your acts or omissions.  You agree, as a condition to such indemnification, to notify the Company promptly of any claim or suit against you and to allow the Company to make such investigation, settlement, or defense as the Company deems prudent.  The Company reserves the right to select counsel to represent you in connection with any such claim or suit.  You also agree to cooperate fully with the Company in any such investigation, settlement, or defense.

B. You will indemnify the Company against liability, including the cost of defense and settlements, imposed on the Company by law for damages sustained by any person and caused by your acts or omission, or those of any employee or other person working in connection with this Agreement, provided that the Company has not caused or contributed to cause such liability by its acts or omissions. The Company agrees, as a condition to such indemnification, to notify you promptly of any such claim or suit against the Company. The Company reserves the right to select counsel to represent it in connection with any such claim or suit and to make such investigation or settlement as the Company deems prudent.

## XI. INSURANCE:

A. You agree that you will, at your sole expense, obtain and maintain during the term of this Agreement policies of insurance as described in the EA Manual, as may be amended from time to time. Such policies must be obtained from companies satisfactory to the Company and must be adequate to protect against all expenses, claims, actions, liabilities, and losses related to the subjects covered by the required policies.

B. Where specified, each policy must name the Company as an additional insured and must contain a severability of interest/cross liability endorsement. Each policy must also expressly provide that it will not be subject to material change or cancellation without at least thirty (30) days prior written notice to the Company.

C. You must furnish the Company with proof of insurance upon request by the Company. If, in the Company's opinion, such policies do not afford adequate protection for the Company, the Company will so advise you, and if you do not furnish evidence of acceptable coverage within fifteen (15) days after being requested to do so by the Company, the Company will have the right to obtain additional insurance at your expense and deduct the cost of such insurance plus a processing fee from monies owed you by the Company.

## XII. FINANCIAL INFORMATION:

You shall maintain all books and records relating to the business under this Agreement including, but not limited to, all checkbooks, check registers, deposit receipts, and general ledgers for a period of not less than five years after the close of the fiscal year to which they relate. All of the foregoing records shall be open and available for inspection or audit at any time during normal agency hours without notice by the Company or its designated auditors and you shall have the duty to cooperate fully with the party(ies) making such inspection or audit.

## XIII. POLICIES IN YOUR ACCOUNT:

Policies which are credited to your account are described in the Supplement. While this Agreement is in effect, the Company will leave in your account all policies credited to your account so long as the policyholder resides within a state in which you are licensed and appointed by the Company, except that the Company may remove any policy from your account at the request of a policyholder.

## XIV. MONEY COLLECTED BY YOU:

All payments collected or received by you in the performance of this Agreement are the property of the Company, will be treated as trust funds, and will be promptly transmitted to the Company without deduction for any purpose in the manner specified by the Company. You must maintain accurate records and current remittance reports which may be inspected by the Company at any time without notice and which shall be submitted to the Company in accordance with its rules and procedures.

**XV.   COMPENSATION:**

A.   The sole compensation to which you will be entitled for services rendered pursuant to this Agreement will be the commissions set forth in the Supplement, as may be amended from time to time.  The Company will pay you your commissions at the time and in the manner set forth in the Supplement. However, due to the inherent uncertainty of business conditions, the Company reserves the right to increase or decrease any commission amounts and to change the commission rules.  If the Company changes commission amounts, it will provide you with written notice of the changes at least ninety (90) days prior to the date on which they are to become effective.

B.   The Company may provide you with such bonuses, awards, prizes, and other remuneration based on performance, if any, as it may prescribe in its sole discretion.

C.   If any application for insurance is rejected, or any policy is surrendered or canceled, in whole or in part, for any reason, before the expiration of the policy period, or if any premium is reduced or any overpayment made to you, or if any premium paid is not earned by the Company, the commissions paid to you on the amount returned or credited to the policyholder, or the amount overpaid to you, will constitute an indebtedness of yours to the Company and will be charged to you or recovered from you by reducing any future commissions, awards, or bonuses due you.

**XVI.   TRANSFER OF INTEREST:**

A.   This Agreement is personal to you and is being entered into in reliance upon and in consideration of your skills, qualifications, and representations.  Accordingly, you may not execute a transfer of your interest in this Agreement or any interest in the business under this Agreement including, but not limited to, any sale, assignment, conveyance or the granting of any lien, security interest, pledge, or mortgage thereof, without the prior written approval of the Company.  A transfer of interest in this Agreement is described in the Supplement and EA Manual and includes, but is not limited to, any sale, merger, or assignment, in whole or in part, directly, indirectly, or contingently, of this Agreement or any rights or obligations under it.  You have the obligation to notify the Company of a proposed transfer and to request Company approval.

B.   You have an economic interest, as defined in this Agreement and the incorporated Supplement and EA Manual, in your Allstate customer accounts developed under this Agreement.  Subject to the terms and conditions set forth in this Agreement and the incorporated Supplement and EA Manual, you may transfer your entire economic interest in the business written under this Agreement upon termination of this Agreement by selling the economic interest in the business to an approved buyer. The Company retains the right in its exclusive judgment to approve or disapprove such a transfer. Any failure to disclose and obtain the prior written approval of the Company for any transfer of your interest in this Agreement or any interest in the business under this Agreement shall constitute a breach of this Agreement and cause for termination of this Agreement.

C.   Approval of a proposed transfer of your entire interest in this Agreement will be conditioned upon the termination of this Agreement and the execution of a then current agency agreement by the proposed transferee.

D.   Policies in your account (Section XIII. above) will be transferred to an approved transferee.

**XVII.** **TERMINATION OF AGREEMENT:**

    A.  This Agreement will be terminated automatically:

        1.  On the effective date of any transfer of your entire interest in this Agreement, whether approved or not, as described in Section XVI. above;

        2.  Upon your death or permanent incapacity;

        3.  Upon your loss of any required agent license; or

        4.  Upon the surrender of, or the election not to renew, the Company's license to sell insurance in all lines in the state in which your sales location is located or the discontinuation of the sale of insurance in the state.

    B.  This Agreement may be terminated:

        1.  At any time by mutual agreement of the parties in writing;

        2.  By either party, with or without cause, upon providing ninety (90) days prior written notice to the other, or such greater number of days as is required by law.  Once written notice of termination has been given by either party, you will, immediately upon request of the Company, cease to act or to represent yourself in any way as an agent or representative of the Company, but you will receive compensation pursuant to Section XV. from the Company for the period up to and including the specified termination date; or

        3.  Alternatively, by the Company, with cause, immediately upon providing written notice to you. Cause may include, but is not limited to, breach of this Agreement, fraud, forgery, misrepresentation or conviction of a crime.  The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination.

**XVIII.** **OBLIGATIONS UPON TERMINATION OF AGREEMENT:**

Except as otherwise provided in a subsequent agreement between you and the Company, upon termination of this Agreement, you agree that:

    A.  You will not act or represent yourself in any way as an agent or representative of the Company.

    B.  You will immediately return all property belonging to the Company, or dispose of it in such manner as the Company specifies.

    C.  You will immediately cease to use such telephone numbers referenced in Section IX. above and execute an Order of Transfer of Responsibility for such numbers in your name to the Company or to any party the Company designates, and you will immediately notify the telephone company of any such transfer.  You will be responsible for all charges incurred up to the date of execution of the transfer.

    D.  For a period of one year following termination, you will not solicit the purchase of products or services in competition with those sold by the Company:

        1.  With respect to any person, company, or organization to whom you or anyone acting on your behalf sold insurance or other products or services on behalf of the Company and who is a customer of the Company at the time of termination of the Agreement;

        2.  With respect to any person, company, or organization who is a customer of the Company at the time of termination of this Agreement and whose identity was discovered by you as a result of your status as a Company agent or as a result of your access to confidential information of the Company; or

3. From any office or business site located within one mile of the agency sales location maintained pursuant to Section V. of this Agreement at the time this Agreement is terminated.

In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law.  If any other provision in this paragraph D. conflicts with any existing law, it will be applied to the extent permitted by such law.

E. You will immediately cease and desist from any and all use of Company service marks and trade names.  You will immediately return to the Company all property in your possession or under your control bearing any Company service mark or trade name, or dispose of it in such manner as the Company specifies.

F. You recognize that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure.  You agree that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and you waive any defense to an application for such order, except that the violation did not occur.  You agree that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

G. You recognize and acknowledge that each of the foregoing provisions of this Section XVIII. is reasonable and necessary to protect and preserve the legitimate business interests of the Company, its present and potential business activities, and the economic benefits derived therefrom.  You recognize and acknowledge that the foregoing provisions will not prevent you from earning a livelihood and are not an undue restraint on you.

## XIX.  NOTICE:

All notices will be deemed to have been given if personally delivered, sent by facsimile transmission, or mailed as follows:

if to the Company:  Allstate Insurance Company

8333 Bryan Dairy Road, Suite 300

Largo, FL 33777

Attention: AET

if to you:  Ulises Cicciarelli

3726 NE 167 St.

North Miami Beach, FL 33160

or to such other person or address as any party may furnish or designate to the other in writing.

## XX.  GENERAL PROVISIONS:

A. This Agreement may not be modified except by a written agreement between the Company and you which expressly states that it modifies this Agreement.  No other written statements, representations, or agreements and no oral statements, representations, or agreements will be effective to modify this Agreement.  No representative of the Company will have authority to modify this Agreement, except as provided in this Section XX.  Nothing in this Section will affect the Company's right to amend the Supplement, EA Manual, and Agency Standards, as provided in Section I.C.

B.  You acknowledge that you have reviewed the Supplement, EA Manual, and Agency Standards and that you have an ongoing responsibility to review all changes to the Supplement, EA Manual and Agency Standards issued by the Company and agree to be bound by them.

C.  References in this Agreement to the Supplement, EA Manual, and Agency Standards are references to the Supplement, EA Manual, and Agency Standards, including any changes which may be made from time to time and distributed to you by the Company.

D.  You acknowledge that you have read this Allstate R3001S Exclusive Agency Agreement, understand it, and agree to be bound by its terms.

E.  The authority granted to you under this Agreement is nonexclusive. The term "Exclusive" as used in the title of this Agreement refers to the obligations assumed by you under Section I.E.

F.  The descriptive headings of this Agreement are intended for reference only and will not affect the construction or interpretation of this Agreement.

G.  If any provision or part of this Agreement is held invalid for any reason, such invalidity will not affect any other provision or part of this Agreement not held invalid, and such remaining provisions and parts will remain in full force and effect.

H.  The failure of either party to insist upon the performance of any of the terms of this Agreement in any one or more instances will not be construed as a waiver or relinquishment of the future performance of any such term.  The obligation of the parties with respect to any such future performance will continue in full force and effect.

I.  Nothing in this Agreement shall be construed to confer upon any person or entity other than the Company and you any rights under this Agreement.

J.  This Agreement, and the obligations or rights hereunder, shall not be assignable by you, except as provided by Section XVI.  The rights and obligations of the parties to this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns.

K.  This Agreement may be executed in counterparts, each of which will be deemed an original.

IN WITNESS WHEREOF, the Company and Agency have caused this Agreement to be executed by their authorized representatives and the parties hereby accept the terms of this Agreement.

ALLSTATE INSURANCE COMPANY

e-Signed by Stephen Gilbert
on 2020-07-27 12:24:20 GMT
_____
(authorized representative)

July 27, 2020
_____
(date)

YOU

e-Signed by Ulises Cicciarelli
on 2020-07-23 22:32:16 GMT
_____
(name)

July 23, 2020
_____
(date)

R3001S
APPENDIX A

## CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

This Confidentiality and Non-Competition Agreement ("Agreement") is entered into this _____ day of _____ , _____ , by and between _____ (referred to in this Agreement as "Service Provider"), and _____ (referred to in this Agreement as "Agent"), and Allstate Insurance Company as a direct third party beneficiary of this Agreement (referred to in this Agreement as "the Company").

WHEREAS, the Company has entered into an agency agreement appointing Agent to act as its agent for the purpose of receiving and accepting applications for insurance and for selling certain specified products of the Company's subsidiaries and affiliates; and

WHEREAS, under the terms of the agency agreement, Agent has agreed to maintain the confidentiality of the Company's confidential information; and

WHEREAS, Agent has employed Service Provider to assist Agent in performing services under the agency agreement; and

WHEREAS, Service Provider will have access to certain confidential information of the Company;

NOW, THEREFORE, for and in consideration of the agreements, covenants, and conditions herein contained, the adequacy and sufficiency of which is expressly acknowledged by each of the parties hereto, the parties agree as follows:

1.  The terms "employed" or "employment" as referred to in this Agreement apply to any service provided by the Service Provider as an employee, independent contractor, or in any other capacity.

2.  Service Provider acknowledges that while assisting Agent in performing services under the agency agreement, Service Provider will have access to or will have disclosed to him/her confidential information concerning the Company, the disclosure of which could be harmful to the Company.

3.  Confidential information includes, but is not limited to, business plans of the Company; information regarding the names, addresses, and ages of policyholders or prospective policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. Confidential information may be oral or recorded on paper, electronic data file, or any other medium.

4.  Service Provider agrees that he/she will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information, except upon the written consent of the Company, nor will Service Provider use any confidential information for his/her own benefit, except for the purposes of assisting Agent in performing services under the agency agreement.

5.  Any and all confidential information and all Company forms, manuals, records, and other materials and supplies furnished to Service Provider by the Agent will at all times remain the property of the Company and will be returned to the Company at any time upon the demand of the Company or upon the termination of Service Provider's employment by Agent.

6.  Upon the termination of Service Provider's employment by Agent, Service Provider agrees to treat as confidential and not disclose, either directly or indirectly, to any third party any confidential information of the Company.

7. For a period of one year following the termination of Service Provider's employment by Agent, Service Provider agrees not to solicit the purchase of products or services in competition with those sold by the Company:

   1. With respect to any person, company, or organization to whom Agent, or any person employed by Agent, including Service Provider, sold insurance or other products or services on behalf of the Company, and who is a customer of the Company at the time of the termination; or

   2. With respect to any person, company, or organization who is a customer of the Company at the time of the termination and whose identity was discovered as a result of access to confidential information of the Company; or

   3. From any office or business site located within one mile of any locations from which the Agent solicited or sold Company insurance or other products or services during the year immediately preceding the termination.

   In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph 7 conflicts with any existing law, it will be applied to the extent permitted by such law.

8. Upon the termination of Service Provider's employment with Agent, Service Provider will immediately cease and desist from any and all use of Company service marks and trade names. Service Provider will immediately return to the Agent or the Company all property bearing any company service marks or trade names, or dispose of such materials in the manner specified by the Company. If requested by the Company, Service Provider will execute an Order of Transfer of Responsibility for any telephone numbers in the Service Provider's name, which were used in connection with the conduct of business on behalf of the Company.

9. While employed by Agent, Service Provider agrees that he/she will not, either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent or broker, or refer a prospect to another company, agent or broker without the prior written consent of the Company.

10. Service Provider recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. Service Provider agrees that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Service Provider waives any defense to an application for such order, except that the violation did not occur. Service Provider agrees that the Company will be entitled to an award of reasonable attorney's fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

11. This Agreement supersedes and replaces any prior confidentiality and non-competition agreement between the parties hereto. The parties agree that the use of electronic signatures for the execution of this Agreement shall be legal and binding and shall have the same full force and effect as if originally signed.

IN WITNESS WHEREOF, the parties hereby accept the terms of this Agreement.

Accepted by:

| SERVICE PROVIDER | AGENT | ALLSTATE INSURANCE COMPANY |
|---|---|---|
| _____ | _____ | _____ |
| (name) | (name) | (authorized representative) |
| _____ | _____ | _____ |
| (date) | (date) | (date) |

R2459-5  04/01/08                                    2

# EXHIBIT C

# ALLSTATE R3001C EXCLUSIVE AGENCY AGREEMENT

This Agreement is between ALLSTATE INSURANCE COMPANY and such affiliates and subsidiaries as are named in the Supplement for the R3001 Agreement (referred to in this Agreement as "the Company") and _____ (referred to in this Agreement as "Agency").

Prestige Insurance Group LLC

The Company and Agency agree as follows:

**I.    AUTHORITY:**

A.    Effective _____ August 1, 2020 _____, the Company appoints Agency as its agent to represent the Company in the Exclusive Agency Program.  Agency is authorized on behalf of the Company, during the term of this Agreement, to receive and accept, subject to such restrictions on binding authority as may be established by the Company, applications for insurance covering such classes of risks located in the state(s) of Florida _____ as the Company may from time to time authorize to be written.  Agency is also authorized to sell products specified by the Company and through the companies specified in the Supplement for the R3001 Agreement (referred to in this Agreement as "Company Business").  The Company will own all business produced under the terms of this Agreement.  Agency will not represent itself as having any authority other than that specifically granted to it by the Company. Agency will not alter any contract or incur any expense or obligation for the Company without prior written approval from the Company.

B.    This Agreement is the sole and entire agency agreement between the Company and Agency, and it supersedes and replaces any prior employment, agency, or other agreement between the Company and Agency and any of its officers, directors, shareholders, members, and employees.  This Agreement also supersedes any prior oral statements and representations by the Company and any prior written statements and representations by the Company in letters, manuals, booklets, memoranda, or any other format.

C.    The Supplement for the R3001 Agreement ("Supplement") and the Exclusive Agency Independent Contractor Manual ("EA Manual"), and the Allstate Agency Standards ("Agency Standards") as they may be amended from time to time, are expressly incorporated in their entirety as part of this Agreement.  The Company reserves the right to amend the Supplement, EA Manual, and Agency Standards at any time without prior notice to Agency, except that notice regarding changes to commission amounts will be given as indicated in Section XV.

D.    The relationship between the Company and Agency and its officers, directors, shareholders, members, employees, and other persons working in connection with this Agreement, will be that of an independent contractor for all purposes.  Agency will not represent that it has authority to act on behalf of the Company or enter into any contract on behalf of the Company, except for contracts of insurance or other contracts as expressly authorized by this Agreement.

E.    Agency will not, either directly or indirectly, solicit, sell, or service insurance of any kind for any other company, agent, or broker, or refer a prospect to another company, agent, or broker, without the prior written approval of the Company. Agency may, however, write applications for insurance under an assigned risk, cooperative industry, or government established residual market plan or facility in accordance with the Company's rules and procedures.

1

F. The Company will determine in its sole discretion all matters relating to its business and the operation of the Company including, but not limited to, the following:

1. The determination of contract forms and provisions, premiums, fees, and charges for insurance and other Company Business;

2. The acceptance or rejection of any application;

3. The termination or modification of any contract or the refusal to renew any contract;

4. The limitation, restriction, or discontinuance of the writing or selling of any policies, coverages, lines, or kinds of insurance or other Company Business;

5. The obtaining of any licenses of the Company or the Company's withdrawal from any state, jurisdiction, or territory; and

6. The type and quality of customer service received by Company policyholders.

G. Agency represents and warrants that prior to the execution of this Agreement, Agency has provided to the Company the full names and addresses of its officers, directors and any persons who own any shares of or interest in Agency. Thereafter, Agency shall promptly furnish to the Company the full names and addresses of any new officers, directors, or owners.

## II.    DUTIES AND CONDITIONS:

A. Agency will act as an agent of the Company for the purpose of soliciting, selling, and servicing insurance and other Company Business in accordance with the provisions of this Agreement. As an agent of the Company, Agency will provide customer service, including the collection of payments, for any and all Company policyholders and will assist in claims administration in accordance with the Company's rules and procedures.

B. Agency will meet certain business objectives established by the Company in the areas of profitability, growth, retention, customer satisfaction and customer service. Agency will build and maintain a profitable book of business, assist the Company in its efforts to achieve market penetration for all forms of insurance offered by the Company and other Company Business, and service the Company's customers in a manner consistent with the Company's goodwill, reputation, and overall business strategy.

C. Agency will record, transmit, and process insurance and Company Business in the manner prescribed in the then current provisions of the Supplement.

D. Agency agrees to comply with any and all applicable federal, state, or local laws, rules, regulations and ordinances affecting its operation and warrants that Agency, its officers, directors, shareholders, members, and employees will maintain any required agent licenses in the state or states in which Agency is appointed to represent the Company.

E. This Agreement is being entered into with Agency in reliance upon and in consideration of the skills, qualifications, and representations of  Ulises Cicciarelli                    (referred to in this Agreement as "Key Person"). Agency agrees that it will employ Key Person to provide services under this Agreement for its term.

F. The Company recognizes that Agency may, in its sole discretion, arrange to have business conducted at its sales location in Key Person's absence by its other employees or other persons and that the time during which Key Person is physically present at Agency's sales location is entirely in Agency's sole discretion. Key Person must, however, remain actively involved in the conduct of business at Agency's sales location.

2

G. The Company shall at all times be entitled to conclusively rely upon the authority of Key Person (or in the event of the death or incapacity of Key Person, his executor or personal representative) to bind Agency and its officers, directors, shareholders and members, regardless of any directions received by the Company from any person or entity which conflict with directions received from Key Person, unless the Company is properly served with an order of a court of competent jurisdiction abrogating Key Person's authority and designating an alternate authorized representative to act on behalf of Agency under this Agreement.

H. Agency agrees that the Company will have the authority to use the name of Agency or Key Person and the Key Person's signature, or facsimile thereof, on policy documents and customer communication materials.

I. Agency agrees to maintain a professional business relationship with the Company, and, when requested, to meet with Company representatives at mutually convenient times to discuss various business topics. Agency also agrees that, because it is conducting business with the public under the Allstate name, Company representatives shall be permitted access to its sales location to review compliance with this Agreement during the business hours of that sales location.

J. Agency agrees that, as requested by the Company, it will demonstrate its knowledge of the Company products it is authorized to sell, as well as of federal, state, or local laws, rules, regulations and ordinances affecting its operation. If Agency is unable to demonstrate its knowledge of any product, the Company reserves the right to deny Agency the authority, or withdraw Agency's existing authority, to sell that product, until Agency demonstrates such knowledge.

## III.   AGENCY EMPLOYEES:

A. Agency has no authority to employ persons on behalf of the Company, and no employee of Agency will be deemed to be an employee or agent of the Company, such employees at all times remaining Agency's employees. Agency has sole and exclusive control over its labor and employee relations policies, and its policies relating to wages, hours, and working conditions of its employees. Agency has the sole and exclusive right to hire, transfer, suspend, lay off, recall, promote, assign, discipline, and discharge its employees.

B. Agency is solely responsible for all salaries and other compensation of all its employees and will make all necessary salary deductions and withholdings from its employees' salaries and other compensation. Agency is solely responsible for the payment of any and all contributions, taxes, and assessments, and all other requirements of the federal Social Security, federal and state unemployment compensation, and federal, state, and local withholding of income tax laws on all salary and other compensation of its employees.

C. Agency will comply with all other contracts, federal, state or local laws, ordinances, rules, or regulations regarding its employees, including federal or state laws or regulations regarding minimum compensation, overtime, and equal opportunities for employment. This includes, but is not limited to, Agency's warranty and agreement to comply with the terms of the federal and state civil rights acts, Age Discrimination in Employment Act, Americans With Disabilities Act, Occupational Safety and Health Act, Immigration Reform and Control Act, and the Fair Labor Standards Act.

D. Agency agrees and warrants that its employees, while working in connection with this Agreement, will comply with any and all applicable federal, state, or local laws, rules, regulations, and ordinances.

3

IV. **COMPANY PROPERTY, CONFIDENTIALITY:**

A. The Company will furnish Agency such signs, forms, manuals, records, and other materials and supplies as the Company deems advisable to assist Agency. All such property and information furnished by the Company will remain the property of the Company. In addition, the Company will offer, at Agency's expense, such additional materials and supplies as the Company feels may be helpful to Agency.

B. Agency agrees that it will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information or any information containing trade secrets concerning any matters affecting or relating to the pursuits of the Company, except upon direct written authority of the Company. Furthermore, upon termination of this Agreement, Agency agrees to treat as confidential and not to disclose, either directly or indirectly, to any third party any confidential information or trade secrets of the Company.

C. Agency agrees that it will not disclose or grant access to any confidential information or trade secrets to any of its employees or other persons providing services for it in connection with this Agreement, unless such employee or other person has signed a copy of the Confidentiality and Non-Competition Agreement, attached as Appendix A if Key Person and Appendix B if other than Key Person. Appendix B is a sample copy of the electronic version of the document that must be transmitted to the Company.

D. Confidential information includes, but is not limited to: business plans of the Company; information regarding the names, addresses, and ages of policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. All such confidential information is wholly owned by the Company. Such confidential information may be used by Agency only for the purposes of carrying out the provisions of this Agreement.

E. Any confidential information or trade secrets recorded on paper, electronic data file, or any other medium, whether provided by the Company or by Agency, is the exclusive property of the Company, as is any such medium and any copy of such medium.

F. Agency recognizes that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure. Agency agrees that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Agency waives any defense to an application for such order, except that the violation did not occur. Agency agrees that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

V. **SALES LOCATION:**

A. Agency may select its sales location, within a geographical area specified by the Company, subject to Company approval. Initially, Agency has selected the location at Tamarac, Florida and such sales location has been approved by the Company. Agency agrees that it will not establish any additional sales location without the prior written approval of the Company. Agency acknowledges that it has no exclusive territorial rights in connection with its sales location.

4

B. Agency agrees to keep its sales location open for business as appropriate in the market to provide a proper level of customer service. As a minimum, Agency agrees to operate its sales location consistently with the Agency Standards.

C. Agency is authorized to sell insurance offered by the Company and Company Business only in the state containing its sales location and other states in which Agency has been authorized to act as a Company agent.

## VI.   ADVERTISING:

A. The Company will advertise its products and provide promotional material in accordance with its advertising policies. Agency may also advertise in its sole discretion, subject to the requirements in paragraph B. below.

B. Agency will submit all signs and advertising copy, including, but not limited to, sales brochures, display advertisements in telephone directories, newspaper advertisements, radio and television commercials, electronic media displays, all sales promotional plans and devices, and all other materials to the Company for approval, if they use or contain any reference to any service mark or trade name of the Company. Agency will not use any such advertising material or sales promotional plan or device without obtaining prior written approval from the Company. The Company has the right to disapprove any or all of the aforesaid advertising forms and other materials insofar as they, in the exclusive judgment of the Company, do not conform to Company policy regarding use of Company service marks or trade names; may subject the Company to liability or loss of goodwill; may damage the reputation of the Company or Company customer relations; may fail to adhere to the requirements of any federal, state, or local governmental rules, regulations, or laws; may fail to conform to community or Company standards of good taste and honest dealing; or may be detrimental to the business interests of the Company.

## VII.   SERVICE MARK AND TRADE NAME PROTECTION:

A. Agency agrees to cooperate fully in the quality control program conducted by the Company relating to the use of its service marks and trade names and the nature and quality of services rendered and goods distributed under its service marks and trade names. The Company will have the right to specify, delineate, or limit the services or goods in connection with which Agency may use any of its service marks or trade names. In the event that the nature or the quality of the services or goods in connection with which Agency uses any of the service marks or trade names of the Company is not acceptable to the Company, then the Company will have the right to require Agency to institute appropriate procedures to correct any deficiencies noted by the Company.

B. Agency agrees, at the request and expense of the Company, to assist the Company in protecting and enforcing the rights of the Company in and to any and all of its service marks and trade names which Agency may then be using.

C. Agency will not in any manner encumber, alienate, license, or transfer to any other entity any right whatsoever concerning the service marks or trade names the Company authorizes the Agency to use in the performance of this Agreement, except as permitted in Section XVI.

D.  Agency recognizes that a breach of the foregoing provisions will cause irreparable damage to the Company's business and that such damage is difficult or impossible to measure.  Agency agrees that in the event of such breach, the Company, in addition to such other rights and remedies it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Agency waives any defense to an application for such order, except that the violation did not occur.  Agency agrees that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

## VIII.  EXPENSES:

Agency will be responsible for the payment of all expenses that it incurs in the performance of this Agreement including, but not limited to: expenses for its sales location, supplies not furnished by the Company, compensation of its employees or other assisting persons whom it engages, telephone, postage, and advertising expenses incurred at its direction, and all other charges and expenses.

## IX.  TELEPHONE:

All telephone numbers used in connection with business conducted pursuant to this Agreement are the property of the Company.

## X.  INDEMNIFICATION:

A.  The Company will defend and indemnify Agency against liability, including the cost of defense and settlements, imposed on Agency by law for damages sustained by policyholders and caused by acts or omissions of the Company, provided that Agency has not caused or contributed to cause such liability by its acts or omissions.  Agency agrees, as a condition to such indemnification, to notify the Company promptly of any claim or suit against it and to allow the Company to make such investigation, settlement, or defense as the Company deems prudent.  The Company reserves the right to select counsel to represent Agency in connection with any such claim or suit.  Agency also agrees to cooperate fully with the Company in any such investigation, settlement, or defense.

B.  Agency will indemnify the Company against liability, including the cost of defense and settlements, imposed on the Company by law for damages sustained by any person and caused by the acts or omission of Agency, its officers, directors, shareholders, members, employees, including Key Person or other persons working in connection with this Agreement, provided that the Company has not caused or contributed to cause such liability by its acts or omissions.  The Company agrees, as a condition to such indemnification, to notify Agency promptly of any such claim or suit against the Company.  The Company reserves the right to select counsel to represent it in connection with any such claim or suit and to make such investigation or settlement as the Company deems prudent.

## XI.  INSURANCE:

A.  Agency agrees that it will, at its sole expense, obtain and maintain during the term of this Agreement policies of insurance as described in the EA Manual, as may be amended from time to time.  Such policies must be obtained from companies satisfactory to the Company and must be adequate to protect against all expenses, claims, actions, liabilities, and losses related to the subjects covered by the required policies.

B.  Where specified, each policy must name the Company as an additional insured and must contain a severability of interest/cross liability endorsement.  Each policy must also expressly provide that it will not be subject to material change or cancellation without at least thirty (30) days prior written notice to the Company.

6

C. Agency must furnish the Company with proof of insurance upon request by the Company. If, in the Company's opinion, such policies do not afford adequate protection for the Company, the Company will so advise Agency and if Agency does not furnish evidence of acceptable coverage within fifteen (15) days after being requested to do so by the Company, the Company will have the right to obtain additional insurance at Agency's expense and deduct the cost of such insurance plus a processing fee from monies owed Agency by the Company.

## XII.   FINANCIAL INFORMATION:

Agency shall maintain all books and records relating to the business under this Agreement including, but not limited to, all checkbooks, check registers, deposit receipts, and general ledgers for a period of not less than five years after the close of the fiscal year to which they relate. All of the foregoing records shall be open and available for inspection or audit at any time during Agency business hours without notice by the Company or its designated auditors and Agency shall have the duty to cooperate fully with the party(ies) making such inspection or audit.

## XIII.   POLICIES IN AGENCY'S ACCOUNT:

Policies which are credited to Agency's account are described in the Supplement. While this Agreement is in effect, the Company will leave in Agency's account all policies credited to such account so long as the policyholder resides within a state in which Agency is authorized to act as a Company agent, except that the Company may remove any policy from Agency's account at the request of a policyholder.

## XIV.   MONEY COLLECTED BY AGENCY:

All payments collected or received by Agency in the performance of this Agreement are the property of the Company, will be treated as trust funds, and will be promptly transmitted to the Company without deduction for any purpose in the manner specified by the Company. Agency must maintain accurate records and current remittance reports which may be inspected by the Company at any time without notice and which shall be submitted to the Company in accordance with its rules and procedures.

## XV.   COMPENSATION:

A. The sole compensation to which Agency will be entitled for services rendered pursuant to this Agreement will be the commissions set forth in the Supplement, as may be amended from time to time. All commissions will be paid solely to the Agency, except as described in Section XIX. below. The Company will pay Agency its commissions at the time and in the manner set forth in the Supplement. However, due to the inherent uncertainty of business conditions, the Company reserves the right to increase or decrease any commission amounts and to change the commission rules. If the Company changes commission amounts, it will provide Agency with written notice of the changes at least ninety (90) days prior to the date on which they are to become effective.

B. The Company may provide Agency with such bonuses, awards, prizes, and other remuneration based on performance, if any, as it may prescribe in its sole discretion.

C. If any application for insurance is rejected, or any policy is surrendered or canceled, in whole or in part, for any reason, before the expiration of the policy period, or if any premium is reduced or any overpayment made to Agency, or if any premium paid is not earned by the Company, the commissions paid to Agency on the amount returned or credited to the policyholder, or the amount overpaid to Agency, will constitute an indebtedness of the Agency to the Company and will be charged to Agency or recovered from Agency by reducing any future commissions, awards, or bonuses due Agency.

7

**XVI.    TRANSFER OF INTEREST:**

A.  Agency may not execute a transfer of its interest in this Agreement without the prior written approval of the Company.  A transfer of interest in this Agreement is described in the Supplement and EA Manual and includes, but is not limited to, any sale, merger, or assignment, in whole or in part, directly, indirectly, or contingently, of this Agreement or any rights or obligations under it.  Neither Agency, nor any shareholder or member of Agency, shall transfer any shares or interest in Agency, including, but not limited to, any sale, assignment, conveyance, or the granting of any lien, security interest, pledge, or mortgage thereof, without the prior written approval of the Company.  Agency has the obligation to notify the Company of a proposed transfer and to request Company approval.

B.  Agency has an economic interest, as defined in this Agreement and the incorporated Supplement and EA Manual, in its Allstate customer accounts developed under this Agreement.  Subject to the terms and conditions set forth in this Agreement and the incorporated Supplement and EA Manual, Agency may transfer its entire economic interest in the business written under this Agreement upon termination of this Agreement by selling the economic interest in the business to an approved buyer.  The Company retains the right in its exclusive judgment to approve or disapprove such a transfer.  Any failure to disclose and obtain the prior written approval of the Company for any transfer of Agency's interest in this Agreement or any share or interest in Agency shall constitute a breach of this Agreement and cause for termination of this Agreement.

C.  Approval of a proposed transfer of Agency's entire interest in this Agreement will be conditioned upon the termination of this Agreement and the execution of a then current agency agreement by the proposed transferee.

D.  Policies in Agency's account (Section XIII. above) will be transferred to an approved transferee.

**XVII.   TERMINATION OF AGREEMENT:**

A.  This Agreement will be terminated automatically:

1.  On the effective date of any transfer of Agency's entire interest in this Agreement, whether approved or not, as described in Section XVI. above;

2.  Upon the death or permanent incapacity of Key Person;

3.  On the date Key Person ceases to be employed by Agency;

4.  Upon the loss of any required agent license of Agency or Key Person;

5.  Upon the dissolution of Agency; or

6.  Upon the surrender of, or the election not to renew, the Company's license to sell insurance in all lines in the state in which Agency's sales location is located or the discontinuation of the sale of insurance in the state.

B.  This Agreement may be terminated:

1.  At any time by mutual agreement of the parties in writing;

2. By either party, with or without cause, upon providing ninety (90) days prior written notice to the other, or such greater number of days as is required by law.  Once written notice of termination has been given by either party, Agency will, immediately upon request of the Company, cease to act or to represent itself in any way as an agent or representative of the Company, but it will receive compensation pursuant to Section XV. from the Company for the period up to and including the specified termination date; or

3. Alternatively, by the Company, with cause, immediately upon providing written notice to Agency.  Cause may include, but is not limited to, breach of this Agreement, fraud, forgery, misrepresentation or conviction of a crime.  The list of examples of cause just stated shall not be construed to exclude any other possible ground as cause for termination.

## XVIII.   OBLIGATIONS UPON TERMINATION OF AGREEMENT:

Except as otherwise provided in a subsequent agreement between Agency and the Company, upon termination of this Agreement, Agency agrees that:

A. Agency will not act or represent itself in any way as an agent or representative of the Company.

B. Agency will immediately return all property belonging to the Company, or dispose of it in such manner as the Company specifies.

C. Agency will immediately cease to use such telephone numbers referenced in Section IX. above and execute an Order of Transfer of Responsibility for such numbers in its or Key Person's name to the Company or to any party the Company designates, and Agency will immediately notify the telephone company of any such transfer.  Agency will be responsible for all charges incurred up to the date of execution of the transfer.

D. For a period of one year following termination, neither Agency, nor any of its officers, directors, shareholders, members, or employees, including Key Person or any other persons working in connection with this Agreement, will solicit the purchase of products or services in competition with those sold by the Company:

1. With respect to any person, company, or organization to whom Agency or anyone acting on its behalf sold insurance or other products or services on behalf of the Company and who is a customer of the Company at the time of termination of the Agreement;

2. With respect to any person, company, or organization who is a customer of the Company at the time of termination of this Agreement and whose identity was discovered as a result of Agency's status as a Company agent or as a result of Agency's access to confidential information of the Company; or

3. From any office or business site located within one mile of the agency sales location maintained pursuant to Section V. of this Agreement at the time this Agreement is terminated.

In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law.  If any other provision in this paragraph D. conflicts with any existing law, it will be applied to the extent permitted by such law.

E. Agency will immediately cease and desist from any and all use of Company service marks and trade names.  Agency will immediately return to the Company all property in its possession or under its control bearing any Company service mark or trade name, or dispose of it in such manner as the Company specifies.

F. Agency recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. Agency agrees that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be immediately entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Agency waives any defense to an application for such order, except that the violation did not occur. Agency agrees that the Company will be entitled to an award of reasonable attorneys' fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

G. Agency recognizes and acknowledges that each of the foregoing provisions of this Section XVIII. is reasonable and necessary to protect and preserve the legitimate business interests of the Company, its present and potential business activities, and the economic benefits derived therefrom. Agency and Key person recognize and acknowledge that the foregoing provisions are not an undue restraint on Agency or Key Person.

**XIX. PAYMENT TO AGENCY UPON DISSOLUTION:**

If at any time following the Company's receipt of notice of Agency's dissolution, the Company shall be obligated under this Agreement to pay money to Agency, the Company is irrevocably authorized to pay such money to Key Person, or in the event of the death or incapacity of Key Person, his executor or personal representative, who shall be responsible to Agency's successors-in-interest for distribution of such payment to the persons or entities legally entitled thereto. Company shall have no liability whatsoever for any payments made pursuant to the foregoing authority regardless of whether Company has received any conflicting demand from any other person or entity, except for payments made by the Company in violation of an order of a court of competent jurisdiction properly served upon the Company which directs the Company not to make any such payment to Key Person and designates an alternate person or entity to which the Company is directed to make such payments.

**XX. NOTICE:**

All notices will be deemed to have been given if personally delivered, sent by facsimile transmission, or mailed as follows:

if to the Company:        Allstate Insurance Company
                          8711 Freeport Parkway
                          Irving, TX 75063

                          Attention:_____

if to Agency:             Ulises Cicciarelli

                          3726 NE 167 Street

                          North Miami Beach, FL 33160

or to such other person or address as any party may furnish or designate to the other in writing.

**XXI.    GENERAL PROVISIONS:**

A.  Agency warrants and represents that Agency is a [corporation] [limited liability company] duly organized, validly existing and in good standing under the laws of the State of _Florida_ and has all requisite power and [corporate] [limited liability company] authority to enter into this Agreement and to perform Agency's duties and obligations under this Agreement.  Agency further warrants and represents that it is duly qualified and in good standing to do business in every jurisdiction in which such qualification is necessary because of the nature of the business conducted by it pursuant to this Agreement.

B.  Agency and Key Person warrant and represent that Agency and Key Person have the power, [corporate] [limited liability company] authority, and capacity to enter into and consummate this Agreement.  The execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated hereby have been duly and validly authorized by all necessary [corporate] [limited liability company] action, as applicable, on the part of Agency and Key Person.

C.  This Agreement may not be modified except by a written agreement between the Company and Agency which expressly states that it modifies this Agreement.  No other written statements, representations, or agreements and no oral statements, representations, or agreements will be effective to modify this Agreement.  No representative of the Company will have authority to modify this Agreement, except as provided in this Section XXI.  Nothing in this Section will affect the Company's right to amend the Supplement, EA Manual, and Agency Standards, as provided in Section I.C.

D.  Agency acknowledges that it has reviewed the Supplement, EA Manual, and Agency Standards and that it has an ongoing responsibility to review all changes to the Supplement, EA Manual and Agency Standards issued by the Company and agrees to be bound by them.

E.  References in this Agreement to the Supplement, EA Manual, and Agency Standards are references to the Supplement, EA Manual, and Agency Standards including any changes which may be made from time to time and distributed to Agency by the Company.

F.  Agency acknowledges that it has read this Allstate R3001C Exclusive Agency Agreement, understands it, and agrees to be bound by its terms.

G.  The authority granted to Agency under this Agreement is nonexclusive.  The term "Exclusive" as used in the title of this Agreement refers to the obligations assumed by Agency under Section I.E.

H.  The descriptive headings of this Agreement are intended for reference only and will not affect the construction or interpretation of this Agreement.

I.  If any provision or part of this Agreement is held invalid for any reason, such invalidity will not affect any other provision or part of this Agreement not held invalid, and such remaining provisions and parts will remain in full force and effect.

J.  The failure of either party to insist upon the performance of any of the terms of this Agreement in any one or more instances will not be construed as a waiver or relinquishment of the future performance of any such term.  The obligation of the parties with respect to any such future performance will continue in full force and effect.

K.  Nothing in this Agreement shall be construed to confer upon any person or entity other than the Company and Agency any rights under this Agreement.

L.  This Agreement, and the obligations or rights hereunder, shall not be assignable by Agency except as provided by Section XVI.  The rights and obligations of the parties to this Agreement shall be binding upon and inure to the benefit of the Company and its successors and assigns.

M.  This Agreement may be executed in counterparts, each of which will be deemed an original.

IN WITNESS WHEREOF, the Company and Agency have caused this Agreement to be executed by their authorized representatives and the parties hereby accept the terms of this Agreement.

ALLSTATE INSURANCE COMPANY

e-Signed by Stacy Wines
on 2020-08-03 17:54:10 GMT
_____
(authorized representative)

August 03, 2020
_____
(date)

AGENCY

e-Signed by ULISES CICCIARELLI
on 2020-08-03 17:05:24 GMT
_____
(name)

ULISES CICCIARELLI
_____
(Key Person)

August 03, 2020
_____
(date)

R3001C
APPENDIX A

**CONFIDENTIALITY AND NON-COMPETITION AGREEMENT**

**KEY PERSON**

This Confidentiality and Non-Competition Agreement ("Agreement") is entered into this **1st** day of August 2020 , _____ , by and between ___Ulises Cicciraelli___ (referred to in this Agreement as "Service Provider"), and _Prestige Insurance Group LLC_ (referred to in this Agreement as "Agency"), and Allstate Insurance Company as a direct third party beneficiary of this Agreement (referred to in this Agreement as "the Company").

WHEREAS, the Company has entered into an agency agreement appointing Agency to act as its agent for the purpose of receiving and accepting applications for insurance and for selling certain specified products of the Company's subsidiaries and affiliates; and

WHEREAS, under the terms of the agency agreement, Agency has agreed to maintain the confidentiality of the Company's confidential information; and

WHEREAS, Agency has employed Service Provider to assist Agency in performing services under the agency agreement; and

WHEREAS, Service Provider will have access to certain confidential information of the Company;

NOW, THEREFORE, for and in consideration of the agreements, covenants, and conditions herein contained, the adequacy and sufficiency of which is expressly acknowledged by each of the parties hereto, the parties agree as follows:

1. The terms "employed" or "employment" as referred to in this Agreement apply to any service provided by the Service Provider as an employee, independent contractor, or in any other capacity.

2. Service Provider acknowledges that while assisting Agency in performing services under the agency agreement, Service Provider will have access to or will have disclosed to him/her confidential information concerning the Company, the disclosure of which could be harmful to the Company.

3. Confidential information includes, but is not limited to, business plans of the Company; information regarding the names, addresses, and ages of policyholders or prospective policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. Confidential information may be oral or recorded on paper, electronic data file, or any other medium.

4. Service Provider agrees that he/she will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information, except upon the written consent of the Company; nor will Service Provider use any confidential information for his/her own benefit, except for the purposes of assisting Agency in performing services under the agency agreement.

5. Any and all confidential information and all Company forms, manuals, records, and other materials and supplies furnished to Service Provider by Agency will at all times remain the property of the Company and will be returned to the Company at any time upon the demand of the Company or upon the termination of Service Provider's employment by Agency.

6. Upon the termination of Service Provider's employment by Agency, Service Provider agrees to treat as confidential and not disclose, either directly or indirectly, to any third party any confidential information of the Company.

1

R2459A/C-3    04/01/2008

7. For a period of one year following the termination of Service Provider's employment by Agency, Service Provider agrees not to solicit the purchase of products or services in competition with those sold by the Company:

   1. With respect to any person, company, or organization to whom Agency, or any person employed by Agency, including Service Provider, sold insurance or other products or services on behalf of the Company, and who is a customer of the Company at the time of the termination; or

   2. With respect to any person, company, or organization who is a customer of the Company at the time of the termination and whose identity was discovered as a result of access to confidential information of the Company; or

   3. From any office or business site located within one mile of any locations from which Agency solicited or sold Company insurance or other products or services during the year immediately preceding the termination.

   In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law.  If any other provision in this paragraph 7 conflicts with any existing law, it will be applied to the extent permitted by such law.

8. Upon the termination of Service Provider's employment with Agency, Service Provider will immediately cease and desist from any and all use of Company service marks and trade names.  Service Provider will immediately return to Agency or the Company all property bearing any company service marks or trade names, or dispose of such materials in the manner specified by the Company.  If requested by the Company, Service Provider will execute an Order of Transfer of Responsibility for any telephone numbers in the Service Provider's name, which were used in connection with the conduct of business on behalf of the Company.

9. While employed by Agency, Service Provider agrees that he/she will not either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent or broker, or refer a prospect to another company, agent or broker without the prior written consent of the Company.

10. Service Provider recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure.  Service Provider agrees that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Service Provider waives any defense to an application for such order, except that the violation did not occur.  Service Provider agrees that the Company will be entitled to an award of reasonable attorney's fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

11. This Agreement may be executed in counterparts, each of which will be deemed an original. This Agreement supersedes and replaces any prior confidentiality and non-competition agreement between the parties hereto.  The parties agree that the use of facsimile signatures for the execution of this Agreement shall be legal and binding and shall have the same full force and effect as if originally signed.

IN WITNESS WHEREOF, the parties hereby accept the terms of this Agreement.

Accepted by:

| SERVICE PROVIDER | AGENCY | ALLSTATE INSURANCE COMPANY |
|---|---|---|
| ULISES CICCIARELLI | e-Signed by ULISES CICCIARELLI on 2020-08-03 17:04:56 GMT | e-Signed by Stacy Wines on 2020-08-03 17:54:16 GMT |
| (Key Person as an Individual) | (Key Person on behalf of Agency) | (authorized representative) |
| August 03, 2020 | August 03, 2020 | August 03, 2020 |
| (date) | (date) | (date) |

R3001C
APPENDIX B

## CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

This Confidentiality and Non-Competition Agreement ("Agreement") is entered into this _____ day of _____ , _____, by and between _____(referred to in this Agreement as "Service Provider"), and _____ (referred to in this Agreement as "Agency"), and Allstate Insurance Company as a direct third party beneficiary of this Agreement (referred to in this Agreement as "the Company").

WHEREAS, the Company has entered into an agency agreement appointing Agency to act as its agent for the purpose of receiving and accepting applications for insurance and for selling certain specified products of the Company's subsidiaries and affiliates; and

WHEREAS, under the terms of the agency agreement, Agency has agreed to maintain the confidentiality of the Company's confidential information; and

WHEREAS, Agency has employed Service Provider to assist Agency in performing services under the agency agreement; and

WHEREAS, Service Provider will have access to certain confidential information of the Company;

NOW, THEREFORE, for and in consideration of the agreements, covenants, and conditions herein contained, the adequacy and sufficiency of which is expressly acknowledged by each of the parties hereto, the parties agree as follows:

1.  The terms "employed" or "employment" as referred to in this Agreement apply to any service provided by the Service Provider as an employee, independent contractor, or in any other capacity.

2.  Service Provider acknowledges that while assisting Agency in performing services under the agency agreement, Service Provider will have access to or will have disclosed to him/her confidential information concerning the Company, the disclosure of which could be harmful to the Company.

3.  Confidential information includes, but is not limited to, business plans of the Company; information regarding the names, addresses, and ages of policyholders or prospective policyholders of the Company; types of policies; amounts of insurance; premium amounts; the description and location of insured property; the expiration or renewal dates of policies; policyholder listings and any policyholder information subject to any privacy law; claim information; certain information and material identified by the Company as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to the pursuits of the Company that is not otherwise lawfully available to the public. Confidential information may be oral or recorded on paper, electronic data file, or any other medium.

4.  Service Provider agrees that he/she will not at any time or in any manner, directly or indirectly, disclose to any third party or permit any third party to access any confidential information, except upon the written consent of the Company, nor will Service Provider use any confidential information for his/her own benefit, except for the purposes of assisting Agency in performing services under the agency agreement.

5.  Any and all confidential information and all Company forms, manuals, records, and other materials and supplies furnished to Service Provider by Agency will at all times remain the property of the Company and will be returned to the Company at any time upon the demand of the Company or upon the termination of Service Provider's employment by Agency.

6.  Upon the termination of Service Provider's employment by Agency, Service Provider agrees to treat as confidential and not disclose, either directly or indirectly, to any third party any confidential information of the Company.

R27394   04/01/2008

1

7. For a period of one year following the termination of Service Provider's employment by Agency, Service Provider agrees not to solicit the purchase of products or services in competition with those sold by the Company:

   1. With respect to any person, company, or organization to whom Agency, or any person employed by Agency, including Service Provider, sold insurance or other products or services on behalf of the Company, and who is a customer of the Company at the time of the termination; or

   2. With respect to any person, company, or organization who is a customer of the Company at the time of the termination and whose identity was discovered as a result of access to confidential information of the Company; or

   3. From any office or business site located within one mile of any locations from which Agency solicited or sold Company insurance or other products or services during the year immediately preceding the termination.

   In the event that such one year period or one mile distance exceeds the time or distance permitted by any applicable law, such period or distance will be automatically adjusted to the maximum period or distance permitted by such law. If any other provision in this paragraph 7 conflicts with any existing law, it will be applied to the extent permitted by such law.

8. Upon the termination of Service Provider's employment with Agency, Service Provider will immediately cease and desist from any and all use of Company service marks and trade names. Service Provider will immediately return to Agency or the Company all property bearing any company service marks or trade names, or dispose of such materials in the manner specified by the Company. If requested by the Company, Service Provider will execute an Order of Transfer of Responsibility for any telephone numbers in the Service Provider's name, which were used in connection with the conduct of business on behalf of the Company.

9. While employed by Agency, Service Provider agrees that he/she will not either directly or indirectly, solicit, sell or service insurance of any kind for any other company, agent or broker, or refer a prospect to another company, agent or broker without the prior written consent of the Company.

10. Service Provider recognizes that a breach of any of the foregoing provisions will cause irreparable damage to the Company's business and that such damage will be difficult or impossible to measure. Service Provider agrees that in the event of any such breach, the Company, in addition to such other rights and remedies as it may have, will be entitled to an order granting injunctive relief from any court of competent jurisdiction against any act which would violate any such provision, without the necessity of posting a bond, and Service Provider waives any defense to an application for such order, except that the violation did not occur. Service Provider agrees that the Company will be entitled to an award of reasonable attorney's fees in the event that it is successful in an application for injunctive relief or in an action based upon breach of the foregoing provisions.

11. This Agreement supersedes and replaces any prior confidentiality and non-competition agreement between the parties hereto. The parties agree that the use of electronic signatures for the execution of this Agreement shall be legal and binding and shall have the same full force and effect as if originally signed.

IN WITNESS WHEREOF, the parties hereby accept the terms of this Agreement.

Accepted by:

| SERVICE PROVIDER | AGENCY | ALLSTATE INSURANCE COMPANY |
|---|---|---|
| _____ | _____ | _____ |
| (name) | (Key Person) | (authorized representative) |
| _____ | _____ | _____ |
| (date) | (date) | (date) |

# EXHIBIT D



You're in good hands.

Char Jordan
District Sales Leader
Zone 3

Prestige Insurance Group LLC                                                November 13, 2020
Attn: Ulises Cicciarelli
5850 Hiatus Rd Ste D
Tamarac, FL 33321

Dear Ulises:

This letter is notice that Allstate Insurance Company is terminating the Allstate R3001C Exclusive Agency
Agreement ("Agreement") with [INSERT AGENCY NAME], ("Agency") effective immediately. The
termination is pursuant to Section XVII.B.3 of the Agreement. Allstate is taking this action for reasons that
include providing false information to the company and failing to issue policies according to Allstate guidelines.

Agency's obligations to Allstate are stated in the Agreement. The Agreement requires that Agency must, among
other things:

•          Immediately return all property belonging to Allstate including all manuals, equipment, and any materials
           bearing any Allstate service mark or trade name;
•          Immediately cease to use any telephone numbers used to conduct Allstate business from the former sales
           location; and
•          Immediately cease and desist from any and all use of Allstate service marks and trade names.

Agency may have the option of accepting a termination payment from Allstate or selling the economic interest to
an approved buyer as outlined in the Independent Contractor Manual and Supplement for the R3001C
Agreement. If Agency is eligible for and elects the termination payment option, Agency will receive such
payment calculated and paid in accordance with the Supplement for the R3001C Agreement. Please note the
termination payment is conditioned upon, for example, compliance with the confidentiality and non-solicitation
provisions that survive the termination of the Agreement and the immediate return of all Allstate property.

If Agency elects to sell the economic interest in the book of business, Allstate has the absolute right of approval of
the buyer. The buyer must meet Allstate's eligibility requirements. If Allstate approves a proposed buyer, **the
sale must be completed on or before March 1, 2021** and must be effective on the first day of that or any earlier
month. If Agency does not present a buyer or the buyer that Agency presents is not approved, we will process the
termination payment as described above.

If agency elects, it may sell its interest in any assigned risk policies it may own. After the Agreement terminates,
agency will continue to receive commissions on existing assigned risk policies processed by Allstate that it
retains, if any. Also, if agency elects, it may seek to transfer any flood policies it may have produced subject to
such rules and policies that are applicable to flood business.

Please contact me with any questions you have regarding the termination process.

Sincerely,

Char Jordan
DSL

# EXHIBIT E



**Allstate.**
You're in good hands.

November 17, 2020

Florida Office of Ins Regulation
200 East Gaines St
Tallahassee FL 32399

Re: **Termination For Cause**
**Producer:** Ulises Cicciarelli
**License Number:** W553959
**NPN:** 19073054

To Whom It May Concern:

The producer referenced above has been terminated for cause from the following companies:

- Allstate Fire & Casualty Insurance Company
- Allstate Insurance Company
- Allstate Indemnity Company
- Allstate Property & Casualty Insurance Company
- Castle Key Indemnity Company
- Castle Key Insurance Company
- Allstate Assurance Company
- Allstate Life Insurance Company
- Lincoln Benefit Life Company
- American Heritage Life Insurance Company

The "for-cause" termination reason is due to providing false information to the company and failing to issue policies according to Allstate guidelines.  Please use the following contact information for any questions or supporting documentation needed:

Ewelina Buczakowski
8711 Freeport Pkwy
Irving TX 75063
Phone: (877) 717-7278
Email: HRPART@allstate.com

Sincerely,

Chris Reetz
Manager

Cc: Ewelina Buczakowski
Ulises Cicciarelli

**Allstate Insurance Company**
**Licensing & Appointing COE**
2940 S. 84th Street Lincoln, NE  68506   email:  appcdpt@allstate.com